**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**



| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| ALTA MESA RESOURCES, INC., *et al.*, | § Case No. 19-31533 (MI) |
| | § |
| Debtors.[1] | § (Joint Administration Requested) |
| | § |

### DECLARATION OF JOHN C. REGAN, CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, John C. Regan, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer of Alta Mesa Resources, Inc. ("<u>AMR</u>", together with its above-captioned affiliates as debtors and debtors in possession, the "<u>Debtors</u>"; and the Debtors together with all other consolidated subsidiaries of AMR, the "<u>Company</u>").  I have served as Chief Financial Officer ("<u>CFO</u>") of the Company since joining in January 2019.  Prior to joining the Company, I served as Executive Vice President and Chief Financial Officer of Vine Oil and Gas, and, before that, as Chief Financial Officer of Quicksilver Resources.  I have over 25 years of public accounting, corporate finance and financial reporting experience, with a particular focus on the energy sector and oil and gas industry.

2.      As the Debtors' CFO, my duties include, or have included, among other things: (i) assisting in the review, presentation, and analysis of the Debtors' cash flow, operating, and financial budgets; (ii) assisting the Debtors' board of directors and management team in the

---

[1]      The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (0642); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); and Oklahoma Energy Acquisitions, LP (3762).  The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

development of a business plan; (iii) assisting the Debtors' professionals in preparing for a bankruptcy filing; and (iv) providing assistance in the analysis and/or development of projections for the Debtors.  Accordingly, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

3.      Concurrently with the filing of this declaration (the "Declaration") on the date hereof (the "Petition Date"), the Debtors have filed in this Court (the "Bankruptcy Court") voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "Bankruptcy Code").

4.      I submit this Declaration to assist the Bankruptcy Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the petitions for relief under Chapter 11 of the Bankruptcy Code; and (ii) the emergency relief that the Debtors have requested from the Bankruptcy Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and advisors (including legal counsel), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.

5.      This Declaration is divided into three parts.  Part I of this Declaration describes the business, organizational structure, and capital structure of the Debtors.  Part II provides an

overview of the circumstances leading to the commencement of these chapter 11 cases, and Part III summarizes the First Day Motions and the bases for the relief sought therein.

## INTRODUCTION

6.      The Company is an independent energy company focused on the acquisition, development, exploration and exploitation of unconventional onshore oil and natural gas reserves in the eastern portion of the Anadarko Basin in Oklahoma.  The Company has two primary business segments: an upstream oil and gas exploration and production business operated by Debtor Alta Mesa Holdings, LP ("AMH") and its subsidiaries (such subsidiaries, together with Debtor AMH and Alta Mesa Holdings GP, LLC, the "AMH Debtors"), and a midstream oil and gas services business operated by non-Debtor Kingfisher Midstream, LLC ("KFM" and, together with its wholly owned subsidiaries, the "KFM Entities").

7.      The Company's upstream business activities are primarily focused on horizontal development of oil and gas properties in an area of the Anadarko Basin commonly referred to as the Sooner Trend Anadarko Basin Canadian and Kingfisher County ("STACK").  The Company's upstream revenue is generated principally by the production and sale of oil, gas and natural gas liquids from such properties.  As of the date hereof, the Company, through the AMH Debtors, has assembled a highly contiguous position of approximately 130,000 net acres in the STACK, primarily in eastern Kingfisher County and in Major County, Oklahoma.  At present, the Company operates two horizontal drilling rigs in the STACK, but is in the process of discontinuing both rigs, as described below.

8.      KFM, which operates the midstream business, has natural gas gathering and processing, crude oil gathering and storage, and produced water gathering and disposal assets located in the Anadarko Basin that generate revenue primarily through long-term, fee based contracts (including certain gathering agreements with Debtor Oklahoma Energy Acquisitions, LP

("Oklahoma Energy")).  Certain of the KFM assets are used in the Company's oil and natural gas operations and are strategically positioned to provide similar services to other producers in the area.  Likewise, the AMH Debtors' upstream operations are critical to KFM's business, and account for approximately 80–90% of KFM's revenue.

9.     The Company's current corporate structure arose from transactions over the course of 2017 and early 2018.  In 2017, AMR consummated an initial public offering of common stock, and a private sale of warrants to Silver Run Sponsor II, LLC, the proceeds of which were placed in a trust account for the purpose of funding a business combination in which ultimately AMR (then known as Silver Run Acquisition Corporation II) would acquire its interests in AMH and KFM (the "Business Combination") through a newly formed subsidiary, non-Debtor SRII Opco, LP ("SRII Opco").  The Business Combination was consummated in February 2018.  These transactions are described in greater detail in Part I of this Declaration, below.

10.    Since the Business Combination, and particularly in recent months, the Debtors have faced a number of challenges, including depressed oil prices (which adversely impact the Company's revenue and profitability), an overlevered balance sheet, and liquidity constraints.  The Debtors liquidity became particularly constrained following an optional borrowing base redetermination under the AMH RBL (defined below) in August 2019, whereby the lenders reduced the borrowing base, resulting in an approximately $162 million deficiency (i.e., actual borrowings exceeded the redetermined borrowing base by approximately $162 million).  The AMH Debtors, which currently have approximately $40 million in cash on hand (on a book basis), were required to pay down the excess borrowings over five consecutive monthly installments.  The first deficiency payment of $32.5 million is due September 12, 2019.

11.     Following the August 2019 redetermination, the Debtors faced an imminent liquidity shortfall and no actionable path to meaningfully extend their runway without jeopardizing the value of their assets.

12.     Likewise, the Debtors had limited means to achieve a consensual deleveraging transaction absent the protections afforded by the Bankruptcy Code.  The Debtors commenced these cases to prevent disruption to their operations and to provide an opportunity to pursue a value-maximizing sale of all or substantially all of the Debtors' assets while also continuing to pursue a comprehensive restructuring alongside certain of their non-debtor affiliates.

## PART I

### I.     Business Overview

#### A.     The Debtors' Corporate Structure and History

##### 1.     The IPO and Business Combination

13.     Debtor AMR was formed in November 2016 by an affiliate of a private investment fund managed by Riverstone Investment Group LLC ("Riverstone") as a special purpose acquisition company, for purposes of effecting a business combination in the energy sector.  In March 2017, AMR consummated (i) an initial public offering of common stock, which generated proceeds of approximately $1.035 billion, and (ii) a private placement of 15,133,333 warrants to Silver Run Sponsor II, LLC, which generated additional proceeds of $22.7 million.  These proceeds were placed in a trust account and ultimately used (along with interest accrued thereon) to partially fund the Business Combination, which closed in February 2018.

14.     Non-Debtor SRII Opco and its general partner, non-Debtor SRII Opco GP, LLC, were formed in connection with the Business Combination.  AMR owns 100% of the equity interests in SRII Opco GP, LLC.  In connection with the closing of the Business Combination:

- AMR issued 40 million shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to an affiliate of Riverstone (pursuant to a forward purchase agreement), which yielded cash proceeds of $400 million. Those proceeds, along with the amounts in the trust account (after redemptions), were contributed to SRII Opco in exchange for approximately 44.2% of the limited partner units in SRII Opco and warrants to purchase additional common units in SRII Opco.

- SRII Opco issued common units representing approximately 55.8% of limited partner units in SRII Opco to non-Debtors High Mesa Holdings, LP, KFM Holdco, LLC, and Riverstone VI Alta Mesa Holdings, L.P. (collectively, the "Contributors"), in exchange for the Contributors' contribution of their ownership interests in Debtor AMH, Debtor Alta Mesa Holdings GP, LLC ("AMH GP"), the general partner of AMH, and non-Debtor affiliate KFM.

- AMR agreed to cause SRII Opco to issue up to approximately 59.9 million additional common units in SRII Opco to non-Debtors High Mesa Holdings, LP and KFM Holdco, LLC, if certain earn-out thresholds provided for in their respective contribution agreements were earned by those Contributors.

- AMR issued a number of shares of its Class C Common Stock to each Contributor equal to the number of limited partner units in SRII Opco held by such Contributor.

- SRII Opco distributed approximately $814.8 million in cash to non-Debtor KFM Holdco, LLC in partial payment for the ownership interests in non-Debtor KFM that were contributed by KFM Holdco, LLC.

- SRII Opco entered into an amended and restated voting agreement with the owners of the remaining 10% of voting interests (i.e., owners other than the Contributors) in Debtor AMH GP whereby the other owners agreed to vote their interests in AMH GP as directed by SRII Opco.

- AMR contributed $554.2 million in net cash to AMH, a substantial portion of which was used to repay the outstanding balance under AMH's credit facility.

15.     As a result of the Business Combination, SRII Opco acquired (and continues to own) (i) all of the limited partner interests in AMH and 100% of the economic interests and 90% of the voting interests in AMH GP, and (ii) 100% of the economic interests in KFM.  AMR currently owns approximately 46.92% of SRII Opco, the remainder of which is owned by the Contributors and certain of their affiliates and related parties.  None of AMR, SRII Opco GP, LLC, or SRII Opco has any operations, and their only significant assets are their equity interests in other affiliates.

16.     In connection with the Business Combination, the Debtors distributed their non-STACK oil and gas assets to a subsidiary of High Mesa Inc. ("HMI") and certain subsidiaries of HMI agreed to indemnify and hold the Company harmless from any liabilities associated with those non-STACK assets.  The Debtors also entered into a management services agreement with HMI, under which the Debtors agreed to provide operational and administrative services to HMI with respect to the non-STACK assets.

17.     The Business Combination made use of an Up-C structure.  In an Up-C structure, the public corporation (AMR) only owns equity in a pass-through entity (SRII Opco), while the remaining equity in the pass-through entity is owned, (directly or indirectly) by the historic owners of the two operating businesses (i.e., the Contributors).  The Contributors are entitled to have each unit in SRII Opco redeemed for Class A stock in AMR (or at AMR's election, cash).  The benefits of the Up-C structure in a transaction such as the Business Combination are to permit (i) the combination of AMR and the historical businesses of the Debtors and their non-Debtor affiliates in a manner that permits the Contributors to receive equity on a tax-deferred basis, and (ii) the Contributors to continue to hold their equity in pass-through form as opposed to stock in a corporation.  The redemption of units in SRII Opco for Class A stock in AMR (or cash) may give rise to certain tax benefits for AMR.  In connection with the Business Combination, certain Contributors entered into a Tax Receivable Agreement with AMR, pursuant to which AMR must pay such Contributors 85% of the cash tax savings (if any) realized as a result of such tax benefits.

2.     Corporate Structure of the Debtor Entities and Non-Debtor Affiliates

18.     The Debtors in these chapter 11 cases are AMR and the AMH Debtors, through which the Company's upstream oil and gas businesses is operated.  The AMH Debtors other than AMH consist of Alta Mesa Holdings GP, LLC ("AMH GP") (the general partner of AMH), Alta

Mesa Services, LP ("Alta Mesa Services"), Oklahoma Energy, OEM GP, LLC ("OEM GP") and Alta Mesa Finance Services Corp. ("Alta Mesa Finance").

19.     The following schematic shows a simplified corporate structure of the Debtors (shaded red) and their non-Debtor affiliates.  A more detailed corporate structure chart is attached hereto as **Exhibit A**.



20.     Alta Mesa Services employs all of the Company's employees, including employees that provide part-time and full-time services to non-Debtor KFM Entities, operates the AMH Debtors' properties and provides the AMH Debtors with certain general and administrative services.  In addition, and as described in greater detail below, Alta Mesa Services employees render services to or on behalf of KFM pursuant to a Management Services Agreement between Debtor AMH and non-Debtor KFM (the "MSA").

21.     Oklahoma Energy has developed certain wells under a Joint Development Agreement with non-Debtor BCE-STACK Development LLC, a fund advised by Bayou City Management, LLC, that was entered into in January 2016 to accelerate development of AMH's STACK acreage.  As described in further detail below, Oklahoma Energy is also party to gathering agreements with KFM entered into in August 2015, under which Oklahoma Energy dedicates and delivers to KFM crude oil, natural gas and associated natural gas liquids for gathering and processing.

