## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION



| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ALTA MESA RESOURCES, INC., *et al.*, | § | Case No. 19-35133 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING (I)(A) BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OR ANY PORTION OF THE DEBTORS' ASSETS AND CERTAIN NON-DEBTOR ASSETS, (B) PROCEDURES FOR THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) THE FORM AND MANNER OF NOTICE OF THE SALE HEARING AND ASSUMPTION PROCEDURES, (D) PROCEDURES FOR SELECTION OF ONE OR MORE STALKING HORSE BIDDERS AND THE PROVISION OF BID PROTECTIONS TO SUCH STALKING HORSE BIDDER(S), AND (E) DATES FOR AN AUCTION AND SALE HEARING, AND (II)(A) THE SALE OF SUBSTANTIALLY ALL OR ANY PORTION OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES, AND (B) THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) RELATED RELIEF**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON OCTOBER 7, 2019 AT 10:00 A.M. (PREVAILING CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING, UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING (OR SUCH EARLIER DATE AS MAY BE ORDERED BY THE COURT). YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (N/A); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); and Oklahoma Energy Acquisitions, LP (3762). The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") respectfully state as follows in support of this motion (the "Motion"):

**<u>PRELIMINARY STATEMENT</u>**

1.      The Debtors seek to maximize the value of the Debtor Assets.  To that end, the Debtors have been evaluating, and continue to evaluate, all of their strategic options.  These include, without limitation, (i) a sale of the Debtor Assets (defined below) alone, or (ii) in coordination with their non-Debtor affiliates, a sale of the Debtor Assets together with the Non-Debtor Assets (defined below).  Other potential options include a reorganization of the Debtors on a standalone basis or a reorganization in conjunction with some or all of the Non-Debtors. Any decision on whether or not to accept any bid(s) for the Debtor Assets would be made by the Debtors and any decision on whether or not to accept any bid(s) for non-Debtor Assets would be made by the Non-Debtors.

2.      By this Motion, the Debtors are taking the first step in developing and evaluating those alternatives—specifically, they are setting up a marketing process that would enable them, and the Non-Debtors, to solicit bids on the Debtor Assets and Non-Debtor Assets (respectively), together or separately, while also maintaining the flexibility to solicit proposals to reorganize the Debtors on a standalone basis or in connection with the Non-Debtors.  The Debtors are willing to entertain all viable proposals and have not committed to any particular path.  Similarly, the Debtors understand that the Non-Debtors are willing to entertain all viable proposals and have not committed to any process that would require them to sell their assets or reorganize either with the Debtors or on a standalone basis, and the Non-Debtors will make all decisions in connection with any sale of their assets or other restructuring transaction that involves the Non-Debtors.

3.     The Debtors are filing this Motion at this juncture primarily to comply with the milestones in the Cash Collateral Order (defined below), which require, among other things, that the Debtors obtain entry of an order, with terms and substance reasonably acceptable to the AMH Agent (defined below) approving bid and sale procedures for the sale of substantially all of the AMH Debtors' assets no later than October 12, 2019, unless the AMH Debtors have filed with the Court a chapter 11 plan reasonably acceptable to the AMH Agent (defined below) (an "Acceptable Plan").  The Debtors unsuccessfully tried to negotiate milestones with the AMH Agent as part of the Cash Collateral Order that would have afforded them with additional time to work with their Key Constituents (defined below) to design and implement a sale and/or plan process.  The Debtors intend to revisit the milestones with the AMH Agent in connection with final cash collateral order.  There can be no assurance, however, that the AMH Agent will entertain any modifications to the milestones.

4.     The Debtors circulated a draft of this Motion and the accompanying Bidding Procedures (defined below) shortly before filing the Motion to counsel to (i) the AMH Agent, (ii) the Non-Debtors, (iii) the Sponsors (defined below) and (iv) the Ad Hoc Noteholder Group (defined below) (collectively, the "Key Constituents").  The Bidding Procedures do not reflect any comments that the Key Constituents may have.   All rights of the Debtors, the Key Constituents and any statutory committees that may be appointed are expressly preserved.  The Debtors intend to work with the Key Constituents, any statutory committees that are appointed and any other party in interest to resolve any comments and concerns with the Bidding Procedures prior to the hearing on this Motion.[2]

---

[2] The Debtors will file revised drafts of the Bidding Procedures and/or proposed Bidding Procedures Order in advance of the hearing on this Motion, as appropriate.

## RELIEF REQUESTED

5.      By this Motion the Debtors hereby seek (i) entry of an order in the form of Exhibit A hereto (the "Bidding Procedures Order") (a) approving the proposed bidding procedures attached as Annex 1 to the Bidding Procedures Order (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or any portion or combination of their assets (the "Debtor Assets" and together with the Non-Debtor Assets (defined below) the "Assets") through one or more sales of the Debtor Assets and/or a combined sale of both the Debtor Assets and the Non-Debtor Assets (each, a "Transaction"); (b) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (c) approving the form and manner of notice of the Auction (defined below) and sale hearing (the "Sale Notice")[3] and Assumption and Assignment Procedures (the "Assumption Notice"),[4] (d) approving the procedures governing Debtors' and/or the Non-Debtors'[5] selection of one or more stalking horse bidders (each, a "Stalking Horse Bidder"), if any, and the provision of Bid Protections (defined below) to such Stalking Horse Bidder(s), if necessary; and (e) scheduling (1) a date for an auction if the Debtors receive one or more timely and acceptable Qualified Bids (defined below) (the "Auction") and (2) a final hearing (the "Sale Hearing") to approve one or more Transactions, as necessary, and (f) granting related relief; and (ii) following the conclusion of the Sale Hearing, an order, the form of which will be filed on the docket of these chapter 11 cases prior to the Sale Hearing, authorizing (a) the

---

[3] The Debtors will file a form of Sale Notice in advance of the Bidding Procedures hearing.

[4] The Debtors will file a form of Assumption Notice in advance of the Bidding Procedures hearing.

[5] For the avoidance of doubt, the Debtors are not requesting that the Court bind any Non-Debtors to the Bidding Procedures without their consent. The Non-Debtors' participation in the Bidding Procedures shall be subject to their consent to such participation and the Non-Debtors will control any decision as to whether the Non-Debtor Assets will be sold alone or in connection with the sale of the Debtor Assets.

sale of the Debtor Assets free and clear of all claims, liens, liabilities, rights, interests and encumbrances, (b) the assumption and assignment of certain executory contracts and unexpired leases, and (c) related relief (the "Sale Order").[6]

6.    By this Motion, the Debtors further request entry of the Bidding Procedures Order establishing the following dates and deadlines, subject modification as needed:

a.    **Bid Deadline**:   November 26, 2019 at 5:00 p.m. (prevailing Central Time), as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline");

b.    **Sale Objection Deadline**:   December 30, 2019, as the deadline to object to the sale Transactions and/or the assumption and assignment of the Designated Contracts and cure amounts related thereto (the "Sale Objection Deadline");

c.    **Stalking Horse Deadline**:   December 31, 2019, as the deadline for the Debtors to identify a stalking horse bidder in advance of the Auction and obtain Court approval of any Bid Protections in connection with the same;

d.    **Auction**:   January 3, 2020 at 10:00 a.m. (prevailing Eastern Time), as the date and time of the auction (the "Auction"), if one becomes necessary, which will be held at the offices of counsel for the Debtors, Latham & Watkins LLP, 811 Main Street, Suite 3700, Houston, TX 77002 or at such other place and time as the Debtors shall notify all Qualified Bidders, the Consultation Parties and all other parties entitled to attend the Auction;

e.    **Reply Deadline**:   January 8, 2020 at 5:00 p.m., (prevailing Central Time), as the deadline for the Debtors to file replies to any objections to the sale Transactions and/or the assumption and assignment of the Designated Contracts and cure amounts related thereto; and

f.    **Sale Hearing**:   January 10, 2020, before the Honorable Judge Marvin Isgur, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas, at 515 Rusk Street, Courtroom 400, Houston, Texas 77002.

## JURISDICTION

7.    The United States Bankruptcy Court for the Southern District of Texas has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of

---

[6] The proposed form of Sale Order will be filed no later than 21 days prior to the Sale Hearing.

Reference from the United States District Court for the Southern District of Texas, dated May 24, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory and legal predicates for the relief requested herein are Sections 105(a), 363, 365, 503, 507 and, if applicable, 1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, 6006, 9007, and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "Complex Case Procedures").

## BACKGROUND

9.      On September 11, 2019 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing these cases under chapter 11 of the Bankruptcy Code.  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of John Regan, Chief Financial Officer of the Debtors, in Support of the Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration")[7], filed on the Petition Date and which is fully incorporated herein by reference.

10.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  As of the

---

[7] The First Day Declaration and other relevant case information is available on the following website maintained by the Debtors' proposed claims, balloting, and noticing agent, Prime Clerk LLC, in connection with these chapter 11 cases: https://cases.primeclerk.com/altamesa.

date hereof, no trustee or examiner has been requested in these chapter 11 cases, and no committees have been appointed or designated.

## BASIS FOR RELIEF REQUESTED

**A.    The Assets**

*The Debtor Assets*

11.    The Debtors are an independent energy company focused on the acquisition, development, exploration and exploitation of unconventional onshore oil and natural gas reserves in the eastern portion of the Anadarko Basin in Oklahoma.  The Debtors operate an upstream oil and gas exploration and production business operated by Debtor Alta Mesa Holdings, LP ("AMH") and its subsidiaries (such subsidiaries, together with Debtor AMH and Alta Mesa Holdings GP, LLC, the "AMH Debtors").  Certain of the Debtors' non-Debtor affiliates operate a "midstream" oil and gas services business through Non-Debtor Kingfisher Midstream LLC, a subsidiary of Debtor AMR ("Kingfisher" and, together with its wholly-owned subsidiaries, the "Kingfisher Entities" or the "Non-Debtors").

12.    The Debtors' "upstream" business activities are primarily directed at the horizontal development of oil and gas properties in an area of the Anadarko Basin commonly referred to as the Sooner Trend Anadarko Basin Canadian and Kingfisher County ("STACK"). The Debtors' upstream revenue is generated principally by the production and sale of oil, gas and natural gas liquids from such properties.  As of the Petition Date, the Debtors, through the AMH Debtors, have assembled a highly contiguous position of approximately 130,000 net acres in the STACK, primarily in eastern Kingfisher County and in Major County, Oklahoma.  As of December 31, 2018, AMH had a 66% average working interest in 1,153 gross producing wells.

13.    As of December 31, 2018, the Debtors estimated that their total proved reserves were approximately 69.1 million barrels of oil equivalent (i.e., 69.1 MMBoe), of which

approximately 65% percent were oil and natural gas liquid reserves and 35% were natural gas reserves.

14.     Since March 2019, AMH has been operating two rigs in the STACK.  In order to preserve liquidity following an August 2019 borrowing base redetermination under the AMH Debtors' prepetition reserve based credit facility (the "AMH RBL Facility"), AMH provided notice of its intent to deactivate one of the rigs.  Then, in September 2019, prior to commencing these chapter 11 cases, AMH provided notice that it intends to deactivate the remaining rig, which was a condition to the administrative agent under the AMH RBL Facility (the "AMH Agent") and the lenders' under the AMH RBL Facility agreement to permit the consensual use of their cash collateral.  AMH is required to provide 30 days' notice before deactivating a rig. AMH provided notice of the first deactivation in August 2019 and the second in September 2019.  Both rigs will be deactivated in September 2019.

