**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ALTA MESA RESOURCES, INC., *et al.*, | § | Case No. 19-35133 |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| ALTA MESA HOLDINGS, LP, and OKLAHOMA ENERGY ACQUISITIONS, LP | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv No. 19-3609 |
| | § | |
| KINGFISHER MIDSTREAM, LLC, and OKLAHOMA PRODUCED WATER SOLUTIONS, LLC, | § | |
| | § | |
| Defendants. | § | |

**FIRST AMENDED COMPLAINT[2]**

Alta Mesa Holdings, LP ("AMH LP"), and Oklahoma Energy Acquisitions, LP ("OEA," together, "AMH" or "Plaintiffs"), are operating their businesses and managing their properties as

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (N/A); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); and Oklahoma Energy Acquisitions, LP (3762). The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

[2]   This copy of Plaintiffs' First Amended Complaint is submitted for purposes of initiating a new adversary proceeding on Count II, pursuant to the parties' Stipulation and Proposed Order Implementing the Court's October 25, 2019 Order Bifurcating Proceeding ¶ 3, ECF No. 119.

1

debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. In support of this adversary proceeding, Plaintiffs state as follows:

## INTRODUCTION

1. AMH is an onshore oil and natural gas company. As an "upstream" company, AMH finds and produces oil and natural gas. Since 2012, AMH has focused on mineral rights in Oklahoma. For the most part, that endeavor has proven unprofitable. Declining oil and gas prices have taken a toll. But so, too, have AMH's officers and controllers.

2. AMH is a subsidiary within a complex corporate structure. Alta Mesa Holdings, GP, LLC ("AMH GP") is the sole general partner of AMH LP, which, in turn, is the sole limited partner of OEA. AMH GP's Board of Managers ("Board") conducted business on behalf of AMH.

3. Prior to February 2018, AMH had two classes of shareholders. President and CEO Harlan Chappelle ("Chappelle") and COO Michael Ellis ("Ellis") owned 89.5% of Class A shares. High Mesa, Inc. ("HMI"), a privately held Delaware corporation, owned 10% of AMH's Class A shares and 100% of its Class B shares.

4. During the relevant time period Chappelle and Ellis also owned common shares of HMI. HPS Investment Partners, LLC ("HPS"), and, beginning in 2016, Bayou City Energy Management ("BCE"), also owned shares of HMI. Together, then, Ellis, Chappelle, and HMI (collectively, the "Controlling Owners") directly and indirectly owned and controlled AMH.

5. In addition to Chappelle and Ellis, in 2015, the Board consisted of CFO Michael McCabe, Don Dimitrievich, Homer "Gene" Cole, and Mickey Ellis.

6. AMH's Board, together with the Controlling Owners (on account of their positions of ownership and control), owed fiduciary duties to AMH, including, among other things, an obligation not to "usurp[] corporate opportunities for personal gain" and dedicating their "uncorrupted business judgment for the sole benefit of" AMH. *Floyd v. Hefner*, 556 F. Supp. 2d

617, 633 (S.D. Tex. 2008). Accordingly, the Controlling Owners were obligated not to enter into related-party transactions on behalf of AMH unless the terms of any such transactions satisfied the exacting "entire fairness" standard.

7. The Controlling Owners breached those fiduciary duties repeatedly. Defendants Kingfisher Midstream, LLC ("Kingfisher") and Oklahoma Produced Water Solutions, LLC ("OPWS") (together, "KFM") aided and abetted those breaches.

8. In 2015, AMH, through the Controlling Owners, entered into an agreement with Asset Risk Management, LLC ("ARM") to construct Kingfisher, a midstream oil and gas gathering and processing plant. Kingfisher would be owned by ARM (30%), HMI (30%), and HPS (40%). That is, the Controlling Owners would also be beneficial owners in Kingfisher.

9. Shortly after KFM's creation the Controlling Owners caused AMH to execute a series of commercial agreements with KFM. Those agreements, often referred to as "gathering agreements," provided that KFM would supply the pipeline and infrastructure to transport AMH's crude oil and gas from AMH's mineral sites to processing facilities. They also purported to dedicate AMH's production to KFM as well as pay volume-based fees.

