**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **ALTA MESA RESOURCES, INC.,** *et al.*, | § | **Case No. 19-35133 (MI)** |
| | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | |

**DECLARATION OF JOHN C. REGAN IN SUPPORT OF**
**KFM DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, John C. Regan, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer ("**CFO**") of Kingfisher Midstream, LLC ("**Kingfisher Parent**"), Kingfisher STACK Oil Pipeline, LLC, Oklahoma Produced Water Solutions, LLC, and Cimarron Express Pipeline, LLC (together with Kingfisher Parent, collectively, the "**KFM Debtors**" or "**Kingfisher**").  I have served as the CFO of Kingfisher since joining in January of 2019.  Prior to becoming employed by an affiliate of the KFM Debtors, Alta Mesa Services, LP, I served as Chief Financial Officer of Vine Oil and Gas LP and as Chief Financial Officer of Quicksilver Resources Inc.  I have over 25 years of public accounting, corporate finance, and financial reporting experience with a particular focus on the energy sector and oil and gas industry.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (0642); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); Oklahoma Energy Acquisitions, LP (3762); SRII Opco GP, LLC (3729); SRII Opco, LP (5874); Kingfisher Midstream, LLC (1357); Kingfisher STACK Oil Pipeline, LLC (8858); Oklahoma Produced Water Solutions, LLC (0256); and Cimarron Express Pipeline, LLC (1545).  The Debtors' mailing address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

2.      On September 11, 2019 (the "**Initial Petition Date**"), Alta Mesa Resources, Inc. ("**AMR**"), Alta Mesa Holdings, LP ("**AMH**"), and certain of their subsidiaries (collectively, the "**Initial Debtors**" and, together with the KFM Debtors, the "**Debtors**") each filed voluntary petitions for relief commencing cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  On the date hereof (the "**KFM Petition Date**"), each KFM Debtor commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the KFM Debtors requested joint administration of their chapter 11 cases with the chapter 11 cases of the Initial Debtors pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.[2]

3.      As the KFM Debtors' CFO, my duties include, or have included, among other things, (i) assisting in the review, presentation, and analysis of the KFM Debtors' cash flow and operating and financial budgets, (ii) assisting the KFM Debtors' board of managers (the "**Board**") and management team in the development and refinement of a business plan, (iii) assisting the KFM Debtors' independent professionals in preparing for a bankruptcy filing, and (iv) providing assistance in the analysis and development of projections for the KFM Debtors. Accordingly, I am familiar and knowledgeable with the KFM Debtors' day-to-day operations, business and financial affairs, and books and records.

4.      I also serve a similar role for the Initial Debtors.  On the Initial Petition Date, I submitted the *Declaration of John C. Regan in Support of the Chapter 11 Petitions and First Day Pleadings* [Docket No. 16] (the "**Initial Declaration**"), which provides additional

---

[2]  On the KFM Petition Date, SRII OpCo, LP and SRII Opco GP, LLC each filed a voluntary petition under chapter 11 of the Bankruptcy Code and are also seeking to have their cases jointly administered with the Initial Debtors' chapter 11 cases.

information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of the Initial Debtors' chapter 11 cases and is incorporated herein by reference.

5.     I submit this declaration (this "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the KFM Debtors' chapter 11 cases and in support of certain of the motions and applications that the KFM Debtors filed with the Court, including the "first-day" pleadings filed concurrently herewith (the "**First Day Pleadings**").  I am authorized to submit this Declaration on behalf of the KFM Debtors.

6.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition, or from my discussions with the KFM Debtors' advisors – Weil, Gotshal & Manges LLP ("**Weil**"), Evercore Partners ("**Evercore**"), Perella Weinberg Partners LP ("**Perella**") and its affiliate Tudor Pickering Holt & Co Advisors LP (together with Perella, "**PWP**"),[3] Quinn Emanuel Urquhart & Sullivan, LLP, and Opportune LLP (collectively, the "**Advisors**").  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7.     This Declaration is organized into five sections.  Section I provides an overview of the KFM Debtors and the chapter 11 cases, including a description of the proposed Sale Transaction (as defined below).  Section II provides background information on the KFM Debtors' organizational structure and business.  Section III describes the KFM Debtors' capital structure.  Section IV describes the events leading to the commencement of the KFM Debtors'

---

[3] PWP also serves as an investment banker for the Initial Debtors.

chapter 11 cases and the KFM Debtors' prepetition restructuring efforts.  Section V summarizes the relief requested in, and the legal and factual bases supporting, the First Day Pleadings.

## I.   Overview

8.      Kingfisher is a midstream oil and gas services business located in the Anadarko Basin in Oklahoma.  As described in greater detail below, Kingfisher is a member of the AMR family of companies, derives the majority of its revenue from the Initial Debtors, and the Initial Debtors and the KFM Debtors utilize a shared management team.

9.      Shortly after the Initial Debtors commenced their chapter 11 cases, they filed a motion seeking to, among other things, sell all or substantially all or any portion or combination of their assets (the "**AMH Assets**") and, subject to the consent of Kingfisher, the assets of Kingfisher (the "**KFM Assets**").[4]  On October 11, 2019, the Court entered the *Order Establishing Bidding Procedures Relating to the Sale of All or a Portion of the Debtors' Assets* [Docket No. 317] which, among other things, established bidding procedures (as amended and modified at [Docket Nos. 626, 657, and 666] the "**AMH Bidding Procedures**") for the sale of the AMH Assets.

10.      Prior to the KFM Petition Date, Kingfisher, through Marc Beilinson, Kingfisher's disinterested manager ("**Disinterested Manager**"), and Kingfisher's independent Advisors, worked extensively to evaluate strategic alternatives available to maximize the value of

---

[4] *See Debtors' Motion for Entry of an Order Approving (I)(A) Bidding Procedures for the Sale of Substantially All or Any Portion of the Debtors' Assets and Certain Non-Debtor Assets, (B) Procedures for the Debtors' Assumption and Assignment of Certain Executory and Unexpired Leases, (C) The Form and Manner of Notice of the Sale Hearing and Assumption Procedures, (D) Procedures for Selection of One or More Staling Horse Bidders and the Provision of Bid Protections to Such Stalking Horse Bidder(s), and (E) Dates For an Auction and Sale Hearing, and (II)(A) the Sale of Substantially All or Any Portion of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Related Relief* [Docket No. 126].

the KFM Assets.[5]  Through this analysis, the Disinterested Manager determined that a restructuring

for the KFM Debtors would be necessary and best implemented through a sale of the KFM Assets.

As such, Kingfisher, the Initial Debtors, and each of their respective advisors, conducted a broad

and robust Marketing Process (as defined below), culminating in the pursuit of a joint sale of all

or substantially all of the KFM Assets with the AMH Assets (the "**Joint Sale**").