22.     OEM GP is the general partner of Alta Mesa Services and Oklahoma Energy.  It does not have any operations and its only significant asset is a 0.1% interest in each of Alta Mesa Services and Oklahoma Energy.

23.     Alta Mesa Finance is the co-issuer of the Unsecured Notes (defined below) together with AMH and does not have any operations or significant assets.

24.     The KFM Entities consist of non-Debtor KFM and its subsidiaries, Oklahoma Produced Water Solutions, LLC ("OPWS") and Kingfisher STACK Oil Pipeline, LLC.  OPWS owns and operates produced water gathering pipelines, disposal wells and related facilities. Kingfisher STACK Oil Pipeline, LLC is part of a joint venture with non-Debtor third-party Ergon-Oklahoma Pipeline, LLC ("Ergon").  The joint venture had planned to develop and operate a 65-mile crude oil pipeline extending from northeastern Kingfisher County to a crude oil terminal in Cushing, Oklahoma.  As of the Petition Date, development has been suspended.

25.     Each of the Debtors and non-Debtors, its owner(s), and its primary business purpose are summarized below:

| | Debtor | Owner(s) | Business Purpose |
|---|---|---|---|
| 1. | AMR | Holders of Class A Common Shares, Series | Corporate parent |

| | Debtor | Owner(s) | Business Purpose |
|---|---|---|---|
| | | A Preferred Shares, Series B Preferred Shares, and Class C Common Shares | |
| 2. | SRII Opco GP, LLC* | AMR | General partner of SRII Opco |
| 3. | SRII Opco* | General Partner: SRII Opco GP, LLC<br><br>Limited Partner Units: AMR and Contributors | Owner of midstream and upstream operating units |
| 4. | AMH GP | SRII Opco holds 100% economic interest and majority voting interest<br><br>Various funds and individuals hold non-economic interest with minority voting interest | General partner of AMH |
| 5. | AMH | General Partner: AMH GP<br><br>Limited Partner Units: SRII Opco; AMH GP (hold less than 1.00%) | Owner of subsidiaries that conduct the AMH Debtors' upstream drilling and extraction activities; borrower under AMH RBL and co-issuer of Unsecured Notes |
| 6. | OEM GP | AMH | General partner of Alta Mesa Services and Oklahoma Energy |
| 7. | Alta Mesa Services | General Partner: OEM GP<br><br>Limited Partner: AMH | Provides AMH with general and administrative services and employs all employees of the Company (including employees who provide services to KFM pursuant to the MSA) |
| 8. | Oklahoma Energy | General Partner: OEM GP | Conducts upstream activities and has a Joint Development Agreement with non-Debtor |

| Debtor | Owner(s) | Business Purpose |
|---|---|---|
| | Limited Partner: AMH | BCE-STACK Development LLC |
| 9. Alta Mesa Finance | AMH | Finance corporation and co-issuer of Unsecured Notes |
| 10. KFM* | SRII Opco | Conducts midstream business and borrower under KFM RCF |
| 11. Kingfisher STACK Oil Pipeline, LLC* | KFM | Owner of 50% interest in Cimarron Express Pipeline, LLC |
| 12. OPWS | KFM | Conducts water gathering and disposal business |
| 13. Cimarron Express Pipeline, LLC* | Kingfisher STACK Oil Pipeline, LLC and Ergon | Joint venture in crude oil pipeline |

**B.      The Debtors' Business**

1.      <u>AMR</u>

26.      AMR is the ultimate parent of the corporate enterprise that includes both the AMH

Debtors and KFM entities.   AMR has no operations, and its only significant assets are its

approximately 47% equity interest in SRII Opco, which, in turn, is the direct or indirect parent of

all of the AMH Debtors and KFM Entities.[2]   AMR historically relied on funding from its

subsidiaries, including the AMH Debtors and KFM Entities, to fund its ordinary course expenses,

including NASDAQ filing fees, director fees, audit fees, director and officer insurance premiums,

and consulting and legal expenses.   AMR has relied on the AMH Debtors to fund approximately

---

\*      Non-Debtor subsidiary of Debtor AMR.

[2]      The Contributors cumulatively hold outstanding units, which they received in exchange for their contributions of their ownership interests in Debtor AMH, Debtor AMH GP, and non-Debtor KFM in connection with the Business Combination.

75% of such expenses, with the KFM Entities funding the remaining portion.  Following the Petition Date, the AMH Debtors will no longer fund AMR's expenses, and AMR will rely on funding exclusively from non-Debtor entities, including SRII Opco, which currently has approximately $6 million in cash.[3]

        2.      <u>AMH Assets and Operations</u>

27.    The Company's upstream business involves the development and production of oil and natural gas from the STACK, a domestic, onshore hydrocarbon basin.  The AMH Debtors hold working interests in oil and gas properties through oil and natural gas leases entered into with mineral owners that give the AMH Debtors the right to drill and maintain wells.

28.    As of August 31, 2019, AMH's STACK properties consist of leases covering a largely contiguous block of approximately 130,000 net acres, primarily located in eastern Kingfisher County and south-eastern Major County, Oklahoma.  As of December 31, 2018, AMH had a 66% average working interest in 1,153 gross producing wells.  Of these wells, AMH had an average working interest of approximately 76% in 403 operated wells and an average 62% working interest in 750 non-operated wells.  AMH's leased assets are shown on the map below (leasehold is shaded yellow, gas and water pipelines are blue and red, respectively):

---

[3]    SRII Opco anticipated to receive approximately $7 million from the dissolution of the Cimarron Express Joint Venture.



29.     As of December 31, 2018, the Debtors estimated that their total proved reserves were approximately 69.1 million barrels of oil equivalent (i.e., 69.1 MMBoe), of which approximately 65% percent were oil and natural gas liquid reserves and 35% were natural gas reserves.

30.     Approximately 96% of our total proved developed reserves were audited by our external reserve engineers.  During January 2019, we received an audit report from our external reserve engineers regarding their opinion of our 2018 ending total proved reserves, which included multi-year development of approximately 89.1 MMBoe of proved undeveloped reserves. During April 2019, in finalizing our financial reporting for 2018, we determined that we may fail to satisfy the leverage covenant under the Alta Mesa RBL during 2019. If we were to fail the leverage

covenant, access to capital under the Alta Mesa RBL would likely be impaired, thus limiting our ability to satisfy the ability-to-drill threshold under the SEC's reserve recognition rule with respect to our future drilling locations. Thus, we did not recognize any proved undeveloped locations in the final December 31, 2018 reserve report. Should our ability to fund the required development costs improve in the future, we expect to re-recognize all or a portion of those reserves as proved.

31.     AMH's existing production base generated 37,500 barrels oil equivalent per day (i.e., 37.5 MBoed) in the second quarter of 2019.

32.     In 2018, AMH drilled 175 wells and completed 174, including wells that were drilled but uncompleted ("DUC") at the end of 2017.  Through September 2019, the AMH Debtors drilled 33 wells and completed 48 wells (including DUCs) at the end of 2018.  In late 2018, AMH released seven of the nine rigs then in operation in the STACK.  In addition, two rigs were idled, in early 2019 in order to conduct a detailed technical review of the seventeen full-section drilling patterns completed in 2017 and 2018.  That technical review was undertaken for the purpose of designing a prospective development plan designed to maximize economic reservoir recovery.

33.     In March 2019, AMH resumed drilling with two rigs.  As part of the 2019 development plan, AMH management, employees and contractors are focused on lowering costs, particularly drilling and completion and lease operating expenses.  In order to preserve liquidity following the August 2019 borrowing base redetermination, AMH's board determined to release one of the rigs.  Then, in September 2019, prior to commencing these chapter 11 cases, AMH made preparations to release the remaining rig, which the AMH Agent (as defined below) and the lenders under the AMH RBL agreement indicated would be a condition to any consensual use of their cash collateral.  Both rigs and associated equipment will complete operations during the first 10 days of the case.

34.     The AMH Debtors hold working interests as both an operator and non-operator. As an operator, the AMH Debtors are the parties conducting the upstream activities on behalf of themselves and other, non-operating working interest holders.  The AMH Debtors initially incur substantially all costs associated with the day-to-day operation of the working interest and subsequently bill the holders of non-operating working interests for their pro rata share of the costs. After receipt of gross proceeds from the sale of captured minerals, the AMH Debtors acting as operator market production on behalf of various working interest holders and other parties with an interest in production and distribute proceeds to such parties.

35.     In their role as operator, the AMH Debtors sell their production to customers generally at prevailing spot prices in effect at the time of sale.  The AMH Debtors primarily sell their production through marketing agreements under which production is marked and sold under short-term contracts, generally with month-to-month pricing based on published indices, adjusted for transportation, location, and quality.

36.     The Company also holds non-operated working interests in many oil and gas properties.  In such circumstances, a third party acts as operator and is responsible for the daily operations and working interest costs associated therewith.  The AMH Debtors' primary responsibility with respect to their non-operator working interests is to timely pay the operators for their pro rata share of working interests costs.  The AMH Debtors then receive their share of proceeds from the sale of captured minerals.

        3.     <u>KFM Assets and Operations</u>

37.     The Company also operates a midstream business through non-Debtor affiliate KFM and its subsidiaries.  The midstream business involves the gathering, transportation, and processing of produced hydrocarbons in addition to gathering and disposing of produced water. KFM and its subsidiaries own natural gas gathering and processing and crude oil gathering and

storage assets located in the Anadarko Basin, including approximately 400 miles of low and high-pressure pipelines, two cryogenic natural gas processing plants with a combined 260 million cubic feet per day (i.e., MMcf/d) of gas processing capacity, 90 MMcf/d in offtake processing capacity, field compression facilities, 50,000 barrels of crude storage, 90,000 gallons of onsite storage and marketing capabilities.  KFM generates revenue primarily through long-term, fee-based contracts to provide midstream services.

38.     Debtor Oklahoma Energy and non-Debtor KFM Entities are party to certain long-term crude oil, gas, and produced water gathering agreements under which KFM agreed to provide gathering services for substantially all of the hydrocarbons extracted by Oklahoma Energy and produced water.  The AMH Debtors believe that the oil and gas gathering agreements are substantially over-market (i.e., the economics are unfavorable to the Debtor parties thereto), and intend to move to reject all three gathering agreements at the outset of these cases.  Approximately 80–90% of KFM's revenue is derived from the gathering agreements with Oklahoma Energy.

39.     In addition, the KFM Entities rely on the AMH Debtors for management services, including operational consulting and accounting and financial support as well as overall administrative support, including services rendered by employees of Alta Mesa Services.  These management services are provided pursuant to the MSA.  Under the MSA, KFM pays AMH a monthly management fee of $10,000 and reimburses AMH for certain costs incurred in providing the services, including a proportionate share of employee wages and benefits.  Specifically, under the MSA, certain AMH personnel allocate their time and efforts to KFM.  KFM reimburses AMH for the proportionate share of that personnel's compensation and benefits.

### 4.     Corporate Leadership

40.     The Company's current leadership has significant experience in the oil and gas industry, consisting of the following individuals:

| Name | Position |
|------|----------|
| Mark P. Castiglione | Chief Executive Officer |
| John C. Regan | Executive Vice President and Chief Financial Officer |
| John H. Campbell, Jr. | President and Chief Operating Officer |
| Kimberly O. Warnica | Executive Vice President, General Counsel, Chief Compliance Officer, and Secretary |
| Randy L. Limbacher | Executive Vice President of Strategy |

41.     There has been substantial turnover in the Company's management team beginning with the resignation of AMR's Chief Financial Officer in November 2018.  In December 2018, AMR's management team, including the Chief Executive Officer, Vice President and Chief Operating Officer – Upstream, and Vice President and Chief Technology Officer were given an opportunity by the Board to resign and chose to do so.   In December 2018, James T. Hackett assumed the position of Interim Chief Executive Officer and Executive Chairman of AMR's Board of Directors.   On September 10, 2019, Mr. Hackett resigned from his role as Interim Chief Executive Officer and Mark P. Castiglione, formerly Chief of Staff to the Interim President and the Interim Executive Vice President of Development and Corporate Strategy of the Company, was appointed as Chief Executive Officer.