*The Non-Debtor Assets*

15.     Kingfisher, which operates the midstream business, has natural gas gathering and processing, and crude oil gathering and storage assets located in the Anadarko Basin that generate revenue primarily through long-term, fee based contracts (including certain gathering agreements with Debtor Oklahoma Energy Acquisition LP ("Oklahoma Energy"), a subsidiary of AMH).  In addition, in November 2018, a subsidiary of Kingfisher purchased produced water gathering pipelines, facilities, disposal wells, surface leases and easements from AMH and entered into a water gathering agreement with AMH.  Certain of the Kingfisher assets are used in the Debtors' oil and natural gas operations and are strategically positioned to provide similar services to other producers in the area.  Likewise, approximately 80–90% of Kingfisher's

revenue is derived from long-term crude oil, gas, and water gathering agreements with Debtor Oklahoma Energy.

**B.      Events Leading to the Chapter 11**

16.      The Debtors' business faces a number of challenges.  Principal among these challenges is volatility and sustained decreases in oil and natural gas prices.  Commodity prices, which have been depressed for a sustained period of time, are the key driver of the Debtors' financial results.  Amidst a challenging commodity price environment, the Debtors' liquidity was further constrained by two borrowing base reductions under the AMH RBL Facility in 2019 that left the Debtors with a $162 million deficiency.

17.      The Debtors and certain non-debtors retained Latham & Watkins LLP ("Latham") as restructuring counsel in early 2019.[8]  In April 2019, the Debtors and Non-Debtors engaged Perella Weinberg Partners ("PWP") as investment banker and financial advisor.  Since retaining Latham and PWP, the Debtors and their advisors have engaged with certain of the major constituents in the capital structure regarding a restructuring transaction.  Specifically, the Debtors and their advisors have facilitated diligence by, and engaged in restructuring negotiations, with the AMH Agent and an ad hoc group of holders of 7.875% senior unsecured notes (the "Ad Hoc Noteholder Group") representing holders of approximately 95% of the outstanding unsecured notes, as well as the Debtors' equity sponsors, Bayou City Energy Management LLC ("Bayou City"), HPS Investment Partners, LLC ("HPS") and Riverstone Investment Group LLC ("Riverstone" and together with Bayou City and HPS, the "Sponsors").  Various of these parties have expressed interest in the the Debtor Assets and Non-Debtor Assets

---

[8] In September 2019, Latham terminated its engagement with the Non-Debtors.

and/or in the reorganization of the Debtors' and Non-Debtors' businesses.  However, none of these parties have provided the Debtors or Non-Debtors with a formal, committed proposal.

18.     Faced with liquidity concerns, and without an operational path forward to accomplish a consensual restructuring, the Debtors commenced these cases to preserve much needed liquidity, prevent disruption to their operations and to pursue a "dual track" strategy to maximize the value of these estates.  Paragraph 10 of the interim cash collateral order negotiated by the Debtors and the AMH Agent (the "Cash Collateral Order") [D.I. 63] includes the following milestones relating to a sale and marketing process:

- unless the AMH Debtors have previously filed an Acceptable Plan, obtain entry of an order acceptable to the AMH Agent approving bid and sale procedures for substantially all of the AMH Debtors' assets by October 12, 2019;

- Unless the disclosure statement for an Acceptable Plan has been approved by the Court, the AMH Debtors shall have received at least one qualified bid by a qualified bidder (in each case, in accordance with the Bidding Procedures Order by December 2, 2019;

- Unless the disclosure statement for an Acceptable Plan has been approved by the Court, the AMH Debtors shall conduct an auction for substantially all of their assets by January 8, 2020;

- The AMH Debtors shall obtain an order of the Court, with terms and substance acceptable to the AMH Agent, approving a sale of substantially all of the AMH Debtors' assets or confirming an Acceptable Plan by January 13, 2020; and

- The AMH Debtors shall consummate the sale of substantially all of their assets or an Acceptable Plan by February 13, 2020.

**C.     Bidding Procedures**

19.     The Debtors believe the proposed Bidding Procedures summarized below, and attached as Annex 1 to the Bidding Procedures Order, are fair and appropriate.  Because the Bidding Procedures are attached as Annex 1 to the Bidding Procedures Order, they are not

restated in their entirety herein.  The Bidding Procedures provide, among other things, the following:

- On or prior to October 18, 2019, potential buyers shall be required to submit written non-binding indications of interest specifying, among other things, (i) the Assets proposed to be acquired; (ii) the amount and type of consideration to be offered for the Debtor Assets and the amount and type of consideration to be offered for the Non-Debtor Assets, (iii) any material conditions or assumptions upon which a bid by such party will be based, and (iv) any other material terms to be included in a bid by such party;

- On or prior to the Bid Deadline, potential buyers shall be required to submit written binding bids (each, a "Bid", and bids satisfying the qualification requirements in the Bidding Procedures, "Qualified Bids");

- Qualified Bids may be for substantially all or any portion of the Assets and may include Non-Debtor Assets;

- Qualified Bids must be accompanied by a deposit equal to 10% of the purchase price;

- Qualified Bids must be based on (i) the form Purchase and Sale Agreement to be provided by the Debtors to all potential buyers and filed with the Court prior to the Bid Procedures hearing (the "PSA") or (ii) the Stalking Horse Agreement, if applicable, and must include (x) executed transaction documents, signed by an authorized representative of such Bidder and (y) a markup showing the bidder's changes to the form PSA or Stalking Horse Agreement, as applicable;

- Qualified Bids must be accompanied by evidence of committed financing or other financial ability to consummate the transaction in a timely manner.  If the bidder is an entity formed for the purpose of the proposed transaction, the Debtors must be provided evidence of the approval of the Bid by the bidder's equity holders;

- Qualified Bids shall not contain any financing, due diligence (other than customary diligence relating to environmental and title matters) or internal approval contingencies to closing on the proposed transaction;

- To the extent a Stalking Horse Bidder is selected prior to the Bid Deadline, each Qualified Bid for any Assets subject to the Stalking Horse Agreement (defined below) (alone or combined with Bids for other Assets subject to the Stalking Horse Agreement) must exceed the Stalking Horse Bidder's Bid by $2,500,000;

- Each subsequent overbid at the Auction must exceed the prior high bid by $2,500,000 plus, in the event that the Debtors have entered into a Stalking Horse Agreement with respect to the Assets to which the overbid relates, the aggregate

amount of Bid Protections (including any break-up fees and/or expense reimbursements) under such Stalking Horse Agreement;

- At the conclusion of the Auction, the Debtors and (and, if the Bid includes Non-Debtor Assets, the Non-Debtors) shall select the overall highest or otherwise best Bid or Bids for their respective assets (each such Bid, a "Successful Bid", and the Bidder submitting each such Successful Bid, a "Successful Bidder") in accordance with the Bidding Procedures; *provided*, that such Backup Bid shall be subject to Court approval in connection with the Court's approval of the Successful Bid. The Debtors (and, if the Bid includes Non-Debtor Assets, the Non-Debtors) shall also select the next highest or otherwise best Bid or Bids at the Auction as the "Backup Bid(s)" and the Bidder(s) submitting such Backup Bid(s), as the "Backup Bidder(s)" in accordance with the Bidding Procedures. The Backup Bidder(s) shall be required to keep the Backup Bid(s) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is 60 days after the date of entry of the Sale Order, or the closing of the Transaction with the Successful Bidder;

- The lenders under AMH RBL Facility shall have the right to credit bid all or any portion of their allowed secured claims at the Auction; *provided*, that such Bid otherwise complies with the Bidding Procedures and the Bankruptcy Code; and

- The Debtors shall not consider any bids submitted after the conclusion of the Auction and any and all such bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

- Nothing in the Bidding Procedures will preclude a bidder from submitting a Qualified Bid in form of a plan of reorganization and it being understood that such Bid may be determined by the Debtors to be a Qualified Bid, Stalking Horse Bid, Successful Bid, or Backup Bid.

**D.** **Stalking Horse Bidder(s), Related Bid Protections and Purchase Agreement(s)**

20. The Bidding Procedures also provide that the Debtors (and, if the Bid includes Non-Debtor Assets, the Non-Debtors) may enter may enter into a stalking horse agreement (a "Stalking Horse Agreement") at any time prior to December 31, 2019, subject to approval by the Court and higher or otherwise better offers at the Auction, with any Stalking Horse Bidder to establish a minimum Bid at the Auction with respect to all or any portion of the Assets. A Stalking Horse Agreement may provide for payment of break-up fees and/or expense reimbursements (the "Bid Protections").

21.     The Bidding Procedures provide that in the event that the Debtors (and, if the Bid includes Non-Debtor Assets, the Non-Debtors) select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall file with the Court and provide, to all parties on the Rule 2002 List, counsel to the Ad Hoc Noteholder Group, counsel to the AMH Agent, and the all parties then known to have expressed an interest in the Debtor Assets as part of the marketing process established by these Bidding Procedures, and all parties holding liens on such Debtor Assets, three (3) business days' notice of and an opportunity to object to the designation of such Stalking Horse Bidder and the Bid Protections set forth in the Stalking Horse Agreement and, absent objection, the Debtors may submit an order to the Court under certification of counsel approving the selection of such Stalking Horse Bidder and the Bid Protections (the "Stalking Horse Order").

**E.     Sale Notice**

22.     The Debtors request that the Court approve the form of Sale Notice attached as Annex 2 to the Bidding Procedures Order.  The Debtors submit that service of the Sale Notice as set forth below is proper and sufficient to provide notice to of the Auction, the Sale Objection Deadline and the Sale Hearing to all known and unknown parties.

23.     The Debtors propose that within five (5) business days after the entry of the Bidding Procedures Order, the Debtors serve the Sale Notice, the Bidding Procedures Order and the Bidding Procedures, by first-class mail, postage prepaid, upon (i) to the best knowledge of the Debtors' management, all entities that have expressed written interest in a Transaction with respect to all or substantially all of the Debtor Assets or the Assets within the past six (6) months; (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Debtor Assets; (iii) counsel for any Committee; (iv) counsel to the AMH Agent; (v) counsel to the administrative agent for the lenders to Kingfisher (the "KFM Agent"); (vi)

counsel to the Ad Hoc Noteholder Group; and (vii) the U.S. Trustee; *provided, however*, that to the extent email addresses are available for any of the foregoing parties, such parties may be served by email.

24.     In addition, the Debtors propose that within five (5) business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors serve the Sale Notice by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF, upon (i) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (ii) the United States Attorney's office for the Southern District of Texas; (iii) the Internal Revenue Service; (iv) all parties entitled to notice pursuant to Bankruptcy Local Rule 2002-1(b); and (v) all known creditors of the Debtors, including their contract counterparties.

25.     Finally, the Debtors propose to publish the Sale Notice, as modified for publication, in the *Wall Street Journal* and *Houston Chronicle* on one occasion on the mailing date or as soon as reasonably practicable thereafter.  In addition, the Debtors seek this Court's approval to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/altamesa.