10. Those gathering agreements are quintessential related-party transactions. The Controlling Owners owned and controlled AMH while simultaneously holding significant financial stakes in KFM. By virtue of these overlapping roles, the Controlling Owners quite literally sat on both sides of the bargaining table: Chappelle—both AMH's President and CEO and a part owner of HMI (and by extension a part owner of KFM)—signed the original agreements on behalf of *both* AMH and KFM.

11. The gathering agreements were not entirely fair to AMH. To the contrary, they were dramatically one-sided in favor of KFM: The service fees that AMH is obligated to pay

3

KFM were and remain substantially above market.  Indeed, in September 2015—barely three weeks after signing the gathering agreements—AMH sought to renegotiate the rates.  By 2016, the parties had agreed on a rate structure and began to negotiate amended agreements.

12. Before that effort finished, the Controlling Owners again attempted to extract more value from AMH to give to KFM by causing AMH to amend the gathering agreements in a (failed) effort to convey to KFM a property interest in AMH's mineral estate.  KFM (through ARM, HMI, and HPS) hoped that this would prevent the agreements from being set aside in bankruptcy.  To the extent there was any substance to that effort (and there was not), AMH received nothing in return for that particular amendment.

13. KFM has been in material breach of one of the gathering agreements for years.  KFM was contractually required to create a system capable of gathering and transporting up to 50,000 barrels of crude oil per day for AMH.  KFM has never come close to providing that level of capacity.  Instead, AMH has had to pay *third-parties* to transport its crude oil.  Adding insult to injury, KFM still charges AMH a fee when third parties gather and transport, on top of what AMH must pay to the third parties.  When Chappelle was informed of this double payment, he dismissed it in light of his admitted "desire to get ebitda into KFM."  KFM's deficient performance, coupled with its above-market service fees, have inflicted substantial harm on AMH.

14. Plaintiffs seek to set aside the gathering agreements pursuant to Sections 365(a) and 363(f) of the Bankruptcy Code.  Plaintiffs, with the assistance of their advisors, have reviewed and analyzed those contracts and have concluded, in their business judgment, that those contracts are unduly burdensome to the estate.  The ability to sell AMH's assets free and clear of these contracts or any purported covenant, or termination of the crude oil gathering agreement as a result of KFM's breach, would substantially benefit the estate.

15. By this action, Plaintiffs seek a judgment that the gathering agreements cannot continue to burden AMH or its estate. That is so for four primary reasons.

16. [Reserved]

17. *Second*, even if the agreements are covenants running with the land, the transfers of such covenants to KFM are avoidable as fraudulent transfers. In 2016, the Controlling Owners and KFM were concerned that the original agreements had failed to create a covenant that ran with AMH's mineral estate. So, they compelled AMH to execute amendments purporting to convey to KFM a property right and to create a covenant in AMH's mineral estate. But AMH received nothing—not a penny—in exchange for those purported conveyances. (The 2016 amendments also altered the fee structures for the agreements, but those negotiations occurred separately from the negotiations related to the covenant.) These purported conveyances to KFM were classic transfers to insiders—the Controlling Owners, who owned both KFM and AMH—with the explicit purpose of protecting their interests in KFM and frustrating AMH's creditors in the event of an AMH bankruptcy. Thus, *if* the gathering agreements are covenants running with the land, then those covenants were fraudulent transfers and should be set aside.

18. [Reserved]

19. [Reserved]

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

21. Pursuant to Federal Rule of Bankruptcy Procedure 7008 and Bankruptcy Local Rule 7008-1, Plaintiffs consent to the entry of final orders or judgments by this Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5

22. Personal jurisdiction over all Defendants is proper pursuant to Bankruptcy Rules 7004(d) and (f).

23. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

24. This adversary proceeding is commenced pursuant to Bankruptcy Rule 7001(2), which allows for an adversary proceeding "to determine the validity, priority, or extent of a lien or other interest in property," and section 105(a) of the Bankruptcy Code. Declaratory relief is appropriate pursuant to Bankruptcy Rule 7001(9) and 28 U.S.C. § 2201.