        11.     After extensive, arm's-length negotiations, on December 31, 2019,

Kingfisher selected an affiliate of an indirect equity owner of the Debtors, BCE-Mach III LLC, as

the stalking horse bidder (in such capacity, the "**Stalking Horse Bidder**") for its assets.  In

connection therewith, Kingfisher entered into that certain Purchase and Sale Agreement

(the "**KFM Stalking Horse PSA**") to sell substantially all of the KFM Assets to the Stalking Horse

Bidder and, on the same day, the Initial Debtors entered into a separate Purchase and Sale

Agreement (the "**AMH Stalking Horse PSA**" and, together with the KFM Stalking Horse PSA,

the "**Stalking Horse PSAs**") to sell substantially all of the AMH Assets to the Stalking Horse

Bidder.  The Stalking Horse PSAs include cross-consummation conditions and, as a result, are

dependent on Kingfisher consummating the sale of the KFM Assets under the KFM Stalking Horse

PSA on substantially the same timeline as set forth in the AMH Bidding Procedures approved by

the Court for the Initial Debtors.[6]

        12.     On January 9, 2020, BCE-Mach's request for a break-up fee and expense

reimbursement pursuant to the AMH Stalking Horse PSA was denied by the Court.  It is my

---

[5] *See Position Statement of Kingfisher Midstream, LLC in Support of Joint Sale of Kingfisher's and Alta Mesa Holdings' Assets and Response to Plaintiff's Emergency Motion to Stay Adversary Proceeding*, filed on December 12, 2019 in the case *Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC*, No. 19-03609 (MI) [Docket No. 208].

[6] Additional information about the Marketing Process, Kingfisher's decision to pursue a Joint Sale and sign the KFM Stalking Horse PSA, and Kingfisher's decision to commence these chapter 11 cases is set forth in the Declarations of Marc A. Beilinson and Daniel Aronson in support of the Sale Motion (as defined below), filed contemporaneously herewith.

understanding that failure to obtain an order granting the break-up fee and expense reimbursement and designating BCE-Mach as the Stalking Horse Bidder is a termination event under the AMH Stalking Horse PSA.  The KFM Stalking Horse PSA provides that BCE-Mach may terminate the KFM Stalking Horse PSA if the AMH Stalking Horse PSA has been terminated by its terms. Despite having the right to terminate the Stalking Horse PSAs, BCE-Mach has agreed to proceed with the Joint Sale provided that the Auction occurs by January 15, 2020 as required by the bidding procedures (the "**Auction**").

13.     Following execution of the KFM Stalking Horse PSA, the KFM Debtors commenced these chapter 11 cases to swiftly implement a comprehensive restructuring through a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code, which the KFM Debtors were required to do by January 12, 2020, pursuant to the KFM Stalking Horse PSA. Contemporaneously with the filing of this Declaration, the KFM Debtors filed the Sale Motion[7] seeking, among other things, ratification and approval of the AMH Bidding Procedures with respect to the KFM Debtors and approval of certain modifications thereto (the "**KFM Bidding Procedures**") prior to the Auction currently scheduled under the AMH Bidding Procedures to be held on January 15, 2020.  The KFM Bidding Procedures were developed by Kingfisher's independent Advisors with the oversight and input of the Disinterested Manager, to maximize the

---

[7] *See Emergency Motion of KFM Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365, 503, and 507 and Fed. R. Bankr. P. 2002, 6004, 6006, 9006, 9007, 9008, 9014, and 9019 for Orders (I)(A) Ratifying and Approving Bidding Procedures, (B) Ratifying and Approving Stalking Horse Purchase Agreement, (C) Approving Bid Protections, (D Approving Assumption and Assignment Procedures and Rights Objection Procedures, (E) Scheduling Auction and Sale Hearing, and (F) Approving Form and Manner of Notice Thereof, (II) Authorizing (A) Sale of Substantially all of Debtors' Assets Free and Clear of All Claims, Encumbrances, and Liabilities, (B) Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Assignment of Other Contracts; and (III) Granting Related Relief,* filed contemporaneously herewith (the "**Sale Motion**").

value of the KFM Assets for the benefit of the KFM Debtors' creditors through a sale to the bidder that submits the highest or otherwise best offer (the "**Sale Transaction**").[8]

## II. KFM Debtors' Business

14.     Kingfisher was formed in 2015 as a partnership between affiliates of ARM Energy Holdings LLC, High Mesa, Inc., and HPS Investments Partners, LLC ("**HPS**") to provide crude oil gathering and natural gas gathering and processing services in the Anadarko Basin.  By early 2018, Kingfisher had successfully contracted acreage dedications of approximately 300,000 gross acres in the STACK[9] play in Oklahoma and had natural gas processing capacity of 350 mmcfd and more than 400 miles of natural gas and crude oil pipelines.  In February 2018, Kingfisher's midstream business was combined with AMH's upstream business when AMR[10] acquired the assets of AMH and Kingfisher (the "**Business Combination**").[11]  In November 2018, the KFM Debtors purchased the Initial Debtors' produced water and gathering disposal system, which the KFM Debtors have since expanded.

15.     Today, Kingfisher continues to operate its midstream oil and gas services business and has substantial gas processing, crude oil gathering and storage, and produced water gathering and disposal assets that generate revenue for Kingfisher primarily through long-term, fee-based contracts.  Kingfisher Parent and Oklahoma Energy Acquisitions, LP ("**Oklahoma**

---

[8] With respect to Bayou City Energy Management LLC ("**BCE**"), an affiliate of BCE-Mach, I understand that (a) BCE is an indirect equity owner of Kingfisher Midstream, LLC and certain of the Initial Debtors; (b) BCE is affiliated with BCE-Stack Development LLC, which is a counterparty to a joint development agreement with Oklahoma Energy Acquisitions, LP; (c) William W. McMullen is a member of Kingfisher Midstream, LLC's Board of Managers; and (d) Mark Stoner, a partner at BCE, previously served as the Initial Debtors' Vice President (Finance). William W. McMullen recused himself from all meetings, discussions, and decisions relating to the KFM Stalking Horse PSA and the Break-Up Fee and Expense Reimbursement (as defined in the KFM Stalking Horse PSA).

[9] STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties. It refers to a geographic area in the Anadarko basin area of Oklahoma.

[10] At the time of the transaction, AMR was known as Silver Run Acquisition Corporation II.

[11] Greater detail regarding the Business Combination is available in the Initial Declaration.

Energy") – an Initial Debtor – are party to gathering agreements entered into in August 2015, under which Oklahoma Energy dedicates and delivers to Kingfisher crude oil, natural gas, and associated natural gas liquids for gathering and processing (collectively, each as amended from time to time, the "**Gathering Agreements**").

16.     While approximately 80-90% of Kingfisher's revenue is derived from services performed under the Gathering Agreements, Kingfisher's assets are strategically positioned to provide similar services to other producers in the area.  The balance of Kingfisher's revenue is mainly derived from the sale of natural gas liquids (NGLs) through certain marketing services agreements and for services provided to customers for gathering and disposing of produced water.  As of the KFM Petition Date, the KFM Debtors service six upstream producers other than the Initial Debtors.

17.     As of the KFM Petition Date, Kingfisher's infrastructure and gathering system consists of approximately 350 miles of low-pressure gas gathering lines, 100 miles of high-pressure 4"-16" rich gas transportation pipelines, 110 miles of crude gathering lines, and 225 miles of water pipelines.  The following chart depicts Kingfisher's gas, crude oil, and water systems:



18.     In addition to the mapped assets, Kingfisher operates two cryogenic natural gas processing plants with a combined 260 million cubic feet per day (*i.e.*, MMcfd)[12] of gas processing capacity, 90 MMcfd in offtake processing capacity, field compression facilities, 50,000 barrels of crude storage, and marketing capabilities.