42.     In the wake of the prior management team's departure in December 2018, the Company (through Alta Mesa Services) entered into a consulting agreement (as amended or amended and restated from time to time, the "Meridian Agreement") with Meridian Energy LLC ("Meridian"), Mr. Limbacher, Mr. Campbell, and Mr. Castiglione (collectively, the "Meridian Team").  The Meridian team was employed by Meridian and was engaged by the Company to be

core members of the new leadership team installed in January 2019.[4]  Each Meridian Team member serves as an officer of AMR and also serves as an officer of other subsidiaries of the Company as designated by the AMR board of directors from time to time.  Alta Mesa Services pays a monthly service fee to Meridian, which then is used to (a) compensate Meridian and (b) provide the Meridian Team with salaries and benefits.[5]  Alta Mesa Services also reimburses Meridian for all documented, reasonable out-of-pocket business expenses incurred in connection with the services provided under the agreement.

5.     <u>Corporate Governance</u>

43.     AMR is managed by a nine-member board of directors comprised of:  (a) James T. Hackett (Chairman); (b) four directors affiliated with the equity sponsors of AMR (Bayou City Energy Management LLC ("<u>Bayou City</u>"), HPS Investment Partners, LLC ("<u>HPS</u>") and Riverstone Investment Group LLC ("<u>Riverstone</u>" and together with Bayou City and HPS, the "<u>Sponsors</u>")):  Pierre F. Lapeyre, Jr. (Riverstone), David M. Leuschen (Riverstone), Donald R. Dimitrievich (HPS), and William W. McMullen (Bayou City); and (c) four independent directors: Jeffrey H. Tepper, Diana J. Walters, Sylvia Kerrigan, and Donald R. Sinclair.

44.     AMH GP (the general partner of AMH, which, in turn, manages directly or indirectly the other AMH Debtors besides Alta Mesa Finance) is managed by a nine-member board of managers that was reconstituted in June 2019, and is comprised of the eight directors of AMR other than Mr. Hackett and one independent manager, Patrick J. Bartels, Jr., who sits only on the

---

[4]     The Meridian Agreement was amended effective September 10, 2019.

[5]     Prior to the amendment of the Meridian Agreement, Meridian Employees had the opportunity to earn certain Quarterly and Milestone Bonuses in addition to their base salaries.  Under the amended Meridian Agreement, Meridian Employees are no longer eligible for bonuses.  The non-management Meridian Employees received bonuses in the aggregate amount of $157,500 in September 2019, prior to the Petition Date.  The Meridian Team also received bonuses prior to the Petition Date as participants in the Executive KERP, which is described in further detail in **<u>Exhibit B</u>** under "Employee Wages Motion".

AMH GP board.  Mr. Bartels also sits as the independent, disinterested director on the Alta Mesa Finance board of directors (together with the AMH GP board, the "AMH Board"), which is also comprised of the eight directors of AMR other than Mr. Hackett.  Mr. Bartels does not sit on any other Company boards and holds no other positions with the Company or any of its affiliates.

45.     The AMH Board delegated to Mr. Bartels the authority to investigate and pursue claims with respect to conflict matters, including the gathering agreements between Debtor Oklahoma Energy and non-Debtor KFM and certain other related party matters, and determine matters as specifically delegated by the AMH Board under a future delegation of authority.  On September 11, 2019, pursuant to the AMH Board resolution authorizing the filing of these chapter 11 cases with respect to the AMH Debtors, the AMH Board delegated Mr. Bartels authority to investigate and determine whether any matter arising in or related to the AMH Debtors' chapter 11 cases constitutes a Conflict Matter.[6]  Following the AMH Board meeting, Mr. Bartels sent a letter to the AMH Board designating three matters as conflict matters: (i) any potential or proposed chapter 11 plan for the AMH Debtors, (ii) any potential or proposed postpetition financing or use of cash collateral by the AMH Debtors, and (iii) any potential or proposed sale of all or substantially all of the assets of the AMH Debtors.  The AMH Debtors also have retained conflicts counsel, Robbins, Russell, Englert, Orseck, Utereiner & Sauber LLP, to advise and assist Mr. Bartels with certain Conflict Matters.

46.     On September 11 2019, the AMH GP board appointed a chief restructuring officer, Robert Albergotti of AlixPartners LLP ("Alix"), to report to and act at the direction of Mr. Bartels, the independent director of AMH.

---

[6]     Under the filing resolutions, "Conflict Matter" means any matter, which in Mr. Bartel's business judgment and with the advice of counsel, "arising in or related to the Chapter 11 Cases constitutes a matter in which a conflict exists between the AMH Parties, on the one hand, and their equity holders, affiliates, or directors, managers and/or officers, on the other hand . . . ."

47.     Non-Debtor KFM was previously managed by its sole member, SRII Opco, but in late August 2019 a nine-member board of managers was appointed to facilitate the appointment of an independent director, Marc Beilinson, who does not sit on any other Company boards or hold any other position with the Company or any of its affiliates.   The KFM board of managers is currently comprised of the eight directors of AMR, other than Mr. Hackett, and Mr. Beilinson, the independent director.   KFM has retained Quinn Emanuel Urquhart & Sullivan, LLP.

48.     The compositions of the AMR, AMH, and KFM boards are as follows:

| Name | Board | Position (Affiliation) |
| --- | --- | --- |
| James T. Hackett | AMR | Chairman (Riverstone appointee) |
| Pierre F. Lapeyre, Jr. | AMR; AMH; KFM | Director (Riverstone) |
| David M. Leuschen | AMR; AMH; KFM | Director (Riverstone) |
| Donald R. Dimitrievich | AMR; AMH; KFM | Director (HPS) |
| William W. McCullen | AMR; AMH; KFM | Director (Bayou City) |
| Sylvia Kerrigan | AMR; AMH; KFM | Director (Independent) |
| Donald R. Sinclair | AMR; AMH; KFM | Director (Independent) |
| Jeffrey H. Tepper | AMR; AMH; KFM | Director (Independent) |
| Diana J. Walters | AMR; AMH; KFM | Director (Independent) |
| Patrick Bartels | AMH | Director (Disinterested) |
| Marc Beilinson | KFM | Director (Disinterested) |

## II.     The Debtors' Prepetition Capital Structure

49.     As of the Petition Date, the Company has approximately $1.08 billion in funded debt outstanding, of which approximately $846 million is attributable to the Debtors.[7]  The AMH Debtors' material long term debt obligations consist of a secured reserve based credit facility with an outstanding principal amount of approximately $346 million (the "AMH RBL") and a series of senior unsecured notes with an outstanding principal amount of approximately $500 million.  Non-Debtor affiliate KFM's material long term debt obligations consist of a secured revolving credit facility (the "KFM RCF"), which has approximately $224 million outstanding.

### A.     AMH RBL

50.     AMH is the borrower under the Eighth Amended and Restated Credit Agreement dated as of February 9, 2018, by and among AMH, Wells Fargo, as administrative agent (the "AMH Agent"), and the lenders party thereto.  As amended, the AMH RBL matures February 9, 2023.

51.     AMH has a choice of borrowing in Eurodollars or at the reference rate.  Eurodollar loans bear interest at a rate per annum equal to the applicable LIBOR rate, plus a margin ranging from 2.00% to 3.00%, with interest payable in one, three, or six-month tranches.  Reference rate loans bear interest at a rate per annum equal to the greater of (i) the agent bank's reference rate, (ii) the federal funds effective rate plus 50 basis points, or (iii) the rate for one-month Eurodollar loans plus 1.00%, plus a margin ranging from 1.00% to 2.00%.

52.     Maximum availability under the AMH RBL is $1 billion, subject to a current borrowing base of $200 million.  As of the Petition Date, borrowings under the AMH ABL totaled approximately $346 million.

---

[7]     Exclusive of letters of credit.

53.     Under the AMH RBL and related collateral documents, the AMH RBL debt is guaranteed by each restricted subsidiary of AMH.  The AMH RBL is secured by senior liens on substantially all of AMH's and the restricted subsidiaries' oil and gas properties and associated assets, as well as AMH's equity interests in the subsidiary guarantors.  Additionally, SRII Opco and AMH GP have pledged their respective limited partner interests in AMH as security for the obligations under the AMH RBL.

54.     The AMH RBL is not tied or otherwise connected to the non-Debtor KFM RCF (described below).  The two facilities are not cross-collateralized and there are no cross-defaults under either facility.  As a result, commencing these chapter 11 cases on behalf of AMR and the AMH Debtors does not cause a default under the KFM RCF or otherwise affect the rights or obligations of the parties thereunder.  While Wells Fargo is the administrative agent under both the AMH RBL and the KFM RCF, the lender groups under each facility do not overlap entirely.  Wells Fargo has indicated that investment decisions and management of the facilities are made by separate silos at Wells Fargo.

**B.     Unsecured Notes**

55.     The AMH Debtors have approximately $500 million in outstanding principal amount of 7.875% senior unsecured notes (the "Unsecured Notes") issued by AMH and Alta Mesa Finance under an indenture, dated as of December 8, 2016, by and among AMH, Alta Mesa Finance, certain subsidiary guarantors party thereto, and U.S. Bank, N.A., as Trustee.  The Unsecured Notes are guaranteed on a senior unsecured basis by each of the other AMH Debtors.  The Unsecured Notes mature on December 15, 2024 and require semi-annual interest payments.  An ad hoc group of holders of Unsecured Notes (the "Ad Hoc Noteholder Group") representing holders of approximately 95% of the outstanding Unsecured Notes has organized and retained

advisors.  A more detailed discussion of the Debtors' engagement with the Ad Hoc Noteholder Group is included below.

### C.     Non-Debtor KFM RCF

56.     KFM is the borrower under the Amended and Restated Credit Agreement dated as of May 30, 2018, by and among KFM, as borrower, and Wells Fargo, as administrative agent (the "KFM Agent"), and the lenders party thereto.  As amended, the KFM RCF matures May 30, 2023.

57.     KFM has a choice of borrowing in Eurodollar loans or reference rate loans. Eurodollar loans bear interest at a rate per annum equal to the applicable LIBOR rate, plus a margin ranging from 2.00% to 3.25%, with interest payable in one, three, or six-month tranches. Reference rate loans bear interest at a rate per annum equal to the greater of (i) the agent bank's reference rate, (ii) the federal funds effective rate plus 50 basis points, or (iii) the rate for one-month Eurodollar loans plus 1%, plus a margin ranging from 1.00% to 2.25%.

58.     Maximum availability under the KFM RCF is $300 million.  There is no borrowing base under the KFM RCF, but KFM is not permitted to draw on the KFM RCF if such draw would cause non-compliance with certain financial covenants, including a total leverage ratio, senior secured leverage ratio, and interest coverage ratio.  As of the Petition Date, borrowings under the KFM RCF totaled approximately $224 million.

59.     Under the KFM RCF and related collateral documents, the KFM RCF debt is guaranteed by certain subsidiary guarantors, including Kingfisher STACK Oil Pipeline LLC and OPWS.

60.     The KFM RCF is secured by senior liens on substantially all of KFM's and its subsidiaries' real property and associated assets, as well as KFM's equity interests in the subsidiary guarantors.  Additionally, SRII Opco has pledged its membership interests in KFM as security for KFM's obligations under the KFM RCF.

### D.    Equity

61.    Debtor AMR issued 40 million shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A shares in connection with the 2017 initial public offering. AMR's Class A Common Stock is traded and quoted on the NASDAQ Capital Market, which is operated by NASDAQ Stock Market LLC ("<u>NASDAQ</u>"), under the symbol AMR. Debtor AMR also has issued shares of Series A Preferred Stock, Series B Preferred Stock, and Class C Common Stock.[8]

62.    On April 3, 2019, NASDAQ notified AMR that it is not in compliance with the minimum bid price requirement set forth in the NASDAQ Listing Rules, which requires listed securities to maintain a minimum bid price of $1.00 per share and that a failure to meet the minimum bid price requirement exists if the deficiency continues for a period of thirty consecutive business days.  To regain compliance, AMR's Class A Common Stock must have a closing bid price of at least $1.00 for a minimum of ten consecutive business days.  AMR has until September 30, 2019, to regain compliance.  If AMR has not regained compliance by that date, then it may face delisting.