**F.     Assumption and Assignment Procedures**

26.     The Debtors also request that the Court approve the form of assumption notice (the "Assumption Notice") attached hereto as Annex 3 to the Bidding Procedures Order.  The Debtors submit that service of the Assumption Notice on the Counterparties (as defined below) is proper and sufficient to provide notice to the Counterparties of the Assumption and Assignment Procedures.

27.     To facilitate the sale Transactions the Debtors seek authority to assume and assign the Designated Contracts to the Successful Bidder(s) in accordance with the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures are as follows:

- On or prior to December 2, 2019, (the "Assumption Notice Deadline"), the Debtors shall file with the Court, post on the case website at https://cases.primeclerk.com/altamesa and serve on each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Designated Contract, the Assumption Notice.

- The Assumption Notice shall include, without limitation, a list of Designated Contracts to be assumed and assigned (the "Designated Contract List") and the cure amount (each, a "Cure Cost"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under Bankruptcy Code Section 365(b)(1)(A) and (B) for each of the Designated Contracts.  If a Counterparty objects to the Cure Cost, the Counterparty must file with the Court and serve on the Contract Objection Notice Parties (as defined below) a written objection (a "Contract Objection") on or before the Contract Objection Deadline (as defined below).

- Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (iii) be filed with the Clerk of the Court on or before 5:00 p.m. (prevailing Central Time) on December 30, 2019 (the "Contract Objection Deadline"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Recipients; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under Bankruptcy Code Sections 365(b)(1)(A) and (B) for the applicable Designated Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

- The "Objection Recipients" are as follows:    (A) the Debtors, Alta Mesa Resources, Inc., 15021 Katy Freeway, Suite 400, Houston, TX 77094, Attn: Robert Albergotti, Chief Restructuring Officer and Kim Warnica, Vice President and General Counsel; (B) counsel to the Debtors, (1) Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Attn: George A. Davis, Annemarie Reilly, and Brett M. Neve, and  Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn: Caroline Reckler; (2) Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, Attn: John F. Higgins; (C) counsel to the AMH Agent, Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas 77002, Attn: William A. Wood III; (D) counsel to the KFM Agent, Vinson & Elkins LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201, Attn: Michael E. Bielby, Jr.; (E) counsel to the Ad Hoc Noteholder Group, Davis Polk & Wardell LLP, 450 Lexington Avenue, New

York, NY 10017, Attn: Damian S. Schaible; (F) counsel to any Committee appointed in these cases; (G) counsel to Kingfisher, Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, Attn: Susheel Kirpalani; and (H) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002.

- Any time after the Assumption and Assignment Service Date and before the date one (1) business day prior to the Sale Hearing, the Debtors reserve the right, and are authorized but not directed, to (i) add previously omitted Designated Contracts as contracts to be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for a Transaction, (ii) remove a Designated Contract from the Designated Contract List that a Successful Bidder proposes be assumed and assigned to it in connection with a Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

- If, after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Designated Contracts in connection with such Transaction or the Debtors seek to modify the previously stated Cure Cost associated with any Designated Contract, as soon as practicable thereafter and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than (a) the Contract Objection Deadline in the event that such Assumption Notice was filed and served at least ten (10) days prior to the Contract Objection Deadline, (b) two (2) days prior to the Sale Hearing in the event that such Assumption Notice was filed and served at least seven (7) days prior to the commencement of the Sale Hearing, and (c) two (2) hours prior to the commencement of the Sale Hearing in the event that such Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing.

- As soon as practicable after the Auction and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties a notice substantially in the form attached as Annex 4 to the Bidding Procedures Order (the "Post-Auction Notice")[9] identifying the Successful Bidder(s), and the Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance by the Successful Bidder not later than two (2) hours prior to the commencement of the Sale Hearing.

- At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder(s) of only those Designated Contracts that have been selected by the such Successful Bidder(s) to be assumed and assigned (collectively, the "Selected Designated Contracts"). The Debtors and their estates

---

[9]     The Debtors will file a form of Post-Auction Notice in advance of the Bidding Procedures hearing.

reserve any and all rights with respect to any Designated Contracts that are not ultimately designated as Selected Designated Contracts.

- If no Contract Objection is timely received with respect to a Selected Designated Contract: (i) the Counterparty to such Selected Designated Contract shall be deemed to have consented to the assumption by the Debtors and assignment to Successful Bidder of the Selected Designated Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Designated Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code Section 365(b)(1)(A) and (B) upon payment of the Cure Cost set forth in the Assumption Notice for such Selected Designated Contract; and (iii) the Cure Cost set forth in the Assumption Notice for such Selected Designated Contract shall be controlling, notwithstanding anything to the contrary in such Selected Designated Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost and shall be forever barred from asserting any other Claims related to such Selected Designated Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and the Sale Order.

- To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code Sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Designated Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Counterparty asserts is required to be paid under Bankruptcy Code Section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

28.    Any party failing to timely file a Contract Objection with respect to the assumption and assignment of any Designated Contract or related Cure Cost specified on an Assumption Notice will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, or the Successful Bidder with respect to such Designated Contract, and shall be deemed to consent to the sale

17

Transactions and the assumption and assignment of such Designated Contract assumed and assigned in connection therewith.

## BASIS FOR RELIEF

### A.    The Bidding Procedures Should Be Approved

29.    For the reasons set forth below, the Debtors believe the Bidding Procedures are reasonable and appropriate and should be approved as proposed.  "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold."  John J. Jerome & Robert D. Drain, *Bankruptcy Court Is Newest Arena for M&A Action*, N.Y.L.J., June 3, 1991.

30.    Here, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts, and in the best interest of the Debtors' estates.  The Debtors also submit that the Bidding Procedures demonstrate a sound exercise of the Debtors' business judgment, as such procedures are designed to maximize the value to be received by the Debtors' estates for the Debtor Assets.

31.    The Bidding Procedures will provide the Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for the Debtor Assets.

### B.    The Procedures and Notice Related to the Selection of Stalking Horse Bidders Should Be Approved

32.    The Debtors submit that the proposed procedures and notice for the selection of Stalking Horse Bidder(s), the execution of the Stalking Horse Agreement(s), the provision of Bid Protections to Stalking Horse Bidder(s) and Court approval of the foregoing pursuant to Stalking Horse Orders are fair and reasonable under the circumstances.  Entry into the Stalking Horse Agreements with Stalking Horse Bidder(s) ensures that the Debtors obtain the highest and best consideration for the Debtor Assets by setting a floor price that can be tested in the marketplace.

**C.      Approval of Bid Protections for Stalking Horse Bidders Is Appropriate**

33.      To induce Stalking Horse Bidders to enter into Stalking Horse Agreements, setting floor prices for the Assets that may be tested in the marketplace, the Debtors may be required to provide Bid Protections.  The terms of any Bid Protections shall be subject to Court approval pursuant to a Stalking Horse Order after three (3) business days' notice to all relevant parties as set forth in the Bidding Procedures.

34.      The Debtors believe that granting Bid Protections to Stalking Horse Bidder(s) is fair and reasonable under the circumstances.  Any break-up fee and the expense reimbursement will be negotiated at arms' length and in good faith and will be necessary to secure the Stalking Horse Bidder(s)' participation in the proposed sale Transaction.  Courts have acknowledged that the approval of break-up fees and expenses in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers.  *See Asarco, Inc. v. Elliot Mgmt. (In re Asarco, LLC)*, 650 F.3d 593, 597-98, 601-03 & n.9 (5th Cir. 2011); In re JW Res., Inc., 536 B.R. 193, 195-96 (Bankr. E.D. Ky. 2015); *In re Hupp Industries, Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992). As listed in *Hupp Indus.*, courts consider various factors in determining whether to authorize break-up fees, such as:

- •        whether the fee requested correlates with a maximization of value to the debtor's estate;

- •        whether the transaction in the negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

- •        whether the principal secured creditors are supportive of the concession;

- •        whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

- •        the existence of available safeguards beneficial to the debtor's estate; and

- whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*In re Hupp Indus.*, 140 B.R. at 194-96; *see also In re JW Res.*, 536 B.R. at 195 (citing with approval Hupp Industries' multi-factor test).

35.     To warrant court approval of such break-up fees and expenses, the Fifth Circuit in *Asarco* required a showing that the requested fees and expenses must be supported by a sound business justification.  *In re Asarco*, 650 F.3d at 602-03 (favoring business judgment standard governing use of assets outside of the ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

36.     Here, the Bid Protections to be paid under the circumstances described herein will satisfy the foregoing tests because they will be: (i) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of Bankruptcy Code Sections 503(b) and 507(a)(2); (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder(s); (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, to the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse Bidder(s); (iv) necessary to induce the Stalking Horse Bidder(s) to continue to pursue the sale Transaction and to continue to be bound by the PSA; and (v) subject to all parties in interests' rights to object and be heard with respect to approval of such Bid Protections.  Indeed, the Bid Protections will enable the Debtors to secure an adequate floor price for the Debtor Assets, thereby ensuring that competing bids would be materially higher or otherwise better than the bids reflected in any Stalking Horse Agreement(s) – a clear benefit to the Debtors' estates.  Moreover, it is unlikely any Stalking Horse Bidder(s) would be willing to agree to act as stalking horse bidders without being granted the Bid Protections.  Without the Bid Protections, the Debtors

might lose the opportunity to obtain the highest and best offer for the Debtor Assets and would certainly lose the downside protection that will be afforded by the existence of Stalking Horse Bidder(s).

37.    Moreover, the Stalking Horse Bidder(s) will have expended, and will continue to expend, considerable time, money and energy in connection with the Transaction and will engage in extended and lengthy good faith negotiations.  In particular, any Stalking Horse Agreement will be the culmination of a marketing effort and part of a process undertaken by the Debtors, and the Debtors' professionals to identify and negotiate a transaction that the Debtors believe to be the highest and best proposal for an acquisition of the Debtor Assets.  For all of the foregoing reasons, the Debtors' believe that granting any Bid Protections requested by the Debtors pursuant to any Stalking Horse Order(s) will maximize the value realized for the benefit of the Debtors' estates, their creditors, and other parties in interest.

38.    Finally, payment of the Bid Protections in the context of a sale to another purchaser that outbids a Stalking Horse Bidder will not diminish the Debtors' estates to the extent they become payable, as the Bidding Procedures require that any competing bid must exceed a Stalking Horse Bid by an amount in excess of the break-up fee and expense reimbursement.  For the foregoing reasons, the Debtors submit that any Bid Protections will reflect a sound business purpose, be fair and appropriate under the circumstances, and should be approved.

**D.    The Assumption and Assignment Procedures Are Appropriate and Should Be Approved**

39.    In connection with the potential assumption and assignment of the Designated Contracts, the Debtors believe it is necessary to establish a process by which (i) the Debtors and the Counterparties can reconcile cure obligations, if any, in accordance with Bankruptcy Code

Section 365, and (ii) such Counterparties can object to the assumption and assignment of executory contracts and unexpired leases and any applicable Cure Costs.

40.     As set forth in the Assumption and Assignment Procedures, the Debtors are also requesting that any Counterparty that fails to object to the proposed assumption and assignment of any Designated Contract be deemed to consent to the assumption and assignment of the applicable Designated Contract pursuant to Bankruptcy Code Section 365 and on the terms set forth in the Sale Order, notwithstanding any anti-alienation provision or other restriction on assignment contained in the applicable contract or lease.  *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not objecting to sale motion, creditor was deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

41.     The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to the Counterparties to the Designated Contracts regarding the potential assumption and assignment of the Designated Contracts, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures.