25. As set forth below, an actual legal controversy exists between Plaintiffs and Defendants.

## PARTIES

26. Plaintiffs Alta Mesa Holdings, LP, and its wholly owned subsidiary Oklahoma Energy Acquisitions, LP (together, "AMH"), are Texas limited partnerships. AMH owns and leases mineral interests in Oklahoma from which it extracts natural gas and oil.

27. Defendants Kingfisher Midstream, LLC ("Kingfisher") and Oklahoma Produced Water Solutions, LLC ("OPWS") (together, "KFM") are Delaware limited liability companies. KFM is in the business of providing pipeline and infrastructure to transport natural gas, crude oil, and wastewater from mineral sites.

28. Debtor Alta Mesa Resources ("AMR"), a publicly-traded Delaware corporation, has an interest in both AMH and KFM.

**ALLEGATIONS**

**I.    AMH's Controlling Owners and ARM Cause AMH To Execute Above-Market Gathering Agreements With KFM**

29.   Beginning in 2012, AMH undertook a play in an area of Oklahoma known as the STACK.[3]  AMH decided to ramp up its investment in late 2014 and 2015.  Around that time, Chappelle began discussions with Zach Lee, CEO of ARM, about constructing a midstream processing plant that would service AMH.

30.   ARM, AMH, and HMI ultimately executed an agreement to create KFM and construct a gas gathering pipeline, gas processing plant, and crude oil transportation system.  AMH would be the "anchor" producer for Kingfisher.

31.   KFM was funded through investments by ARM, HMI, and HPS.  Thus, HMI both owned and controlled AMH and held a significant financial stake in KFM.  By extension, Chappelle and Ellis owned a large stake in KFM.

32.   It was immediately clear that the economics of the deal disfavored AMH.  Instead of paying KFM a percentage of proceeds, as AMH did with its other midstream gatherers, KFM charged AMH a host of volume-based fees.  These terms reduced KFM's exposure (and increased AMH's exposure) to declining commodity prices, because KFM would receive the same fees even if gas and oil prices continued their steep decline.  The fee structure also included a capital recovery/facility fee designed to rapidly reimburse KFM's investment in building the gathering system.  Such a fee is virtually unheard of in the industry; typically gatherers recover their investment over the life of the gathering agreements through the base fees.  Further, because AMH

---

[3]   STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties.  It refers to a geographic area in the Anadarko basin area of Oklahoma.

7

dedicated its production to KFM exclusively, in the likely event that prices continued to spiral downward, AMH would be unable to negotiate for more economically attractive alternatives.

33. Certain members of the AMH Board, including Ellis, were skeptical. Ellis recognized that the fee structure would place nearly all of the risk for falling prices on AMH and regarded the deal as one where the "producer loses." But Chappelle and ARM persisted, funneling ARM-generated valuations to the Board with unrealistic rates of return and alleging that KFM's pricing would be cheaper than AMH's existing contracts. Ellis failed to do his own due diligence to ensure that the agreements were beneficial for AMH.

34. The Board and AMH's officers abdicated their duty to conduct their own valuations before committing to KFM and made that commitment even though certain members and officers did not believe that the economics made sense.

35. Thus, on August 31, 2015, the Controlling Owners caused AMH to execute two commercial agreements with KFM (the "2015 Agreements"). The 2015 Agreements provided that KFM would gather and transport the natural gas and crude oil that AMH produced. *See* ECF. No. 37-2 (2015 Gas Agreement); ECF. No. 37-3 (2015 Crude Oil Agreement). In exchange, KFM would receive volume-based "Service Fees" based on the amount of gas and crude oil that AMH delivered to KFM.[4]

36. The 2015 Agreements were paradigmatic related-party transactions: HMI, which controlled AMH, simultaneously held financial interests in KFM. AMH's Board members also had a financial stake in KFM. Not surprisingly, the agreements were not executed at arm's length. Rather, AMH's CEO, Harlan Chappelle, signed on behalf of both AMH *and* KFM. At that time, Chappelle was a part owner of HMI and thus had a financial stake in KFM.

---

[4]   *2015 Gas Agreement* § 6.1 & Sched. 6.1; *2015 Crude Oil Agreement* § 6.1.