19.     Since the Business Combination, Kingfisher has not employed any individuals.  Rather, Initial Debtor Alta Mesa Services, LP ("**AMS**") provides employees and shared administrative services to Kingfisher pursuant to that certain Management Services Agreement between AMH and Kingfisher Parent (the "**MSA**").  Under the MSA, Kingfisher Parent pays a monthly management fee of $10,000 and reimburses for costs incurred in providing the services, including a proportionate share of employee wages and benefits, which is currently approximately $1.3 million per month.  Specifically, under the MSA, certain AMH and AMS personnel allocate their time and efforts to Kingfisher Parent and Kingfisher Parent thereafter reimburses AMH for the proportionate share of that personnel's compensation and benefits.

20.     In the ordinary course of business, excluding under the Gathering Agreements, the KFM Debtors engage in various routine transactions (the "**Intercompany Transactions**") with the Initial Debtors that result in intercompany receivables and payables.  As described more fully below, the KFM Debtors typically engage in Intercompany Transactions to, among other things, receive the benefit of enterprise-wide management and support services and facilitate operations on a daily basis.  The Intercompany Transactions include general administrative costs, including allocated office rent and supplies, insurance coverage on behalf of the KFM Debtors, costs related to services provided by third parties for the benefit of the KFM Debtors that are jointly billed or billed to the Initial Debtors and a portion of which is allocated to

---

[12] "MMcfd" means millions of cubic feet per day.

the KFM Debtors, and products or services purchased for the Debtors' collective benefit, which are allocated accordingly. Amounts arising under the Gathering Agreements and amounts arising under the Intercompany Transactions may be settled on a gross basis or netted together as a single settlement.

21.     The KFM Debtors' real property interests include land associated with its cryogenic natural gas processing plants, the KFM Debtors' gathering systems, disposal wells, and all buildings and other structures, facilities, improvements or fixtures located thereon. The KFM Debtors and the Initial Debtors also share office space and reimburse each other for rent (as applicable), including an office lease in Oklahoma City, Oklahoma for which the Initial Debtors (as applicable) reimburse the KFM Debtors for its shared portion of the rent and an office lease in Houston, Texas, for which the KFM Debtors reimburse the Initial Debtors.

### III.  Corporate and Capital Structure

**A.     Corporate Structure**

22.     Kingfisher consists of four limited liability companies formed under Delaware law. Kingfisher Parent is the company that owns, either directly or indirectly, 100% of the membership interests in each of its subsidiaries. A copy of the Debtors' organizational chart is annexed hereto as Exhibit A. Below is a simplified chart illustrating the KFM Debtors' organizational structure as of the KFM Petition Date:



23.     Each of the KFM Debtors, its owner, and its primary business purpose is summarized in the following chart:

| Debtor | Owner(s) | Business Purpose |
|---|---|---|
| Kingfisher Parent | SRII Opco, LP ("**SRII OpCo**") | Conducts midstream business and borrower under Credit Agreement |
| Kingfisher STACK Oil Pipeline, LLC ("**KSOP**") | Kingfisher Parent | Owner of 100% interest in Cimarron Express Pipeline, LLC ("**Cimarron**") |
| Oklahoma Produced Water Solutions, LLC | Kingfisher Parent | Owns Kingfisher's produced water gathering pipelines, disposal wells and related facilities |
| Cimarron | KSOP | Formed on May 8, 2018 as part of a joint venture in crude oil pipeline with non-Debtor third-party Ergon Oklahoma Pipeline, LLC ("**Ergon**"); development has since been abandoned[13] |

---

[13] The joint venture was terminated pursuant to a membership interest redemption agreement entered into between KSOP, Cimarron, and Ergon on November 14, 2019.  As a result, KSOP now owns 100% of the equity interests in Cimarron.

## B.     Directors and Officers

24.     Kingfisher is controlled by the Board of Kingfisher Parent.  The Board consists of nine members, eight of which also serve as members of the boards of directors of AMR and AMH:[14]

| Name | Position (Affiliation) |
| --- | --- |
| Pierre F. Lapeyre, Jr. | Director (Riverstone; AMR; AMH) |
| David M. Leuschen | Director (Riverstone; AMR; AMH) |
| Donald R. Dimitrievich | Director (HPS; AMR; AMH) |
| William W. McCullen | Director (BCE; AMR; AMH) |
| Sylvia Kerrigan | Director (Independent; AMR; AMH) |
| Donald R. Sinclair | Director (Independent; AMR; AMH) |
| Jeffrey H. Tepper | Director (Independent; AMR; AMH) |
| Diana J. Walters | Director (Independent; AMR; AMH) |
| Marc Beilinson | Director (Disinterested) |

25.     Pursuant to resolutions adopted by the Board in September 2019, the Board delegated to Marc Beilinson, as the Disinterested Manager, the power to exercise, in his sole discretion, all of the powers and authority of the Board, to the fullest extent permitted by applicable law, over the AMH Litigation (as defined below), any related party transaction,[15] and any other matter in which the Disinterested Manager has been advised by counsel that a conflict exists or may exist between Kingfisher and AMH.[16]

26.     Kingfisher Parent's management team consists of the following individuals:

| Name | Position |
| --- | --- |
| Mark P. Castiglione | Chief Executive Officer |

[14] Kingfisher and AMH have identical boards of managers other than Marc Beilinson for Kingfisher Parent and Patrick Bartels for AMH, each of which serves as a disinterested manager for their respective board.

[15] A "related party transaction" includes a transaction or arrangement (or any series of similar transactions or arrangements) in which Kingfisher Parent and/or any of its subsidiaries was, is, or will be a participant, and in which any Initial Debtor or any of its direct or indirect subsidiaries (other than direct or indirect subsidiaries of the Kingfisher Parent) had, has, or will have a material interest, whether direct or indirect.  For the avoidance of doubt, any joint marketing of assets of the Kingfisher Parent and any Initial Debtor and the transactions contemplated by the KFM Stalking Horse PSA are deemed to be related party transactions.

[16] The Disinterested Manager was appointed as an independent manager to Kingfisher Parent's Board through a written consent of the sole member of Kingfisher Parent on August 29, 2019.

12

| Name | Position |
|---|---|
| John C. Regan | Chief Financial Officer |
| John H. Campbell, Jr. | President and Chief Operating Officer |
| Randy L. Limbacher | Vice President of Strategy |
| Kimberly O. Warnica | Vice President, General Counsel, Chief Compliance Officer, and Secretary |

27.     As described in greater detail in the Initial Declaration, the Debtors' management team experienced substantial turnover beginning in November of 2018.  In the wake of the prior management team's turnover in December 2018, AMS entered into a consulting agreement (as amended or amended and restated from time to time, the "**Meridian Agreement**") with Meridian Energy LLC ("**Meridian**"),  Mr. Limbacher, Mr. Campbell, and Mr. Castiglione (collectively, the "**Meridian Team**").  The Meridian Team is employed by Meridian and was engaged by the Debtors to be core members of the new leadership team installed in January of 2019.  Each of the listed Meridian Team members serve as an officer of Kingfisher Parent.  AMS pays a monthly fee to Meridian, which is then used to (i) compensate Meridian and (ii) provide the Meridian Team with salaries and benefits.  AMS also reimburses Meridian for all documented and reasonable out-of-pocket business expenses incurred in connection with the services provided under the Meridian Agreement.  As noted above, the KFM Debtors pay and reimburse AMS for such services and expenses rendered on behalf of the KFM Debtors in accordance with the terms of the MSA.