63.    The Securities and Exchange Commission (the "<u>SEC</u>") is conducting a formal investigation into, among other things, the Company's reserve estimates and asset impairments. The Debtors are cooperating with the investigation.  If the SEC determines that violations of federal securities laws have occurred, the agency has a broad range of civil penalties and other remedies available, some of which, if imposed, could be material to the Company's business,

---

[8]    Neither the Series A Preferred Stock nor the Series B Preferred Stock provide the holders thereof any economic rights but each provide the holders certain rights to appoint directors in certain circumstances.

financial condition, or results of operations.  Shortly before the Petition Date, the Debtors informed the SEC of their impending chapter 11 filing.

64.     AMR, certain of its current and former officers and Directors, Riverstone Investment Group LLC, and Riverstone Holdings LLC were named as defendants in a putative securities class action filed in the United States District Court for the Southern District of New York (the "SDNY Action") and/or putative securities class actions in the United States District Court for the Southern District of Texas (the "Texas Actions" and, collectively with the "SDNY Action," the "Actions").  The plaintiffs in the Actions generally allege that the defendants disseminated proxy materials containing materially false or misleading statements in connection with the Business Combination and following the Business Combination, and therefore violated securities laws.  The plaintiffs are seeking compensatory and/or rescissory damages against the defendants.  The SDNY Action was transferred to the U.S. District Court for the Southern District of Texas, and, in the Texas Actions, plaintiffs have filed motions to consolidate and for appointment as lead plaintiff.  While AMR believes that the claims asserted in the Actions are meritless, the outcome of the Actions are uncertain at this time.

### E.     Operating Debt and Similar Obligations

65.     As of the Petition Date, the Debtors had provided credit support and pledged collateral as assurance of payment to the Debtors' vendors ($17 million in letters of credit) and to comply with regulatory requirements relating to potential environmental obligations ($1.275 million in sureties).[9]  As of the Petition Date, the total outstanding obligations due and owing to vendors, suppliers, and other general unsecured creditors are approximately $30 million.

---

[9]    The Surety bonds listed in the insurance motion refer only to AMH and do not include surety bonds associated with non-Debtor affiliate HMI and are subject to ongoing disputes and litigation.

66.     The Debtors' cash on hand as of the Petition Date is approximately $40 million. The primary uses of the Debtors' cash have been to finance the operating business, service indebtedness, and fund capital expenditures.

## PART II

### I.     Circumstances Leading to the Commencement of the Chapter 11 Cases

#### A.     Challenges Facing the Debtors' Business

67.     The Debtors' business faces a number of challenges.  Principal among these challenges is volatility and sustained decreases in oil and natural gas prices.  Oil, natural gas, liquids, and natural gas prices are the key driver of the Company's financial results.  As an independent exploration and production company, the AMH Debtors are particularly vulnerable to oil, natural gas liquids, and natural gas prices because their revenues are primarily generated from the sale of these commodities.  Likewise, non-Debtor KFM's revenue is tied to production levels and demand for hydrocarbons.  The decline in commodity gas prices since late 2018 has had a severe and adverse effect on the Debtors' financial performance.

68.     In addition, the Debtors' business requires significant capital expenditures to maintain exploration, drilling, and production activities.  Liquidity constraints brought on by operational challenges associated with aggressive growth in 2018 (when the Debtors operated up to nine rigs) and the decline in commodity prices have negatively affected the Debtors' ability to maintain drilling activities.  Poorer than expected well performance, together with an inability to sustain adequate drilling levels, has inhibited the Debtors' capacity to generate revenue.

69.     Amidst these operational and market challenges, the Company's liquidity has been further strained by two borrowing base reductions under the AMH RBL in 2019.  In April 2019, a scheduled borrowing base redetermination reduced the availability under the AMH RBL from $400 million to $370 million.  In addition, the lenders under the AMH RBL made an optional

borrowing base redetermination in August 2019, which further reduced the borrowing base to $200 million and resulted in an approximate $162 million deficiency.  The AMH Debtors are obligated to pay down the deficiency over five consecutive monthly installments.  The first deficiency payment of $32.5 million is due September 12, 2019.

70.     Under the AMH RBL, certain financial covenants are tested on September 30, 2019.  Absent a successful deleveraging transaction, an infusion of capital, and/or covenant relief, the AMH Debtors would not be in compliance with financial covenants, which would result in an event of default under the AMH RBL.

**B.      Prepetition Restructuring Efforts**

71.     Facing operational challenges and a volatile commodity environment, the Debtors retained outside advisors to explore strategic alternatives.  In March 2019, the Debtors and certain non-debtors retained Latham & Watkins LLP ("Latham") as restructuring counsel.  In April 2019, the Debtors engaged Perella Weinberg Partners ("PWP") as investment banker and financial advisor, and in May 2019, the Debtors engaged AlixPartners ("Alix") as restructuring advisor. Latham has since resigned from representing the non-Debtor affiliates.  Likewise, Alix has resigned from representing Debtor AMR and the non-Debtor affiliates.

72.     Since retaining Latham, PWP, and Alix, the Debtors and their advisors have engaged with certain of the major constituents in the capital structure regarding a restructuring transaction, including in- or out-of-court deleveraging and refinancing transactions.  Specifically, the Debtors and their advisors have facilitated diligence by, and engaged in restructuring negotiations with, the AMH Agent and Ad Hoc Noteholder Group, as well as the Company's equity sponsors, Bayou City, HPS and Riverstone.

73.     In June 2019, the Debtors' advisors conducted a marketing process to refinance the AMH RBL.  As part of the marketing process, the Debtors' advisors contacted over 50 financial

institutions, executed a number of non-disclosure agreements, opened and populated a dataroom, and had discussions with a number of interested parties regarding potential financing strategies. These efforts did not ultimately materialize into a viable out-of-court financing alternative.

74.     In August 2019, following the conclusion of the refinancing process, the Debtors and their advisors renewed discussions with major creditor constituencies and their respective advisors regarding a restructuring transaction. The August 2019 redetermination under the AMH RBL magnified the Debtors' short-term liquidity challenges and accelerated the pace of negotiations. While these discussions were constructive, the Debtors were unable to achieve a consensual deleveraging transaction before the initial $32.5 million deficiency payment due date of September 12, 2019.

75.     Faced with imminent liquidity concerns, and without an operational path forward to accomplish a consensual restructuring transaction, the Debtors commenced these cases to preserve much needed liquidity, prevent disruption to their operations and to provide an opportunity to pursue a "dual track" strategy to maximize the value of these estates, pursuant to which the Debtors intend to continue discussions with stakeholders regarding a potential comprehensive restructuring transaction while simultaneously pursuing a sale process for all or substantially all of the Debtors' assets together with the non-Debtor affiliates' assets.

76.     Pursuant to the requirements of the proposed cash collateral order (the "Proposed Cash Collateral Order"), the Debtors will commence a marketing and sale process immediately. The AMH Debtors are negotiating an expedited litigation schedule with the KFM Entities concerning the potential rejection of the gathering agreements to resolve the issue in a timeframe that accommodates the sale timeline contemplated by the Proposed Cash Collateral Order. In the meantime and on a parallel path as the sale process and the litigation, the Debtors will continue to

pursue a global consensual resolution of the issues facing their capital structure with the AMH Agent, the KFM Agent, the Ad Hoc Noteholder Group, the KFM Entities, and the Sponsors.

**PART III**

**I.    Relief Sought in the Debtors' First Day Motions**

77.    Contemporaneously herewith, the Debtors filed numerous First Day Motions in this Chapter 11 Case seeking orders granting various forms of relief intended to provide stability and facilitate the Debtors' continued operations and the efficient administration of the Chapter 11 Case. The Debtors seek by the First Day Motions to, among other things, (i) ensure the continuation of their business operations and cash management system without interruption and (ii) preserve valuable relationships with customers, trade vendors and other creditors who might be able to successfully assert liens over the Debtors' assets or otherwise interrupt their operations, to the detriment of all stakeholders.  The First Day Motions include:

    I.    Administrative Motions

        A.    Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion")

        B.    Debtors' Emergency Application for Entry of an Order (I) Authorizing Employment and Retention of Prime Clerk, LLC as Claims Noticing, and Solicitation Agent; and (II) Granting Related Relief

        C.    Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports; (II) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of 30 Largest Unsecured Creditors, (III) Modifying the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief (the "Schedules Motion")

    II.    Operational Motions

        D.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management

29

System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>")

E. Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief (the "<u>Employee Wages Motion</u>")

F. Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Amend, Supplement, Extend, Terminate, and Purchase New Insurance Policies, (C) Continue and Maintain Their Security Program and Satisfy Postpetition Obligations Related Thereto, and (D) Renew, Replace Amend, Supplement, Extend Terminate and Enter Into New Surety Bonds or Letters of Credit and (II) Granting Related Relief (the "<u>Insurance Motion</u>")

G. Debtors' Emergency Motion for Entry of an Order (I) Authorizing Mineral Payments and Working Interest Disbursements and (II) Granting Related Relief (the "<u>Working Interest Motion</u>")

H. Debtors' Emergency Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers and Declarations of Worthlessness with Respect to Stock (the "<u>Equity Trading Motion</u>")

I. Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Tax Motion</u>")

J. Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief (the "<u>Utility Motion</u>")

K. Debtors' Emergency Motion for Entry of an Interim and Final Order (I) Authorizing the Payment of Working Interest Costs, Joint Interest Billings, Production Sale Expenses, and 503(b)(9) Claims and (II) Confirming Administrative Expense Priority of Outstanding Orders (the "<u>JIB Motion</u>")

78.    I have read and understand each of the First Day Motions and the relief requested therein.  Based on my review, and to the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement

is incorporated herein by reference.  I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption during the pendency of this Chapter 11 Case.  Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtor, their business, and their estates.

79.    A description of the relief requested and the facts supporting each of the First Day Motions is attached hereto as **Exhibit B.**  Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Bankruptcy Court should grant the relief requested in each of the First Day Motions.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 11, 2019
      Houston, Texas

                                    John C. Regan, Chief Financial Officer
                                    Alta Mesa Resources, Inc.

## Exhibit A

**Organizational Structure Chart**

US-DOCS\107579082



## **EXHIBIT B**

**Evidentiary Support for First Day Motions**

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

### Administrative Motions

A.  Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion")

1.  Pursuant to the Joint Administration Motion, the Debtors seek joint administration of their seven chapter 11 cases for procedural purposes only.  Many of the motions, hearings, and other matters involved in these chapter 11 cases will affect the Debtors.  I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings by permitting counsel for all parties in interest to use a single caption on the numerous documents that will be served and filed and file the papers in one case rather than in multiple cases.   Moreover, this Court will be relieved of the burden of entering duplicative orders and maintaining duplicative files as joint administration of the chapter 11 cases will permit the Clerk of the Court to use a single general docket for all of the Debtor's cases.

2.  Because the Debtors seek only administrative, not substantive consolidation of the estates, joint administration will not adversely affect the Debtors' respective constituencies.  Each creditor and other party in interest will maintain whatever rights it has against the particular estate in which it asserts a claim or right.   Thus, all creditors will benefit from the reduced costs as a result of such joint administration.

3.  I believe that the Court directing the joint administration of the chapter 11 cases is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the respective First Day Motions.

B.   Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports, (II) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of 30 Largest Unsecured Creditors, (III) Modifying the Requirement to File a List of Equity Security Holders, and (IV) Granting Related Relief (the "Schedules Motion")

4.      Through the Schedules Motion, the Debtors seek entry of an order (a) granting the Debtors an additional 30 days, without prejudice to the Debtors' ability to request additional extensions, to file their schedules of assets and liabilities, schedules of current income and current and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements"), (b) allowing the Debtors additional time to file financial information reports under Rule 2015.3(a) of the Federal Rules of Bankruptcy Procedure to the latest of (i) 15 days after the meeting of creditors to be held pursuant to Section 341 of the Bankruptcy Code, (ii) 45 days after the Petition Date, or (iii) another such date ordered by the Court upon request by the Debtors pursuant to a motion seeking a modification of such reporting requirements for cause, without prejudice to the Debtors' ability to request additional extensions, (c) authorizing the Debtors to file a consolidated creditor matrix and list of the 30 largest unsecured creditors in lieu of a separate creditor matrix and list of 30 largest unsecured creditors for each Debtor, (d) modifying the requirement to file a list of and provide notice directly to the Debtors' equity security holders, and (d) granting related relief.