**E.     The Form and Manner of the Sale Notice Should Be Approved**

42.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c)(1), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

43.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, together with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Auction, the Sale Hearing and the

proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rules 2002, 6004, and 6006.

**F.      Approval of the Sale Is Appropriate and in the Best Interests of the Debtors' Estates**

> **I.      The Sale Should Be Approved as an Exercise of the Debtors' Sound Business Judgment**

44.      Bankruptcy Code Section 363(b) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Although Bankruptcy Code Section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification," as established by the Second Circuit in *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983), which decision has been adopted in this circuit.  *See Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Asarco*, 650 F.3d at 601; *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014); *In re St. Marie Clinic PA*, No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).   Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief

that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

45.     The Debtors have a sound business justification for selling the Debtor Assets pursuant to a competitive-bidding process consistent with the Bidding Procedures.  Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and Board concluded that a sale of the Debtor Assets pursuant to a competitive-bidding process would be the best way to maximize recoveries for creditors in connection with the Debtors' restructuring efforts in these Chapter 11 Cases.

46.     Thus, the Debtors submit that the Successful Bid(s) resulting from the Bidding Procedures will constitute the highest and best offer for the Debtor Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Debtor Assets pursuant to a competitive-bidding process as provided for in the Bidding Procedures is a valid and sound exercise of the Debtors' business judgment.

47.     The Debtors believe that they have proposed a fair process for obtaining the highest and best offer and sale of the Debtor Assets for the benefit of the Debtors' estates and their creditors.  The fairness and reasonableness of the consideration to be received by the Debtors will be demonstrated by a "market check" through the Auction.

### II.     Adequate and Reasonable Notice of the Sale Will Be Provided

48.     As set forth above, the Sale Notice (a) will be served in a manner that provides at least 21-days' notice of the date, time and location of the Auction and the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the sale Transaction, and

(c) otherwise includes all information relevant to parties interested in or affected by the sale Transaction.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served on parties in interest, and, as such, the Debtors are confident that the Sale Notice will be properly vetted by the time of service thereof.

### III.   The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder(s) Will Each Be a "Good Faith Buyer"

49.      Pursuant to Bankruptcy Code Section 363(m), a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *O'Dwyer v. O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); *see also In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

50.      In other words, a party would have to show fraud or collusion between the successful bidder(s) and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

51.     The Debtors submit that the successful bidder(s) arising from the Auction (if any), will be "good faith" purchasers within the meaning of Bankruptcy Code Section 363(m) and the terms of any PSA with any successful bidder(s) will be negotiated at arms-length and in good faith without any collusion or fraud.[10]   Accordingly, the Debtors will be prepared to show at the hearing to approve any such sale that the Successful Bidder(s) are entitled to the full protections of Bankruptcy Code Section 363(m).

## IV.     The Sale Should Be Approved "Free and Clear" Under Bankruptcy Code Section 363(f)

52.     Bankruptcy Code Section 363(f) permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).   As Bankruptcy Code Section 363(f) is stated in the disjunctive, when proceeding pursuant to Section 363(f), it is only necessary to meet one of the five conditions of section 363(f).   *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").   The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

---

[10] Bankruptcy Code Section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

See 11 U.S.C. § 363(m).

### V.     Assumption and Assignment of Contracts Should Be Approved

53.     Bankruptcy Code Section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 524-25 & n.5 (5th 2004); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Gucci*, 193 B.R. 411 (S.D.N.Y. 1996); *In re Pisces Energy, LLC*, No. 09-36591H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009). Under the business judgment test, a court should approve a debtor's proposed assumption of executory contracts if such assumption will benefit the estate. *In re Pisces Energy*, 2009 WL 7227880, at *6; *In re Gunter Hotel Assocs.*, 96 B.R. 696, 698 (Bankr. W.D. Tex. 1988); *In re Food City, Inc.*, 94 B.R. 91, 93-94 (Bankr. W.D. Tex. 1988). Any more exacting scrutiny would slow the administration of a debtor's estates, increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. *See Richmond Leasing*, 762 F.2d 1303 at 1311. Moreover, pursuant to Bankruptcy Code Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

54.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. Bankruptcy Code Section 365(f) specifically provides that contract provisions seeking to prohibit or limit assignment are unenforceable. *See* 11 U.S.C. § 365(f)(1); *see also In re Amidee Capital Group, Inc.*, No. 10-20041, 2010 WL 5141276, at *5 (Bankr. S.D.

Tex. Oct. 7, 2010) (treating such prohibitions or limitations as null and void under section 365(f)); *In re Office Prods. of Am., Inc.*, 140 B.R. 407 (Bankr. W.D. Tex. 1992) (provisions that work as a restriction on assignment of leases should be struck down); *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he code generally favors free assignability as a means to maximize the value of the debtor's estate").

55.     Bankruptcy Code Section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999) (internal quotations omitted); *see also Carlisle Homes. Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re PRK Enters.*, 235 B.R. at 603 ("The financial evidence presented by [assignee] demonstrates the likelihood that it has the financial capacity to perform its future obligations under the lease agreements and that its principal officers are serious in their commitment to rehabilitate this corporation."); *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

56.     The terms of the Bidding Procedures ensure that any Successful Bidder will have financial resources that are more than sufficient to perform under any Designated Contracts it seeks to have assumed and assigned by the Debtors.  Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating the financial wherewithal of the Successful Bidder(s), and their willingness and ability to perform under the Designated Contracts to be assigned to them.  The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge, the ability of the Successful Bidder(s) to provide adequate assurance of future performance with respect to the Designated Contracts to be assumed and assigned.

57.     The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide adequate notice in the form of the Assumption Notice, including the proposed Cure Costs be communicated pursuant thereto.  The Counterparties will then be given an opportunity to object to such Cure Costs.  If a Contract Objection is timely filed, such objection will be heard at the Sale Hearing or at a later hearing, in accordance with the Court's schedule.

58.     Furthermore, to the extent that any monetary defaults exist under any Designated Contracts, the Debtors (or, in certain cases, the Buyer, as applicable under the PSA) will cure any such defaults prior to assuming and assigning the Designated Contracts.  Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these Chapter 11 Cases.  The Debtors submit that this Court therefore should authorize the Debtors to assume and assign the Designated Contracts as may be set forth in the PSA with the Successful Bidder.

**G.      The Court Should Waive the Stay of Bankruptcy Rules 6004 and 6006**

59.      Because time is of the essence in regard to the Transactions, the Debtors request that the Court waive the 14-day stay (i) provided in Bankruptcy Rule 6004(h) in all orders requested to be entered herein and (ii) provided in Bankruptcy Rule 6006(d) in the Sale Order.

## NOTICE

60.      Notice of this Motion will be given to: (a) the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"); (b) the holders of the 30 largest unsecured claims against the Debtors; (c) counsel to Wells Fargo Bank, N.A., as AMH Agent; (d) counsel to U.S. Bank, N.A., as indenture trustee for the 7.875% Senior Notes due 2024 (the "Indenture Trustee"); (e) counsel to the Ad Hoc Noteholder Group; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; (j) counsel to the Non-Debtors and (k) all parties that have requested or that are required to receive notice pursuant to Rule 2002 of the Bankruptcy Rules. The Debtors submit that, under the circumstances, no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested in this Motion and such other and further relief as the Court deems appropriate under the circumstances.

Dated: September 16, 2019        Respectfully,
      Houston, Texas

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
Aaron J. Power (TX 24058058)
M. Shane Johnson (TX 24083263)
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 226-6248
Email:  jhiggins@porterhedges.com
      eenglish@porterhedges.com
      apower@porterhedges.com
      sjohnson@porterhedges.com

– and –

George A. Davis (*pro hac vice* admission pending)
Annemarie Reilly (*pro hac vice* admission pending)
Brett M. Neve (*pro hac vice* admission pending)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email: george.davis@lw.com
      annemarie.reilly@lw.com
      brett.neve@lw.com

– and –

Caroline Reckler (*pro hac vice* admission pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9667
Email: caroline.reckler@lw.com

– and –

Andrew Sorkin (*pro hac vice* admission pending)
**LATHAM & WATKINS LLP**
555 Eleventh Street, Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
Email: andrew.sorkin@lw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ALTA MESA RESOURCES, INC., *et al.*, | § | Case No. 19-31533 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |

**ORDER ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALES OF**
**ALL OR A PORTION OF THE DEBTORS' ASSETS**

[Relates to Docket No. _____ ]

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (i) approving the proposed auction and bidding procedures attached as Annex 1 hereto (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or any portion or combination of their assets (the "Debtor Assets" and, together with the Non-Debtor Assets, the "Assets") through one or more sales of the Debtor Assets and/or a combined sale of both the Debtor Assets and the Non-Debtor Assets (each, a "Transaction"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iii) approving the form and manner of notice of the Auction, the Sale Notice, and the Assumption Notice; (iv) approving the procedures governing Debtors' selection of one or more stalking horse

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (N/A); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); and Oklahoma Energy Acquisitions, LP (3762). The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion and Bidding Procedures, as applicable.

bidders (each, a "Stalking Horse Bidder"), if any, and the provision of Bid Protections (defined below) to such Stalking Horse Bidder, if necessary; (v) scheduling (A) a date for an auction if the Debtors receive one or more timely and acceptable Qualified Bids (the "Auction") and (B) a final hearing (the "Sale Hearing") to approve one or more Transactions, as necessary; and (vi) granting related relief, all as more fully described in the Motion; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at the hearing on the Motion (the "Bidding Procedures Hearing"); and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY FOUND AND DETERMINED THAT**:

A.      The predicates for relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

B.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties-in-interest.

C.      The Debtors' notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the

Bankruptcy Rules, and the Bankruptcy Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Order is necessary or required.

D.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and granting Bid Protections (if any); (ii) establish the Assumption and Assignment Procedures; (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (iv) schedule a date for the (A) Auction and (B) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

F.      The Bidding Procedures, substantially in the form attached as <u>Annex 1</u> hereto, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

G.      The Sale Notice, substantially in the form attached as <u>Annex 2</u> hereto, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Assets, including the sale of Debtor Assets free and clear of all liens, claims and encumbrances, the Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

H.      The Assumption Notice, substantially in the form attached as <u>Annex 3</u> hereto, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Assets and the related Cure Costs, and no other or further notice is required.

I.      The Post-Auction Notice, substantially in the form attached as <u>Annex 4</u> hereto, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bid(s) and Back-Up Bid(s), and no other or further notice is required.

J.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**A.      Process Timeline**

1.      The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Date | Event |
|---|---|
| October 18, 2019 | Deadline for Indications of Interest |
| November 8, 2019 | Assumption Notice Deadline |
| November 26, 2019 | Bid Deadline |
| December 19, 2019 | Deadline to File Proposed Sale Order |
| December 30, 2019 | Sale Objection Deadline and Contract Objection Deadline |
| December 31, 2019 | Deadline for Approval of Stalking Horse Agreement(s) and approval of Bid Protections, if any |

| January 3, 2020 | Auction |
| January 8, 2020 | Reply Deadline |
| January 10, 2020 | Sale Hearing |

2.      The failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Stalking Horse Order or Sale Order and/or consummation of a Transaction(s), including the assumption and assignment of contracts and leases to the Successful Bidder pursuant to the Purchase Agreement, and shall be deemed to constitute any such party's consent to entry of the applicable order and consummation of the Transaction(s) and all other transactions related thereto.