37.     The 2015 Agreements were dramatically tilted in KFM's favor. In particular, the Service Fees that AMH was required to pay KFM were—and remain to this day—significantly above market. The Service Fees exceeded the market prices in 2015 for similar gathering contracts. By way of example, the 2015 Gas Agreement (as subsequently amended) has requires AMH to pay an average $1.01 per million BTUs ("MMBTUs") solely for KFM's gathering and processing services—a massive 104% premium to market prices:



38.     And this is to say nothing of the additional fees that KFM extracted from AMH—including the inexplicable capital recovery/facility fee, which one would never find in an arm's-length gathering contract.

39.     Each of the 2015 Agreements also included a provision stating that the agreements were "covenant[s] running with the land."[5]

---

[5]     *2015 Gas Agreement* § 3.4; *2015 Crude Oil Agreement* § 3.4.

40. The 2015 Crude Oil Agreement further required that KFM have capacity sufficient to gather up to 50,000 barrels per day.[6] KFM's gathering system has never been capable of gathering the required amount of crude oil per day. KFM is aware of this deficiency and has not remedied it.

## II. With AMH Sliding Toward Bankruptcy, Chappelle and HPS Cause AMH to Amend The Gathering Agreements To Protect KFM

41. AMH had buyer's remorse almost immediately after signing the 2015 Agreements. The exorbitant fees made it difficult for AMH to remain profitable and harmed AMH's long-term value, facts that AMH's Board and officers would have been aware of had they done their own due diligence as opposed to taking Chappelle and ARM's word as to the economics of the deal. Two weeks *after* signing the 2015 Agreements, even Chappelle realized that the rates were unsustainable. AMH began searching for a way to revise the terms, but Chappelle was interested only if doing so "preserve[d or] enhance[d] KFM's economics." These "negotiations" resulted in a change to the rates that reduced the capital recovery fees but, in the case of the gas gathering agreement, *raised* the base rates to a 114% premium over the market.

42. AMH was in no position to pay such outsized fees. Loaded with debt, nearly all of AMH's cash had been spent on the STACK bet, leaving little for day-to-day operations. By mid-2016, Moody's downgraded AMH's debt, citing a "weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk." The combination of high leverage, declining energy prices, and KFM's outrageous fees put AMH at risk of breaching its debt covenants.

---

[6] *2015 Crude Oil Agreement* § 3.6

43. By the end of 2016, AMH was running at a net loss. It was severely inadequately capitalized, with a debt-to-equity ratio of 24.3 to 1, and was cash-flow insolvent.

44. AMH's financial problems were a pressing concern for HPS. Between 80% and 90% of KFM's revenue was derived from AMH's gas and oil production. And KFM could not just pick up and leave; its gathering equipment, immovable as it was, depended entirely on AMH's churning out oil and gas. KFM would be practically worthless if it lost its gathering contract with AMH. This was especially concerning to HPS, which through its direct equity stake and investment in HMI held a larger interest in KFM than other owners of HMI.

45. Separate and apart from the rate negotiations, in 2016, a bankruptcy court had entered orders rejecting gathering agreements substantively identical to the 2015 Agreements on the ground that they did not constitute covenants that ran with the land. *In re Sabine Oil & Gas Corp.*, 547 B.R. 66 (Bankr. S.D.N.Y. 2016); *In re Sabine Oil & Gas Corp.*, 550 B.R. 59 (Bankr. S.D.N.Y. 2016).

46. HPS (through HMI), concerned that KFM would suffer the same fate when AMH filed for bankruptcy, sprang to action. On December 1, 2016, AMH's officers executed amended gathering agreements with KFM to supplant the 2015 Agreements. *See* ECF. No. 37-4 (2016 Gas Amendment);[7] ECF. No. 37-5 (2016 Crude Oil Amendment) (together, the "2016 Amendments").

47. The 2016 Amendments were designed, in part, as an attempt to insulate KFM's gathering agreements from challenge in bankruptcy. Indeed, HPS threatened to withhold AMH's funding unless it accepted the amendments. The 2016 Amendments included a host of additional provisions and legalese in an effort to transform the 2015 Agreements into covenants running with

---

[7] The Gas Agreement was again amended in April 2018. *See* Ex. 5 (2018 Gas Amendment). Its terms were not materially altered.