**C.**     Capital Structure

28.     The following description of the KFM Debtors' capital structure is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

(i)        **Equity Ownership**

29.      Kingfisher Parent is a wholly owned subsidiary of SRII Opco, which is a limited partnership managed by its general partner SRII Opco GP, LLC ("**SRII Opco GP**").  AMR owns 100% of the equity interests in SRII Opco GP and 47.75% of the limited partnership units of SRII Opco.  The remaining 52.25% of SRII Opco's limited partnership units are owned by contributors High Mesa Holdings, LP; KFM Holdco, LLC; and Riverstone VI Alta Mesa Holdings, L.P. and their affiliates and related parties (the "**Contributors**").   Additional information regarding the equity ownership of AMR and SRII Opco is set forth in the Initial Declaration.

(ii)       **Prepetition Indebtedness**

30.      As of the KFM Petition Date, the KFM Debtors have funded debt obligations in the amount of approximately $224 million under a prepetition credit facility. Specifically, the KFM Debtors are party to that certain Amended and Restated Credit Agreement, dated as of May 30, 2018 (as amended, modified, or otherwise supplemented from time to time, the "**Credit Agreement**"), by and among Kingfisher Parent, as borrower, Wells Fargo Bank, N.A., ("**Wells Fargo**") as administrative agent for and on behalf of the lenders party thereto from time to time (in such capacity, the "**Administrative Agent**"), and the lenders party thereto from time to time (the "**Lenders**," and the claims thereunder, the "**Credit Agreement Claims**").   The scheduled maturity date of the Credit Agreement is May 30, 2023.

31.      Pursuant to the Credit Agreement, the Lenders agreed to provide the KFM Debtors with up to $300 million in loans, subject to certain limitations on Kingfisher Parent's ability to access the facility, including total leverage ratio, senior secured leverage ratio, and interest coverage ratio covenants.

32.    Pursuant to the Credit Agreement and related documents, the Credit Agreement Claims are guaranteed by each of the KFM Debtors and are secured by senior liens on substantially all of Kingfisher's and its subsidiaries' real property and associated assets, as well as Kingfisher Parent's equity interests in the subsidiary guarantors.  Additionally, SRII Opco has also pledged its membership interests in Kingfisher Parent as security for the Credit Agreement Claims.

(iii)    **Trade Payables and Ordinary Course Obligations**

33.    In addition to the KFM Debtors' funded debt obligations under the Credit Agreement, as of the KFM Petition Date, the KFM Debtors owe an estimated $9.0 million[17] in outstanding unsecured obligations to certain third-party suppliers, vendors and other ordinary course unsecured creditors, including upstream producers, transportation providers and surface land-owners.

**D.**    Legal Proceedings

34.    On September 12, 2019, AMH and Oklahoma Energy commenced an adversary proceeding in their chapter 11 cases, captioned Adv. Proc. No. 19-03609-MI (the "**AMH Litigation**"), against Kingfisher Parent and KFM Debtor Oklahoma Produced Water Solutions, LLC seeking, among other things, a declaratory judgment that the Gathering Agreements between Kingfisher, on the one hand, and AMH and Oklahoma Energy on the other hand, do not contain covenants that run with the land under Oklahoma law.  On December 20, 2019, the Court issued an opinion finding that certain covenants contained in the Gathering Agreements formed real property covenants and that, accordingly, AMH and Oklahoma Energy could not reject such covenants under the Bankruptcy Code.  As of the KFM Petition Date, the AMH Litigation has been stayed until a time and date to be determined at a status conference

---

[17] $2.1 million of the $9.0 million is attributable to AMH under the MSA.

scheduled for January 13, 2020, with respect to the only two remaining counts – alleged breaches of fiduciary duties – pursuant to the Court's *Order Granting Plaintiff's Emergency Motion to Stay Adversary Proceeding*, Adv. Proc. No. 19-03609 (MI) [Docket No. 241].

35.     In addition, Kingfisher Parent is a defendant in pending cases commenced by Mustang Gas Products, LLC ("**Mustang**")[18] and Chisholm Oil & Gas Operating LLC ("**Chisholm**").[19]  In the Mustang litigation, Mustang alleges that certain of the Debtors and other parties colluded to wrongfully divert to the KFM Debtors gas production dedicated to Mustang and seeks unspecified damages.  In the Chisholm litigation, Chisholm alleges that Kingfisher Parent breached a certain gas gathering agreement and seeks damages for improper payments and charges.[20]  While the KFM Debtors continue to work to resolve each of the foregoing disputes, the KFM Debtors reserve all rights and will address the allegations made at the appropriate time.

## IV.  Key Events Leading to Commencement of the Chapter 11 Cases

**A.**     AMR Bankruptcy Filing

36.     The KFM Debtors' business has suffered as a direct result of the recent challenges faced by the Initial Debtors, which are set forth more fully in the Initial Declaration. While Kingfisher's midstream business is less susceptible to commodity prices than AMH's upstream business, the decline in commodity prices since late 2018, in addition to poor well performance, has tempered AMH's ability to conduct the development necessary to meet its

---

[18] *See. Mustang Gas Products LLC v. Oklahoma Energy Acquisitions, LP, Alta Mesa Resources, LP; Alta Mesa Resources, Inc., Alta Mesa Holdings, LP; High Mesa Inc., f/k/a Alta Mesa Investment Holdings, Inc.; Alta Mesa Services, LP; ARM Midstream, LLC; HPS Investment Partners f/k/a Highbridge Principal Strategies, LLC, BCE-Mesa Holdings, LLC and Kingfisher Midstream, LLC*, Case No. CJ-17-22 in the District Court of Kingfisher County, Oklahoma.

[19] *See Chisholm Oil & Gas Operating, LLC v. Kingfisher Midstream, LLC*, Case No. CJ-2019-2166 in the District Court of Tulsa County, Oklahoma.

[20] Chisholm and Kingfisher Parent are parties to an Amended and Restated Gas Gathering Purchase Agreement dated April 10, 2017 but effective as of May 1, 2017.

anticipated growth targets and, as a result, Kingfisher's projected revenue and cash flow has been significantly reduced. Because the KFM Debtors' revenue is heavily correlated to the Initial Debtors' production levels, the severe operational challenges faced by the Initial Debtors has made the KFM Debtors' restructuring necessary. Specifically, the Initial Debtors' poorer than expected well performance and inability to sustain adequate drilling levels has severely impacted the KFM Debtors' financial performance. The combination of AMH's prolonged performance challenges, AMH's suspended capital program, and the resulting decrease in production estimates (and thus, Kingfisher's projected cash flows) have resulted in Kingfisher's capital structure becoming unsustainable in light of the KFM Debtors' obligations under the Credit Agreement.

37.     Additionally, the Lenders have asserted violations under the terms of the Credit Agreement, and the KFM Debtors have not had access to funds thereunder to cover operating and professional service costs since September 2019.