5.      I submit that good cause for granting an extension of time to file the Schedules and Statements exists.   To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to creditor claims, as well as the Debtors' thousands of assets and contracts.  This information is voluminous and located in numerous places throughout the Debtors' organization.  Collecting the necessary information requires an enormous

expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to improve the Debtors' business operations.   Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

6.     Although the Debtors have commenced the process that will enable them to prepare and finalize the Schedules and Statements, the Debtors anticipate that they may require at least 30 additional days to complete the Schedules and Statements.   The Debtors therefore request that the Court extend the 14-day period through and including October 25, 2019.   Accordingly, I respectfully ask the Court to approve the Schedules Motion.

**Operations Motions**

C. Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief (the "Cash Management Motion")

7.     By the Cash Management Motion the Debtors seek entry of an order:

i.     authorizing, but not directing, the Debtors to maintain and use their existing Cash Management System.

ii.     authorizing, but not directing, the Debtors to continue using their existing Bank Accounts, in the same manner and with existing account numbers, styles and document forms;

iii.     authorizing, but not directing, the Debtors to deposit funds in, and withdraw funds from, their existing Bank Accounts by usual means, including wires, automated clearinghouse transfers, direct deposits, book transfers, and other similar methods;

iv.     authorizing, but not directing, the Debtors to pay any prepetition and ordinary-course Bank Fees;

v.      authorizing, but not directing, the Debtors to treat their existing Bank Accounts for all purposes as "debtor in possession" accounts;

vi.     authorizing, but not directing, the Debtors to maintain existing Business Forms in the ordinary course of business;

vii.    authorizing, but not directing, the Debtors to continue to perform Intercompany Transactions consistent with historical practice, except as otherwise provided in the Cash Management Motion; and

viii.   granting related relief.

8.      The Debtors use the Cash Management System in the ordinary course of business. The Cash Management System allows the Debtors to (a) monitor and control all of the Debtors' cash receipts and disbursements, (b) identify the case requirements of the Debtors, and (c) transfer cash as needed to respond to the cash requirements of the Debtors, as depicted in the diagram below.

9.      The Cash Management System is organized in a way that respects the separate cash funding and operating needs of each of the Debtors.  Based on my experience and understanding, the Cash Management System is comparable to the cash management systems used by similarly-situated upstream companies to efficiently collect, concentrate, and disburse funds generated by the Debtors' business operations and to facilitate cash monitoring, forecasting, and reporting.

10.     The Cash Management System is composed of a total of nine (9) Debtor-owned bank accounts, and one Debtor-owned investment account, (collectively, the "Bank Accounts"), together with and two (2) non-Debtor affiliate owned accounts:

- Two (2) Debtor Bank Accounts maintained at Citibank, N.A. ("Citibank");

- Seven (7) Debtor Bank Accounts maintained at Wells Fargo, N.A. ("Wells Fargo");

- One (1) Debtor Bank Account maintained at UnionBanc Investment Services, LLC ("UnionBanc");

- One (1) non-Debtor affiliate bank account maintained at Citibank; and

- One (1) non-Debtor affiliate bank account maintained at Wells Fargo.

11. A summary of the Bank Accounts is included in the chart below:

| Bank Account | Bank Account Description |
|---|---|
| **Alta Mesa Holdings, LP** | |
| **Citibank** (4806) | AMH maintains an account at Citibank for the purpose of receiving positive hedge settlement payments. Deposits are made to this account as necessary via wires. There is a low volume of transfers to and from this account. This account is subject to a deposit account control agreement. As of the Petition Date, this account held a balance of approximately $887,000. |
| **Wells Fargo** (5875) | AMH maintains an operating account at Wells Fargo for the purpose of (i) making interest and fee payments on the AMH revolving credit facility with Wells Fargo, (ii) settling hedging transactions with hedging counterparties (other than as noted with respect to the Citibank account (4806), and (iii) making transfers to the SRII Opco operating account (5112). Transfers and payments are made via wires, book transfers, and ACH transfers. This account is subject to a deposit account control agreement. As of the Petition Date, this account held a balance of approximately $654,000. |
| **Wells Fargo** (3341) | AMH recently opened a utility deposit account at Wells Fargo (the "Utility Deposit Account") for the purpose of holding and funding utility and state agency deposits. This account will be funded by deposits from the AMS Funding Account. This account is subject to a deposit account control agreement. As of the Petition Date, this account held a balance of approximately $0. |
| **Alta Mesa Resources, Inc. ("AMR")** | |
| **Wells Fargo** (5535) | AMR maintains a checking account at Wells Fargo for funding AMR related corporate expenses such as NASDAQ filing fees, director fees, audit fees, D&O insurance premiums, and consulting and legal fees, among other expenses.  This account was historically funded on an as-needed basis from both AMS and KFM; while KFM may continue to transfer funds to this account postpetition, AMH will not. SRII OpCo may also transfer funds to this account to fund AMR expenses on an as-needed basis This account has historically had a low volume of activity. As of the Petition Date, this account held a balance of approximately $12,000. |

| Bank Account | Bank Account Description |
|---|---|
| **Citibank**<br><br>(5109) | AMR maintains a checking account at Citibank which was historically used to fund AMR's stock buyback program and may also be used for AMR's general expenses from time to time. Funds were transferred to this account on an as-needed basis from both AMS and KFM and, thus, no funds are typically maintained in this account. Consequently, this account has a low volume of activity.<br><br>As of the Petition Date, this account held a balance of approximately $0. |
| *Alta Mesa Services, LP ("AMS")* | |
| **Wells Fargo – AMS Funding Account**<br><br>(5396) | AMS maintains a funded operating account at Wells Fargo that collects working interest and oil and gas customer receipts via ACH transfers, wires, and checks (the "<u>AMS Funding Account</u>").  AMS makes transfers and payments from the account to pay general operating expenses, tax payments, and non-operated joint interest billings and royalty payments via the controlled distribution operating and revenue accounts described immediately below (8537 and 8545, respectively). The Debtors also use this account to make payments of principal and interest on the prepetition reserve based lending facility, pay workforce obligations and settle hedges.  This account receives interest credit daily.<br><br>This account is subject to a deposit account control agreement.<br><br>As of the Petition Date, this account held a balance of approximately $42,600,000. |
| **Wells Fargo – Controlled Disbursement Operating Account**<br><br>(8537) | AMS maintains an AP disbursement account at Wells Fargo (the "<u>AMS Operating Account</u>") for the purpose of making payments to trade vendors and tax authorities, as well as paying related operating expenses by check. This account is a zero-balance account funded by cash swept from the AMS Funding Account (5396).<br><br>This account is subject to a deposit account control agreement.<br><br>As of the Petition Date, this account held a balance of approximately $0. |
| **Wells Fargo – Controlled Disbursement Revenue Account**<br><br>(8545) | AMS maintains a revenue and royalty disbursement account at Wells Fargo (the "<u>AMS Revenue Account</u>") for the purpose of making payments on non-operated working interest and joint interest billing and royalty disbursements. This account is a zero-balance account funded from the AMS Funding Account (5396). Payments from this account are made via checks and zero-balance coverage of checks.<br><br>This account is subject to a deposit account control agreement.<br><br>As of the Petition Date, this account held a balance of approximately $0. |
| **Wells Fargo – Segregated "Escrow" Account**<br><br>(3929) | AMS maintains a segregated account at Wells Fargo that is used as a depository for funds due to the Oklahoma Corporation Commission ("<u>OCC</u>") for unclaimed royalty payments under the OCC's pooling rules as well as bonus payments for unknown owners.<br><br>This account is subject to a deposit account control agreement and treated as restricted cash.<br><br>As of the Petition Date, this account held a balance of approximately $749,000. |

| Bank Account | Bank Account Description |
|---|---|
| **UnionBanc**<br><br>(2331) | AMS maintains an investment account at UnionBanc.  This account is a legacy account holding funds pending resolution of a dispute with  non-Debtor affiliate High Mesa regarding non-STACK assets. The funds in this account are held in a treasury money-market funds offered by Fidelity Investments.  This account is not an operating account that is used by the Debtors and thus has a low volume of activity.<br><br>As of the Petition Date, this account held a balance of approximately $108,000 |

12.     The diagram below illustrates the Debtors' cash management system, including the manner in which the Debtors transfer funds among the Bank Accounts, and distribute and collect funds from certain non-Debtor affiliates:



The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System, which fees and services are generally paid each month (the "Bank Fees"). The Debtors have historically incurred Bank Fees between approximately $15,000 and

$20,000 per month, which are debited from the respective Bank Account for which the Bank Fee was incurred.  As of the Petition Date, the Debtors estimate that they owe approximately $26,000 in unpaid Bank Fees, which is broken out as approximately $20,000 in arrears for the prior month and approximately $6,000 for the current month through the Petition Date.  The Debtors seek permission to pay these Bank Fees and continue paying the Bank Fees in accordance with past practices.

13.     The U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an approved depository that agrees to comply with the requirements of the U.S. Trustee's office.  With the exception of the UnionBanc account, the Debtors maintain Bank Accounts at Citibank and Wells Fargo, each of which is an approved depository under the U.S. Trustee Guidelines.[2]  I am informed both Citibank and Wells Fargo have signed Uniform Depository Agreements with the U.S. Trustee.  Likewise, with the exception of UnionBanc, each of the Bank Accounts is insured by the FDIC.

14.     As part of the Cash Management System, Debtors excess cash held in the AMS Funding Account and the non-Debtor Kingfisher Operating Account is swept overnight into separate overnight interest bearing accounts at Wells Fargo (the "Investment Accounts") and invested in conservative instruments that satisfy prudent investment guidelines, which have a primary goal of protecting principal and a secondary goal of maximizing yield (the "Investment Practices").  Funds in the Investment Accounts are invested in liquid, investment-grade short-term instruments, which may include bank bearing deposits on a pooled basis, money-market funds and

---

[2]     Funds in the UnionBanc account, which may not be in strict compliance with the U.S. Trustee Guidelines or Section 345(b) of the Bankruptcy Code, are invested in money-market funds that can be readily liquidated.  The UnionBanc account is not an operating account and the Debtors do not rely on it to fund their day-to-day operations.  Rather, the funds in the UnionBanc account were set aside as a contingency pending resolution of a dispute with a third party.

repurchase agreements.  Funds in the Investment Accounts are transferred back to the respective operating accounts at the opening of the following business day.

15.     The Investment Practices permit the Debtors to accrue interest on excess cash while also protecting principal and ensuring access to liquidity daily.  Requiring the Debtors to bond the Investment Accounts would impose costs on the Debtors and their estates and further strain liquidity.

16.     The Debtors utilize certain limited preprinted correspondence and business forms, such as letterhead, envelopes, purchase orders, invoices, and other business forms (collectively, the "Business Forms"), in the ordinary course of their businesses.  The Debtors also maintain books and records for accounting and reporting purposes.  It would be burdensome and expensive for the Debtors to order new forms or alter current printing arrangements.

17.     The Debtors have historically engaged in routine business relationships with each other and their non-Debtor affiliates (collectively, the "Intercompany Transactions"), resulting in intercompany receivables and payables (collectively, the "Intercompany Claims").  The Debtors and their non-Debtor affiliates engage in Intercompany Transactions to provide company-wide management and support services and facilitate operations on a daily basis.

18.     The Intercompany Transactions are reflected as receivables and payables and then settled periodically, often in cash.  The Intercompany Transactions are traceable, and the Debtors intend to account for all postpetition Intercompany Transactions in accordance with past practice.[3] As funds are disbursed throughout the Cash Management System and as business is transacted

---

[3]   Historically, the AMH Debtors have made transfers to AMR to pay certain AMR operating expenses and, in certain instances, have paid obligations of AMR and non-Debtor KFM to third parties directly.  I understand that the Cash Collateral Order and Budget provide that the AMH Debtors will not be making such transfers or payments postpetition. AMR expects to receive sufficient funding from SRII Opco and KFM to pay its ongoing expenses for the duration of these chapter 11 cases and does not anticipate needing to rely on any payments or distributions for the AMH Debtors.

between the Debtors and/or their non-Debtor affiliates, at any given time there may be intercompany balances owing by one Debtor to another Debtor or to a non-Debtor affiliate.