3.      The Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "Modifications") in accordance with the Bidding Procedures.

**B.      Bidding Procedures**

4.      The Bidding Procedures are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision.

5.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the deadline to submit Indications of Interest shall be October 18, 2019.

6.      As further described in the Bidding Procedures, the deadline to submit a Bid shall be November 26, 2019.  Any disputes or objections, if any, to the selection of Qualified Bid(s),

Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing.

7.     The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on January 3, 2020 at the offices of counsel for the Debtors, Latham & Watkins LLP, 811 Main Street, Suite 3700, Houston, TX 77002 or at such other place and time as the Debtors shall notify all Qualified Bidders, the Consultation Parties and all other parties entitled to attend the Auction.

**C.     Stalking Horse Bidder, Related Bidding Protections and Purchase Agreement**

8.     In accordance with the Bidding Procedures, the Debtors may enter into a Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, with any Stalking Horse Bidder that submits a Qualified Bid acceptable to the Debtors to establish a minimum Qualified Bid at the Auction.

9.     The Stalking Horse Agreement may provide for payment of break-up fees and/or expense reimbursements (the "Bid Protections"), subject to entry of the Stalking Horse Order (defined below).

10.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall file with the Court and provide, to all parties on the Rule 2002 List, counsel to the Ad Hoc Noteholder Group, counsel to the AMH Agent, and all parties then known to have expressed an interest in the Debtor Assets or the Assets as part of the marketing process established by the Bidding Procedures, and all parties holding liens on such Debtor Assets, three (3) business days' notice of and an opportunity to object to the designation of such Stalking Horse Bidder and the Bid Protections set forth in the Stalking Horse Agreement and absent objection, the Debtors may submit an order to the Court under certification of counsel

approving the selection of such Stalking Horse Bidder and the Bid Protections (the "Stalking Horse Order"). To the extent necessary, the Debtors' right to seek this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved.

**D.    Notice Procedures**

11.    The form of Sale Notice, substantially in the form attached as Annex 2 hereto, is approved.

12.    Within five (5) business days after the entry of this Order, the Debtors shall serve the Sale Notice and this Order, including the Bidding Procedures, by first-class mail, postage prepaid, upon (i) to the best knowledge of the Debtors' management, all entities that have expressed written interest in a Transaction with respect to all or substantially all of the Debtor Assets or the Assets within the past six (6) months; (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Debtor Assets; (iii) counsel for any Committee; (iv) counsel to the AMH Agent; (v) counsel to the KFM Agent; (vi) counsel to the Ad Hoc Noteholder Group; and (vii) the U.S. Trustee; *provided, however*, that to the extent email addresses are available for any of the foregoing parties, such parties may be served by email.

13.    In addition, within five (5) business days after the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF, upon (i) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (ii) the United States Attorney's office for the Southern District of Texas; (iii) the Internal Revenue Service; (iv) all parties entitled to notice pursuant to Bankruptcy Local Rule 2002-1(b); and (v) all known creditors of the Debtors, including their contract counterparties.

14.     Service of the Sale Notice as described above shall be good and sufficient notice of the Transaction with respect to known interested parties.

15.     The Debtors are directed to publish the Sale Notice, as modified for publication, in the *Wall Street Journal* and *Houston Chronicle* on one occasion on the mailing date or as soon as reasonably practicable thereafter.  In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/altamesa.

16.     Service of the Sale Notice as described above shall be good and sufficient notice of the Transaction with respect to all unknown parties.

17.     The form of Post-Auction Notice, substantially in the form attached as <u>Annex 4</u>, is approved.  As soon as reasonably practicable after the conclusion of the Auction, if any, the Debtors shall file the Post-Auction Notice identifying any Successful Bidder(s) on the docket and serve such notice on any non-Debtor party to an executory contract or unexpired lease that is proposed to be assumed and assigned to the Successful Bidder(s) by email, overnight mail or facsimile.

**E.     Assumption and Assignment Procedures**

18.     The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in the Order, are approved.

19.     The Assumption Notice, substantially in the form attached as <u>Annex 3</u>, is approved.

20.     On or before November 8, 2019 (the "<u>Assumption Notice Deadline</u>"), the Debtors shall file with the Court, and post on the case website at https://cases.primeclerk.com/altamesa, the Assumption Notice and Designated Contracts List.  If no Cure Cost is listed on the Designated

Contracts List for a particular Designated Contract, the Debtors' asserted Cure Cost for such Designated Contract shall be deemed to be $0.00.  On or before the Assumption Notice Deadline, the Debtors shall serve, via first-class mail, the Assumption Notice that contains (i) the Designated Contracts List, (ii) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Designated Contract(s) and rights thereunder, (iii) Cure Costs, if any, and (iv) the procedures for objecting thereto, on all counterparties to the Designated Contracts and all parties on the Rule 2002 Notice List.  Service of such Assumption Notice as set forth herein shall be deemed good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts, the applicable Cure Costs related thereto, and the procedures for objecting thereto, and no other or further notice is necessary.

21.     Any objection by a Counterparty to a Designated Contract (a "Contract Objection") must (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules and Bankruptcy Local Rules; (iii) be filed with the Clerk of Court on or before 5:00 p.m. (prevailing Central Time) on December 30, 2019 (the "Contract Objection Deadline"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Recipients (as defined below); and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under Bankruptcy Code Sections 365(b)(1)(A) and (B) for the applicable Designated Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

22.     Any time after the Assumption Notice Deadline and before the date one (1) business day prior to the Sale Hearing, the Debtors reserve the right, and are authorized but not directed, to

(i) add previously omitted Designated Contracts as contracts to be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for a Transaction, (ii) remove a Designated Contract from the Designated Contract List that a Successful Bidder proposes be assumed and assigned to it in connection with a Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

23.     If, after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Designated Contracts in connection with such Transaction or the Debtors seek to modify the previously stated Cure Cost associated with any Designated Contract, as soon as practicable thereafter and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery on the applicable counterparties, a revised Assumption Notice (which shall deemed to amend and restate the prior Assumption Notice with respect to such Designated Contracts and/or Cure Costs), and such counterparties shall file any Contract Objections not later than (a) the Contract Objection Deadline in the event that such revised Assumption Notice was filed and served at least ten (10) days prior to the Contract Objection Deadline, (b) two (2) days prior to the Sale Hearing in the event that such revised Assumption Notice was filed and served at least seven (7) days prior to the commencement of the Sale Hearing, and (c) two (2) hours prior to the commencement of the Sale Hearing in the event that such revised Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing.

24.     As soon as practicable after the Auction and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery, on the counterparties a notice substantially in the form attached as Annex 4 hereto (the "Post-Auction Notice") identifying the Successful Bidder(s), and the counterparties

shall file any Contract Objections solely on the basis of adequate assurance of future performance not later than two (2) hours prior to the commencement of the Sale Hearing.

25.    At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder(s) of only those Designated Contracts that have been selected by such Successful Bidder(s) to be assumed and assigned (collectively, the "Selected Designated Contracts").  The inclusion of a Designated Contract on an Assumption Notice will not (i) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take assignment of such Designated Contract or (ii) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.  The Debtors and their estates reserve any and all rights with respect to any Designated Contracts that are not ultimately designated as Selected Designated Contracts.

26.    If no Contract Objection is timely received with respect to a Selected Designated Contract: (i) the Counterparty to such Selected Designated Contract shall be deemed to have consented to the assumption by the Debtors and assignment to Successful Bidder of the Selected Designated Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Designated Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code Section 365(b)(1)(A) and (B) upon payment of the Cure Cost set forth in the Assumption Notice for such Selected Designated Contract; and (iii) the Cure Cost set forth in the Assumption Notice for such Selected Designated Contract shall be controlling, notwithstanding anything to the contrary in such Selected Designated Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost

and shall be forever barred from asserting any other Claims related to such Selected Designated Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and the Sale Order.

27.     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code Sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Designated Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Counterparty asserts is required to be paid under Bankruptcy Code Section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

**F.     Sale Hearing**

28.     A Sale Hearing to (i) approve a sale of a portion or substantially all of the Assets to the Successful Bidder(s), (ii) approve designation of a Backup Bid and Backup Bidder in accordance with the Bidding Procedures, and (iii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on January 10, 2020 at [_____] a.m./p.m. (prevailing Central Time)], and may be adjourned or rescheduled without further notice. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and Backup Bid(s).  Unless the Bankruptcy Court orders otherwise, any Sale Hearing shall be an

evidentiary hearing on matters relating to the Transaction(s) and there will be no further bidding at such hearing.  In the event that the Successful Bidder(s) cannot or refuses to consummate the Transaction(s) because of the breach or failure on the part of such Successful Bidder, the Debtors, may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

29.     Any and all objections, if any, to any Transaction (a "Sale Objection") must be filed no later than December 30, 2019 (the "Sale Objection Deadline").  Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.  For avoidance of doubt, any objections to a Successful Bidder's proposed form of adequate assurance of future performance will be resolved at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable.  All replies to such objections must be filed by January 8, 2020 (the "Reply Deadline").

**G.     Additional Provisions**

30.     Except as otherwise provided herein, any objection provided hereunder must be (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and Bankruptcy Local Rules, (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor, and (iv) be filed with this Court and served so actually received no later than the applicable objection deadline by the following parties: (A) the Debtors, Alta Mesa Resources, Inc., 15021 Katy Freeway, Suite 400, Houston, TX 77094, Attn: Robert Albergotti and Kim Warnica; (B) counsel to the Debtors, (1) Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Attn: George A. Davis, Annemarie Reilly, and Brett M. Neve, and  Latham &

Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn: Caroline Reckler; (2) Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, Attn: John F. Higgins; (C) counsel to the AMH Agent, Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas 77002, Attn: William A. Wood III; (D) counsel to the KFM Agent, Vinson & Elkins LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201, Attn: Michael E. Bielby, Jr.; (E) counsel to the Ad Hoc Noteholder Group, Davis Polk & Wardell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Damian S. Schaible; (F) counsel to any statutory committee appointed in these cases; (G) counsel to Kingfisher, Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, Attn: Susheel Kirpalani; and (H) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Stephen Statham (the "Objection Recipients").

31.     The Bidding Procedures and any Bid Protections approved in accordance with the terms of this Order shall apply solely to the assets of the Debtors and their estates and shall not apply to any assets of any non-Debtor entity; *provided,* that nothing contained herein or in the Bidding Procedures shall be deemed to prohibit non-Debtor entities from selling their assets or separately agreeing to provide any bid protections to any Stalking Horse Bidder in connection with any Transaction.  If any assets of a non-Debtor entity are sold in conjunction with the Debtors' assets, this Court may approve any corporate action taken by the Debtors in connection with the sale of such non-Debtor entity's assets.

32.     Nothing in this Order or the Bidding Procedures shall preclude a Bidder from submitting a Bid in the form of a plan of a reorganization and it being understood that such Bid may be determined by the Debtors to be a Qualified Bid, Stalking Horse Bid, Successful Bid, or Backup Bid.

33.     Any substantial contribution claims by any Bidder are deemed waived, to the extent based on such Bidder's submission of a Bid in accordance with the Bidding Procedures.