11

the land, including a purported conveyance of transportation interests. AMH received nothing in exchange for those purported conveyances.[8]

48. The 2016 Crude Oil Amendment additionally required KFM to construct a system capable of gathering up to 50,000 barrels per day for AMH.[9] Not only has KFM failed to construct such a system and has never met the capacity threshold, but KFM charges AMH for every barrel of oil that AMH pays someone *else* to truck away—meaning KFM is being paid for doing nothing, and AMH is paying twice to move the same barrel of oil.

49. AMH's officers knew of this double charge but did not think it was "material." In fact, Chappelle noted that, in obligating AMH to pay exorbitant and unnecessary fees to KFM, it was the officers' "desire to get ebitda into KFM since it all rolls up" to HMI.

50. After the ink dried on the gathering agreements, AMH continued its downward trajectory. It continued to draw down on its credit facility, and it refinanced its debt.

51. In February 2018, AMR underwent a substantial reorganization in which AMH and KFM were shuffled around the corporate structure. Following that transaction, AMH and KFM grew even closer: They both are now 100% owned by SRII OpCo.

52. The proxy statement accompanying the business combination acknowledged the "higher than current market rates" of the crude oil and gas gathering agreements. As part of the purchase deal, AMH recorded as a liability, and KFM as an asset, "the premium payment terms" valued at $254.6 million.

53. On October 1, 2018, AMH and KFM entered into another gathering agreement. This one provided that KFM would gather and dispose of wastewater produced at AMH's mineral

---

[8] *E.g.*, *2016 Gas Amendment* §§ 3.1, 3.2; *2016 Crude Oil Amendment* §§ 3.1, 3.2.

[9] *2016 Crude Oil Amendment* § 4.5.

sites in Oklahoma. Like the agreements before it, the 2018 Water Agreement contained purported dedications and assertions that it would run with the land.

54. On September 11, 2019, AMH filed a voluntary petition for Chapter 11 protection.

### III. It Is In AMH's Best Interests To Reject The Gathering Agreements

55. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."[10]

56. Shortly before filing for bankruptcy protection, AMH delegated to Patrick Bartels, AMH's only independent and disinterested director, the authority to investigate and take appropriate action with respect to certain of AMH's related-party transactions. Bartels is the lone member of AMH's nine-member Board of Managers who is not also a member of KFM's Board of Managers. Consistent with that delegation, Bartels is overseeing the instant adversary proceeding and separately is investigating, through counsel, additional related-party transactions that AMH has brokered over the years.

57. AMH, through Bartels, has determined that it is not necessary or desirable to maintain the gathering agreements with KFM. Among other things, the terms of the Gas Agreement and Crude Oil Agreement are wildly above market.

58. Rejection of the Crude Oil Agreement, as amended, is further appropriate because KFM is in material breach of that agreement. KFM's primary responsibility under the 2016 Crude Oil Amendment is to gather up to 50,000 barrels of oil per day from AMH.[11] KFM is not

---

[10] Section 363(f) of the Bankruptcy Code also permits a debtor in possession to "sell property" . . . free and clear of any interest in such property" if "applicable nonbankruptcy law permits sales of such property free and clear of such interest," "such interest is in bona fide dispute," or "such entity could be compelled . . . to accept a money satisfaction of such interest."

[11] *2016 Crude Oil Amendment* § 4.5.

13

meeting—and cannot meet—that requirement. Its gathering system is not capable (and has never been capable) of gathering the amount required under the agreements. As a result of KFM's nonperformance, AMH has been forced to pay additional fees to a third-party vendor to truck oil from its wells.

### Count I: Claim for Declaratory Judgment That the Gathering Agreements Are Subject To Rejection Under Sections 365(a) And 363(f) Of The Bankruptcy Code

[Reserved]

### Count II: Constructive Fraudulent Transfer Under Sections 544(b) and 550 of the Bankruptcy Code (As to the Gas Agreement and Crude Oil Agreement)

59. Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

60. Both Oklahoma (the situs of AMH's assets) and Texas (AMH's principal place of business) have adopted the Uniform Fraudulent Transfer Act ("UFTA") in substantially identical statutes. *See* 24 Okla. Stat. Ann.§ 112 *et seq.*; Tex. Bus. & Com. Code § 24.001 *et seq.*

61. If, as Defendants contend, the 2016 Amendments established covenants that run with the land, then those covenants constituted transfers of AMH's property interests to an insider (namely, the Controlling Owners and their affiliates).