**B.**     Prepetition Restructuring & Marketing Efforts

38.     On October 11, 2019, at the Disinterested Manager's direction, the KFM Debtors retained Evercore to serve as their investment banker and market their assets. Evercore, PWP, and the KFM Debtors, with the assistance of the Initial Debtors and their advisors, spent several months conducting a robust sale and marketing process (the "**Marketing Process**") for both a Joint Sale or a sale of Kingfisher's assets. As part of the Marketing Process, I understand that PWP and Evercore contacted over 240 potential buyers and prepared numerous materials and analyses to assist and encourage potential bidders to consummate a purchase.

39.     Prior to the KFM Petition Date, the KFM Debtors, through the Disinterested Manager and Kingfisher's independent Advisors, including Evercore, evaluated strategic alternatives available to Kingfisher in light of the Initial Debtors' financial condition and the

correlating impact on Kingfisher. The KFM Debtors considered and evaluated multiple scenarios, including renegotiating the Gathering Agreements and operating Kingfisher as a standalone business. The Disinterested Manager determined that there was no viable out-of-court scenario in which the KFM Debtors could service their debt obligations under the Credit Agreement and that pursuing a sale of the KFM Assets provided the best opportunity to maximize the value of such assets.

40.     Over the course of the Marketing Process, potential buyers of the KFM Assets requested a "free and clear" sale order and bids would not provide enough value to satisfy Kingfisher's debt obligations in full. Accordingly, the Disinterested Manager determined that any value-maximizing sale transaction would have to be implemented through chapter 11.

41.     In late November 2019, Kingfisher engaged Weil as co-counsel, to work alongside the Disinterested Manager, Kingfisher's existing Advisors, and the management team, as well as AMH and its counsel and professionals to, among other things, constructively work toward a value maximizing sale of the KFM Assets. These efforts and the Marketing Process culminated in the KFM Debtors' entry into the KFM Stalking Horse PSA on December 31, 2019 with a purchase price of $85.25 million, well below funded debt obligations of $224 million. The selection of the Stalking Horse Bidder and the KFM Debtors' entry into the KFM Stalking Horse PSA was the product of arm's-length, good faith negotiations in a competitive bidding process overseen by the KFM Debtors' Disinterested Manager.

42.     Kingfisher and its Advisors communicated and coordinated with the Administrative Agent and the Lenders regarding the foregoing process and the bids received. It is my understanding that a sufficient voting percentage of the Lenders supported the KFM Debtors' entry into the KFM Stalking Horse PSA, including with respect to the allocation of sale proceeds

18

between the KFM Debtors and the Initial Debtors, and the KFM Debtors' commencement of chapter 11 cases to consummate the sale pursuant to section 363 of the Bankruptcy Code.

43.     The KFM Debtors commenced these chapter 11 cases on the KFM Petition Date, as required by the terms of the KFM Stalking Horse PSA, to implement their sale process described above and to allow the KFM Debtors to consummate their duties and pursue a value-maximizing Sale Transaction.  Additionally, absent a speedy consummation of a Sale Transaction, the KFM Debtors will be at risk of running out of liquidity given the burden of administrative costs of the bankruptcy proceedings.

## V.  First Day Pleadings

44.     The First Day Pleadings seek relief to allow the KFM Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary to enable the KFM Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value and best serves the KFM Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Pleading.  Below is an overview of each of the First Day Pleadings.

## A.     Joint Administration Motion

45.     Pursuant to the *Emergency Motion of KFM Debtors Pursuant to Fed. R. Bankr. P. 1015(b) and Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases* filed concurrently herewith, the KFM Debtors request entry of an order directing joint administration of the recently filed chapter 11 cases of the KFM Debtors with the jointly

administered chapter 11 cases of the Initial Debtors for procedural purposes only.  I believe that joint administration of these cases would save the KFM Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders.  Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") and other parties in interest will similarly benefit from joint administration of these chapter 11 cases, sparing them the time and effort of reviewing duplicative dockets, pleadings, and papers.

46.     I believe that joint administration would not adversely affect any creditors' rights because the KFM Debtors' motion requests only the administrative consolidation of these cases for procedural purposes.  It does not seek substantive consolidation of the Debtors' estates.  Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the KFM Debtors, their estates, and all other parties in interest and should be granted in all respects.

**B.     Creditor List Motion**

47.     Pursuant to the *Emergency Motion of KFM Debtors Pursuant to 11 U.S.C. § 107(c)(1)(a) and Fed. R. Bankr. P. 1007(a)(1) and (d) and for an Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors and (II) Granting Related Relief* filed concurrently herewith, the KFM Debtors request (i) authority to file a consolidated creditor matrix (the "**Consolidated Creditor Matrix**") and a consolidated list of the KFM Debtors' 30 largest unsecured creditors (the "**Consolidated Top 30 Creditors List**") and (ii) related relief.

48.     I am advised that Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F,

G, and H . . . ."  I understand that, although a list of creditors is usually filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a Consolidated Creditor Matrix because the preparation of separate lists of creditors for each KFM Debtor would be unduly expensive, time consuming, and administratively burdensome, the KFM Debtors request authority to file a single Consolidated Creditor Matrix for all KFM Debtors.

49.     Further, I am advised that, pursuant to Bankruptcy Rule 1007(d), a debtor generally must file "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders . . . ."  Because a large number of creditors may be shared among the KFM Debtors, the KFM Debtors request authority to file a single, consolidated list of the top 30 unsecured creditors for all KFM Debtors collectively.  The Consolidated Top 30 Creditors List would help alleviate undue administrative burdens, costs, and the possibility of duplicative service.

**C.     Cash Management Motion**

50.     Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(A), 345(B), 363(B), 363(C), 364(A), and 503(B) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Honor Certain Related Obligations, (C) Continue Intercompany Transactions, and (D) Maintain Existing Bank Accounts And Business Forms and (II) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the KFM Debtors request (i) authority to (a) continue operating their cash management system (the "**Cash Management System**"), as described in the Cash Management Motion, including through the continued maintenance of existing bank accounts (the "**Bank Accounts**") at the existing bank (the "**Bank**") consistent with the KFM Debtors' prepetition practices, (b) honor certain prepetition obligations

related to the Cash Management System, (c) continue to conduct Intercompany Transactions, and (d) maintain existing Business Forms and (ii) related relief.

51.     I understand that the KFM Debtors support their business operations by using the Cash Management System to collect, concentrate, and disburse funds generated by their midstream business, including funds received from various gas gathering, crude oil gathering, and produced water gathering and disposal agreements (the "**Gathering Agreements**"). The Cash Management System, which includes Initial Debtor bank accounts,[21] enables the KFM Debtors to efficiently (i) fund their operations and pay their financial obligations, (ii) monitor and forecast their cash needs, (iii) track the collection and disbursement of funds, and (iv) maintain control over the administration of their Bank Accounts.  As described in more detail below, the KFM Debtors also receive payment from, and remit payment to, the Initial Debtors on account of certain Intercompany Transactions.

52.     The Cash Management System is comprised of five Bank Accounts which are maintained by Wells Fargo.  Wells Fargo is designated as an authorized depository by the U.S. Trustee pursuant to the U.S. Trustee's Operating Guidelines for Chapter 11 Cases.

53.     Although many aspects of the Cash Management System are automated, the Initial Debtors' employees monitor the system and manage the proper collection, processing, and disbursement of funds, including in connection with Intercompany Transactions, check processing and issuance, and ACH transactions.  Any disruption to the Cash Management System would significantly interfere with the KFM Debtors' business.