19.     The Intercompany Transactions are integral to the Debtors day-to-day operations. Any interruption of the Intercompany Transactions would disrupt the Debtors' operations and impose unnecessary costs on the Debtors' estates.

20.     I understand that the Debtors historically have reflected Intercompany Claims as journal entry receivables and payables in the respective Debtor or non-Debtor affiliate's accounting system.  Transactions related to the flow of funds between and among the Debtors and their subsidiaries are sometimes settled in cash or book transfers or may be reflected as journal entry receivables and payables.

21.     The Intercompany Transactions are an essential component of the Debtors' operations.  Any interruption in the Intercompany Transactions would severely disrupt the Debtors' operations and result in harm and avoidable expense to the Debtors and their estates.  For these reasons, maintaining the current Cash Management System is in the best interest of the Debtors' estates, its creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.

22.     Accordingly, I submit that the Cash Management Motion should be approved.

D.  Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief (the "Employee Wages Motion")

23.     Pursuant to the Employee Wages Motion, the Debtors seek entry of an order:

     i.     authorizing the Debtors to (i) pay all prepetition and postpetition obligations on account of the Workforce Compensation and Benefits in the ordinary course of business and (ii) continue to administer the Workforce Compensation and Benefits programs, including payment of prepetition obligations related thereto;

      ii.     authorizing all banks to receive, process, honor, and pay all the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant to the Employee Wages Motion; and

      iii.    granting related relief.

24.     The Debtors estimate that the aggregate amount of prepetition obligations they seek authority to pay under the Wages order :

| Prepetition Workforce Obligations | Requested Final Order Amount |
|---|---|
| Wage and Salary Obligations | $195,000 |
| *Net payroll* | *$139,000* |
| *Withholdings* | *$56,000* |
| Payroll Processing Services | $4,000 |
| Expense Reimbursements | $122,000 |
| Health and Welfare Benefits | $51,305 |
| *Flexible Spending Accounts* | *$605* |
| *Wellness Allowance* | *$13,300* |
| *Life & AD&D Insurance* | *$20,800* |
| *Disability Benefits* | *$16,600* |
| 401(k) Plan | $32,250 |
| Workers' Compensation Claims | $10,000 |
| Benefits Management & Consultation | $9,000 |
| Employee Severance Programs | $128,847 |
| Other Benefits | $41,600 |
| Temporary Worker Compensation | $79,000 |
| Operations Independent Contractor Obligations | $6,000 |

    **a. The Debtors' Workforce**

25.     The Debtors employ approximately 155 Employees. Approximately 115 Employees are salaried, and approximately 40 Employees are paid on an hourly basis. Approximately 150 Employees are employed on a full-time basis and approximately 5 Employees are employed on a part-time basis.

26.     The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Employees would be exposed to significant financial hardship if the Debtors were not permitted to continue paying their compensation, providing benefits, and maintaining existing programs.

27.     The Debtors also periodically employ temporary workers to fulfill certain duties on a short-term basis.  As of the date hereof, the Debtors retain approximately thirteen (13) Temporary Workers in treasury, risk management, information technology, human resources, accounting and finance.

28.     The Debtors supplement their workforce from time to time by relying on approximately four (4) Operations Independent Contractors—independent and small contracts to perform a variety of services that are essential to the Debtors' ongoing operations.  The Operations Independent Contractors are often highly trained professionals who bring specialized knowledge and skills not otherwise available to the Debtors.  The Debtors engage Operations Independent Contractors to provide management, field support, pipeline installation and inspection, and field operations management services.  The continued use of Operations Independent Contractors is a critical and cost-effective addition to the Debtors' Workforce.

29.     As discussed above, Debtor Alta Mesa Services is party to a consulting agreement with independent contractor Meridian Energy LC ("Meridian"), under which Meridian provides certain key management services. (the consulting agreement, as amended, the "Meridian Agreement").[4]  The services provided by Meridian are critical to the Debtors' business operations. The Debtors do not have the resources that would be necessary to replicate the services provided

---

[4]     The amendment to the Meridian Agreement was effective as of September 10, 2019.

by Meridian.  Further, considering Meridian's intimate knowledge of the Debtors' business, the Debtors' counsel not feasibly replace the services Meridian provides.

30.     While the Workforce is paid by Debtor Alta Mesa Services, the Workforce provides services to, and for the benefit of, various other Debtors and non-Debtor affiliates.  Certain members of the Workforce provide management services, including operational consulting, accounting, legal and financial support (as well as overall administrative support) to KFM under a Management Services Agreement ("MSA") between AMH and KFM. Under the MSA, KFM pays AMH a monthly management fee of $10,000 and reimburses AMH for certain costs incurred in providing the services, including a proportionate share of Workforce Compensation and Benefits.

### b.  Workforce Compensation

#### i.     Compensation

31.     The Debtors pay their Employees' wage and salary obligations bi-weekly on either a salaried or hourly basis.  Employee Compensation is paid in arrears for work performed during a given bi-weekly period.  All Employees are paid by Debtor Alta Mesa Services.

32.     The Debtors' gross payroll expenses on account of Employee Compensation are approximately $870,000 per pay period.  As of the Petition Date, the Debtors owe approximately $195,000 on account of prepetition wages, salaries, overtime, and other compensation, excluding reimbursable expenses, paid time off, and amounts related to the Debtors' 401(k) Plan (as defined herein) (collectively, the "Unpaid Wages").  The Debtors seek authority to pay prepetition Unpaid Wages and continue paying wages incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

#### ii.    Withholding Obligations

33.     The Debtors deduct certain amounts from Employees' paychecks during each applicable pay period on account of miscellaneous items, including garnishments, child support and related fees, wage overpayments, certain personal expenses, and pre-tax deductions payable pursuant to certain of the health and welfare programs (collectively, the "Deductions").   On average, Deductions total approximately $50,000 per month in the aggregate.

34.     The Debtors are also required to withhold Payroll Taxes, which are then forwarded to the appropriate federal, state, or local taxing authority at the same time the Employees' payroll checks are disbursed.   On average, Employee Payroll Taxes total approximately $379,000 per month in the aggregate.

35.     As of the date hereof, the Debtors estimate that approximately $56,000 in Deduction and Payroll Tax Obligations are accrued and outstanding.   The Debtors seek authority to satisfy prepetition Withholding Obligations and continue to satisfy Withholding Obligations incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

### iii.     Payroll Process

36.     The Debtors utilize a Payroll Processor to process payroll disbursements, administer Withholding Obligations, and provide certain related services, including benefit administration and paycheck deductions, among others.   As of the date hereof, the Debtors owe approximately $4,000 on account of prepetition services provided by the Payroll Processor.   The Debtors seek to pay prepetition obligations owing to the Payroll Processor and continue administering payroll on a postpetition basis in the ordinary course of business and consistent with past practice (including paying any postpetition amounts payable to the Payroll Processor).

### iv.     Reimbursable Expenses

37.     The Debtors customarily reimburse their Employees for a variety of ordinary, necessary, and reasonable business-related expenses incurred as part of their official duties and in furtherance of the Debtors' business. Reimbursable Expenses typically include expenses associated with travel, transportation, lodging, meals, rental cars, personal car use, certain business entertainment, continuing professional education, office equipment and supplies, and other reasonable business-related expenses. The Debtors reimburse Employees for Reimbursable Expenses in two ways:  through the use of corporate credit cards and direct reimbursement of out-of-pocket expenses.

38.     As of the date hereof, the Debtors estimate that approximately $45,000 is accrued and outstanding on account of the Corporate Cards.  The Debtors seek authority to pay prepetition amounts owing on the Corporate Cards and continue paying Corporate Card obligations incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

39.     As of the date hereof, the Debtors estimate that approximately $77,000 in out-of-pocket expenses is accrued and outstanding.  The Debtors seek authority to pay prepetition out-of-pocket expenses and continue paying out-of-pocket Expenses incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

v.     Temporary Worker Compensation

40.     To supplement their workforce, the Debtors rely on the support of Temporary Workers to fill short-term positions that are not economically feasible to employ on a full- or part-time basis.  As of the date hereof, the Debtors estimate that the aggregate amount of accrued but unpaid Temporary Worker Compensation is approximately $79,000.  The Debtors seek authority to pay prepetition Temporary Worker Compensation and continue paying Temporary Worker

Compensation and other obligations related thereto incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

### vi.     Operations Independent Contractors

41.     The Debtors engage approximately four Operations Independent Contractors to conduct a range of important services for the Debtors, including consulting, land management, basic drilling, completions and workover operations, geologic modeling, and seismic and well data management, among others.  On average, the Debtors pay approximately $22,000 per month on account of compensation owed to the Operations Independent Contractors.  As of the date hereof, the Debtors estimate that the aggregate amount of accrued but unpaid Operations Independent Contractor compensation is approximately $6,000.  By this Motion, the Debtors seek authority to pay prepetition Operations Independent Contractor obligations and continue paying Operations Independent Contractor obligations incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

### vii.     Meridian Agreement

42.     Under the Meridian Agreement, Debtor Alta Mesa Services pays Meridian a monthly service fee (the "Service Fee"), which is used to (a) compensate Meridian and (b) provide the Meridian Team and Meridian Staff Employees with salaries and benefits.  Alta Mesa Services also reimburses Meridian for all documented, reasonable, out-of-pocket expenses incurred in connection with the provision of services to the Debtor Alta Mesa Services.  As of the date hereof, the Debtors have no accrued and outstanding Service Fees.  The Debtors seek authority to pay prepetition Service Fees and continue satisfying obligations under the Meridian Agreement on a postpetition basis in the ordinary course of business and consistent with past practice.

viii.   <u>Director Compensation</u>

43.     The Debtors compensate certain Eligible AMR Directors and the AMH Independent Manager for their services.  The Debtors also reimburse the directors for certain out-of-pocket business expenses incurred by the directors.  The Debtors do not believe they presently owe any prepetition amounts on account of retainers, fees, or reimbursable expense obligations to the AMR Directors and AMH Independent Manager (collectively, the "<u>Director Compensation</u>").  Nevertheless, out of an abundance of caution, by this Motion, the Debtors seek authority to pay any prepetition amounts that may have accrued and to continue to pay Director Compensation incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

ix.   <u>Recruiting and Agency Expenses</u>

44.     The Debtors engage Russell Reynolds Associates ("<u>RRA</u>") to provide certain Recruitment Services.  As of the date hereof, there is nothing accrued and outstanding for Recruitment Services.  The Debtors seek authority to continue paying Recruitment Service obligations incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

**c.  Employee Benefit Programs**

45.     In the ordinary course the Debtors offer eligible Employees the opportunity to participate in a number of benefit programs, including (a) medical, dental, vision, and prescription drug plans, (b) a flexible spending account program to pay certain out-of-pocket health care and dependent care expenses; (c) a wellness allowance program that entitles Employees to reimbursement for a health club membership or other approved wellness or fitness related activity or membership; (d) life, disability, and critical illness insurance; (e) workers' compensation; (f) retirement benefits, including a 401(k) plan, (g) severance benefits, (h) vacation, holiday, sick

53

time, and other leaves of absence, and (i) other miscellaneous benefits provided to the Employees in the ordinary course of business.  The Debtors seek to pay prepetition obligations owing on account of the benefit programs and continue paying such obligations on a postpetition basis in the ordinary course of business and consistent with past practice, as set forth in the Employee Wages Motion.

46.     In connection with administering the benefit programs, the Debtors engage Gallagher Benefits Services, Inc. ("Gallagher") to provide benefits management and consulting services.  The Debtors have historically paid approximately $10,000 per month to Gallagher for such services.  As of the Petition Date, the Debtors do not believe any amounts are accrued and outstanding for Recruitment Services.  Nevertheless, out of an abundance of caution, the Debtors seek authority to pay any outstanding prepetition amounts owed to RRA and to continue paying Recruitment Service obligations incurred on a postpetition basis in the ordinary course of business and consistent with past practice.