34.     The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Order.

35.     This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

36.     This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

37.     To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

38.     To the extent of the deadlines set forth in this Order do not comply with the Bankruptcy Local Rules, such Bankruptcy Local Rules are waived and the terms of this Order shall govern.

39.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

40.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

41.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

42.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

43.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Agreement, and the implementation of this Order.

Dated: _____, 2019
       Houston, Texas

                                                 _____
                                               HONORABLE MARVIN ISGUR
                                               UNITED STATES BANKRUPTCY JUDGE

**<u>Annex 1</u>**

Bidding Procedures

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ALTA MESA RESOURCES, INC., *et al.*, | § | Case No. 19-35133 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

## BIDDING PROCEDURES

These Bidding Procedures have been approved by the United States Bankruptcy Court for the Southern District of Texas (the "Court") in connection with the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company") chapter 11 cases pursuant to an order dated as of [_____], 2019 [Docket No. ____] (the "Bidding Procedures Order").[2]

These Bidding Procedures set forth the process by which the Debtors and their non-Debtor affiliates will solicit and select the highest and otherwise best offer for the sale of substantially all or any portion or combination of their assets (the "Debtor Assets") and the assets of the Debtors' non-Debtor affiliates, including the gathering assets owned by Kingfisher Midstream, LLC ("Kingfisher") and/or its subsidiaries (the "Non-Debtor Assets" and, collectively with the Debtor Assets, the "Assets") either through one sale to a Successful Bidder (defined below) or multiple sales to multiple Successful Bidders (each, a "Transaction").

## KEY DATES

These Bidding Procedures provide interested parties with the opportunity to complete diligence, to submit competing bids for all or any portion or combination of the Assets, and to participate in an auction to be conducted by the Debtors and their non-Debtor affiliates (the "Auction").

---

[1]  The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (N/A); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); and Oklahoma Energy Acquisitions, LP (3762). The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Motion for Entry of an Order Approving (I)(A) Bidding Procedures for the Sale of Substantially All or Any Portion of the Debtors' Assets, (B) Procedures for the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) the Form and Manner of Notice of the Sale Hearing and Assumption Procedures, (D) Procedures for the Selection of One or More Stalking Horse Bidder(s), and (E) Dates for an Auction and Sale Hearing, and (II)(A) the Sale of Substantially All or Any Portion of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Related Relief* [Docket. No. ____].

The key dates for the sale process are as follows.  Such dates may be extended or otherwise modified by the Debtors with the consent of the AMH Agent:

| Date | Event |
|---|---|
| October 25, 2019 | Deadline for Indications of Interest |
| November 8, 2019 | Assumption Notice Deadline |
| November 26, 2019 | Bid Deadline |
| December 19, 2019 | Deadline to File Proposed Sale Order |
| December 30, 2019 | Sale Objection Deadline and Contract Objection Deadline |
| December 31, 2019 | Deadline for Debtors to Identify Stalking Horse Bidder (if any) and obtain Court approval of Bid Protections (if any) |
| January 3, 2020 | Auction |
| January 8, 2020 | Reply Deadline |
| January 10, 2020 | Sale Hearing |

## PURCHASE AGREEMENT

The Debtors have drafted a form of Asset Purchase Agreement (together with all ancillary documents and agreements, the "PSA") for parties interested in acquiring the Debtor Assets and/or the Non-Debtor Assets.  The Debtors intend to provide copies of the form of PSA to all parties who express interest in submitting a Bid and will also make such form of PSA available in the electronic dataroom established by the Debtors in connection with their sale process.[3]  Pursuant to the form of PSA, the Successful Bidder shall acquire the Debtor Assets free and clear of any and all interests to the maximum extent permitted by Section 363 of title 11 of the United States Code (the "Bankruptcy Code") subject to certain other conditions.

## ACCESS TO DEBTORS' DILIGENCE MATERIALS

To receive access to due diligence materials and to participate in the bidding process, an interested party must submit to the Debtors and Kingfisher the following documents (collectively, the "Preliminary Bid Documents"):  (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors, (ii) evidence demonstrating the party's financial ability to consummate a Transaction, (iii) a statement that such party has a bona fide interest in purchasing all or some of the Assets or providing a Bid pursuant to a chapter 11 plan, and (iv) a written, non-

---

[3]   For the avoidance of doubt, parties may purchase substantially all or any portion or combination of the Assets, and the Debtors intend to provide parties interested in acquiring substantially all of the Assets or any portion or combination thereof with a form of PSA.

binding indication as to whether such party would also be interested in purchasing Non-Debtor Assets.

The Preliminary Bid Documents must be delivered to each of (i) Alta Mesa Holdings, LP, 15021 Katy Freeway, Suite 400, Houston, Texas 77094, Attn: Robert Albergotti, Chief Restructuring Officer and Kim Warnica, Vice President and General Counsel; (ii) Latham & Watkins, LLP, 885 Third Avenue, New York, NY 10022, Attn: George Davis, Annemarie Reilly, and Brett Neve; (iii) Latham & Watkins, LLP, Suite 2800, Chicago, IL 60611, Attn: Caroline Reckler; (iv) Perella Weinberg Partners, 767 Fifth Avenue, New York, NY 10153, Attn: John M. Cesarz; (v) Tudor, Pickering, Holt & Co., Heritage Plaza, 1111 Bagby, Suite 4900, Houston, Texas 77002, Attn: Travis Nichols; and (vi) counsel to Kingfisher, Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, Attn: Susheel Kirpalani.

A party who, in the Debtors' reasonable discretion, satisfies the requirements set forth in the first paragraph of this Section for receiving access to diligence materials shall be a "Diligence Party." As promptly as practicable after the Debtors determine that a party is a Diligence Party, the Debtors will deliver to the Diligence Party access to the Debtors' confidential electronic data room. The Debtors will afford any Diligence Party the time and opportunity to conduct reasonable due diligence before the Bid Deadline (as defined below). Notwithstanding the foregoing, the Debtors reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Diligence Party who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Diligence Party.

All due diligence requests must be directed to (i) John M. Cesarz of Perella Weinberg Partners at jcesarz@pwpartners.com and (ii) Warren Williamson and Travis Nichols of Tudor, Pickering, Holt & Co. at wwilliamson@tphco.com and tnichols@tphco.com, respectively.

Each Diligence Party and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Diligence Party to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties (defined below), that such bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that a bid made by such Qualified Bidder is not a Qualified Bid. The Debtors reserve the right, in their discretion to permit a Diligence Party or Qualified Bidder to remedy any such failure to comply.

## INDICATIONS OF INTEREST

The Diligence Parties shall submit written indications of interest specifying, among other things, (i) the Assets (including, if applicable, Non-Debtor Assets) proposed to be acquired, including whether such party intends to bid for (A) the Assets of Debtor Alta Mesa Resources, Inc., (B) the Assets of Debtor Alta Mesa Holdings, LP and its subsidiaries, and/or (C) the Assets of non-Debtor Kingfisher Midstream, LLC and its subsidiaries, or, in each case, any portion or

combination thereof; (ii) the amount and type of consideration to be offered for any Debtor Assets to be purchased and the amount and type of consideration to be offered for any Non-Debtor Assets to be purchased, (iii) any material conditions or assumptions upon which a bid by such party will be based, including with respect to treatment of the Gathering Agreement (defined below), and (iv) any other material terms to be included in a bid by such party (an "<u>Indication of Interest</u>") on or before October 18, 2019.  Notwithstanding anything to the contrary herein, an Indication of Interest may indicate the submitting party's interest in bidding in the form of a plan of reorganization.

A Diligence Party that fails to timely submit an Indication of Interest, may not, in the Debtors' discretion, be provided further diligence access or be permitted to participate further in the auction process.  The Debtors also reserve the right to exclude any Diligence Party (prior to its submission of a Qualified Bid) from continuing in the auction process if the Debtors determine, in consultation with the Bid Consultation Parties (defined below), that the consideration proposed to be paid by such Diligence Party is insufficient.

## <u>QUALIFICATION PROCESS</u>

To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>") must satisfy each of the conditions set forth below, as determined by the Debtors in consultation with the Consultation Parties.  A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

(a)     <u>Good Faith Deposit</u>.   Each Bid for all or a portion of the Assets must be accompanied by a deposit (a "<u>Good Faith Deposit</u>") submitted by wire transfer of immediately available funds to an account identified by the Debtors.  Each Good Faith Deposit must equal in the case of a Bid for all or a portion of the Assets, the amount of ten percent (10%) of the purchase price contained in the Modified PSA (defined below), or such other amount as the Debtors determine, in consultation with the Consultation Parties.

(b)     <u>Bids for Portions of the Assets</u>.  A Bid may offer to purchase all or substantially all of the Assets, any portion of the Assets, any combination of the Assets and any combination of Debtor Assets and Non-Debtor Assets. The Debtors may, in consultation with the Consultation Parties, waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Assets.

(c)     <u>Higher or Better Terms</u>.   To the extent a Stalking Horse Bidder (defined below) is selected, each subsequent Bid for any Assets subject to the Stalking Horse Agreement (defined below) (alone or combined with Bids for other Assets subject to the Stalking Horse Agreement) must be on terms that, in the Debtors' business judgment (and, if the Bid includes Non-Debtor Assets, that in Kingfisher's business judgment), in consultation with the Bid Consultation Parties, are higher and better than the terms of the Stalking Horse Agreement, and the aggregate value of such subsequent Bid, as determined by the Debtors (and, if the Bid includes Non-Debtor Assets, Kingfisher) in consultation with the Bid Consultation Parties, must exceed

the Stalking Horse Bid by $2,500,000 allocated between the Debtor Assets and Non-Debtor Assets in the same proportion as the Bid of the Stalking Horse Bidder.

(d)    <u>Executed Agreement</u>.  Each Bid contemplating a Transaction must be based on the PSA or Stalking Horse Agreement, if applicable, and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate a Transaction (the "<u>Modified PSA</u>").  Each such Bid shall also include a copy of the Modified PSA to show all changes requested by the Bidder (including those related to purchase price).

(e)    <u>Designation of Contracts and Leases</u>.  A Bid must (i) identify any and all executory contracts and unexpired leases of the Debtors for which assumption and assignment or rejection is required and (ii) provide for the payment of all cure amounts payable with respect to such assumed or assigned contracts and leases under the Bankruptcy Code.  In addition, with respect to the Gathering Agreements (as defined below), each Bid must indicate (x) the total consideration that the Bidder would be willing to offer if the Gathering Agreements were assumed and assigned to the Purchaser and/or determined by the Bankruptcy Court to run with the Debtor Assets to be purchased pursuant to such Bid, and (y) the total consideration that the Bidder would be willing to offer if the Gathering Agreements were rejected and/or in the event that the Debtor Assets were sold free and clear of such Gathering Agreements.  "Gathering Agreements" means, collectively: (A) that certain Crude Oil Gathering Agreement by and between Oklahoma Energy Acquisitions, LP ("<u>OEA</u>") and Kingfisher Midstream LLC ("<u>KFM</u>"), dated as of August 31, 2015, as the same may have been amended, modified and/or supplemented; (B) that certain Gas Gathering and Processing Agreement, by and between OEA and KFM, dated as of August 31, 2015, as the same may have been amended, modified and/or supplemented; and (C) that certain Water Gathering and Disposal Agreement, by and between OEA and Oklahoma Produced Water Solutions, LLC, dated as of October 1, 2018, as the same may have been amended, modified and/or supplemented.