62. In the 2016 Amendments, AMH purported to transfer a "Transportation Interest" to KFM. The contracts specify that the Transportation Interest is intended to "be a conveyance of a portion of [AMH]'s real property interests."[12]

---

[12] *2016 Gas Amendment* § 3.2; *2016 Crude Oil Amendment* § 3.2.

14

63. AMH received no new consideration—let alone reasonably equivalent value—in return for those "Transportation Interests." The rate re-negotiations occurred separately and had no relation to the purported *Sabine*-fix that KFM extracted in the 2016 Amendments.

64. At the time it executed the 2016 Amendments, AMH was inadequately capitalized. Because AMH was forced to dedicate its assets to KFM at an above-market price, the 2016 Amendments left AMH with unreasonably small capital and unable to pay its debts as they came due.

65. Such a covenant is an interest in AMH—the debtor's—property. The 2016 Amendments represent a transfer of that interest to KFM, an insider.

66. AMH was also operating with unreasonably small capital at the time of the 2016 Amendments. At that time AMH's liquidity ratios were persistently below 1. A liquidity ratio below 1 indicates that a company's current assets are insufficient to pay current liabilities. It was clear, prior to and after the 2016 Amendments, that AMH was experiencing severe liquidity pressure.

67. At least one creditor could have asserted these claims as of the date of the 2016 Amendments.

68. Both of the 2016 Amendments occurred within four years of the petition date.

69. Both of the 2016 Amendments diminished AMH's estate and harmed creditors. Avoidance of the 2016 Amendments is necessary to satisfy AMH's creditors.

**Count III: Actual Fraudulent Transfer
Under Sections 544(b) and 550 of the Bankruptcy Code
(As to the Gas Agreement and
Crude Oil Agreement)**

[Reserved]

**Count IV: Claim for Declaratory Judgment That The
Gathering Agreements Are Subject To Rescission
As The Products Of Breaches of Fiduciary Duty
(As to the Gas Agreement and
Crude Oil Agreement)**

[Reserved]

**Count V: Aiding and Abetting Breach of Fiduciary Duty
(As to the Gas Agreement and the Crude Oil Agreement)**

[Reserved]

**Count VI: Claim for Declaratory Judgment That KFM
Materially Breached The Crude Oil Agreement and
That the Agreement and Its Covenants Are Terminated**

[Reserved]

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

1. [Reserved]

2. On Count II, avoidance of the Gas Agreement and Crude Oil Agreement, together with recovery of the above-market payments made pursuant to those agreements.

3. [Reserved]

4. [Reserved]

5. For such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Date: November 25, 2019 | Respectfully submitted, |

        **ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP**

        /s/ *Lawrence S. Robbins*
        Lawrence S. Robbins (*pro hac vice*)
        D.C. Bar. No. 420260
        lrobbins@robbinsrussell.com
        Mark T. Stancil (*pro hac vice*)
        mstancil@robbinsrussell.com
        D.C. Bar No. 479012
        William J. Trunk (*pro hac vice*)
        D.C. Bar No. 1003673
        wtrunk@robbinsrussell.com
        Matthew Madden (*pro hac vice*)
        mmadden@robbinsrussell.com
        D.C. Bar No. 991139
        2000 K St. NW, 4th Floor
        Washington, D.C. 20006
        202-775-4500 (Telephone)
        202-775-4510 (Facsimile)

        **FOLEY GARDERE**
        **Foley & Lardner LLP**

        /s/ *James G. Munisteri*
        James G. Munisteri
        TX Bar No. 14667380
        jmunisteri@foley.com
        713-276-5752 (Telephone)
        713-276-6752 (Facsimile)
        Michael K. Riordan
        TX Bar No. 24070502
        mriordan@foley.com
        1000 Louisiana, Suite 2000
        Houston, Texas 77002-5011
        713-276-5178 (Telephone)
        713- 276-6178 (Facsimile)

        *Proposed Counsel for Alta Mesa Holdings, LP and Oklahoma Energy Acquisitions, LP*