---

[21] *See Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 13] for more information regarding the Cash Management System with respect to the Initial Debtors.

54.     It is my understanding that the KFM Debtors' collections for services are generally deposited between the 20th and 25th of every month into the concentration account (Account No. XXXXXX8683) (the "**Concentration Account**"), which is maintained by Wells Fargo in the name of Kingfisher Midstream, LLC and functions as a centralized repository of cash in the Cash Management System.  All payments made from the Cash Management System, including operating expenses and payments to trade vendors, suppliers, and other holders of accounts payable, are made through the same Concentration Account.

55.     Each night, cash balances in the Concentration Account are swept and deposited into an account held by Wells Fargo under its Stagecoach Sweep Preferred Option Account program under which swept funds earn interest overnight.  Early each business day, Wells Fargo returns the cash, plus interest earned, to the Concentration Account.  As of January 12, 2020, the balance in the Concentration Account was approximately $4.0 million.

56.     The KFM Debtors also hold two active accounts (Account No. XXXXXX4095, and Account No. XXXXXX2347 (the "**Utility Account**")) and two inactive accounts (Account Nos. XXXXX4103 and XXXXX1735), which are maintained by Wells Fargo, in the name of Cimarron Express Pipeline, LLC (the "**Cimarron Accounts**").  Given that Cimarron Express Pipeline, LLC has no ongoing operations or cash flow, the KFM Debtors plan to close all three Cimarron Accounts on or before January 31, 2020.

57.     I understand that, in the ordinary course of business, the KFM Debtors engage in various routine transactions (the "**Intercompany Transactions**") with the Initial Debtors that result in intercompany receivables and payables (the "**Intercompany Claims**").  To avoid multiple transactions, an invoice is sometimes created for one payment, netting multiple transactions.  The Debtors typically engage in Intercompany Transactions to, among other things,

provide enterprise-wide management and support services and facilitate operations on a daily

basis.  Specifically, the Intercompany Transactions include the following:

  a.  the KFM Debtors remit payment to Initial Debtor AMS for the KFM Debtors' allocable share (generally around 25%-30%) of AMS's costs for its employees, including wages, payroll taxes, office, rent, supplies, executive management, and other related services;

  b.  the Initial Debtors remit payment to the KFM Debtors for amounts owed under the Operating Agreements;

  c.  the Initial Debtors bind and fund insurance coverage on behalf of themselves and the KFM Debtors;

  d.  the Initial Debtors pay certain costs related to services provided by third parties for the benefit of the KFM Debtors that are jointly billed or billed to the Initial Debtors and a portion of which is ascribed by the vendor or allocated to the KFM Debtors; and

  e.  the Debtors pay certain costs (including IT costs) or receive refunds related to the products or services purchased for their collective benefit, which are allocated accordingly.

58.  It is my understanding that the Debtors historically have reflected Intercompany Claims as receivables and payables in the respective Initial Debtor's and KFM Debtor's accounting system.  Intercompany Transactions related to the flow of funds between and among the Initial Debtors and the KFM Debtors are typically settled monthly in arrears in cash. In connection with the operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Initial Debtors and the KFM Debtors, at any given time there may be intercompany balances owing by one Debtor to another Debtor. The Intercompany Transactions are, and expected to continue to be, identifiable and segregable.[22]

---

[22] Historically, the KFM Debtors have made transfers to AMR to pay certain AMR operating expenses.  The KFM Debtors will not be making such transfers or payments postpetition.

59.     In addition, it is my understanding that, in the ordinary course of business, the KFM Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts, certain service charges and other related fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees**").  The KFM Debtors have historically incurred Bank Fees between approximately $1,000 and $1,500 per month, which are withdrawn from the respective Bank Accounts.  As of the KFM Petition Date, the KFM Debtors estimate that they owe approximately $2,250 in unpaid Bank Fees.  I also understand that in the ordinary course of business, the KFM Debtors use a variety of correspondence and business forms, including checks (collectively, the "**Business Forms**").  I believe that the KFM Debtors' requested relief to continue using their Business Forms substantially in the forms used immediately prior to the KFM Petition Date is critical to minimizing the expense to the KFM Debtors' estates associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms, and the resulting confusion caused for key constituencies of the KFM Debtors.

60.     Given the scale of the KFM Debtors' business operations, I believe any disruption to the Cash Management System would significantly interfere with the KFM Debtors' business and may impede the sale process.  Accordingly, on behalf of the KFM Debtors, I respectfully submit the relief requested in the Cash Management Motion is in the best interest of the KFM Debtors' estates and all parties in interest and should be granted.

**D.     Insurance and Financial Assurances Motion**

61.     Pursuant to the *Emergency Motion of KFM Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 6003 and 6004 for Order Authorizing KFM Debtors to Continue Insurance Policies and Financial Assurances and Pay all Obligations with Respect Thereto and (II) Granting Related Relief* (the "**Insurance and Financial Assurances Motion**")

the KFM Debtors request authority to (a) continue all Insurance Policies and the Surety Bond and Certificate of Deposit in accordance with their terms and to perform with respect thereto in the ordinary course of business, (b) pay any prepetition obligations arising under the Insurance Policies, the Surety Bond, and the Certificate of Deposit and (c) grant related relief.

62.    As set forth in the Initial Debtors' Insurance Motion, it is my understanding that the KFM Debtors are beneficiaries under the Initial Debtors' Insurance Policies, which are all issued in the name of AMR.  Accordingly, the KFM Debtors reimburse AMR for their allocable share of Insurance Obligations on account of their status as beneficiaries under the Initial Debtors' Insurance Policies.  Approximately 25% of such Insurance Obligations are attributable to the KFM Debtors, which the KFM Debtors pay through an intercompany balance reconciliation process at the beginning of each policy period.  These policies provide coverage for, among other things, the Debtors' property, general liability, environmental liability, commercial crime, directors' and officers' liability, property, pollution, and auto coverage (the "**Insurance Policies**").  Additionally, the KFM Debtors participate in one pollution coverage Insurance Policy that was issued in the name of KFM.

63.    The KFM Debtors also provide a surety bond related to plugging and abandonment obligations (the "**Surety Bond**").  Unlike an insurance policy, if a surety incurs a loss on a surety bond, it is entitled to recover the full amount of that loss form principal.  The Debtors are party to an indemnity agreement that sets forth the surety's rights to recover from the Debtors (collectively, the "**Surety Indemnity Agreement**").   Under the Surety Indemnity Agreement, the KFM Debtors agree to indemnify the surety from any loss, cost, or expense that the surety may incur on account of the issuance of any Surety Bond on behalf of the KFM Debtors (the "**Indemnity Obligations**").  Additionally, the Surety Indemnity Agreement may require the

26

KFM Debtors to cash collateralize the Indemnity Obligations.  The KFM Debtors also maintain a certificate of deposit posted as financial insurance for gross production taxes (the "**Certificate of Deposit**," and, together with the Surety Bond, the "**Financial Assurances**").  It is my understanding that failure to provide, maintain, or timely replace the Financial Assurances could prevent the KFM Debtors from undertaking essential functions related to their operations.