### d. Employee Incentive Programs

47.     The Debtors offer certain incentive programs as an additional component of overall Employee Compensation.   The incentive programs are an additional component of overall Employee Compensation (the "Employee Incentive Program").   I believe that the Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.  Given the large percentage of the Employees covered by the Employee Incentive Programs, the Debtors believe that any interruption in payments pursuant to the Employee Incentive Programs could upset Employee morale or cause attrition.  Accordingly, the Debtors seek authority to continue their ordinary course incentive programs and to honor their obligations to non-insider Employees under the preexisting programs.

54

i.  Annual Incentive Compensation Plan

48.     The Debtors maintain an annual incentive compensation plan (the "AICP").  As of the date hereof, no AICP obligations to non-Insider Employees are accrued and outstanding. Approximately $1,267,833 is expected to be paid to non-insiders under the non-management AICP on March 1, 2020.  The Debtors seek authority, but not direction, to (a) honor amounts that may come due on account of the AICP with respect to non-Insider Employees, and (b) continue the AICP in the ordinary course on a postpetition basis.

ii.  Long-Term Incentive Plan

49.     The Debtors also maintain a long-term incentive plan under which the Debtors' Employees were eligible to receive non-cash awards, including options, stock appreciation rights, restricted stock, restricted stock units, or any combination of the foregoing (collectively, "Stock Awards") under the LTIP (the "Prior LTIP").  In the first quarter of 2019, the Debtors modified the terms of the Prior LTIP for the 2019 calendar year (the "2019 LTIP") to provide for cash awards in lieu of the Stock Awards (each a "Cash Award" and together, the "Cash Awards").  As of the date hereof, the Debtors no not believe any amounts are accrued and outstanding under the 2019 LTIP obligations with respect to non-Insiders.

50.     While the Debtors have not granted any Stock Awards under the Prior LTIP in 2019 and have no plans to do so, certain Employees retain unvested Stock Awards.  Under the Prior LTIP, approximately six of the Debtors' current and former Insiders and 281 non-Insider Employees were awarded restricted stock, options and/or performance based restricted stock units in Debtor AMR's class A common stock.  Restricted stock awards and stock options under the Prior LTIP generally vest over a three-year period, while performance based restricted stock units relate to a performance year and vest at a range of 0% to 200% at the end of such performance year depending on whether certain performance criteria is met.  Upon vesting of the performance

based restricted stock units, the Debtors have the option of making a payment equal to the cash value of the restricted stock units or delivering shares of Debtor AMR's class A common stock. Upon an Employee's termination, all vested Stock Awards remain fully vested with the former Employee. All remaining unvested Stock Awards are forfeited upon termination except as otherwise provided in individual employment agreements and individual grant agreements.

51.     The Debtors project that approximately 46,538 options and restricted stock units and restricted stock awards will vest in 2019. There is a potential range of 0 to 1,071,242 performance based restricted stock units related to the 2019 performance year that could vest as of December 31, 2019, depending on whether certain performance criteria are met. The Debtors seek authority to continue the Prior LTIP for non-Insider Employees, including authority to exercise the option to cash out Employee's restricted stock units upon vesting.

52.     When a vesting event occurs with respect to the restricted stock units, restricted stock awards or an option is exercised, the Debtors are required to withhold income and employment taxes and to pay the employer portion of employment taxes associated with the income recognized by the Employee (the "Equity Taxes"), which are *de minimis*. As of the date hereof, the Debtors do not have any . In addition, the Debtors utilize certain third-party providers to administer the Prior LTIP and 2019 LTIP. On average, the Debtors pay approximately $40,000 on an annual basis to these third-party providers. As of the date hereof, there are no outstanding amounts owed to such third-party providers. The Debtors seek authority to continue to pay the Equity Taxes associated with the Prior LTIP, and continue to pay any third-party providers that administer the Prior LTIP and/or the 2019 LTIP.

53.     In addition to the AICP and LTIP, the Debtors also implemented two Key Employee Retention Plans (the "KERPs") prior to the Petition Date – the Non-Executive KERP

and the Executive KERP.  Under the Non-Executive KERP, ten non-Insider Employees were paid an aggregate of $755,000 prior to the Petition Date, subject to clawback if the non-executive Employee voluntarily terminates or is terminated for cause (as defined in the relevant compensation documents) before the earlier of (i) March 11, 2020, (ii) an AMR Event,[5] or (iii) involuntary termination without cause, death, or disability; provided that if an AMH Event[6] occurs while they are employed and prior to an AMR Event, then the non-executive does not have to repay 75% of the advanced KERP payment.

54.     Under the Executive KERP, two Employee Insiders were paid an aggregate of $1.2 million prior to the Petition Date, subject to clawback if an Employee voluntarily terminates or is terminated for cause (as defined in the relevant compensation documents) before the earlier of (a) March 11, 2020, (b) consummation of an AMR Event, or (c) involuntary termination without cause, death, or disability; provided that if an AMH Event occurs while they are employed and prior to an AMR Event, then the Insider Employee does not have to repay 75% of the advanced KERP payment.  In exchange for the KERP payment, the Insider Employees agreed to relinquish their rights to any AICP or 2019 LTIP payments.

55.     In connection with the amendment and restatement of the Meridian Agreement and in consideration for Meridian's agreement to cancel the right to certain regular quarterly and milestone payments, the Debtors advanced to Meridian for payment to the Insider Meridian Consultants the aggregate amount of $1.8 million prior to the Petition Date, subject to clawback if

---

[5]  An "AMR Event" means (i) the effective date of AMR's plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (ii) dismissal of AMR's Chapter 11 case, or (iii) conversion of AMR's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.

[6]  An "AMH Event" means (i) a sale of AMH or substantially all of its assets, (ii) the effective date of a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code of AMH, (iii) dismissal of any case filed by AMH under Chapter 11 of the Bankruptcy Code, or (iv) conversion of AMH's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.

Meridian terminates the Meridian Agreement without cause (as set forth in the Meridian Agreement), Alta Mesa Services terminates the Meridian Agreement for certain cause events (as set forth in the Meridian Agreement) or, with respect to any amount allocated to a specific Meridian Consultant, if the Consultant resigns before the earlier of (i) March 11, 2020, (ii) an AMR Event, (iii) the termination of the Meridian Agreement by Alta Mesa Services without cause (as set forth in the Meridian Agreement), (iv) termination of the Meridian Agreement by Meridian for certain cause events (as set forth in the Meridian Agreement), and (as with respect to the amount allocated to a specific Meridian Consultant, the Meridian Consultant's termination of services by Alta Mesa Services, or his death or disability; provided that if an AMH Event occurs prior thereto and prior to an AMR Event, then Meridian does not have to repay 75% of the advanced payment.

56.     Accordingly, I request that the Employee Wages Motion be approved.

E.   Debtors' Emergency Motion for Entry an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto (B) Renew, Amend, Supplement, Extend, Terminate, and Purchase New Insurance Policies, (C) Continue and Maintain Their Security Program and Satisfy Postpetition Obligations Related Thereto, and (D) Renew, Replace Amend, Supplement, Extend Terminate and Enter Into New Surety Bonds or Letters of Credit and (II) Granting Related Relief (the "Insurance Motion")

57.     By the Insurance Motion the Debtors seek entry of an order:

(i)     authorizing the Debtors to (a) continue to administer the Insurance Policies (as defined herein) and satisfy any prepetition payment obligations related thereto (the "Insurance Obligations"), and (b) renew, amend, supplement, extend, terminate, replace, and/or secure new insurance coverage as needed in the ordinary course of business;

(ii)    authorizing the Debtors to (a) continue and maintain their Security Program and satisfy any postpetition payment obligations related thereto, and (b) renew, amend, supplement, extend, terminate, replace and/or enter into new Surety Bonds or Letters of Credit as needed in the ordinary course of business;

(iii)   authorizing all banks to receive, process, honor, and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant to the Insurance Motion; and

(iv)    granting related relief.

58.    In the ordinary course of their business, the Debtors maintain approximately 20 insurance policies that are administered by various insurance carriers (collectively, the "Insurance Carriers").  These policies provide coverage for, among other things, the Debtors' property, general liability, sudden and accidental environmental liability, automobile liability, excess umbrella liability, directors' and officers' liability, errors and omission, workers compensation and employer's liability, commercial crime, employment practices liability, and fiduciary liability (collectively, the "Insurance Policies").  I believe that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

59.    Policies are issued in the name of Debtor AMR and include the AMH Debtors and the non-Debtor KFM Entities. AMR typically pays premiums and is reimbursed by AMH and KFM for their proportionate shares of the premiums.  Because the Insurance Policies are paid in advance, there are no outstanding prepetition obligations relating to the premiums for the Insurance Policies.

60.    I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, properties, and assets, and in some cases, such coverage is required by various regulations, laws and contracts that govern the Debtors' business activities.

61.    In the ordinary course of business, the Debtors are required to provide surety bonds (the "Surety Bonds") or other forms of collateral, including but not limited to, letters of credit, to certain third parties, including governmental units and other public agencies to secure the Debtors' payment or enforcement of certain obligations (the "Security Program").  As part of the Security Program, the Debtors have nine outstanding letters of credit (collectively, the "Letters of Credit"). The jurisdictions in which the Debtors operate require the Debtors to post Surety Bonds to secure

the Debtors' contractual obligations, relating to the Security Program. The Security Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.

62.     The Debtors are also party to certain indemnity agreements (collectively, the "Surety Indemnity Agreements"). Pursuant to the Surety Indemnity Agreements, the Debtors have agreed to indemnify the Surety from any loss, cost, or expense that the Surety may incur on account of the issuance of the Surety Bond on behalf of the Debtors.

63.     The success of the Debtors' efforts to operate efficiently and effectively during these chapter 11 cases, will depend on the maintenance of the Security Program on an interrupted basis. In order to continue their business operations, the Debtors must be able to provide the necessary financial assurances to the applicable governmental and/or regulatory agencies in the jurisdictions in which the Debtors operate. While there are no prepetition amounts owed on account of the Security Program, the Debtors must maintain their existing Security Program, which requires that the Debtors have the ability to (i) pay any obligations that may arise in connection with their Security Program as they come due postpetition and (ii) renew, replace or potentially provide additional as needed in the ordinary course of business.

64.     Accordingly, I submit that the Insurance Motion should be approved.

F.  Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Make Mineral Payments and Working Interest Disbursements and (II) Granting Related Relief (the "Working Interest Motion")

65.     Pursuant to the Working Interest Motion, the Debtors seek entry of an entry:

(i)     authorizing the Debtors to pay or apply, in the ordinary course of business, any and all amounts owed to Mineral Payees and Working Interest Holders (each as defined in the Working Interest Motion) in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred postpetition; and

(ii)    granting related relief.

66.     Failure to make payments on account of the Interest Burdens (the "Mineral Payments"), would have a severe negative effect on the Debtors and their interests in the Oil and Gas Leases. Mineral Payments are governed by the terms of the Oil and Gas Leases and state statutory frameworks that set strict payment deadlines and contain enforcement mechanisms, including lien rights, interest, fines, recovery of costs and attorneys' fees, and treble damages. Failure to pay Mineral Payments could expose the Debtors to such enforcement actions and could result in actions seeking the forfeiture, cancellation, or termination of Oil and Gas Leases. The Debtors estimate that, as of the Petition Date, there are approximately $25 million in Mineral Payments that are due to be paid following the Petition Date.

67.     Additionally, failure to pay Working Interest Disbursements could result in a material adverse effect on the Debtors and their interests in the Oil and Gas Leases. Non-Op Working Interest holders often have the same statutory protections as Mineral Payees. As a result, failure to pay Working Interest Disbursements could expose the Debtors to statutory enforcement mechanisms. Moreover, Non-Op Working Interest holders often have additional remedies pursuant to mutual agreements such as a JOA or the rules established by the OCC, including Unit Agreements. Such remedies can include the grant of a security interest in production to secure amounts owed by the Operator, the right to remove the Operator, the right to suspend rights in the Contract Area, and the right to interest on amounts owed. As of the Petition Date, the Debtors estimate that they have approximately $20 million of Working Interest Disbursements outstanding.