(f)    <u>Corporate Authority</u>.  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to submit the Bid and consummate the proposed Transaction; *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the submission of the Bid and consummation of the Transaction by equity holder(s) of such Bidder.

(g)    <u>Disclosure of Identity of Bidder</u>.  A Bid must fully disclose the identity of each entity and its affiliates that will be bidding for or purchasing the Assets (including Non-Debtor Assets, if applicable) or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity specifically formed for the purpose of effectuating the Transaction), and the complete terms of any such participation, including any binding agreements,

arrangements, or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(h)   <u>Proof of Financial Ability to Perform</u>.  A Bid must include written evidence that the Debtors reasonably conclude, in consultation with the Bid Consultation Parties, demonstrates that the Bidder has the necessary financial ability to (i) close the Transaction and (ii) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Transaction.  Such information must include, *inter alia*, the following:

1.   contact names and telephone numbers for verification of financing sources;

2.   evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized financial institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid (including, if applicable, the Bidder's payment of cure amounts) or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in such amount, in each case, as are needed to close the Transaction;

3.   the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

4.   a description of the Bidder's pro forma capital structure; and

5.   any such other form of financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors demonstrating that such Bidder has the ability to close the Transaction.

(i)   <u>Regulatory and Third-Party Approvals</u>.  A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Transaction, if any, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified PSA, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(j)   <u>Conditions to Closing</u>.  Each Bid must identify with particularity each condition to closing.

(k)   <u>Contingencies</u>.  Each Bid may not be conditioned on (i) obtaining financing, (ii) any internal approval, (iii) the outcome or review of due diligence (other than customary diligence relating to environmental and title matters), or (iv) regulatory contingences, except as provided under "Regulatory and Third-Party Approvals".

(l)   <u>Irrevocable</u>.  Each Bid must expressly provide that (i) the Bidder is prepared to consummate the transaction set forth in the Modified PSA promptly following Bankruptcy Court approval of the proposed Transaction and satisfaction of the

closing conditions (if any) set forth in the Modified PSA, and (ii) the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction, *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain open and irrevocable as provided under "Closing the Auction; Successful Bidder" and "Backup Bidder" below.

(m)  <u>Purchase Price Allocation</u>.  Each Bid must: (i) clearly state which Debtor Assets (and Non-Debtor Assets, if any) the Bidder is agreeing to purchase and which liabilities the Bidder is agreeing to assume; (ii) clearly set forth the purchase price to be paid, including and identifying separately any cash and non-cash components; and (iii) specify the portion of the aggregate purchase price thereunder that is being allocated to each of the Debtor Assets and Non-Debtor Assets (if any), including, if applicable, any equity interests in non-Debtor entities.

(n)  <u>Jurisdiction</u>.  Each Bid must state that the Bidder is consents to the jurisdiction of the Court.

(o)  <u>Independent Review</u>.  Each Bid shall include an acknowledgment and representation of the Bidder that it has had an opportunity to conduct any and all due diligence regarding the Debtor Assets and Non-Debtor Assets (if applicable) prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Debtor Assets and Non-Debtor Assets (if applicable) in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures.

(p)  <u>Bid Deadline</u>.  Each Bid must be received by each of the following parties, in writing, on or before November 26, 2019 (the "<u>Bid Deadline</u>"): (i) the Alta Mesa Resources, Inc., 15021 Katy Freeway, Suite 400, Houston, Texas 77094, Attn: Robert Albergotti and Kim Warnica; (ii) Latham & Watkins, LLP, 885 Third Avenue, New York, NY 10022, Attn:  George Davis, Annemarie Reilly, and Brett Neve; (iii) Latham & Watkins, LLP, Suite 2800, Chicago, IL 60611, Attn: Caroline Reckler; (iv) Perella Weinberg Partners, 767 Fifth Avenue, New York, NY 10153, Attn: John M. Cesarz; (v) Tudor, Pickering, Holt & Co., Heritage Plaza, 1111 Bagby, Suite 4900, Houston, Texas 77002, Attn: Travis Nichols; (vi) solely to the extent such Bid relates to the Non-Debtor Assets, counsel to Kingfisher, Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, Attn: Susheel Kirpalani; (vii) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Stephen Statham; and (viii) counsel to any Committee appointed in these cases.

A Bid received from a Bidder on or before the Bid Deadline that meets the requirements set forth above for the applicable Assets shall constitute a "<u>Qualified Bid</u>" for such Assets, and such Bidder shall constitute a "<u>Qualified Bidder</u>" for such Assets.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors.

Nothing herein shall preclude a Bidder from submitting a Bid in form of a plan of reorganization it being understood that such a Bid shall not be required to meet each of the requirements above to constitute a Qualified Bid; *provided* that (i) in order for a Bid in the form of a plan of reorganization to constitute a Qualified Bid, the Debtors must determine in good faith that such Bid is capable of satisfying the requirements of section 1129 of the Bankruptcy Code and being consummated,[4] and (ii) the Debtors may take the failure of any such Bid to satisfy the requirements set forth above may be taken into account in evaluating such Bid.  Any Bid in the form of a plan of reorganization satisfying the requirements of this paragraph may be determined by the Debtors to be a Qualified Bid, Stalking Horse Bid, Successful Bid, or Backup Bid (each as defined below).

## CREDIT BIDDING

Notwithstanding anything else contained in the Bidding Procedures, the lenders (the "<u>RBL Lenders</u>") under the secured revolving credit facility with Wells Fargo Bank, N.A. as AMH Agent shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of their allowed secured claims at the Auction pursuant to Bankruptcy Code section 363(k) or other applicable law, in accordance with the applicable provisions of the documents governing such debt obligations; *provided*, that such Bid otherwise complies with the Bidding Procedures and the Bankruptcy Code and such credit bidding rights shall be subject to entry of a final cash collateral order and any challenge rights preserved therein.  To be a Qualified Bid, a credit bid must, on or prior to the Bid Deadline, (i) include a cash amount as part of the purchase price for all Debtor Assets and Non-Debtor Assets upon which the RBL Lenders do not have a first priority security interest, (ii) provide for payment in cash at closing and/or the assumption of the administrative and priority expense claims of the Debtors that own any of the Assets purchased, and (iii) include a cash amount as part of the purchase price sufficient to pay the any break-up fee, reimbursable expenses, or other obligations owed to a Stalking Horse Bidder (if any).

## STALKING HORSE BIDS

Subject to the provisions set forth in the Bidding Procedures, the Debtors (and, if the Bid includes Non-Debtor Assets, Kingfisher) may enter into a stalking horse agreement (a "<u>Stalking Horse Agreement</u>"), subject to higher or otherwise better offers at the Auction, with any Bidder to establish a minimum Qualified Bid at the Auction (such Qualified Bidder, a "<u>Stalking Horse Bidder</u>").  Subject to approval by the Court in accordance with the below, Stalking Horse Agreement may provide for payment of break-up fees and/or expense reimbursements (the "<u>Bid</u>

---

[4]   In advance of the hearing on these Bid Procedures, the Debtors may specify additional requirements that must be satisfied in order for a Bid in the form of a plan of reorganization to be deemed a Qualified Bid.

Protections"). For the avoidance of doubt, a Stalking Horse Bid may be in the form of a plan of reorganization.

In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall file with the Court and provide, to all parties on the Rule 2002 List, counsel to the Ad Hoc Noteholder Group, counsel to the AMH Agent, and all parties then known to have expressed an interest in the Debtor Assets as part of the marketing process established by these Bidding Procedures, and all parties holding liens on such Debtor Assets, three (3) business days' notice of and an opportunity to object to the designation of such Stalking Horse Bidder and the Bid Protections set forth in the Stalking Horse Agreement, and absent objection, the Debtors may submit an order to the Court under certification of counsel approving the selection of such Stalking Horse Bidder. To the extent necessary, the Debtors' right to seek the Bankruptcy Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved. The Stalking Horse Bidder and Stalking Horse Agreement, if any, shall be approved by the Court no later than December 31, 2019.

Any Stalking Horse Agreement executed by the Debtors and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtors will be deemed to be a Qualified Bidder.

Other than as provided by order of the Bankruptcy Court, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for any Stalking Horse Bidder. Any substantial contribution claims by any Bidder are deemed waived, to the extent based on such Bidder's submission of a Bid hereunder.

## HIGHEST OR OTHERWISE BEST BID

Whenever these Bidding Procedures refer to the highest or otherwise best Qualified Bid, such determination shall take into account any factors the Debtors (and, if Non-Debtor Assets are included in the Bid, Kingfisher), in consultation with the Bid Consultation Parties (solely in the case of the Debtors), reasonably deem relevant to value of the Qualified Bid to the estates and may include, but are not limited to, the following: (i) the amount and nature of the consideration, including any Assumed Liabilities; (ii) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such Qualified Bid (including any litigation attendant to rejection of the Gathering Agreements); (iii) the number, type and nature of any changes to the PSA requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; and (vi) the net benefit to the Debtors' estates (collectively, the "Bid Assessment Criteria"). Notwithstanding anything to the contrary herein, with respect to any Bid for any assets of the AMH Debtors, the Bid Assessment Criteria and any other consideration of such Bid shall be evaluated solely with respect to the value thereof, and the effect of such Bid on, the estates of the AMH Debtors.

## AUCTION

If two or more Qualified Bids for the same Debtor Assets are received by the Bid Deadline, the Debtors will conduct the Auction to determine the highest or otherwise best Qualified Bid. If less than two Qualified Bids are received by the Bid Deadline with respect to any portion of the Debtor Assets, the Debtors shall not conduct the Auction with respect to such Assets. If only one Qualified Bid is received with respect to all or a portion of the Assets, the Debtors (and, if Non-Debtor Assets are included in the Bid, Kingfisher) may, after consultation with the Consultation Parties, designate such Qualified Bid as a Successful Bid. Only Qualified Bidders may participate in the Auction.

## PROCEDURES FOR AUCTION

The Auction shall take place on January 3, 2020 at the offices of counsel for the Debtors, Latham & Watkins LLP, 811 Main Street, Suite 3700, Houston, TX 77002 or at such other place and time as the Debtors shall notify all Qualified Bidders, the Consultation Parties and all other parties entitled to attend the Auction. The Auction shall be conducted according to the following procedures:

Only the Debtors, the Consultation Parties, the Stalking Horse Bidder(s) (if any), any other Qualified Bidders, Kingfisher (if any Qualified Bid includes Non-Debtor Assets), and/or other party as the Debtors may determine to include in their discretion, in each case along with their representatives and advisors, shall be entitled to attend the Auction and only Qualified Bidders will be entitled to make any Overbids (defined below) at the Auction. The Qualified Bidders and any other authorized attendees shall appear in person or through duly-authorized representatives at the Auction.