64.     It is my understanding that, in the 12 months preceding the KFM Petition Date, the aggregate payment for the Financial Assurances totaled approximately $860,000.  As of the KFM Petition Date, the payment amount of the Surety Bond is approximately $3 million and the incremental amount of the Certificate of Deposit is $832,586.

65.     The Liability and Property Insurance Programs help the KFM Debtors manage the various risks associated with their businesses, and I understand that some of the Insurance Policies are also required by certain regulations, laws, and contracts that govern the KFM Debtors commercial activities.  In this regard, I believe the Insurance Programs and the Financial Assurances are essential to the Debtors' operations, as the Debtors would be exposed to significant liability if the Insurance Programs and the Financial Assurances were allowed to lapse or terminate, which exposure could detrimentally impact the KFM Debtors' sale process.  It is similarly critical that the Debtors have the authority to supplement, amend, extend, renew, or replace their Insurance Programs, Surety Bond Program, or Certificate of Deposit.  Based on the foregoing, I believe that the relief requested in the Insurance and Financial Assurances Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**E.     Trade Creditors Motion**

66.     Pursuant to the *Emergency Motion of KFM Debtors Pursuant to 11 U.S.C. §§ 105, 363(b) and 503(b)(9), and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders*

*(I) Authorizing Payment of Certain Prepetition Trade Claims in Ordinary Course of Business and (II) Granting Related Relief*, filed concurrently herewith (the "**Trade Creditors Motion**"), the KFM Debtors request (i) authority to pay creditors (the "**Trade Creditors**"), in the ordinary course of business, undisputed prepetition claims for goods and services related to the KFM Debtors' ongoing business operations and other ordinary course claims (collectively, the "**Trade Claims**") and to seek customary trade terms during the pendency of and after these chapter 11 cases and (ii) related relief.

       67.     The KFM Debtors, as providers of midstream oil and gas services, incur costs for the purchase of raw natural gas and other hydrocarbons from upstream producers and pay suppliers, service providers, land-owners, and other vendors necessary for conducting business operations.  The KFM Debtors also incur costs related to employee, overhead, and administrative expenses, paid as an allocable share to the Initial Debtors, for support services for corporate and administrative functions, and for transportation.  In addition, as part of their salt water disposal business, the KFM Debtors pay for access to salt water disposals and key pipelines ("**Salt Water Disposal**").  Finally, I understand that pursuant to section 503(b)(9) of the Bankruptcy Code, the KFM Debtors owe payments to all vendors for goods provided in the 20 days prior to the KFM Petition Date ("**503(b)(9) Claims**").

       68.     During the 12 months before the KFM Petition Date, the KFM Debtors paid Trade Creditors on average approximately $14.9 million each month.  The KFM Debtors estimate that, as of the KFM Petition Date, they owe a total of approximately $9.0 million on account of undisputed Trade Claims and approximately $5.6 million in Trade Claims will become due and payable within the first 21 days of these chapter 11 cases.  Additionally, holders of an aggregate amount of approximately $5.1 million of such Trade Claims may be entitled to assert (a)

mechanics' liens claims or (b) first purchaser lien claims against certain of the KFM Debtors' assets under various state and federal laws.  Furthermore, the majority of Intercompany Payments are for employee compensation, which are directly attributable to the KFM Debtors' continued operations.

69.     It is my understanding that the Trade Creditors are essential to maintaining the going concern value of the KFM Debtors' enterprise, (the "**Critical Vendors**" and their prepetition Trade Claims, the "**Critical Vendor Claims**").  Many of the Critical Vendors provide access to Salt Water Disposal wells or key pipelines which cannot be easily replaced in a feasible manner due to, among other things, the (i) location and integration of these Salt Water Disposal wells and pipelines into the day to day operations of the KFM Debtors and (ii) significant costs that would be associated with acquiring access to different Salt Water Disposal facilities or alternate forms of transportation.  I believe that payment of Critical Vendors is necessary for the KFM Debtors to maintain operations, to preserve the value of the KFM Debtors' business, and moreover, to enable the KFM Debtors to function in the ordinary course.  Without ensuring payment to the Critical Vendors, the KFM Debtors believe that they could be completely unable to generate a material portion of their revenue, which would not only restrain the KFM Debtors' cash flow but could derail the KFM Debtors' entire sale process.  Additionally, the disruption has the potential to negatively affect the environment and subject the KFM Debtors to environmental liabilities.  Accordingly, I believe that if the KFM Debtors do not pay Critical Vendor Claims, the KFM Debtors' value will be reduced by amounts well in excess of amounts that the KFM Debtors seek authorization to pay.  In addition, I believe that maintaining favorable trade terms with the Critical Vendors is in the best interests of all parties in interest.

70.     I believe that payment of the Trade Claims as they become due in the ordinary course of business is a sound exercise of the KFM Debtors' business judgment because doing so will avoid a value-destructive business interruption and reflects only a difference in when Trade Creditors will be paid, not in how much.  As indicated above, the KFM Debtors have filed a motion seeking approval of bidding and auction procedures and a sale of substantially all of their assets, along with the Initial Debtors' assets in an expeditious manner under section 363 of the Bankruptcy Code.  I believe the proposed asset sale transaction will maximize value for the KFM Debtors' estates and provide the funds necessary to confirm a chapter 11 plan.  I believe that the relief sought in the Trade Creditors Motion is an essential component of the KFM Debtors' restructuring plan because any interruptions in the KFM Debtors' operations could delay the proposed sale or lead to a suboptimal outcome at such sale.

71.     Further, because the Trade Creditors are already familiar with the KFM Debtors' assets and business needs, often as a result of years-long relationships, they are in the best position to provide goods and services to the KFM Debtors and are the most likely to do so on commercially reasonable terms.  Forcing the KFM Debtors to obtain replacement goods and services, if replacements are even an option, would likely cause significant disruption to or cessation of KFM's operations, resulting in significant losses for both KFM Debtors and the Initial Debtors, including but not limited to a delay in or failure to complete the sale under the 363 process.  I anticipate that failure to pay the Trade Claims as they become due may result in an inability to secure vital goods and services required to maintain the KFM Debtors' operations, resulting in the destruction of the KFM Debtors' going-concern value, to the detriment of their estates.  Paying the Trade Claims as they come due is essential to ensure the KFM Debtors'

uninterrupted operations during the intervening period and is in the best interests of the KFM Debtors, their stakeholders, and all parties in interest, including the Initial Debtors.

72.     In accordance with the above, I believe that paying the Trade Claims—which account for less than 4% of the KFM Debtors' total debt—in the ordinary course is prudent when compared to the amount the KFM Debtors' stakeholders stand to lose if the KFM Debtors' business was to be interrupted.  Therefore, payment of the Trade Claims is a sound exercise of the KFM Debtors' business judgment.  Accordingly, I believe that the relief requested in the Trade Creditors Motion furthers the KFM Debtors' overarching goals without prejudice to the KFM Debtors' stakeholders, and should be approved.

**F.     Taxes Motion**

73.     Pursuant to the *Emergency Motion of KFM Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541(d), and Fed. R. Bankr. P. 6003 and 6004 for an Order (I) Authorizing KFM Debtors to Pay Certain Prepetition Taxes and Assessments and (II) Granting Related Relief* filed concurrently herewith (the "**Taxes Motion**"), the KFM Debtors request (i) authority to satisfy, in the KFM Debtors' sole discretion, all Taxes and Assessments (as defined herein) due and owing to various local, state, and federal taxing authorities (collectively, the "**Taxing Authorities**") that arose prior to the KFM Petition Date, including all Taxes and Fees substantially determined by audit or otherwise to be owed for periods prior to the KFM Petition Date and (ii) related relief.