68.     As such, I submit that the relief requested in the Working Interests Motion should be granted.

G.  Debtors' Emergency Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers and Declarations of Worthlessness with Respect to Stock (the "Equity Trading Motion")

69.     The Debtors seek entry of interim and final orders:

(i)      approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to, the shares of Class A common stock of Debtor AMR or any Beneficial Ownership thereof (the "Stock"), as detailed in the Procedures;

(ii)     directing that any purchase, sale, conversion, exchange, or other transfer of, or declaration of worthlessness with respect to, Stock in violation of the Procedures shall be null and void *ab initio*; and

(iii)    granting related relief.

70.     The Debtors believe that they possess certain net operating losses ("NOLs") and other tax benefits (collectively, the "Tax Attributes"), including, as of December 31, 2018, estimated federal NOLs of approximately $100 million, and additional NOLs have been generated prior to the Petition Date.  Moreover, the Debtors believe that, as of December 31, 2018, they have disallowed business interest expense totaling approximately $20 million and capitalized intangible drilling costs totaling approximately $150 million.  These Tax Attributes provide potential tax savings in these chapter 11 cases and thereafter, which will inure to the benefit of all of the Debtors' stakeholders.  As a result, it is in the best interests of the Debtors and their estates to preserve the Tax Attributes by restricting acquisitions of AMR Stock that could result in an Ownership Change occurring before the effective date of a chapter 11 plan or other disposition of the Debtors' assets. Such restriction would protect the Debtors' ability to use the Tax Attributes during the pendency of the chapter 11 cases or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale of their assets, which may be significant in amount.

71.     To that end, the Debtors seek to establish the Procedures to monitor certain transfers of Stock and certain worthless stock deductions with respect to Stock so as to be in a position to

act expeditiously to prevent such transfers or worthlessness deductions, if necessary, to preserve the Tax Attributes.

72.     For purposes of the Procedures, a "Substantial Shareholder" is any entity or individual that has direct or indirect Beneficial Ownership of Stock representing at least 4.5 percent of the overall value of the Stock.

73.     Procedures for Transfers of Stock.  Under the Procedures, Substantial Shareholders and potential Substantial Shareholders are required to file declarations with the court and provide notice to certain notice parties under the following circumstances:

    a.  Any Substantial Shareholder wishes to transfer Stock that would affect the size a Substantial Shareholder's Beneficial Ownership or would result in another entity becoming or ceasing to be a Substantial Shareholder, in which case the parties must file and serve a declaration on or before the later of (a) thirty (30) calendar days after the date of the Notice of Interim Order or (b) ten (10) calendar days after becoming a Substantial Shareholder;

    b.  Prior to effectuating any transfer of Stock that would result in an increase in the amount of Stock of which a Substantial Shareholder has Beneficial Ownership or would result in an entity or individual becoming a Substantial Shareholder; and

    c.  Prior to effectuating any transfer of Stock that would result in a decrease in the amount of Stock of which a Substantial Shareholder has Beneficial Ownership or would result in an entity or individual ceasing to be a Substantial Shareholder.

74.     Procedures for Declarations of Worthlessness of Stock. Any person or entity that is a 50-Percent Shareholder[7] must file with the court, and serve on certain notice parties on or before the later of: (i) ten (10) calendar days after the date of the Notice of Interim Order; and (ii) ten (10) calendar days after becoming a 50-Percent Shareholder.  Prior to claiming any deduction for worthlessness of Beneficial Ownership of Stock for a tax year ending before the Debtors'

---

[7]   A "50-Percent Shareholder" is any person or entity that at any time preceding the Petition Date has owned 50 percent or more of Stock (determined in accordance with section 382(g)(4)(D) of the IRC and the applicable Treasury Regulations thereunder).

emergence from chapter 11 protection, a 50-Percent Shareholder must file with the court, and serve on certain notice parties an advance written notice of the intended claim of worthlessness.

75. <u>Objection Procedures.</u> The Debtors will have 30 calendar days after receipt of any declaration described above to file with the court and serve on such Substantial Shareholder or potential Substantial Shareholder an objection to any proposed transfer of Stock described in the declaration.  If the Debtors file an objection, the transaction or worthlessness claim, as applicable, will remain ineffective unless the objection is withdrawn and the transaction or claim is approved by the court.  If the Debtors do not timely object, such transaction or claim can proceed solely as set forth in the declaration.

76. Due to the importance of the Debtors' Tax Attributes to the value of the estate, I request that this relief be granted.

H. Debtors' Emergency Motion for Entry an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Tax Motion</u>")

77. Pursuant to the Tax Motion, the Debtors seek entry of an order:

(iv) authorizing the Debtors to remit and pay (or use tax credits to offset) the Taxes and Fees (as defined herein) in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the commencement of these chapter 11 cases; and

(v) granting related relief.

78.  In the ordinary course of their business, the Debtors collect, withhold, and incur sales, use, income, withholding, franchise, severance, and property taxes, and are required to pay certain escheat payments, as well as other business, environmental, and regulatory fees (collectively, the "<u>Taxes and Fees</u>").  The Debtors estimate that approximately $6,158,800 million in Taxes and Fees relating to the prepetition period will become due and owing after the Petition Date.

79.     The continued payment of the Taxes and Fees on a timely basis and on their normal due dates, will preserve the resources of the Debtors' estates, thereby improving their prospects for a successful chapter 11 process.  If such obligations are not timely paid, the Debtors' business operations could be materially disrupted and the Debtors may be required to expend time and money to resolve a variety of issues related to the Taxes and Fees, each turning on the specific terms of each taxing Authority's applicable laws.  These issues include (a) whether the obligations enjoy priority, are secured or unsecured and (b) whether the Taxes and Fees are proratable or fully payable prepetition or postpetition.  Meanwhile, the Taxes and Fees, as well as penalties, interest, and attorneys' fees and costs, will continue to accrue on a postpetition basis, which will invariably lead to questions of whether such penalties, interest, attorneys' fees and costs are priority, secured or unsecured in nature.

80.     I believe the relief requested in the Tax Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interests and will enable the Debtors to continue to operate their businesses successfully in these chapter 11 cases without disruption. Accordingly, I believe the Tax Motion should be approved, and submit as such on behalf of the Debtors.

I.  Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief (the "Utility Motion")

81.     Pursuant to the Utility Motion, the Debtors seek entry of an order:

(i)     approving the Proposed Adequate Assurance of payment for future Utility Services;

(ii)    prohibiting Utility Providers (as defined herein) from altering, refusing, or discontinuing services;

(iii)   approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance; and

(iv)   granting related relief.

82.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water and sewage, telecommunications, internet, cable, and other similar services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Providers").

83.    I have been informed that there are no defaults or arrearages with respect to the Debtors' undisputed invoices for prepetition Utility Services. On average, the Debtors pay approximately $460,000 per month for the Utility Services, as calculated for the twelve-month period ended July 2019. Accordingly, the Debtors estimate that the cost for the Utility Services during the next 21 days (not including any deposits to be paid) will be approximately $345,000. To provide additional assurance of payment, the Debtors propose to deposit $42,000 (the "Adequate Assurance Deposit") into a segregated bank account owned by the Debtors. The Adequate Assurance Deposit represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over the twelve months ended July 2019, less any existing prepetition deposits or surety bonds. Importantly, one Utility Provider, Cimarron Electric Cooperative ("Cimarron") has been allocated $0 of the proposed Adequate Assurance Deposit because prepetition surety bonds or deposits held by Cimarron exceed one half of the Debtors' average monthly cost for Utility Services from Cimarron. The average monthly cost of the Utility Services provided by Cimarron is approximately $376,000, which would ordinarily require $188,000 to be deposited in the Adequate Assurance Deposit on account of Cimarron. However, since Cimarron holds the above mentioned surety bond, $0 have been included in the Adequate Assurance Deposit on account of Cimarron.

84.     Uninterrupted Utility Services is essential to the Debtors ongoing business operations and overall success of these chapter 11 cases.  Should any Utility Provider refuse or discontinue service, even for a brief time, the Debtors' business would be severely disrupted, which, in turn, would jeopardize the Debtors' ability to manage their reorganization efforts. Accordingly, it is essential to the success of the Debtors' chapter 11 cases, that the Utility Providers be required to continue providing uninterrupted services during these chapter 11 cases and I submit that the Utility Motion should be approved.

J.   Debtors' Emergency Motion for Entry of an Interim and Final Order (I) Authorizing the Payment of Working Interest Costs, Joint Interest Billings, Production Sale Expenses, and 503(b)(9) Claims and (II) Confirming Administrative Expense Priority of Outstanding Orders (the "JIB Motion")

85.     Pursuant to the JIB Motion, the Debtors seek entry of an interim and final order:

(i)     authorizing, but not directing, the Debtors to pay in the ordinary course of business all prepetition and postpetiton amounts owing on account of (a) Working Interests Costs, (b) Joint Interest Billings, (c) Production Sale Expenses (each as defined in the JIB Motion), and (d) 503(b)(9) Claims; and

(ii)    confirming the administrative expense priority stats of Outstanding Orders and authorizing payment of such obligations in the ordinary course of business.

86.     The relief requested in the JIB Motion is critical to the Debtors' continued operations and the failure to pay on account of the relief requested would likely result in severe environmental and economic consequences.  The amounts the Debtors are requesting authority to pay pursuant to the JIB Motion, if left unpaid, would result in the potential for contractors to refuse completion of wells at critical junctures.  For example, if drilling activity is ceased prior to reaching a certain "casing point," there is a risk of contamination of underground freshwater supplies, uncontrolled well flow of explosive hydrocarbons and brine water to the surface, or the release of poisonous hydrogen sulfide, among other things.  Further, if wells are not completed, it is likely

that the Debtors will face fines or penalties under various state and federal regulations.  Payment of prepetition amounts owed to the Critical Mineral Contractors, in an amount not to exceed $12.5 million on an interim basis, is, therefore, in the best interest of the Debtors' estates, their creditors, and all parties in interest.

87.     Additionally, failure to timely pay the Joint Interest Billings owing by the Debtors is likely to result in Operators asserting lien rights under applicable state laws on the Debtors' interests in the Oil and Gas Leases or the production therefrom.  If asserted, such liens could restrict the Debtors' ability to dispose, transfer, or otherwise alienate its property, potentially severely impairing the Debtors' businesses.  Joint Interest Billings are not uniform and are not entirely predictable on a month-to-month basis.  In the twelve months prior to the Petition Date, the Debtors paid approximately $55 million in Joint Interest Billings.  As of the Petition Date, the Debtors estimate that they have approximately $9 million of prepetition Joint Interest Billings outstanding.

88.     By this Motion, the Debtors also seek relief to comply with Production Sale Arrangements and therefore gain the critical ability to receive revenue from production that they market both on behalf of themselves and third parties (the "Marketed Production").

89.     In instances where delivery of Marketed Production is refused, the Debtors may be forced to "shut-in" a well.  Shutting in a well may have economic consequences to the Debtors beyond temporary cessation of production and revenue therefrom.  For instance, once shut-in, a well may not be able to be returned to producing status in the future.  Further, the act of shutting in a well can trigger obligations to other interest holders in that well, including payment obligations or potential forfeiture of the Debtors' interest under the terms of an Oil and Gas Lease.  Without seamless compliance with their Production Sale Arrangements and the ability to make marketable

for sale the Debtors' production, the Debtors' revenue stream and ability to operate their business potentially would be severely impaired.

90.     In the twelve months before the Petition Date, the Debtors paid, or had netted from revenue, approximately $80 million in Production Sale Expenses.  As of the Petition Date, the Debtors estimate that they have approximately $12 million of prepetition Production Sale Expenses outstanding.

91.     The Debtors may have received certain materials or other goods from various vendors (collectively, the "503(b)(9) Claimants") within the 20 days prior to the Petition Date. Such goods include materials and supplies used to develop, operate and maintain the wells.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

92.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, the creditors and any parties in interest for the relief requested in the JIB Motion to be granted.