### *The Debtors Shall Conduct the Auction*

The Debtors and their advisors shall direct and preside over the Auction, which shall be transcribed. Other than as expressly set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest or otherwise best offer for any of the Assets or otherwise maximize the value of the Assets. The Debtors shall use their best efforts to, at least twenty-four (24) hours prior to commencement of the Auction, provide the Consultation Parties and each Qualified Bidder participating in the Auction and any other parties entitled to attend the Auction with a copy of the Modified PSA associated with the highest or otherwise best Qualified Bid with respect to the Assets for which such Qualified Bidder is bidding, as determined by the Debtors and, if Non-Debtor Assets are included in the Bid, Kingfisher (such highest or otherwise best Qualified Bid, the "Starting Bid"). At the start of the Auction, the Debtors shall describe the material terms of the Starting Bid and each Qualified Bidder participating in the Auction must confirm that (i) it has not engaged in any collusion with respect to the bidding or sale of any of the Assets described herein, (ii) it has reviewed, understands, and accepts the Bidding Procedures, (iii) it has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below), and (iv) its Qualified Bid is a good-faith bona fide offer that it intends to consummate if selected as the Successful Bidder.

### *Terms of Overbid*

An "<u>Overbid</u>" is any bid made at the Auction, in accordance with the requirements set forth herein, subsequent to the Debtors' announcement of the respective Starting Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(a)     <u>Minimum Overbid Increments</u>.  The initial Overbid, if any, shall provide for total consideration to the Debtors and, if the Overbid includes Non-Debtor Assets, the non-Debtor owners of such assets, with an aggregate value that exceeds the value of the consideration under the Starting Bid by an incremental amount that is not less than the sum of (i) $2,500,000 (the "<u>Minimum Overbid Increment</u>") allocated between the Debtor Assets and Non-Debtor Assets in the same proportion as the Starting Bid, plus (ii) in the event that the Debtors have entered into a Stalking Horse Agreement with respect to the Assets to which the Overbid relates, the aggregate amount of Bid Protections (including, for the avoidance of doubt, any break-up fees and/or expense reimbursements) under such Stalking Horse Agreement, and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid Increment allocated between the Debtor Assets and Non-Debtor Assets in the same proportion as the Starting Bid.  The Debtors reserve the right, in consultation with the Bid Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction.  Additional consideration in excess of the amount set forth in the respective Starting Bid may include (a) cash and/or non-cash consideration, *provided, however,* that the value for such non-cash consideration shall be determined by the Debtors (and, if the Bid includes Non-Debtor Assets, Kingfisher) in their reasonable business judgment in consultation with the Bid Consultation Parties, and (b) in the case of a Bid by the RBL Lenders, a credit bid up to the full amount of such secured creditors' allowed secured claims, subject to the Bankruptcy Code and such credit bidding rights shall be subject to entry of a final cash collateral order and any challenge rights preserved therein.

(b)     <u>Remaining Terms Are the Same as for Qualified Bids</u>.  Except as modified in the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, *provided, however*, that the Bid Deadline shall not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the PSA, Modified PSA, as the case may be, in connection therewith.  For the avoidance of doubt, any Overbid shall be irrevocable and shall remain open and binding on the Bidder in accordance with these Bidding Procedures and the conditions for a Qualified Bidder.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors), as the Debtors, in their reasonable business judgment may request, demonstrating such Bidder's ability to consummate the Transaction proposed by such Overbid.

***Announcement and Consideration of Overbids***

    (a)   <u>Announcement of Overbids</u>.  A Bidder submitting an Overbid at the Auction shall announce at the Auction the material terms of such Overbid, including the total amount and type of consideration offered in such Overbid.

    (b)   <u>Consideration of Overbids</u>.  The Debtors reserve the right, in their reasonable business judgment to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Transaction at the prevailing Overbid amount.

***Additional Procedures***

The Debtors in the exercise of their fiduciary duties for the purpose of maximizing value for their estates from the sale process, may modify the Bidding Procedures and implement additional procedural rules for conducting the Auction.  Specifically, among other things, the Debtors may determine, in consultation with the Bid Consultation Parties, to select more than one Successful Bid and more than one Successful Bidder (and/or more than one Backup Bid and more than one Backup Bidder, in which event such  Backup Bids may provide for groupings of Assets that are different from the groupings of Assets reflected in the Successful Bid(s)) for separate portions of the Assets.

***Consent to Jurisdiction as Condition is Bidding***

All Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, their chapter 11 cases, the Bidding Procedures, the PSA, the Auction, or the construction and enforcement of documents relating to any Transaction and waived any right to a jury trial in connection with any disputes relating to the Debtors, their chapter 11 cases, the Bidding Procedures, the PSA, the Auction, or the construction and enforcement of documents relating to any Transaction.

***Sale Is As Is/Where Is***

Any of the Debtor Assets sold pursuant to the Bidding Procedures shall be sold free and clear of all liens, claims and encumbrances as permitted by Bankruptcy Code section 363(f) other than any Assumed Liabilities and conveyed at Closing in their then-present condition, "**AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED**", except to the extent set forth in the definitive agreement for the Successful Bid, if applicable.

For the avoidance of doubt, the "free and clear" provisions of section 363(f) of the Bankruptcy Code shall not apply to any sale of Non-Debtor Assets and such sale shall not be subject to Bankruptcy Court approval; *provided*, that the foregoing shall not preclude the sale of any Debtor Assets free and clear of any interests of the Non-Debtors in such assets.

### *Closing the Auction; Successful Bidder*

The Auction shall continue until there is only one Qualified Bid for the Assets that the Debtors (and, if Non-Debtor Assets are included in the Bid, Kingfisher) determine in their reasonable business judgment, in consultation with the Bid Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction. Thereafter, the Debtors (and, if Non-Debtor Assets are included in the Bid, Kingfisher) shall select such Qualified Bid, in consultation with the Bid Consultation Parties, as the overall highest or otherwise best Qualified Bid (such Bid, the "Successful Bid", and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors (and, if Non-Debtor Assets are included in the Bid, Kingfisher) shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder(s) submits fully executed sale and/or other transaction documents memorializing the terms of the Successful Bid(s).

If an Auction is held, the Debtors (and, if Non-Debtor Assets are included in the Bid, Kingfisher) shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction and (ii) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Court of the Successful Bid and the entry of an order approving such Successful Bid.

Promptly following the Debtors' (and, if Non-Debtor Assets are included in the Bid, Kingfisher's) selection of the Successful Bid(s) and the conclusion of the Auction, the Debtors shall announce the Successful Bid(s) and Successful Bidder(s) and shall file with the Bankruptcy Court notice of the Successful Bid(s) and Successful Bidder(s).

Neither the Debtors nor the Court shall consider any Bids submitted after the conclusion of the Auction. The Successful Bidder(s) shall be required to keep the Successful Bid(s) open and irrevocable until the closing of the transactions contemplated thereby.

### *Backup Bidder*

Notwithstanding anything in the Bidding Procedures to the contrary, the Qualified Bid that the Debtors (and, if Non-Debtor Assets are included in the Bid, Kingfisher) determine in their reasonable business judgment, in consultation with the Bid Consultation Parties, is the next highest or otherwise best Qualified Bid at the Auction after the Successful Bid, will be designated the "Backup Bid" and the Bidder submitting such Backup Bid, the "Backup Bidder." The Backup Bidder shall be required to keep the Backup Bid open and irrevocable until the earlier of 11:59 p.m. (prevailing Central Time) on the date that is 30 days after the date of entry of the Sale Order (the "Outside Backup Date"), or the closing of the transaction with the Successful Bidder.

Following entry of the Sale Order, if the Successful Bidder fails to consummate the Successful Bid, the Debtors (and, if Non-Debtor Assets are included in the Bid, Kingfisher) may, in consultation with the Bid Consultation Parties, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court; *provided*, that such Backup Bid shall be subject to Court approval in connection with the Court's approval of the Successful Bid. In such case of a breach or failure to perform on the part of the Successful Bidder and in such other circumstances as may be specified in the definitive documentation governing the Successful Bid, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors (or, if Non-Debtor Assets are included in the Bid, to the Debtors and Kingfisher in the same proportions as the aggregate purchase price was allocated between the Debtor Assets and the Non-Debtor Assets in such Bid). The Debtors specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

## SALE HEARING

A hearing to consider approval of a Transaction and the transfer of all of the Assumed Liabilities to the Successful Bidder(s) (the "Sale Hearing") is presently scheduled to take place on January 10, 2020 at [___ a.m.] prevailing Central Time, or as soon thereafter as counsel may be heard, before the Honorable Judge Marvin Isgur, United States Bankruptcy Judge in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, Texas 77002.

The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

## RETURN OF GOOD FAITH DEPOSITS

The Good Faith Deposits of all Qualified Bidders shall be held in one or more accounts by the Debtors, but shall not become property of the Debtors' estates; *provided, however*, that the Good Faith Deposit of any Successful Bidder (including any Backup Bidder that becomes a Successful Bidder) shall be forfeited to the Debtors if the Successful Bidder fails to consummate the Successful Bid or credited towards the purchase price set forth in the Successful Bid if the Successful Bid is consummated (provided, that if Non-Debtor Assets are included in the Bid, any forfeit or credit shall go to the Debtors and Kingfisher in the same proportions as the aggregate purchase price was allocated between the Debtor Assets and the Non-Debtor Assets in such Bid). The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than seven (7) days after the conclusion of the Auction. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder not later than three (3) business days after (i) the closing of the transaction with the Successful Bidder for the Assets bid upon by the Backup Bidder and (ii) the Outside Backup Date; *provided, however*, that if the Backup Bid becomes the Successful Bid as provided herein, any subsequent breach or failure to perform by the Backup Bidder may result in the forfeit

14

of the Good Faith Deposit of the Backup Bidder to the Debtors (or, if Non-Debtor Assets are included in the Bid, to the Debtors and Kingfisher in the same proportions as the aggregate purchase price was allocated between the Debtor Assets and the non-Debtor Assets in such Bid). Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that may have accrued thereon.

## CONSULTATION PARTIES

The Debtors shall consult with advisors to the AMH Agent, the indenture trustee for the 7.785% senior unsecured notes issued by Alta Mesa Holdings, LP and Alta Mesa Finance Services Corp., the Ad Hoc Noteholder Group, and any Committee (collectively, the "Consultation Parties" and each, a "Consultation Party") as explicitly provided for in these Bidding Procedures; *provided, however*, that, in certain circumstances as set forth in these Bidding Procedures, the Debtors shall consult only with the Bid Consultation Parties. The "Bid Consultation Parties" shall be all Consultation Parties (and their advisors) other than any Consultation Party (and its advisors) that submits a Bid or has a Bid submitted on its behalf for so long as such Bid remains open.

## RESERVATION OF RIGHTS OF THE DEBTORS

Except as otherwise provided in the PSA, these Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right, in their reasonable business judgment: (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (iv) reject, at any time prior to the closing of the Auction or, if no Auction is held, at any time prior to entry of the Sale Order, any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of these Bidding Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to all potential bidders; (vi) impose additional terms and conditions; (vii) extend the deadlines set forth herein; (viii) continue or cancel the Auction and/or Sale hearing in open court, or by filing a notice on the docket of the Debtors' chapter 11 cases, without further notice; (ix) include any other party as an attendee at the Auction; and (x) modify the Bidding Procedures and implement additional procedural rules for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bankruptcy Code, the Bidding Procedures order, or any other order of the Court.

**<u>Annex 2</u>**

Sale Notice
*(To Be Filed)*

## **Annex 3**

Assumption Notice
*(To Be Filed)*

## **<u>Annex 4</u>**

Post-Auction Notice
*(To Be Filed)*