74.     I understand that the Taxes and Fees the KFM Debtors typically incur generally falls into the following categories: Sales and Use Taxes, Income and Franchise Taxes, Property Taxes, Severance Taxes, and Regulatory and Compliance Fees (each as defined in the Taxes Motion and collectively, the "**Taxes and Assessments**").  I understand that approximately

$475,000 in Taxes and Assessments relating to the prepetition period will become due and owing to the Taxing Authorities after the KFM Petition Date, with approximately $215,000 coming due within the first 21 days following the KFM Petition Date.

75.     Further, I understand that failure to pay the aforementioned Taxes and Assessments may cause the Taxing Authorities to take actions that would interfere with the KFM Debtors' continued business operations and potentially impose significant costs on the KFM Debtors' estates, including, but not limited to, asserting liens on estate assets or seeking to lift the automatic stay.  Additionally, I understand that failing to pay prepetition Taxes and Assessments may jeopardize the KFM Debtors' maintenance of good standing in the jurisdictions in which they operate, and could potentially subject the KFM Debtors' officers and directors to lawsuits or criminal prosecution during the pendency of these chapter 11 cases.  Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the KFM Debtors, their estates, and all parties in interest and should be approved.

**G.     Utilities Motion**

76.     Pursuant to the *Emergency Motion of KFM Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 and Fed. R. Bankr. P. 6003 and 6004 for an Order (I) Applying Utilities Order in Initial Debtors' Chapter 11 Cases and, (II) Granting Related Relief* filed concurrently herewith (the "**Utilities Motion**"), the KFM Debtors request entry of an order (i) applying the *Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief*, dated September 12, 2019 [Docket No. 65] (the "**Utilities**

Order") previously entered in the Initial Debtors' chapter 11 cases to the KFM Debtors in their respective chapter 11 cases and (ii) granting related relief.

77.     As more fully described in the Utilities Motion, the KFM Debtors obtain natural gas, water and sewage, electric, and other utility services (collectively, the "**KFM Utility Services**") from a number of utility companies (collectively, the "**KFM Utility Providers**").  I believe that uninterrupted Utility Services are essential to the KFM Debtors' ongoing operations and the success of these chapter 11 cases.  Should any KFM Utility Provider alter, refuse, or discontinue service, even briefly, the KFM Debtors' business operations could be severely disrupted.  The KFM Debtors operate a complex business with significant operations in Oklahoma, and the interruption of the KFM Utility Services provided would disrupt necessary communication and coordination between the KFM Debtors' employees, vendors, customers, and various regulatory authorities, and would prevent the provision of necessary support to these same parties.  I believe that any such disruption would jeopardize the KFM Debtors' ability to manage their reorganization efforts.   As a result, it is essential that the KFM Utility Services continue uninterrupted during the chapter 11 cases.

78.     I believe that there are no material defaults or arrearages of any significance for the KFM Debtors' undisputed invoices for prepetition KFM Utility Services.  Based on a monthly average for the twelve months prior to the KFM Petition Date, the KFM Debtors estimate that their aggregate cost of KFM Utility Services for the next 30 days will be approximately $330,720.28.

79.     I believe and am advised that the protections and authorizations provided in the Utilities Order, including the Adequate Assurance Procedures, are necessary to the success of the Debtors' chapter 11 cases.  If the Utilities Order is not applied to the KFM Debtors, the KFM

Debtors could be forced to address multiple requests for adequate assurance by KFM Utility Providers in a disorganized manner when the KFM Debtors' efforts should be more productively focused on continuing to operate their business for the benefit of all parties in interest. Discontinuation of KFM Utility Service could disrupt operations and jeopardize the KFM Debtors' reorganization efforts and, ultimately, the value of the KFM Debtors' estates and stakeholders' recoveries.

80.    Based on the foregoing, I believe that the relief requested in the Utilities Motion would ensure the continuation of the KFM Debtors' businesses at this critical juncture as the KFM Debtors transition into chapter 11.   Furthermore, I believe that the relief requested provides the KFM Utility Providers with a fair and orderly procedure for determining requests for additional adequate assurance.   Accordingly, I believe that the relief requested in the Utilities Motion should be granted in all respects.

**H.    Claims Agent Retention Application**

81.    Pursuant to *the Emergency Application of KFM Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and 327 For An Order (I) Expanding Scope of Order Appointing Prime Clerk LLC as Claims and Noticing Agent and (II) Granting Related Relief*, filed concurrently herewith (the "**Claims Agent Retention Application**"), the KFM Debtors request entry of an order (i) expanding the scope of the relief granted in the *Order Authorizing Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 62] (the "**Prime Clerk Retention Order**") to appoint Prime Clerk LLC ("**Prime Clerk**") as claims, noticing, and solicitation agent (the "**Claims and Noticing Agent**") to the KFM Debtors, subject to the modifications described in the Claims Agent Retention Application, and (ii) granting related relief.

34

82.     As Claims and Noticing Agent, Prime Clerk will provide the services identified in the Prime Clerk Retention Order.  The KFM Debtors will compensate Prime Clerk for its services in accordance with the Prime Clerk Retention Order and the agreement between the KFM Debtors and Prime Clerk executed on December 26, 2019 (the "**KFM Engagement Agreement**").  Under the KFM Engagement Agreement, the KFM Debtors have agreed to indemnify Prime Clerk and its agents under certain circumstances specified in the KFM Engagement Agreement.  I believe that such indemnification obligation is customary, reasonable, and necessary to retain the services of a claims, noticing and solicitation agent in these chapter 11 cases.

83.     I believe that the appointment of Prime Clerk as the Claims and Noticing Agent will provide the most effective and efficient means of providing notice, as well as soliciting and tabulating votes on a proposed plan of reorganization, thereby relieving the KFM Debtors of the administrative burden associated with all of these necessary tasks.  As Prime Clerk has done in the Initial Debtors' cases, I understand that Prime Clerk will follow the notice and claims procedures that conform to the guidelines promulgated by the clerk's office or as otherwise directed by the Court, and will provide expedited distribution of notices.  I believe and am advised that the appointment of Prime Clerk as the KFM Debtors' Claims and Noticing Agent in these chapter 11 cases, pursuant to the terms and conditions provided in the Prime Clerk Retention Order, is in the best interests of the KFM Debtors, their estates, their creditors, and all other parties in interest in the case.  Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

## <u>Conclusion</u>

84.     The above describes the KFM Debtors' businesses and capital structure, the factors that precipitated the commencement of these chapter 11 cases, and the critical need for the KFM Debtors to obtain the relief sought in the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated:  January 12, 2020
          Houston, Texas

                              */s/ John C. Regan*                          
                              Name: John C. Regan
                              Title: Chief Financial Officer

**<u>Certificate of Service</u>**

I hereby certify that on January 12, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the KFM Debtors' proposed claims, noticing, and solicitation agent.


  */s/ Alfredo R. Pérez*
Alfredo R. Pérez

## Exhibit A

## Organizational Chart

