**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | Case No. 19-35133 (MI) |
| Debtors.[1] | (Jointly Administered) |

**JOINT PLAN OF LIQUIDATION OF ALTA MESA RESOURCES, INC.**
**AND ITS AMH AND SRII DEBTOR AFFILIATES**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE[2]**

**LATHAM & WATKINS LLP**
George A. Davis (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Brett M. Neve (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:   george.davis@lw.com
          annemarie.reilly@lw.com
          brett.neve@lw.com

- and -

Caroline A. Reckler (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:   caroline.reckler@lw.com

-and-

Andrew Sorkin
555 Eleventh Street, Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
Email:   andrew.sorkin@lw.com

**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
Aaron J. Power (TX 24058058)
M. Shane Johnson  (TX 24083263)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
          (713) 226-6248
Email:   jhiggins@porterhedges.com
          eenglish@porterhedges.com
          apower@porterhedges.com
          sjohnson@porterhedges.com

*Counsel to the Debtors and Debtors in Possession*

Dated:   April 17, 2020

---

[1]   The debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (0642); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); Oklahoma Energy Acquisitions, LP (3762); SRII Opco GP, LLC (3729); SRII Opco, LP (5874); Kingfisher Midstream, LLC (1357), Kingfisher STACK Oil Pipeline, LLC (8858), Oklahoma Produced Water Solutions, LLC (0256), and Cimarron Express Pipeline, LLC (1545). The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

[2]   This *Joint Plan of Liquidation of Alta Mesa Resources, Inc. and Its AMH and SRII Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* is a joint plan of liquidation for the following debtors and debtors in possession:  Alta Mesa Resources, Inc., Alta Mesa Holdings, LP, Alta Mesa Holdings GP, LLC, OEM GP, LLC, Alta Mesa Finance Services Corp., Alta Mesa Services, LP, Oklahoma Energy Acquisitions, LP, SRII Opco GP, LLC, and SRII Opco, LP.  A separate joint plan of liquidation has been filed with respect to Kingfisher Midstream, LLC, Kingfisher STACK Oil Pipeline, LLC, Oklahoma Produced Water Solutions, LLC, and Cimarron Express Pipeline, LLC. *See* [Docket No. 1326].

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
    GOVERNING LAW ....................................................................................................................1
    A.     Defined Terms ...............................................................................................................1
    B.     Rules of Interpretation ................................................................................................21
    C.     Computation of Time ..................................................................................................21
    D.     Governing Law ...........................................................................................................21
    E.     Reference to Monetary Figures ...................................................................................22

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS....................................22
    A.     Administrative Claims ................................................................................................22
    B.     Priority Tax Claims .....................................................................................................23
    C.     Other Priority Claims ..................................................................................................23

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS...................24
    A.     Introduction.................................................................................................................24
    B.     Summary of Classification .........................................................................................24
    C.     Treatment of Claims and Interests .............................................................................25

ARTICLE IV. ACCEPTANCE REQUIREMENTS .........................................................................30
    A.     Acceptance or Rejection of this Plan .........................................................................30
    B.     Confirmation of This Plan Pursuant to Section 1129(b) of the Bankruptcy Code ........31
    C.     Subordinated Claims ...................................................................................................31
    D.     Controversy Concerning Impairment..........................................................................31
    E.     Elimination of Vacant Classes ...................................................................................31
    F.     Presumed Acceptance by Non-Voting Classes ..........................................................31

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ...............................................31
    A.     Transactions Effective as of the Effective Date .........................................................31
    B.     Closing of Sale and Uses of Cash ..............................................................................31
    C.     SRII Claims Bar Date .................................................................................................32
    D.     KFM/AMH Settlement ...............................................................................................32
    E.     Plan Administration Trust Funding and AMH GUC Claim Administrator Reserve
          Funding .......................................................................................................................33
    F.     The Plan Administration Trusts/AMH GUC Administrator Agreement.......................33
    G.     The AMH GUC Claim Administrator..........................................................................34
    H.     Certain Powers and Duties of the Plan Administration Trusts, the Plan Administrators,
          and the AMH GUC Claim Administrator ...................................................................34
    I.     Federal Income Tax Treatment of the Plan Administration Trusts for the Plan
          Administration Trust Assets; Tax Reporting and Tax Payment Obligations .................36
    J.     Authority to Pursue, Settle, or Abandon Retained Causes of Action...........................37
    K.     AMH Litigation Trust .................................................................................................37
    L.     Treatment of AMH Litigation Trust Causes of Action ...............................................40
    M.     Federal Income Tax Treatment of the AMH Litigation Trust for the AMH Litigation
          Trust Assets; Tax Reporting and Tax Payment Obligations .......................................40
    N.     Cancellation of Documents .........................................................................................41
    O.     Filing of Monthly and Quarterly Reports and Payment of Statutory Fees ...................42
    P.     Directors, Managers and Officers of the Debtors........................................................42
    Q.     Corporate Authorization .............................................................................................43
    R.     Insurance Policies .......................................................................................................43
    S.     Effectuating Documents and Further Transactions .....................................................43
    T.     Employee and Retiree Benefits ...................................................................................43
    U.     Exemption from Certain Taxes and Fees.....................................................................44
    V.     Assignment of Reserved ORRI ..................................................................................44
    W.     Exchange of SRII Interests..........................................................................................44

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................44
    A.     Treatment of Executory Contracts and Unexpired Leases ...............................44
    B.     Rejection of Indemnification Obligations ......................................................44
    C.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ...........45
    D.     Rejection Damages Claim ...........................................................................45
    E.     Reservation of Rights ..................................................................................45
    F.     Nonoccurrence of Effective Date .................................................................45

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................................45
    A.     Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions ....................45
    B.     Disbursing Agent .......................................................................................46
    C.     Distributions on Account of Claims Allowed After the Effective Date .....................46
    D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions .................47
    E.     Compliance with Tax Requirements/Allocations ...........................................47
    F.     Surrender of Cancelled Instruments or Securities ..........................................48
    G.     Claims Paid or Payable by Third Parties .......................................................48

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
    DISPUTED CLAIMS .............................................................................................49
    A.     Allowance and Disallowance of Claims .......................................................49
    B.     Prosecution of Objections to Claims ............................................................49
    C.     Estimation of Claims ..................................................................................49
    D.     Distributions After Allowance .....................................................................50

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE
    EFFECTIVE DATE ...............................................................................................50
    A.     Conditions Precedent to Confirmation .........................................................50
    B.     Conditions Precedent to the Effective Date ...................................................50
    C.     Waiver of Conditions .................................................................................51
    D.     Effect of Nonoccurrence of Conditions ........................................................51

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ...........................52
    A.     Compromise and Settlement of Claims, Interests, and Controversies ...................52
    B.     Releases by the Debtors ..............................................................................52
    C.     Releases by Holders of Claims and Interests .................................................54
    D.     Restrictions on Lender Releases. ..................................................................55
    E.     Exculpation ...............................................................................................55
    F.     Permanent Injunction .................................................................................55
    G.     Setoffs ......................................................................................................56
    H.     Release of Liens .........................................................................................56
    I.     Preservation of All Causes of Action Not Expressly Settled or Released ...............56
    J.     Limitations on Executable Assets with Respect to the Specified Directors and Officers
        Claims. .....................................................................................................57

ARTICLE XI. BINDING NATURE OF PLAN ......................................................................................57

ARTICLE XII. RETENTION OF JURISDICTION ...................................................................................57

ARTICLE XIII. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ..........................59
    A.     Modifications and Amendments ...................................................................59
    B.     Effect of Confirmation on Modifications ......................................................59
    C.     Revocation or Withdrawal of the Plan ..........................................................59
    D.     Substantial Consummation of the Plan ..........................................................60

ARTICLE XIV. MISCELLANEOUS PROVISIONS ................................................................................60
    A.     Successors and Assigns...............................................................................60

B.     Reservation of Rights ................................................................................................ 60
C.     Further Assurances ..................................................................................................... 60
D.     Payment of Fees and Expenses ................................................................................. 60
E.     Service of Documents ................................................................................................ 60
F.     Dissolution of Committee .......................................................................................... 62
G.     Nonseverability of Plan Provisions ........................................................................... 63
H.     Return of Security Deposits ....................................................................................... 63
I.     Term of Injunctions or Stays ..................................................................................... 63
J.     Entire Agreement ....................................................................................................... 63
K.     Exhibits ...................................................................................................................... 63
L.     Votes Solicited in Good Faith ................................................................................... 63
M.     Conflicts ..................................................................................................................... 64
N.     Filing of Additional Documents ................................................................................ 64
O.     Tax Reporting and Compliance ................................................................................. 64

## INTRODUCTION

Alta Mesa Resources, Inc. and certain of its subsidiaries in the above-captioned Chapter 11 Cases respectfully propose the following joint plan of liquidation under chapter 11 of the Bankruptcy Code.  Capitalized terms used in the Plan shall have the meanings ascribed to such terms in Article I hereof.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent, or unpaid fees and expenses (including, without limitation, success fees) for legal, financial advisory, accounting, and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a), or 331 of the Bankruptcy Code before the Effective Date by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount).  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation shall include all Committee Fees.

2.    "*Ad Hoc Noteholder Group*" means the ad hoc group of Holders of the Prepetition Senior Notes represented by Davis Polk & Wardwell LLP, Rapp & Krock, PC and Houlihan Lokey.

3.    "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the AMR/AMH Petition Date or the SRII Petition Date, as applicable, and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses Allowed as Fee Claims pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the AMR/AMH Petition Date or the SRII Petition Date, as applicable, and through the Effective Date; and (c) all Statutory Fees.

4.    "*Administrative Claims Bar Date*" means the Business Day that is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court.

5.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    "*Allowed*" means, with reference to any Claim or Interest:  (a) any Claim or Interest as to which no objection to allowance has been interposed (either in the Bankruptcy Court or in the ordinary course of business) on or before the Claims Objection Deadline or the applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or that has been allowed by a Final Order, either before or after the Effective Date; (b) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of the Bankruptcy Court, either before or after the Effective Date; (c) any Claim or Interest expressly deemed Allowed by the Plan; (d) all scheduled Claims listed as undisputed, not contingent and not unliquidated; or (e) any Claim or Interest affirmatively Allowed by the Debtors, or following the Effective Date, by the Plan Administrator.

7.    "*AMH Adequate Protection Claims*" means the Adequate Protection Claims belonging to the Prepetition AMH RBL Agent pursuant to and as defined in the Cash Collateral Orders.

8.     "*AMH Adequate Protection Payments*" means all adequate protection payments made to or for the benefit of the Prepetition AMH RBL Agent or Prepetition AMH RBL Lenders under the Cash Collateral Orders, including without limitation the Prepetition AMH RBL Agent Fees paid by the Debtors postpetition, and all interest, fees, costs and charges and all other amounts paid under the Cash Collateral Orders, but excluding the Interim Distribution.

9.     "*AMH Cash on Hand*" means all Cash held by the AMH Debtors on the Effective Date other than the Net Sale Proceeds.

10.     "*AMH Claims Reserve*" means a reserve to be established by the Debtors on or before the Effective Date and comprised of AMH Distributable Cash in the amount of the AMH Claims Reserve Amount, except to the extent any portion of such amount is distributed on the Effective Date pursuant to the Plan Administration Process, which reserve shall vest in the AMH Plan Administration Trust as of the Effective Date; *provided, that* the Prepetition AMH RBL Agent, on behalf of the Prepetition AMH RBL Lenders, shall have a reversionary interest in any funds remaining in the AMH Claims Reserve after all required payments from the AMH Plan Administration Trust in accordance with the terms of this Plan.

11.     "*AMH Claims Reserve Amount*" means the sum of (a) the AMH Other Secured Claims Reserve Amount, (b) the AMH Priority Claims Reserve Amount, (c) the AMH GUC Distribution Cash, (d) the Prepetition Senior Notes Distribution Cash, (e) the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of Cure Claims against the AMH Debtors by counterparties to Executory Contracts and Unexpired Leases to be assumed or assigned by the AMH Debtors, to the extent any such Cure Claim is disputed by the Debtors, and (f) the estimated aggregate face amount of accrued but unpaid Administrative Claims (including Fee Claims) against the AMH Debtors as of the Effective Date, including Claims arising under section 503(b)(9) of the Bankruptcy Code, which estimate shall be made in good faith by the AMH Debtors, in consultation with the Prepetition AMH RBL Agent, based on the AMH Debtors' books and records, in the case of each of (a) through (f), solely to the extent such Claims or expenses are not assumed or otherwise paid by the Purchaser pursuant to the Purchase Agreement in connection with the Sale.  Notwithstanding anything to the contrary herein, the AMH Claims Reserve Amount with respect to the Claims described in clauses (a), (b), (e) and (f) above shall not exceed the budgeted amounts for payment of such Claims set forth in the Wind Down Budget.

12.     "*AMH Debtor Releases*" shall have the meaning given to such term in Article X.B.1 of the Plan.

13.     "*AMH Debtor Representatives*" means with respect to each of the AMH Debtors, such Debtor's (a) current and former directors, managers, and officers set forth on Schedule 1 of this Plan, in all relevant capacities (including, without limitation, in their capacity as directors, managers, or officers of the Debtors or the KFM Debtors), (b) current and former employees who are not directors, managers or officers (in their respective capacities as employees of the Debtors or the KFM Debtors), (c) financial advisors, (d) attorneys, (e) accountants, (f) investment bankers, (g) consultants (including, without limitation, Meridian Energy LLC in all capacities other than its capacity as a consultant to any Excluded Parties, but not in its capacity as a consultant to any Excluded Parties), and (h) other professionals; *provided, however*, that notwithstanding anything to the contrary herein, "AMH Debtor Representatives" shall not include any Excluded Parties.

14.     "*AMH Debtors*" means Alta Mesa Holdings, LP, Alta Mesa Holdings GP, LLC, OEM GP, LLC, Alta Mesa Finance Services Corp., Alta Mesa Services, LP, and Oklahoma Energy Acquisitions, LP.

15.     "*AMH Distributable Cash*" means Cash in an amount equal to the sum of (a) the Net Sale Proceeds from the Sale, plus (b) all AMH Cash on Hand, plus (c) the proceeds of all other non-Cash assets of the Estates of the AMH Debtors after giving effect to the Sale, plus (d) the KFM/AMH Settlement Proceeds, plus (e) any Unused Professional Fee Reserve Amount, but excluding any AMH Litigation Trust Causes of Action Proceeds.

16.     "*AMH General Unsecured Claim*" means any unsecured Claim against any of the AMH Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Fee Claim, a Prepetition Senior Notes Claim, a Prepetition AMH RBL Deficiency Claim, an Intercompany Claim, or a Section 510(b) Claim.

17.     "*AMH GUC Claim Administrator*" means the individual appointed to File, settle, compromise, withdraw, or litigate to judgment any objections to AMH General Unsecured Claims as more fully set forth in Article VIII of this Plan and pursuant to the terms of the AMH GUC Claim Administrator Agreement.  The AMH GUC Claim Administrator shall be designated by the Committee, reasonably acceptable to the AMH Debtors and the Prepetition AMH RBL Agent, and identified in the Plan Supplement.

18.     "*AMH GUC Claim Administrator Agreement*" means the agreement to be entered into by and among the AMH Debtors, the AMH Plan Administrator, the AMH GUC Claim Administrator, and the AMH GUC Claim Oversight Committee, and included in the Plan Supplement.  The AMH GUC Claim Administrator Agreement shall incorporate and provide more detail regarding the provisions of this Plan concerning the AMH GUC Claim Administrator, including, without limitation, its rights, privileges and duties pursuant to this Plan.

19.     "*AMH GUC Claim Administrator Reserve*" means the reserve to be established by the AMH Debtors on or before the Effective Date and comprised of Cash in the amount of $200,000 which shall be held by and used to pay the reasonable fees and expenses incurred by the AMH GUC Claim Administrator as set forth in this Plan and the AMH GUC Claim Administrator Agreement, *provided*, *however*, that the aggregate amount of such fees and expenses shall be capped at $200,000 and neither the AMH Debtors, nor the AMH RBL Agent or AMH RBL Lenders, any member of the Committee or any other party shall have any obligation to provide additional funds to pay for such fees and expenses and in the event that the full amount of such AMH GUC Claim Reserve is not utilized by the GUC Claims Administrator, such excess funds shall be added to AMH GUC Distribution Cash or donated to a charity chosen by the AMH GUC Claim Administrator in consultation with the AMH GUC Claim Oversight Committee.

20.     "*AMH GUC Claim Disbursing Agent*" means the Person designated by the Committee, which designation shall be reasonably acceptable to the AMH Debtors, who shall act as the exclusive Disbursing Agent for, and shall make all required distributions under this Plan to the holders of, Allowed Class 5 AMH General Unsecured Claims.  The AMH GUC Claim Disbursing Agent shall be identified in the Plan Supplement.

21.     "*AMH GUC Claim Oversight Committee*" means (if applicable) that certain board consisting of up to three (3) individuals initially appointed by the Committee to advise the AMH GUC Claim Administrator in connection with the claims reconciliation, objection and settlement process pursuant to this Plan and the AMH GUC Claim Administrator Agreement.  The initial members of the AMH GUC Claim Oversight Committee shall be identified in the Plan Supplement.

22.     "*AMH GUC Distribution Cash*" means Cash in the amount of $2.5 million, which shall be funded from the AMH Distributable Cash; *provided*, *however*, that to the extent any AMH General Unsecured Claim of Mustang Gas Products, LLC is Allowed in an amount in excess of $10 million, the amount of the AMH GUC Distribution Cash may be modified as mutually agreed by the Ad Hoc Noteholder Group and the Committee in good faith.

23.     "*AMH Interest*" means an Interest in an AMH Debtor that is not an Intercompany Interest.

24.     "*AMH Litigation Trust*" means the trust to be formed pursuant to Article V.K. of the Plan.

25.     "*AMH Litigation Trust Agreement*" means the litigation trust agreement to be entered into by and among the AMH Debtors and the AMH Litigation Trustee with respect to the AMH Litigation Trust, which shall be in form and substance acceptable to the Prepetition AMH RBL Agent and the Ad Hoc Noteholder Group in consultation with the AMH Debtors.

26.     "*AMH Litigation Trust Assets*" means the (a) AMH Litigation Trust Funds (solely to the extent contributed to the AMH Debtors' Estates prior to the Effective Date) and (b) AMH Litigation Trust Causes of Action.

27.     "*AMH Litigation Trust Causes of Action*" means all Causes of Action belonging to the AMH Debtors, which shall be contributed to the AMH Litigation Trust under the Plan, including without limitation, all Causes of Action of the AMH Debtors identified on the Schedule of Retained and Assigned Causes of Action and all Causes of Action of the AMH Debtors against the Excluded Parties, but excluding (i) any Causes of Action released by the

Debtors under this Plan (including any Causes of Action against the KFM Debtors and KFM Releasing Parties in connection with that certain adversary proceeding under the caption *Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC*, No. 19-03609 (MI) released pursuant to Article V.D hereof, to the extent the KFM Debtors and KFM Releasing Parties are AMH Released Parties hereunder) or (ii) acquired by the Purchaser pursuant to the Purchase Agreement in connection with the Sale.

28.     "*AMH Litigation Trust Causes of Action Proceeds*" means all proceeds of the AMH Litigation Trust Causes of Action.

29.     "*AMH Litigation Trust Contribution Parties*" means the Persons or Entities to be identified in the Plan Supplement.

30.     "*AMH Litigation Trust Funds*" means Cash to be funded to the AMH Litigation Trust Fund by the AMH Litigation Trust Contribution Parties and to be used to by the AMH Litigation Trust to pursue the AMH Litigation Trust Causes of Action and otherwise administer the AMH Litigation Trust in accordance with the Plan, the AMH Litigation Agreement, the Confirmation Order or other orders of the Bankruptcy Court.

31.     "*AMH Litigation Trust Interests*" means the beneficial interests in the AMH Litigation Trust to be distributed on a *pro rata* basis to holders of Prepetition Senior Notes Claims and Prepetition AMH RBL Deficiency Claims; *provided* that the AMH Litigation Trust Interests distributed in respect of the Prepetition AMH RBL Deficiency Claims shall be subject to adjustment, as provided in the AMH Litigation Trust Agreement, as a result of the distribution of Excess AMH Reserve Amounts or the Cash monetization of the Reserved ORRI issued pursuant to Article III.C.2.c.iii hereof.

32.     "*AMH Litigation Trustee*" means the individual appointed to act as trustee of the AMH Litigation Trust or any successor thereto pursuant to the terms of the AMH Litigation Trust Agreement.  The identity of the AMH Litigation Trustee shall be acceptable to the Prepetition AMH RBL Agent and Ad Hoc Noteholder Group, in consultation with the AMH Debtors.

33.     "*AMH Other Secured Claims Reserve Amount*" means the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims against the AMH Debtors, other than Prepetition AMH RBL Claims, that are either (a) identified in the Schedules as Secured or (b) asserted to be Secured in a proof of claim validly submitted on or before the AMR/AMH Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims (x) identified by the Debtors in their reasonable discretion as duplicative of other such Claims or (y) that shall be satisfied in full by the return of the applicable collateral to the Holder of such Claim, as determined by the AMH Debtors, each with the consent of the Prepetition AMH RBL Lenders (not to be unreasonably withheld); *provided* that the Debtors shall disclose the AMH Other Secured Claims Reserve Amount in a document filed with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.  Notwithstanding anything to the contrary herein, the AMH Other Secured Claims Reserve Amount shall not exceed the budgeted amounts for payment of AMH Other Secured Claims set forth in the Wind Down Budget.

34.     "*AMH Plan Administration Trust*" means the trust to be formed pursuant to Article V.F of the Plan.

35.     "*AMH Plan Administration Trust Agreement*" means the liquidating trust agreement to be entered into by and among the AMH Debtors and the AMH Plan Administrator with respect to the AMH Plan Administration Trust, which shall be in form and substance acceptable to the Debtors, the Prepetition AMH RBL Agent, and the Ad Hoc Noteholder Group (solely in respect of any provisions relating to Class 4 Prepetition Senior Notes Claims or Prepetition Senior Notes Cash) and the Committee (solely in respect of any provisions relating to Class 5 General Unsecured Claims or AMH GUC Distribution Cash), and shall be included in the Plan Supplement.

36.     "*AMH Plan Administration Trust Assets*" shall have the meaning given to such term in Article V.F of the Plan.

37.     "*AMH Plan Administration Trust Funds*" means Cash in the amount set forth in the Wind Down Budget, to be funded to the AMH Wind Down Reserve and to be used by the AMH Plan Administrator to administer the AMH Plan Administration Trust in accordance with the Plan Administration Process.

38.     "*AMH Plan Administrator(s)*" means Michael A. Tribolet, who will act as the administrator of the Plan Administration Process with respect to the AMH Debtors and the trustee of the AMH Plan Administration Trust or any successor(s) thereto pursuant to the terms of the AMH Plan Administration Trust Agreement, with any such successor(a) being acceptable to the Prepetition AMH RBL Agent and the Committee, and reasonably acceptable to the AMH Debtors and the Ad Hoc Noteholder Group, and shall be included in the Plan Supplement.

39.     "*AMH Priority Claims Reserve Amount*" means the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims, including Other Priority Claims and Priority Tax Claims, and excluding Administrative Claims, against the AMH Debtors that are either (a) identified in the Schedules as entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, or (b) asserted to be entitled to such priority in a proof of claim validly submitted on or before the AMR/AMH Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims; *provided* that the Debtors shall disclose the AMH Priority Claims Reserve Amount in a document filed with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.  Notwithstanding anything to the contrary herein, the AMH Priority Claims Reserve Amount shall not exceed the aggregate budgeted amounts for payment of such Claims set forth in the Wind Down Budget.

40.     "*AMH Released Party*" means (a) the Purchaser and the Purchaser Parties; (b) each of the Prepetition AMH RBL Agent and the Prepetition AMH RBL Lenders and each of their respective Representatives; (c) the AMH Debtors and the AMH Debtor Representatives; (d) the AMR/SRII Debtor Representatives; (e) the Committee and each of its members; (f) each member of the Ad Hoc Noteholder Group; (g) the Indenture Trustee; (h) the KFM Releasing Parties; (i) each Holder of the Prepetition Senior Notes, to the extent they are an AMH Releasing Party, (j) each Holder of an AMH General Unsecured Claim, solely with respect to any Avoidance Actions that could be asserted by any AMH Debtor against such Holder, to the extent such Holder is an AMH Releasing Party; (k) each Holder of a Claim or Interest described in clauses (h) through (j) of the definition of AMH Releasing Parties; *provided*, *however*, that notwithstanding anything to the contrary herein, (x) "AMH Released Parties" shall not include any Excluded Parties and (y) the AMH Released Parties shall not include the KFM Releasing Parties (1) if the KFM Plan does not include mutual releases of the AMH Releasing Parties set forth in clauses (b) through (g) of the definition of "AMH Releasing Parties" and (2) unless and until (x) the KFM Effective Date has occurred and the releases by the KFM Releasing Parties of the AMH Releasing Parties set forth in clauses (b) through (g) of the definition of "AMH Releasing Parties" have become effective and binding, and (y) the KFM/AMH Settlement Proceeds have been paid by the KFM Debtors and received by the AMH Debtors pursuant to Article V.D hereof.

41.     "*AMH Releasing Parties*" means (a) the Purchaser and the Purchaser Parties; (b) each of the Prepetition AMH RBL Agent and the Prepetition AMH RBL Lenders and each of their respective Representatives; (c) the AMH Debtors and the AMH Debtor Representatives; (d) AMR and the SRII Debtors and the AMR/SRII Debtor Representatives; (e) the Committee [and each of its members;] (f) each member of the Ad Hoc Noteholder Group; (g) the Indenture Trustee; (h) each Holder of a Claim or Interest that votes to accept the Plan; (i) each Holder of a Claim or Interest that is entitled to vote on the Plan and does not both (x) vote to reject the Plan or abstain from voting to accept or reject the Plan and (y) elect the Release Opt-Out on its Ballot; and (j) each Holder of a Claim or Interest that is presumed to accept or deemed to reject the Plan and does not elect the Release Opt-Out on its Release Opt-Out Form.  For the avoidance of doubt, (i) any Person or Entity that opts out of the AMH Third-Party Releases set forth in this Plan shall not be deemed an AMH Releasing Party, (ii) the AMH Releasing Parties set forth in clauses (a) through (h) above shall not be entitled to exercise the Release Opt-Out with respect to the AMH Debtors and any purported exercise of the Release Opt-Out by such parties shall be void *ab initio* and (iii) notwithstanding anything to the contrary herein, "AMH Releasing Parties" shall not include any Excluded Parties.

42.     "*AMH Third-Party Releases*" shall have the meaning given to such term in Article X.C.2 of the Plan.

43.     "*AMH Wind Down Amount*" means the net Cash expenditures attributable to the Wind Down of the AMH Debtors as reflected in the Wind Down Budget (as the same may be modified or amended from time to time

before the Effective Date with the consent of the Prepetition AMH RBL Agent), which, for the avoidance of doubt, shall include the AMH Plan Administration Trust Funds and the AMH GUC Claim Administrator Reserve; *provided, however,* that the Wind Down Budget and AMH Wind Down Amount cannot be modified or amended to reduce the amounts budgeted for any Fee Claims without the express consent of the applicable Professionals).

44.     "*AMH Wind Down Reserve*" means a reserve to be established by the Debtors on or before the Effective Date and comprised of AMH Distributable Cash in the amount of the AMH Wind Down Amount, which reserve shall vest in the AMH Plan Administration Trust as of the Effective Date; *provided, however,* that, on the Effective Date, the AMH GUC Claim Administrator Reserve shall be transferred to the AMH GUC Claim Administrator and the AMH GUC Distribution Cash shall be transferred to the AMH GUC Claim Disbursing Agent to be held in trust for the benefit of the Holders of Allowed Class 5 AMH General Unsecured Claims; *provided further, that* the Prepetition AMH RBL Agent, on behalf of the Prepetition AMH RBL Lenders, shall have a reversionary interest in any funds remaining in the AMH Wind Down Reserve after completion of the Wind Down in accordance with the terms of this Plan.

45.     "*AMR*" means Alta Mesa Resources, Inc.

46.     "*AMR/AMH Claims Bar Date*" means the applicable deadline by which proofs of Claim must be filed under the Claims Bar Date Order.

47.     "*AMR/AMH Petition Date*" means the date on which AMR and the AMH Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

48.     "*AMR Cash on Hand*" means all Cash held by AMR on the Effective Date.

49.     "*AMR Claims Reserve*" means a reserve to be established by the Debtors on or before the Effective Date and comprised of AMR Distributable Cash in the amount of the AMR Claims Reserve Amount, except to the extent any portion of such amount is distributed on the Effective Date pursuant to the Plan Administration Process, which reserve shall vest in the Plan Administration Trust as of the Effective Date.

50.     "*AMR Claims Reserve Amount*" means the sum of (a) the AMR Other Secured Claims Reserve Amount, (b) the AMR Priority Claims Reserve Amount, (c) the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of Cure Claims against AMR by counterparties to Executory Contracts and Unexpired Leases to be assumed or assigned by AMR, to the extent any such Cure Claim is disputed by the Debtors, and (d) the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of accrued but unpaid Administrative Claims (including Fee Claims) against AMR as of the Effective Date, including Claims arising under section 503(b)(9) of the Bankruptcy Code, in each case, solely to the extent such Claims or expenses are not assumed by the Purchaser pursuant to the Purchase Agreement in connection with the Sale.

51.     "*AMR Debtor Releases*" shall have the meaning given to such term in Article X.C.1 of the Plan.

52.     "*AMR Distributable Cash*" means Cash in an amount equal to the sum of (a) all AMR Cash on Hand, plus (b) the proceeds of all AMR Retained Causes of Action, plus (c) the proceeds of all other non-Cash assets of the Estates of AMR, including any Excess SRII Distributable Cash and Excess SRII Reserve Amounts to which AMR may be entitled on account of its Interest in SRII pursuant to Article III.C.10 of this Plan.

53.     "*AMR General Unsecured Claim*" means any unsecured Claim against AMR that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Fee Claim, an Intercompany Claim, or a Section 510(b) Claim.

54.     "*AMR Interest*" means an Interest in AMR.

55.     "*AMR Other Secured Claims Reserve Amount*" means the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims against AMR that are either (a) identified in the Schedules as Secured or (b) asserted to be Secured in a proof of claim validly submitted on or before the

AMR/AMH Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims (x) identified by the Debtors in their reasonable discretion as duplicative of other such Claims or (y) that shall be satisfied in full by the return of the applicable collateral to the Holder of such Claim, as determined by the AMH Debtors, which shall be funded from the AMR Distributable Cash; *provided* that the Debtors shall disclose the AMR Other Secured Claims Reserve Amount in a document filed with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.

56.     "*AMR/SRII Debtor Representatives*" means with respect to each of AMR and the SRII Debtors, such Debtor's current and former (a) equity holders, (b) officers, directors, and managers (in all relevant capacities, including, without limitation, in their capacity as officers, directors or managers of the Debtors or the KFM Debtors), (c) principals, (d) employees (in all relevant capacities, including, without limitation, in their capacity as employees of the Debtors or the KFM Debtors), (e) members, (f) agents, (g) advisory board members, (h) financial advisors, (i) partners, (j) attorneys, (k) accountants, (l) investment bankers, (m) consultants (including, without limitation, Meridian Energy LLC), (n) representatives, and (o) other professionals, each in their capacity as such; provided, however, that "AMR/SRII Debtor Representatives" shall not include (i) ARM Energy Management, LLC, ARM-M-1 LLC, Asset Risk Management, LLC, and ARM Midstream, LLC, (ii) High Mesa, Inc. and its subsidiaries (excluding, for the avoidance of doubt, any Debtors), (iii) KFM Holdco LLC, or (iv) the Sponsor Parties.

57.     "*AMR/SRII Plan Administration Trust*" means the trust to be formed pursuant to Article V.F of the Plan.

58.     "*AMR/SRII Plan Administration Trust Agreement*" means the liquidating trust agreement to be entered into by and among AMR, the SRII Debtors, and the AMR/SRII Plan Administrator with respect to the AMR/SRII Plan Administration Trust.

59.     "*AMR/SRII Plan Administration Trust Funds*" means (a) Cash to be funded to the AMR Wind Down Reserve and (b) Cash to be funded to the SRII Wind Down Reserve, in each case to be used by the AMR/SRII Plan Administration Trust to pursue the AMR Retained Causes of Action and the SRII Retained Causes of Action, respectively, and otherwise administer the AMR/SRII Plan Administration Trust, in accordance with the Plan Administration Process. For the avoidance of doubt, no assets of the AMH Debtors shall be used to fund the AMR Wind Down Reserve or the SRII Wind Down Reserve.

60.     "*AMR/SRII Plan Administrator*" means that person selected by AMR and the SRII Debtors to act as the administrator of the Plan Administration Process with respect to AMR and the SRII Debtors and the trustee of the AMR/SRII Plan Administration Trust or any successor thereto pursuant to the terms of the AMR/SRII Plan Administration Trust Agreement.

61.     "*AMR/SRII Retained Causes of Action*" means, collectively, the AMR Retained Causes of Action and the SRII Retained Causes of Action and shall exclude, for the avoidance of doubt, the AMH Litigation Trust Causes of Action and any Causes of Action released by the Debtors under this Plan or acquired by the Purchaser pursuant to the Purchase Agreement in connection with the Sale.

62.     "*AMR/SRII Trust Assets*" shall have the meaning given to such term in Article V.F of the Plan.

63.     "*AMR Priority Claims Reserve Amount*" means the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims, including Other Priority Claims and Priority Tax Claims, but excluding Administrative Claims, against AMR that are either (a) identified in the Schedules as entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, or (b) asserted to be entitled to such priority in a proof of claim validly submitted on or before the AMR/AMH Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims, which shall be funded from the AMR Distributable Cash; *provided* that the Debtors shall disclose the AMR Priority Claims Reserve Amount in a document filed with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.

64.     "*AMR Released Party*" means (a) the Purchaser and the Purchaser Parties; (b) each of the Prepetition AMH RBL Agent and the Prepetition AMH RBL Lenders and each of their respective Representatives; (c) the AMH Debtors and the AMH Debtor Representatives; (d) AMR, the SRII Debtors and the AMR/SRII Debtor Representatives; (e) the current and former directors, managers, and officers of the KFM Debtors; (f) the Committee and each of its members; and (g) each of the Sponsor Parties; *provided*, that notwithstanding anything to the contrary herein, "AMR Released Parties" shall not include (i) ARM Energy Management, LLC, ARM-M-1 LLC, Asset Risk Management, LLC, and ARM Midstream, LLC, or (ii) High Mesa, Inc. and its subsidiaries (excluding, for the avoidance of doubt, any Debtors).

65.     "*AMR Releasing Parties*" means (a) the Purchaser and the Purchaser Parties; (b) each of the Prepetition AMH RBL Agent and the Prepetition AMH RBL Lenders and each of their respective Representatives; (c) the AMH Debtors and the AMH Debtor Representatives; (d) AMR, the SRII Debtors, and the AMR/SRII Debtor Representatives; (e) the Committee [and each of its members]; (f) each of the Sponsor Parties; (g) each Holder of a Claim or Interest that votes to accept the Plan; (h) each Holder of a Claim or Interest that is entitled to vote on the Plan and does not both (x) vote to reject the Plan or abstain from voting to accept or reject the Plan and (y) elect the Release Opt-Out on its Ballot; and (i) each Holder of a Claim or Interest that is presumed to accept or deemed to reject the Plan and does not elect the Release Opt-Out on its Release Opt-Out Form; *provided, however*, that notwithstanding anything to the contrary herein, (1) the parties identified in clauses (b), (c) and (e) of this definition shall not be deemed to release any of the Excluded Parties in any capacity, and (2) neither the Indenture Trustee nor any Holder of the Prepetition Senior Notes shall be deemed an AMR Releasing Party.  For the avoidance of doubt, (i) any Person or Entity that opts out of the AMR Third-Party Releases set forth in this Plan shall not be deemed an AMR Releasing Party, and (ii) the AMR Releasing Parties set forth in clauses (a) through (g) above shall not be entitled to exercise the Release Opt-Out with respect to AMR and the SRII Debtors and any purported exercise of the Release Opt-Out by such parties shall be void *ab initio*.

66.     "*AMR Retained Causes of Action*" means the Causes of Action belonging to AMR that are being retained by AMR and vesting in the AMR/SRII Plan Administration Trust under the Plan, as identified on the applicable Schedule of Retained and Assigned Causes of Action, which shall exclude, for the avoidance of doubt, any Causes of Action released by the Debtors under this Plan.

67.     "*AMR Third-Party Releases*" shall have the meaning given to such term in Article X.B.2 of the Plan.

68.     "*AMR Wind Down Amount*" means the net Cash expenditures attributable to the Wind Down of AMR, which, for the avoidance of doubt, shall include the AMR/SRII Plan Administration Trust Funds.

69.     "*AMR Wind Down Reserve*" means a reserve to be established by the Debtors on or before the Effective Date and comprised of AMR Distributable Cash in the amount of the AMR Wind Down Amount, which reserve shall vest in the Plan Administration Trust as of the Effective Date.

70.     "*Avoidance Actions*" means any and all claims and Causes of Action that any of the Debtors, the Debtors in Possession, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.  Notwithstanding anything to the contrary herein, all Avoidance Actions against holders of AMH General Unsecured Claims who are AMH Releasing Parties, AMR General Unsecured Claims or SRII General Unsecured Claims shall be automatically deemed released upon the occurrence of the Effective Date, regardless of whether any such Holder votes to accept or reject the Plan, or abstains from voting, or elects the Release Opt-Out on its Ballot; *provided*, that the foregoing shall not apply to any claims or Causes of Action of any AMH Debtors against any of the Excluded Parties or any creditor of the AMH Debtors who elects the Release Opt-Out on its Ballot.

71.     "*Balloting Agent*" means Prime Clerk LLC, in its capacity as notice and balloting agent for the Debtors.

72.     "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims and Interests entitled to vote shall, among other things, indicate their acceptance or rejection of the

Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

73. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases.

74. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

75. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as each may be amended from time to time.

76. "*Bidding Procedures Order*" means the order of the Bankruptcy Court approving bidding procedures for the Debtors' asset marketing and sale process (as amended) [Docket Nos. 317, 636, and 666].

77. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

78. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

79. "*Cash Collateral*" has the meaning set forth in the Cash Collateral Orders.

80. "*Cash Collateral Orders*" means the *Second Amended Final Order Under Bankruptcy Code Sections 105(a), 361, 362, 363, 503, and 507, Bankruptcy Rules 4001 and 9014, and Complex Case Rules (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 1250], as the same may be amended, modified or supplemented from time to time, and all other interim and final orders granting the Debtors use of cash collateral, as filed at Docket Nos. 63, 308, 481, and 567.

81. "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, accounts, agreements, debts, dues, sums of money, damages, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, controversies, covenants, promises, judgments, remedies, demands, setoffs, defenses, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims, disputed or undisputed, suspected or unsuspected, known or unknown, foreseen or unforeseen, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, secured, or unsecured, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, whether asserted or assertable directly or derivatively, based in whole or in part upon any act or omission or other event occurring prior to the AMR/AMH Petition Date or the SRII Petition Date, as applicable, or during the course of the Chapter 11 Cases, including through the Effective Date and also includes, without limitation: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

82. "*Certificate*" means any instrument evidencing an extinguished Claim or Interest.

83. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered and procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

84. "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

85.     "*Claims Bar Date Order*" means the order of the Bankruptcy Court establishing the deadline by which proofs of Claim against AMR or the AMH Debtors must be Filed [Docket No. 188].

86.     "*Claims Objection Deadline*" means the date that is six (6) months after the Effective Date, which such date may be extended by the applicable Plan Administrator with the approval of the Bankruptcy Court.

87.     "*Claims Reserves*" means, collectively, the AMR Claims Reserve, the AMH Claims Reserve, and the SRII Claims Reserve.

88.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

89.     "*Committee*" means the Official Committee of Unsecured Creditors (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

90.     "*Committee Fees*" means the reasonable and documented fees and expenses incurred by counsel to the Committee, Brown Rudnick LLP and Snow Spence Green LLP, the financial advisor to the Committee, Conway MacKenzie, Inc., and the landman to the Committee, Cochran Land Service, LLC.

91.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been:  (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

92.     "*Confirmation Date*" means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

93.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation, as such hearing may be adjourned or continued from time to time in the Debtors' sole discretion.

94.     "*Confirmation Order*" means the final, non-appealable order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, supplemented, or modified from time to time.

95.     "*Consummation*" means the occurrence of the Effective Date.

96.     "*Coverage Determination Date*" has the meaning assigned in Article X.J hereof.

97.     "*Cure Claim*" means a Claim based upon a monetary default, if any, by any Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

98.     "*D&O Insurance Coverage*" means coverage for insureds under any applicable D&O Policies, including (without limitation) any applicable D&O Tail Coverage.

99.     "*D&O Policies*" means all insurance policies (including policies providing D&O Tail Coverage) and related agreements of indemnity for directors', members', trustees' and officers' liability that have been issued at any time to, or provided coverage to, any of the Debtors or their Representatives and all agreements, documents or instruments relating thereto, for any policy period whatsoever.

100.    "*D&O Tail Coverage*" means the extension of the D&O Insurance Coverage for any period beyond the end of the policy period, including but not limited to any extension for a period of six (6) years after the Effective Date for claims based on conduct occurring prior to the Effective Date.

101. "*Debtor*" or "*Debtor in Possession*" means AMR, the AMH Debtors, and the SRII Debtors, each in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases under sections 1107 and 1108 of the Bankruptcy Code.

102. "*Definitive Documents*" shall include all definitive documents and agreements governing the transactions contemplated hereunder, including, without limitation, this Plan (including the Plan Supplement and all other exhibits and supplements hereto), the Disclosure Statement and other solicitation materials, and the Confirmation Order, each of which shall be in form and substance acceptable to the Debtors and acceptable to the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee (in each case, to the extent of their consent rights as provided in this Plan); *provided*, that the Plan and the Confirmation Order shall also be acceptable to the Purchaser, to the extent (a) required by the Purchase Agreement or this Plan or (b) relating to the release or exculpation of the Purchaser or the Purchaser Parties.

103. "*Disbursing Agent*" means the Debtors or the Entity or Entities chosen (at any time) by the Debtors, and acceptable to the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee, to make or facilitate distributions pursuant to the Plan.

104. "*Disclosure Statement*" means the *Disclosure Statement for Joint Plan of Liquidation of Alta Mesa Resources, Inc. and Its AMH and SRII Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated April 17, 2020, as the same may be amended, supplemented, or modified from time to time, which shall be in form and substance acceptable to the Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

105. "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

106. "*Distribution Record Date*" means the date on which the Confirmation Order is entered or such other date that is designated by the Debtors; provided however, that the Distribution Record Date shall not apply to the securities of the Debtors deposited with DTC, the Holders of which shall receive a distribution, if any, in accordance with Article VII of this Plan and, as applicable, the customary procedures of the DTC.

107. "*DTC*" means the Depositary Trust Company.

108. "*Effective Date*" means the date on which the Confirmation Order becomes a Final Order and all of the conditions specified in Article IX.B hereof have been satisfied or waived pursuant to Article IX.C hereof.

109. "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

110. "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

111. "*Excess AMH Distributable Cash*" means the AMH Distributable Cash remaining after the funding of the AMH Claims Reserve Amount, the Professional Fee Claims Reserve, and the AMH Wind Down Amount.

112. "*Excess AMH Reserve Amounts*" means the AMH Claims Reserve Amount and the AMH Wind Down Amount remaining in the AMH Claims Reserve and the AMH Wind Down Reserve, if any, after (i) the satisfaction in full in accordance with the Plan of all Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, in each case to the extent Allowed against the AMH Debtors, (ii) the payment in full of the AMH GUC Distribution Cash and the Prepetition Senior Notes Distribution Cash, and (iii) the conclusion of the Wind Down of the AMH Debtors and the Plan Administration Process in accordance with the AMH Plan Administration Trust Agreement.

113. "*Excess AMR Distributable Cash*" means the AMR Distributable Cash remaining, if any, after the funding of the AMR Claims Reserve Amount and the AMR Wind Down Amount.

114.     "*Excess AMR Reserve Amounts*" means the AMR Claims Reserve Amount and the AMR Wind Down Amount remaining in the AMR Claims Reserve or the AMR Wind Down Reserve, if any, after the satisfaction in full of all Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, in each case to the extent Allowed against AMR, and the conclusion of the Wind Down of AMR and the Plan Administration Process in accordance with the AMR/SRII Plan Administration Trust Agreement.

115.     "*Excess SRII Distributable Cash*" means the SRII Distributable Cash remaining, if any, after the funding of the SRII Claims Reserve Amount and the SRII Wind Down Amount.

116.     "*Excess SRII Reserve Amounts*" means the SRII Claims Reserve Amount and the SRII Wind Down Amount remaining in the SRII Claims Reserve or the SRII Wind Down Reserve, if any, after the satisfaction in full of all Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, in each case to the extent Allowed against the SRII Debtors, and the conclusion of the Wind Down of the SRII Debtors and the Plan Administration Process in accordance with the AMR/SRII Plan Administration Trust Agreement.

117.     "*Excluded D&O Parties*" means the current and former directors, managers and officers of the AMH Debtors not identified on <u>Schedule 1</u> to this Plan, including, without limitation, the Specified Directors and Officers.

118.     "*Excluded Parties*" means, collectively:  (i) the AMH Debtors' direct and indirect equity holders; (ii) the Excluded D&O Parties, (iii) High Mesa, Inc. and each of its direct or indirect, wholly or partially-owned subsidiaries (excluding, for the avoidance of doubt, any Debtors or KFM Debtors), (iv) KFM Holdco, LLC, (v) ARM Energy Management, LLC, ARM-M-1 LLC, Asset Risk Management, LLC, and ARM Midstream, LLC, (vi) the Sponsor Parties, (vii) Harlan Chappelle, Michael Ellis, and Mickey Ellis, any of their respective Representatives, and any entities for which they individually or collectively, directly or indirectly, own a controlling interest; and (viii) the Specified Directors and Officers.  For the avoidance of doubt, "Excluded Parties" shall not include any Purchaser Parties.

119.     "*Exculpated Claim*" means any Claim related to any act or omission on or prior to the Effective Date in connection with, relating to or arising out of the Debtors' in- or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan, the Purchase Agreement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other agreement; *provided, however,* that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, willful misconduct, or criminal conduct.

120.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Committee and each of its members; (c) the Purchaser and Purchaser Parties; (d) the Prepetition AMH RBL Agent and Prepetition AMH RBL Lenders; (e) the Ad Hoc Noteholder Group; (f) the AMH GUC Claim Administrator and the AMH GUC Claim Oversight Committee; (g) the Plan Administrators; (h) the AMH Litigation Trustee; and (i) with respect to each of the foregoing Persons or Entities, such Person's or Entity's Representatives; *provided, however*, that notwithstanding anything to the contrary set forth herein, no Excluded Party shall be an Exculpated Party.

121.     "*Exculpation*" means the exculpation provision set forth in Article X.E hereof.

122.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

123.     "*Federal Judgment Rate*" means the federal judgment rate, which rate was in effect as of the AMR/AMH Petition Date or the SRII Petition Date, as applicable.

124.     "*Fee Claim*" means a Claim for Accrued Professional Compensation.

125.   "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases.

126.   "*Final Decree*" means the order entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 closing a chapter 11 case.

127.   "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice, or as to which an appeal or motion for reargument or rehearing is pending, but no stay of the order is in effect; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

128.   "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

129.   "*Holder*" means any Person or Entity holding a Claim or an Interest.

130.   "*Impaired*" means any Claim or Interest in an Impaired Class.

131.   "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

132.   "*Indemnification Provision*" means each of the indemnification provisions currently in place, whether in the bylaws, certificates of incorporation, or other formation documents in the case of a limited liability company, board resolutions, or employment or service contracts, for the current directors, managers, managing members, officers, members (including any *ex officio* members), and employees of the Debtors.

133.   "*Indemnified Parties*" means each of the Debtors' respective officers, directors, managers, managing members, and employees that served in any such capacity on or after the AMR/AMH Petition Date or the SRII Petition Date, as applicable, each in their respective capacities as such before or after the AMR/AMH Petition Date or the SRII Petition Date, as applicable.

134.   "*Indenture Trustee*" means U.S. Bank, N.A. in its capacity as indenture trustee for the Prepetition Senior Notes under the Prepetition Senior Notes Indenture, or any such successor indenture trustee.

135.   "*Indenture Trustee Charging Lien*" means the lien of the Indenture Trustee arising under the Prepetition Senior Notes Indenture, upon any distributions relating to or on account of the Prepetition Senior Notes, securing the payment of, including without limitation, the fees and expenses of the Indenture Trustee, including fees and expenses of each counsel and other professionals engaged by, on behalf of, or for the benefit of the Indenture Trustee, whether incurred prepetition, postpetition, or before or after the Effective Date.

136.   "*Insurance Policy*" means all insurance policies and related agreements of indemnity that have been issued at any time to, or provide coverage to, any of the Debtors and all agreements, documents, or instruments relating thereto.

137.   "*Insurer*" means any company or other entity that issued any Insurance Policy, and any respective predecessors or affiliates thereof.

138.   "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor other than a claim held by an AMH Debtor against AMR or an SRII Debtor.

139.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

140.    "*Interests*" means, collectively, (a) any equity security (as defined in section 101(16) of the Bankruptcy Code) or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other entity) in any Debtor, and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, earn-out rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, including arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

141.    "*Interim Distribution*" means the distribution of $99,000,000 of Cash proceeds of the Sale to the Prepetition AMH RBL Agent prior to the Effective Date in accordance with the Cash Collateral Order and the Supplemental Sale Order, which distribution shall be unconditionally and fully vested in, and not subject to any clawback from, the Prepetition AMH RBL Agent as of the Effective Date.

142.    "*IRC*" means the U.S. Internal Revenue Code of 1986, as amended.

143.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

144.    "*KFM Agent*" means Wells Fargo Bank, N.A., as administrative agent for the KFM Lenders.

145.    "*KFM Cash Collateral Order*" means the *Final Order (I) Authorizing the KFM Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court at Docket No. 1137.

146.    "*KFM Debtors*" means Kingfisher Midstream, LLC, Kingfisher STACK Oil Pipeline, LLC, Oklahoma Produced Water Solutions, LLC, and Cimarron Express Pipeline, LLC.

147.    "*KFM Effective Date*" means the "Effective Date" (as defined in the KFM Plan).

148.    "*KFM Credit Agreement*" that certain Amended and Restated Credit Agreement, dated as of May 30, 2018 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time), by and among Kingfisher Midstream, LLC, as borrower, Wells Fargo Bank, N.A., as administrative agent, and the lenders party thereto from time to time.

149.    "*KFM Lenders*" means the lenders from time to time party to the KFM Credit Agreement.

150.    "*KFM Plan*" means the *Joint Chapter 11 Plan of KFM Debtors* [Docket No. 1326], filed in the chapter 11 cases of the KFM Debtors, as the same may be amended, modified or supplemented from time to time.

151.    "*KFM Releasing Parties*" means (a) each of the KFM Debtors; (b) the KFM Agent and KFM Lenders that do not "opt out" of the releases set forth in Section 10.6(b) of the KFM Plan, and (c) for both (a) and (b), each of their respective Representatives; *provided*, *however*, that notwithstanding anything to the contrary herein, "KFM Releasing Parties" shall not include any Excluded Parties.

152.    "*KFM/AMH Settlement Proceeds*" shall have the meaning set forth in Article V.D of this Plan.

153.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

154.    "*Meridian Employees*" means the Meridian Employees, as defined in the *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* [Docket No. 8].

155.   "*Net Sale Proceeds*" means all Cash proceeds of the Sale distributed to the AMH Debtors upon or following closing of the Sale in accordance with the terms of the Purchase Agreement, <u>minus</u> any sale proceeds distributed pursuant to the Interim Distribution.

156.   "*Ordinary Course Professionals Order*" means any orders of the Bankruptcy Court permitting the Debtors to retain certain professionals in the ordinary course of their businesses.

157.   "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim or (b) a Priority Tax Claim.

158.   "*Other Secured Claim*" means a Claim that is Secured, but excluding any Prepetition AMH RBL Claims.

159.   "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

160.   "*Plan*" means this *Joint Plan of Liquidation of Alta Mesa Resources, Inc. and Its AMH and SRII Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated April 17, 2020, as the same may be amended, supplemented, or modified from time to time (including, without limitation, any exhibits hereto, which are incorporated herein by reference), which shall be in form and substance acceptable to the Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee.

161.   "*Plan Administrators*" means the AMH Plan Administrator and the AMR/SRII Plan Administrator.

162.   "*Plan Administration Process*" means the process for resolving and paying Claims described in Article VIII of the Plan.

163.   "*Plan Administration Trust Agreements*" means, collectively, the AMH Plan Administration Trust Agreement and AMR/SRII Plan Administration Trust Agreement.

164.   "*Plan Administration Trusts*" means AMH Plan Administration Trust and the AMR/SRII Plan Administration Trust.

165.   "*Plan Supplement*" means the documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall include (a) the Plan Administration Trust Agreements and identity of the Plan Administrators, (b) the AMH Litigation Trust Agreement and the identity of the AMH Litigation Trustee, (c) the AMH GUC Claim Administrator Agreement and the identity of the AMH GUC Claim Administrator and members of the AMH GUC Claim Oversight Committee; (d) Schedules of Retained and Assigned Causes of Action, (e) the Schedule of Assumed Contracts, and (f) the Wind Down Budget, with copies of all such documents and forms of documents, agreements, schedules and exhibits to be filed no later than fourteen (14) days before the Voting Deadline, which each shall be in form and substance acceptable to the Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee (in each case, to the extent of their consent rights as provided in this Plan).

166.   "*Prepetition AMH RBL Agent*" means Wells Fargo Bank, N.A. in its capacity as administrative agent under the Prepetition AMH RBL Credit Agreement and any other applicable Prepetition AMH RBL Credit Documents.

167.   "*Prepetition AMH RBL Agent Fees*" means the reasonable and documented fees and expenses incurred by counsel to the Prepetition AMH RBL Agent, Bracewell LLP, and the financial advisor to the Prepetition AMH RBL Agent, RPA Advisors, LLC.

168.   "*Prepetition AMH RBL Claim*" means a Claim against the AMH Debtors arising under the Prepetition AMH RBL Credit Documents, including the AMH Adequate Protection Claims under the Cash Collateral Orders.

169.   "*Prepetition AMH RBL Credit Agreement*" means that certain Eighth Amended and Restated Credit Agreement, dated as of February 9, 2018, by and among Alta Mesa Holdings, LP, as borrower, Wells Fargo Bank,

N.A., as administrative agent, and the lenders and other parties thereto (as subsequently modified, amended, or supplemented from time to time).

170. "*Prepetition AMH RBL Credit Documents*" means the Prepetition AMH RBL Credit Agreement and any related security, guaranty, or other Loan Documents (as defined in the Prepetition AMH RBL Credit Agreement).

171. "*Prepetition AMH RBL Deficiency Claim*" means, at any given time, the unsecured Claim held by the Prepetition AMH RBL Lenders, which shall be in an amount equal to (a) the Prepetition AMH RBL Claims, minus (b) the aggregate amount of the Interim Distribution, minus (c) the Excess AMH Distributable Cash, minus (d) any Cash received by the Prepetition AMH RBL Agent or the Prepetition AMH RBL Lenders on account of the Reserved ORRI, minus (e) any distributions to the AMH RBL Agent or the Prepetition AMH RBL Lenders on account of any Excess AMH Reserve Amounts.

172. "*Prepetition AMH RBL Lenders*" means the Holders of the Prepetition AMH RBL Claims.

173. "*Prepetition Secured AMH RBL Claim*" means all Prepetition AMH RBL Claims that are not Prepetition AMH RBL Deficiency Claims.

174. "*Prepetition Senior Notes*" means the 7.875% senior unsecured notes due 2024 issued by Alta Mesa Holdings, LP and Alta Mesa Finance Services Corp. under the Prepetition Senior Notes Indenture.

175. "*Prepetition Senior Notes Claim*" means any and all Claims arising from, under, or in connection with the Prepetition Senior Notes, the Prepetition Senior Notes Indenture, or any other related document or agreement against the AMH Debtors, which shall be deemed Allowed in the aggregate principal amount of $500,000,000.00, plus any unpaid interest, fees, and expenses due and owing pursuant to the terms of the Prepetition Senior Notes Indenture as of the AMR/AMH Petition Date.

176. "*Prepetition Senior Notes Documents*" has the meaning assigned in Article V.N.

177. "*Prepetition Senior Notes Distribution Cash*" means Cash in the amount of $2,250,000, which shall be funded from the AMH Distributable Cash; *provided, however*, that to the extent the AMH General Unsecured Claim of Mustang Gas Products, LLC is Allowed in an amount in excess of $10,000,000, the amount of the Prepetition Senior Notes Distribution Cash may be modified as may be agreed by the Ad Hoc Noteholder Group and the Committee.

178. "*Prepetition Senior Notes Indenture*" means the Indenture dated as of December 8, 2016 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof), by and among Alta Mesa Holdings, LP, Alta Mesa Finance Services Corp., the guarantors named thereunder, and the Indenture Trustee.

179. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

180. "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interest under the Plan.

181. "*Professional*" means a Person or Entity: (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

182.    "*Professional Fee Claim Reserve*" means the reserve established in the amount set forth for payment of Professional Fee Claims in the Wind Down Budget and maintained by the AMH Plan Administration Trust from Cash on hand existing immediately prior to the Effective Date to pay in full in Cash the Professional Fee Claims against the AMH Debtors incurred on or prior to the Effective Date (solely to the extent permitted by the Wind Down Budget) as and when such Claims become Allowed.

183.    "*Purchase Agreement*" means that certain Purchase and Sale Agreement by and among Alta Mesa Holdings, LP, Alta Mesa Holdings GP, LLC, OEM GP, LLC, Alta Mesa Finance Services Corp., Alta Mesa Services, LP, and Oklahoma Energy Acquisitions, LP, AMR (for the limited purposes set forth therein), and the Purchaser, dated as of January 17, 2020 in connection with the Sale, and including all exhibits, schedules, amendments, modifications and supplements thereto, including the First Amendment to Amended and Restated Purchase and Sale Agreement, dated April 2, 2020.

184.    "*Purchaser*" means BCE-Mach III LLC.

185.    "*Purchaser Parties*" means (a) Bayou City Energy Management LLC; (b) BCE-AMH Holdings, LLC; (c) BCE-AMR Holdings LLC; (d) BCE-MESA Holdings, LLC; (e) William W. McMullen; (f) Mark Stoner; (g) Andrew Koehler; (h) Mach Resources LLC; (i) BCE-Mach LLC; (j) BCE-Mach II LLC; and (k) any Representative of a Person or Entity (as such terms are defined in section 101 of the Bankruptcy Code) identified in (a) through (j) above, in the case of each of the Persons and Entities identified in clauses (a) through (k) above, in their applicable capacities with respect to the Purchaser or the Debtors; provided that under no circumstances shall Representatives of the Purchaser Parties include (i) KFM Holdco, LLC, (ii) High Mesa Inc. or any of its direct or indirect, wholly or partially owned, subsidiaries or any of its related Persons or Entities that would otherwise be included in the definition of Representatives (other than William W. McMullen, Mark Stoner, and Andrew Koehler), (iii) Alta Mesa Resources, Inc. or any of its direct or indirect, wholly or partially owned, subsidiaries or any of its related Persons or Entities that would otherwise be included in the definition of Representatives (other than William W. McMullen, Mark Stoner, and Andrew Koehler), (iv) Riverstone VI Alta Mesa Holdings, L.P. or any of its related Persons or Entities that would otherwise be included in the definition of Representatives, or (v) HPS Investment Partners LLC or any of its related Persons or Entities that would otherwise be included in the definition of Representatives.  For the avoidance of doubt, "Purchaser Parties" shall not include any Excluded Parties or any directors, officers or managers of the Debtors other than William McMullen.

186.    "*Reimbursement Right*" has the meaning assigned in Article X.J hereof.

187.    "*Reinstated*" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before, on or after the AMR/AMH Petition Date or the SRII Petition Date, as applicable, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest or any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder.

188.    "*Release Opt-Out*" means the election, to be made solely through validly-submitted Ballots or Release Opt-Out Forms, to opt-out of the release provisions set forth in Article X.C.1 or Article X.C.2, as applicable.

189.    "*Release Opt-Out Deadline*" means the date that is the Voting Deadline.

190.    "*Release Opt-Out Form*" means the form upon which certain Holders of Claims or Interests not entitled to vote shall indicate their election with respect to the Release Opt-Out, in each case in accordance with the

Plan and the procedures governing the solicitation process, which Release Opt-Out Form must be actually received by the Balloting Agent on or before the Release Opt-Out Deadline.

191. "*Representatives*" means, with respect to a Person or Entity, such Person's or Entity's current and former (a) equity holders, (b) controlled subsidiaries, (c) officers, (d) directors, (e) managers, (f) principals, (g) employees, (h) members, (i) agents, (j) advisory board members, (k) financial advisors, (l) partners, (m) attorneys, (n) accountants, (o) investment bankers, (p) consultants, (q) representatives, and (r) other professionals each in their capacity as such.

192. "*Reserved ORRI*" means the AMH Debtors' right, title and interest in the Reserved ORRI (as defined in the Purchase Agreement), after giving effect to the conveyance of the KFM ORRI (as defined in the Purchase Agreement) contemplated by the Purchase Agreement.

193. "*Restructuring*" means any and all proposed restructuring, recapitalization, sale or liquidation transactions involving one of more of the Debtors.

194. "*Sale*" means the sale of all or substantially all of the AMH Debtors' assets pursuant to the Purchase Agreement.

195. "*Sale Order*" means the order approving the Sale [Docket No. 1013], as supplemented or modified by the Supplemental Sale Order.

196. "*Schedule of Assumed Contracts*" means the schedule of executory contracts or unexpired leases to be assumed by the Debtors, which schedule shall be filed with the Plan Supplement.

197. "*Schedules of Retained and Assigned Causes of Action*" means (a) the schedule of Causes of Action to be retained by AMR's and the SRII Debtors' Estates and contributed to the AMR/SRII Plan Administration Trust, which schedule will be filed with the Plan Supplement, and (b) the schedule of AMH Litigation Trust Causes of Action, which will be filed with the Plan Supplement and which schedule of AMH Litigation Trust Causes of Action will be reasonably acceptable to the AMH Debtors, the Prepetition AMH RBL Agent and the Ad Hoc Noteholder Group.

198. "*Section 510(b) Claim*" means any Claim arising from: (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

199. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

200. "*Specified Directors and Officers*" means James T. Hackett, Michael A. McCabe (and his estate), and Tim J. Turner.

201. "*Specified Directors and Officers Claim*" means any AMH Litigation Trust Cause of Action against any of the Specified Directors and Officers.

202. "*Sponsor Parties*" means (a) Riverstone VI Alta Mesa Holdings, L.P., (b) HPS Investment Partners, LLC, or (c) any of their respective Representatives (including, without limitation, in their capacities as officers, directors, managers, or employees of the Debtors or any of their controlled subsidiaries, and including Meridian Energy, LLC, solely in its capacity as consultant to any Sponsor Parties and not in any other capacity, and excluding the Meridian Employees).  For the avoidance of doubt, "Sponsor Parties" shall include David M. Leuschen, Pierre Laypeyre, Jr., Donald Dimitrievich, and James Hackett.

203. "*SRII Cash on Hand*" means all Cash held by the SRII Debtors on the Effective Date.

204. "*SRII Claims Bar Date*" shall have the meaning set forth in Article V.C of this Plan.

205. "*SRII Claims Reserve*" means a reserve to be established by the Debtors on or before the Effective Date and comprised of SRII Distributable Cash in the amount of the SRII Claims Reserve Amount, except to the extent any portion of such amount is distributed on the Effective Date pursuant to the Plan Administration Process, which reserve shall vest in the Plan Administration Trust as of the Effective Date.

206. "*SRII Claims Reserve Amount*" means the sum of (a) the SRII Other Secured Claims Reserve Amount, (b) the SRII Priority Claims Reserve Amount, (c) the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of Cure Claims against the SRII Debtors by counterparties to Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the Sale, to the extent any such Cure Claim is disputed by the Debtors, and (d) the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of accrued but unpaid Administrative Claims (including Fee Claims) against the SRII Debtors as of the Effective Date, including Claims arising under section 503(b)(9) of the Bankruptcy Code, in each case, solely to the extent such Claims or expenses are not assumed by the Purchaser pursuant to the Purchase Agreement in connection with the Sale.

207. "*SRII Debtors*" means SRII Opco GP, LLC and SRII  Opco, LP.

208. "*SRII Distributable Cash*" means Cash in an amount equal to the sum of (a) all SRII Cash on Hand, plus (b) the proceeds of all SRII Retained Causes of Action, plus (c) the proceeds of all other non-Cash assets of the Estates of the SRII Debtors not subject to the Sale.

209. "*SRII General Unsecured Claim*" means any unsecured Claim against any of the SRII Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Fee Claim, an Intercompany Claim, or a Section 510(b) Claim.

210. "*SRII Interests*" means an Interest in SRII Opco, LP, other than an Intercompany Interest.

211. "*SRII Other Secured Claims Reserve Amount*" means the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims against the SRII Debtors that are either (a) identified in the Schedules as Secured or (b) asserted to be Secured in a proof of claim validly submitted on or before the SRII Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims, which shall be funded from the SRII Distributable Cash; *provided* that the Debtors shall disclose the SRII Other Secured Claims Reserve Amount in a document filed with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.

212. "*SRII Petition Date*" means the date on which the SRII Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

213. "*SRII Plan Administration Trust Funds*" means Cash to be funded to the SRII Wind Down Reserve and to be used by the AMR/SRII Plan Administration Trust to pursue the SRII Retained Causes of Action in accordance with the Plan Administration Process.  For the avoidance of doubt, no assets of the AMH Debtors shall be used to fund the AMR Wind Down Reserve or the SRII Wind Down Reserve.

214. "*SRII Priority Claims Reserve Amount*" means the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims, including Other Priority Claims and Priority Tax Claims, but excluding Administrative Claims, against the SRII Debtors that are either (a) identified in the Schedules as entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, or (b) asserted to be entitled to such priority in a proof of claim validly submitted on or before the SRII Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims, which shall be funded from the SRII

Distributable Cash; *provided* that the Debtors shall disclose the SRII Priority Claims Reserve Amount in a document filed with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.

215.   "*SRII Retained Causes of Action*" means the Causes of Action belonging to the SRII Debtors that are being retained by the SRII Debtors and vesting in the AMR/SRII Plan Administration Trust under the Plan, as identified on the applicable Schedule of Retained and Assigned Causes of Action, which shall exclude, for the avoidance of doubt, any Causes of Action released by the Debtors under this Plan.

216.   "*SRII Wind Down Amount*" means the net Cash expenditures attributable to the Wind Down of the SRII Debtors as reflected in the Wind Down Budget (as the same may be modified or amended from time to time before the Effective Date), which, for the avoidance of doubt, shall include the SRII Plan Administration Trust Funds.

217.   "*SRII Wind Down Reserve*" means a segregated account to be established by the Debtors into which SRII Distributable Cash, in the amount of the SRII Wind Down Amount, shall be deposited on or before the Effective Date, which account shall vest in the Plan Administration Trust as of the Effective Date.

218.   "*Statutory Fees*" means all fees and charges assessed against the Estates under section 1930, chapter 123, of the Judicial Code.

219.   "*Supplemental Sale Order*" means the *Order Authorizing AMH/AMR Debtors to Enter Into and Perform Under Modified PSA With BCE-Mach III, LLC* [Docket No. 1512].

220.   "*Turner Claims*" has the meaning assigned in Article X.J hereof.

221.   "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

222.   "*Unused Professional Fee Reserve Amount*" means the remaining Cash, if any, in the Professional Fee Claim Reserve after all obligations and liabilities for which such reserve was established are paid, satisfied, and discharged in full in Cash or are disallowed by Final Order in accordance with this Plan.

223.   "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

224.   "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

225.   "*Voting Class*" means Class 2 Prepetition Secured AMH RBL Claims, Class 3 AMR General Unsecured Claims, Class 4 Prepetition Senior Notes Claims, Class 5 AMH General Unsecured Claims, Class 6 Prepetition AMH RBL Deficiency Claims, and Class 7 SRII General Unsecured Claims, as applicable.

226.   "*Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on May 20, 2020.

227.   "*Wind Down*" means the process of winding down the Debtors' businesses and Estates after closing of the Sale.

228.   "*Wind Down Budget*" means the budget setting forth (a) the aggregate amounts of Administrative Claims (including Fee Claims), Other Priority Claims, Priority Tax Claims, and Other Secured Claims, in each case against the AMH Debtors, that may be paid from AMH Distributable Cash under the Plan; and (b) the anticipated expenses of the Wind Down from and after the Effective Date.  The Wind Down Budget shall be included in the Plan Supplement and, with respect to the amounts set forth in clause (a) above and the AMH Wind Down Amount, shall be in form and substance (x) acceptable to the AMH Debtors and the Prepetition AMH RBL Agent and (y) reasonably acceptable to the Ad Hoc Noteholder Group, and the Committee (except that, with respect to Fee Claims of the Committee's Professionals incurred in respect of the AMH Debtors, the amount budgeted for such Fee Claims in the Wind Down Budget shall be acceptable to the AMH Debtors, the Prepetition AMH RBL Agent, and the Committee), or, if such parties cannot agree on such amounts, as approved by the Bankruptcy Court.  Notwithstanding anything to

the contrary herein, the aggregate Allowed amounts of Administrative Claims, Other Priority Claims, Priority Tax Claims, and Other Secured Claims, in each case against the AMH Debtors, shall not exceed the aggregate budgeted amounts for such Allowed Claims set forth in the Wind Down Budget, and any payments of such Allowed Claims shall not exceed the amounts set forth in the Wind Down Budget, absent written consent of the Prepetition AMH RBL Agent.

229.    "*Wind Down Reserves*" means, collectively, the AMR Wind Down Reserve, the AMH Wind Down Reserve, and the SRII Wind Down Reserve.

B.    *Rules of Interpretation*

For purposes of this Plan, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) unless otherwise specified, any reference in this Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in this Plan to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Plan to Articles are references to Articles of this Plan or to this Plan; (6) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (7) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (9) the word "or" shall not be exclusive; (10) unless otherwise set forth in this Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form in this Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (14) any immaterial effectuating provisions may be interpreted by the Debtors, the applicable Plan Administrator or the AMH Litigation Trustee, as applicable, in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.    *Computation of Time*

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply.  If a payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall instead occur on the next succeeding Business Day, but shall be deemed to have occurred as of the required date.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors not incorporated or organized in Texas shall be governed by the laws of the jurisdiction of incorporation or organization of the applicable Debtor.

E.      *Reference to Monetary Figures*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

1.   General Administrative Claims

Except with respect to Administrative Claims that are Fee Claims or Statutory Fees and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment for such Holder's Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid in full in Cash from the applicable Claims Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable.  The AMH Debtors shall pay Administrative Claims against the AMH Debtors solely to the extent permitted by the Wind Down Budget.

Except as otherwise provided in this Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the applicable Plan Administrator pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; provided that the foregoing shall not apply to either the Holders of Claims under section 503(b)(1)(D) of the Bankruptcy Code or the Bankruptcy Court or United States Trustee as the Holders of Administrative Claims. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors and their respective Estates and property and such Administrative Claims shall be deemed discharged as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F hereof.  Nothing in this Article II.A shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the AMR/AMH Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to such requests must be Filed and served on the applicable Plan Administrator and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

As part of the global settlement and compromise embodied in the Plan, neither the Ad Hoc Noteholder Group nor its advisors shall seek allowance of any Administrative Claim pursuant to section 503(b)(3)(D) or 503(b)(4) of the Bankruptcy Code, and no such Administrative Claim shall be Allowed.

2.   Fee Claims

On or immediately prior to the Effective Date, AMR and the SRII Debtors shall pay all amounts owing to the Professionals for all unpaid Fee Claims relating to prior periods and for the period ending on the Effective Date;. The Professionals shall estimate Fee Claims against AMR and the SRII Debtors due for periods that have not been billed as of the Effective Date, which amounts, for the avoidance of doubt, shall be paid on or immediately prior to the Effective Date.

On or before the Effective Date, the AMH Debtors will fund the Professional Fee Claim Reserve with Cash in the amount permitted to be paid in respect of unpaid Fee Claims against the AMH Debtors under the Wind Down Budget. The Cash contained in the Professional Fee Claim Reserve will be used solely to pay the Fee Claims for which such reserve was established, with any Unused Professional Fee Reserve Amount being returned to the AMH Plan Administration Trust and becoming Excess AMH Distributable Cash to be distributed in accordance with this Plan. The Professional Fee Claim Reserve shall be maintained in trust for the Professionals and will not be considered property of the AMH Debtors' Estates or the AMH Plan Administration Trust; *provided*, that the AMH Plan Administration Trust shall have a reversionary interest in the Unused Professional Fee Reserve Amount. After the Effective Date, the AMH Plan Administration Trust will not deposit any funds or property into the Professional Fee Claim Reserve without further order of the Bankruptcy Court or otherwise commingle funds in the Professional Fee Claim Reserve.

On or prior to forty-five (45) days after the Effective Date, each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the AMR/AMH Petition Date or the SRII Petition Date, as applicable, through the Effective Date; *provided* that the Debtors may pay retained Professionals or other Entities in the ordinary course of business for services rendered after the Effective Date solely to the extent permitted by the Wind Down Budget, without further Bankruptcy Court order; and *provided, further*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Fee Claim must be Filed and served on the Debtors and the requesting party no later than twenty-one (21) days after such Fee Claim is Filed with the Bankruptcy Court. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims. Within five (5) business days after entry of a Final Order with respect to a particular Professional's final fee application: (a) in the case of Fee Claims against AMR and the SRII Debtors, such Professional shall remit any overpayment to the applicable Debtors and AMR and/or the SRII Debtors (as applicable) shall pay any unpaid amounts to such Professional; and (b) in the case of Fee Claims against the AMH Debtors, any Allowed and unpaid Fee Claims of such Professional shall be paid from the Professional Fee Claim Reserve (solely to the extent permitted to be paid to such Professional by the Wind Down Budget).

    3.    Statutory Fees

All Statutory Fees due and payable prior to the Effective Date shall be paid by the applicable Debtors on the Effective Date. After the Effective Date, the applicable Plan Administrator shall pay any and all such fees when due and payable from the applicable Claims Reserve. The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the applicable Plan Administrator shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Disbursing Agent during the applicable period, attested to by an authorized representative of the Disbursing Agent. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**B.**    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtors agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid in full in Cash from the applicable Claims Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim is Allowed; and (c) the date such Allowed Priority Tax Claim becomes due and payable. The AMH Debtors shall pay Allowed Priority Tax Claims against the AMH Debtors solely to the extent permitted by the Wind Down Budget.

**C.**    *Other Priority Claims*

Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtors agree to less favorable treatment for such Holder's Allowed Other Priority Claim, each Holder of an Allowed Other Priority

Claim will be paid in full in Cash from the applicable Claims Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Other Priority Claim is Allowed; and (c) the date such Allowed Other Priority Claim becomes due and payable.  The AMH Debtors shall pay any Other Priority Claims against the AMH Debtors solely to the extent permitted by the Wind Down Budget.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Introduction*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor.  Therefore, the classifications set forth in Article III.B herein apply separately with respect to each Plan proposed by each Debtor. This joint Plan and the classifications set forth herein shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a substantive consolidation of any of the Debtors, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.  Notwithstanding the joint nature of this Plan, nothing herein shall permit or grant a party in interest in the chapter 11 case of one Debtor with standing, or the right to vote to accept or reject this Plan, in the chapter 11 case of another Debtor.  If there are no Claims or Interests in a particular Class for a particular Debtor, then such Class of Claims or Interests shall not exist for all purposes of the Plan for that Debtor.

If the Bankruptcy Court does not confirm this Plan with respect to one or more of the Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

B.      *Summary of Classification*

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Prepetition Secured AMH RBL Claims | Impaired | Entitled to Vote |
| 3 | AMR General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Senior Notes Claims | Impaired | Entitled to Vote |
| 5 | AMH General Unsecured Claims | Impaired | Entitled to Vote |

## SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 6 | Prepetition AMH RBL Deficiency Claims | Impaired | Entitled to Vote |
| 7 | SRII General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 8 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | SRII Interests | Impaired | Entitled to Vote |
| 11 | AMR Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 13 | AMH Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

C.    *Treatment of Claims and Interests*

    1.    Class 1:    Other Secured Claims

        (a)    *Classification*:  Each Class 1 Claim is an Other Secured Claim against the applicable Debtor.  With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 1A, Class 1B, and so on), so that each Holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

        (b)    *Treatment*:  Except to the extent a Holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date, each Holder of an Allowed Other Secured Claim (including any Claim for postpetition interest accrued until the Effective Date at the non-default rate provided in the applicable contract or, if there is no contract, then at the Federal Judgment Rate, to the extent permissible under section 506(a) of the Bankruptcy Code) shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Secured Claim, in the discretion of the Debtors or the applicable Plan Administrator, one of the following alternative treatments:

            (i)    payment of the Allowed Class 1 Other Secured Claim in full in Cash from the applicable Claims Reserve on the later of the Effective Date or as soon as practicable after a particular Claim becomes Allowed in accordance with the Plan Administration Process;

            (ii)    delivery to the Holder of the Allowed Class 1 Other Secured Claim of the collateral securing such Allowed Class 1 Other Secured Claim; or

            (iii)    such other treatment as may be agreed to by the applicable Debtor (or, after the Effective Date, the applicable Plan Administrator), with the consent of the

Prepetition AMH RBL Agent (solely with respect to Other Secured Claims against the AMH Debtors), and the Holder.

Notwithstanding the foregoing, the AMH Debtors shall make payments to holders of Other Secured Claims against the AMH Debtors solely to the extent permitted by the Wind Down Budget.

(c)     *Voting*: Class 1 is Unimpaired. Holders of Class 1 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.   Class 2:     Prepetition Secured AMH RBL Claims

(a)     *Classification*: Class 2 consists of all Prepetition Secured AMH RBL Claims.

(b)     *Allowance of Prepetition AMH RBL Claims*: Prepetition AMH RBL Claims are deemed Allowed in the aggregate principal amount of $360,948,646, minus the aggregate amount of all AMH Adequate Protection Payments. The Prepetition AMH RBL Agent and the Holders of Prepetition AMH RBL Claims shall not be required to file proofs of Claim on account of any Prepetition AMH RBL Claims.

(c)     *Treatment*: In satisfaction of its Prepetition Secured AMH RBL Claim,

(i)     each Holder of a Prepetition AMH RBL Claim shall have received its Pro Rata share of the Interim Distribution, which distribution shall be unconditionally and fully vested in, and not subject to any clawback from, the Prepetition AMH RBL Agent on the Effective Date;

(ii)     each Holder of a Prepetition AMH RBL Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, in accordance with the Plan Administration Process, its Pro Rata share of 100% of the Excess AMH Distributable Cash, up to satisfaction in full of its Prepetition AMH RBL Claim (with any Unused Professional Fee Reserve Amount that later becomes Excess AMH Distributable Cash distributed Pro Rata to each Holder of a Prepetition AMH RBL Claim as soon as practicable after such later time),

(iii)     each Holder of a Prepetition AMH RBL Claim shall be assigned on the Effective Date or as soon as reasonably practicable thereafter, its pro rata share of the Reserved ORRI, and

(iv)     to the extent such Prepetition AMH RBL Claim has not been satisfied in full under the foregoing sections (c)(i), (c)(ii) and (c)(iii), upon the conclusion of the Plan Administration Process or as soon as reasonably practicable thereafter, each Holder of a Prepetition AMH RBL Claim shall receive its Pro Rata share of the Excess AMH Reserve Amounts, up to satisfaction in full of its Prepetition AMH RBL Claim.

For the avoidance of doubt, the foregoing treatment is on account of the Prepetition Secured AMH RBL Claims, and any Prepetition AMH RBL Deficiency Claims shall instead receive the treatment prescribed in Article III.C.6 of the Plan.

(d)     *Voting*: Class 2 is Impaired. Holders of Class 2 Prepetition Secured AMH RBL Claims are entitled to vote to accept or reject the Plan.

3.   Class 3:     AMR General Unsecured Claims

    (a)    *Classification*:  Class 3 consists of all AMR General Unsecured Claims.

    (b)    *Treatment*: Each Holder of an Allowed Class 3 AMR General Unsecured Claim shall receive:

        (i)    on the Effective Date or as soon as reasonably practicable thereafter, in accordance with the Plan Administration Process, its Pro Rata share of the Excess AMR Distributable Cash, if any, up to satisfaction in full of such AMR General Unsecured Claim, and

        (ii)    to the extent such AMR General Unsecured Claim has not been satisfied in full under the foregoing section (b)(i), upon the conclusion of the Plan Administration Process or as soon as reasonably practicable thereafter, its Pro Rata share of the Excess AMR Reserve Amounts, up to satisfaction in full of its AMR General Unsecured Claim.

    (c)    *Voting*:  Class 3 is Impaired.  Holders of Class 3 AMR General Unsecured Claims are entitled to vote to accept or reject the Plan.

4.   Class 4:     Prepetition Senior Notes Claims

    (a)    *Classification*: Class 4 consists of all Prepetition Senior Notes Claims.

    (b)    *Treatment*:  Each Holder of an Allowed Class 4 Prepetition Senior Notes Claim shall receive:

        (i)    on the Effective Date or as soon as reasonably practicable thereafter, in accordance with the Plan Administration Process, subject to the Indenture Trustee Charging Lien, its Pro Rata share of 100% of the Prepetition Senior Notes Distribution Cash, up to satisfaction in full of such Prepetition Senior Notes Claim; and

        (ii)    on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of the AMH Litigation Trust Interests (which shall, for the avoidance of doubt, be shared Pro Rata by the Holders of Prepetition Senior Notes Claims and Prepetition AMH RBL Deficiency Claims calculated at the time of distribution; *provided*, that the AMH Litigation Trust Interests distributed in respect of the Prepetition AMH RBL Deficiency Claims shall be subject to adjustment, as provided in the AMH Litigation Trust Agreement, as a result of the distribution of Excess AMH Reserve Amounts or the Cash monetization of the Reserved ORRI issued pursuant to Article III.C.2.c.iii hereof.

For the avoidance of doubt, pursuant to Article VII.B hereof, for purposes of any distributions on account of the Prepetition Senior Notes Claims to be made under this Plan, (a) the Indenture Trustee shall be deemed to be the Holder of all Prepetition Senior Notes Claims and (b) all Cash to be distributed under this Plan on account of Prepetition Senior Notes Claims (including Prepetition Senior Notes Distribution Cash and any Cash on account of AMH Litigation Trust Interests) shall be paid to the Indenture Trustee for distribution (i) subject in all respects to the Indenture Trustee Charging Lien (and no such Cash shall be distributed by the Indenture Trustee to any holder of Prepetition Senior Notes until all obligations secured by the Indenture Trustee Charging Lien have been fully and indefeasibly satisfied) and (ii) otherwise pursuant to and in accordance with the terms of the Prepetition Senior Notes Indenture.

(c) *Voting*: Class 4 is Impaired.  Holders of Class 4 Prepetition Senior Notes Claims are entitled to vote to accept or reject the Plan.

5.  Class 5:     AMH General Unsecured Claims

(a) *Classification*:  Class 5 consists of all AMH General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed Class 5 AMH General Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, in accordance with the Plan Administration Process, its Pro Rata share of 100% of the AMH GUC Distribution Cash, up to satisfaction in full of such AMH General Unsecured Claim.

(c) *Voting*:  Class 5 is Impaired.  Holders of Class 5 AMH General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.  Class 6:     Prepetition AMH RBL Deficiency Claims

(a) *Classification*:  Class 6 consists of all Prepetition AMH RBL Deficiency Claims.

(b) *Treatment*: Each Holder of an Allowed Class 6 Prepetition AMH RBL Deficiency Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of the AMH Litigation Trust Interests (which shall, for the avoidance of doubt, be shared Pro Rata by the Holders of Prepetition Senior Notes Claims and Prepetition AMH RBL Deficiency Claims calculated at the time of distribution; *provided*, that the AMH Litigation Trust Interests distributed in respect of the Prepetition AMH RBL Deficiency Claims shall be subject to adjustment, as provided in the AMH Litigation Trust Agreement, as a result of the distribution of Excess AMH Reserve Amounts or the Cash monetization of the Reserved ORRI issued pursuant to Article III.C.2.c.iii hereof).

(c) *Voting*:  Class 6 is Impaired.  Holders of Class 6 Prepetition AMH RBL Deficiency Claims are entitled to vote to accept or reject the Plan.

7.  Class 7:     SRII General Unsecured Claims

(a) *Classification*:  Class 7 consists of all SRII General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed Class 7 SRII General Unsecured Claim shall receive payment in full in Cash from the SRII Claims Reserve on the later of the Effective Date or as soon as practicable after such Claim becomes Allowed in accordance with the Plan Administration Process, and

(c) *Voting*:  Class 7 is Unimpaired.  Holders of Class 7 SRII General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such SRII General Unsecured Claims are not entitled to vote to accept or reject the Plan.

8.  Class 8:     Intercompany Claims

(a) *Classification*:  Class 8 consists of all Intercompany Claims.

(b) *Treatment*:  On the Effective Date, all Class 8 Intercompany Claims not released under the Plan shall, at the option of the Debtors, either be (i) Reinstated or (ii) cancelled and extinguished, in which case Holders of Intercompany Claims shall receive no recovery on account of such Claims; *provided*, that notwithstanding anything to the contrary herein, any Intercompany Claims of the SRII Debtors against AMR, including any superpriority

administrative claims of the SRII Debtors arising under the cash management orders entered by the Bankruptcy Court in AMR and the SRII Debtors' cases, shall be released, cancelled and extinguished and the SRII Debtors shall receive no recovery on account thereof.

(c) *Voting*:  Class 8 is Impaired.  Holders of Class 8 Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Intercompany Claims are not entitled to vote to accept or reject the Plan.

9. **Class 9:**    Intercompany Interests

(a) *Classification*.  Class 9 consists of all Intercompany Interests.

(b) *Treatment*:  Upon the completion of the Wind Down pursuant to the Plan Administration Process, Class 9 Intercompany Interests shall be cancelled and discharged, with the Holders of such Class 9 Intercompany Interests receiving no distribution on account of such Intercompany Interests.

(c) *Voting*: Class 9 is Impaired.  Holders of Class 9 Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

10. **Class 10:**    SRII Interests

(a) *Classification*.  Class 10 consists of all SRII Interests.

(b) *Treatment*:  Class 10 SRII Interests for which the Holders thereof have not effectuated an exchange prior to the Effective Date pursuant to Article V.W hereof shall be cancelled and discharged.  The Holders of such Class 10 SRII Interests and AMR (on account of AMR's Interest in SRII Opco, LP) shall receive, in exchange for their respective Interests in the SRII Debtors, their Pro Rata shares of Excess SRII Distributable Cash and Excess SRII Reserve Amounts remaining after satisfaction in full of SRII General Unsecured Claims.

(c) *Voting*: Class 10 is Impaired.  Holders of Class 10 SRII Interests are entitled to vote to accept or reject the Plan.

11. **Class 11:**    AMR Interests

(a) *Classification*.  Class 11 consists of all AMR Interests.

(b) *Treatment*:  Class 11 AMR Interests, including those held by Holders as a result of an exchange prior to the Effective Date pursuant to Article V.W hereof, shall be cancelled and discharged, with the Holders of such Class 11 AMR Interests receiving no distribution on account of such AMR Interests, except to the extent that Excess AMR Distributable Cash and Excess AMR Reserve Amounts remain after satisfaction in full of AMR General Unsecured Claims, in which event the Holders of AMR Interests and any Section 510(b) Claims against AMR shall be entitled to their Pro Rata share of such remaining amounts.

(c) *Voting*: Class 11 is Impaired.  Holders of Class 11 AMR Interests are expected to receive no distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of AMR Interests are not entitled to vote to accept or reject the Plan.

12. Class 12:    Section 510(b) Claims

    (a)    *Classification*:  Class 12 consists of all Section 510(b) Claims.

    (b)    *Treatment*:  Each Section 510(b) Claim shall be deemed canceled and discharged, with the Holders of such Class 11 Section 510(b) Claims receiving no distribution on account of such Claims, except to the extent that Excess AMR Distributable Cash and Excess AMR Reserve Amounts remain after satisfaction in full of AMR General Unsecured Claims, in which event the Holders of AMR Interests and any Section 510(b) Claims against AMR shall be entitled to their Pro Rata share of such remaining amounts.

    (c)    *Voting*: Class 12 is Impaired.  Holders of Class 12 Section 510(b) Claims are expected to receive no distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

13. Class 13:    AMH Interests

    (a)    *Classification:*  Class 13 consists of all AMH Interests.

    (b)    *Treatment:*  Class 13 AMH Interests shall be cancelled and discharged, with the Holders of such Class 13 AMH Interests receiving no distribution on account of such AMH Interests.

    (c)    *Voting*:  Class 13 is Impaired.  Holders of Class 13 AMH Interests will receive no distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of AMH Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE IV.

## ACCEPTANCE REQUIREMENTS

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, (a) an impaired class of claims has accepted a chapter 11 plan if the holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in such class actually voting have voted to accept the plan and (b) an impaired class of interests has accepted the plan if the holders of at least two-thirds in amount of the allowed interests in such class actually voting have voted to accept the plan.

*A.*     *Acceptance or Rejection of this Plan*

1.    Voting Classes

Classes 2, 3, 4, 5, 6, and 10 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. If no Holder of a Claim in any such Class votes to accept or reject the Plan, the Class will be deemed to have accepted the Plan.

2.    Presumed Acceptance of the Plan

Classes 1 and 7 are Unimpaired under the Plan and is, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.      Deemed Rejection of the Plan

Classes 8, 9, 11, 12 and 13 are Impaired under the Plan and are not entitled to receive or retain any property on account of the Claims and Interests in Classes 8, 9, 11, 12 and 13. Therefore, Classes 8, 9, 11, 12 and 13 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

B.      *Confirmation of This Plan Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors intend to seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code.

C.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the applicable Plan Administrator reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

D.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests (or any Class of Claims or Interests) are Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

E.      *Elimination of Vacant Classes*

Any Class that, as of the commencement of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

F.      *Presumed Acceptance by Non-Voting Classes*

With respect to each Debtor, if a Class contains Claims or Interests eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Transactions Effective as of the Effective Date*

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, their stockholders, or any other person or entity.

B.      *Closing of Sale and Uses of Cash*

On April 9, 2020, the Debtors consummated the Sale pursuant to the terms and conditions of the Purchase Agreement, including, without limitation, selling the Assets (as defined in the Purchase Agreement) free and clear of certain liens and encumbrances to the extent set forth in the Purchase Agreement, assuming and assigning to the

Purchaser pursuant to the Purchase Agreement in connection with the Sale certain contracts and unexpired leases, and reserving the Reserved ORRI and reserving and conveying to KFM the KFM ORRI free and clear of liens and encumbrances as set forth in the Sale Order.

Upon consummation of the Sale, the Net Sale Proceeds of the Sale were used to fund the Interim Distribution and placed into accounts established and maintained by the Debtors in accordance with and to the extent required under the Sale Order. The Net Sale Proceeds constitute AMH Distributable Cash. On the Effective Date, the Debtors shall fund (a) from the AMR Distributable Cash, (i) the AMR Wind Down Reserve with the AMR Wind Down Amount and (ii) the AMR Claims Reserve with the AMR Claims Reserve Amount, (b) from the AMH Distributable Cash, (i) the AMH Wind Down Reserve with the AMH Wind Down Amount and (ii) the AMH Claims Reserve with the AMH Claims Reserve Amount (provided that the AMH GUC Claim Administrator Reserve shall be transferred to the AMH GUC Claim Administrator and the AMH GUC Distribution Cash shall be transferred to the AMH GUC Claim Disbursing Agent to be held in trust for the benefit of the Holders of Allowed Class 5 AMH General Unsecured Claims), and (c) from the SRII Distributable Cash, (i) the SRII Wind Down Reserve with the SRII Wind Down Amount and (ii) the SRII Claims Reserve with the SRII Claims Reserve Amount. The balance of the AMR Distributable Cash, the AMH Distributable Cash, and the SRII Distributable Cash shall be held by the Debtors and distributed in accordance with the Plan on the Effective Date.

*C.*      *SRII Claims Bar Date*

All Claims against one or more of the SRII Debtors must be Filed with the Balloting Agent and served upon the AMR/SRII Plan Administrator and counsel for the Debtors within thirty (30) days after the occurrence of the Effective Date.

*D.*      *KFM/AMH Settlement*

Subject to the occurrence of the KFM Effective Date, the KFM Debtors shall provide the AMH Debtors with an allowed administrative expense claim in the amount of $100,000 in accordance with the terms of the KFM Plan, including the conditions to allowance of such administrative expense claim set forth therein, and, upon the satisfaction of such conditions, shall satisfy that claim by paying the full amount of such claim in Cash to the AMH Debtors' estates as soon as reasonably practicable thereafter (the "***KFM/AMH Settlement Proceeds***"). In exchange therefor, the AMH Debtors have agreed to (i) provide the releases of the KFM Releasing Parties set forth in Section X.B. hereof, subject to the occurrence of the KFM Effective Date and the KFM Plan containing fully-mutual releases of the AMH Releasing Parties set forth in clauses (b) through (g) of the definition of "AMH Releasing Parties" and subject in all respects to the receipt of such KFM/AMH Settlement Proceeds; and (ii) waive their rights to challenge the liens of the KFM Lenders. Further, as additional consideration and in exchange for the agreement to pay the KFM/AMH Settlement Proceeds and the mutual releases described in the foregoing sentence, effective as of April 7, 2020, the AMH Debtors, their Estates, the Committee and its members, and the each member of the Ad Hoc Noteholder Group each waived all of their respective rights to (i) challenge the liens of the KFM Agent and the KFM Lenders on all property of the KFM Debtors and their estates and (ii) object to, contest, hinder, or otherwise delay confirmation of the KFM Plan, and the Challenge Period (as defined in the KFM Cash Collateral Order), to the extent then still effective, expired immediately upon such date. For the avoidance of doubt, the releases of the KFM Releasing Parties set forth in Section X.B. hereof include the waiver by the AMH Debtors and their Estates of all of their rights to pursue any claims against the KFM Released Parties (including in connection with that certain adversary proceeding under the caption *Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC*, No. 19-03609 (MI)) or to otherwise challenge the KFM Agent's or the KFM Lenders' liens on all property of the KFM Debtors and their estates.

Pursuant to sections 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to this Plan and the KFM Plan, including the KFM/AMH Settlement Proceeds, the provisions of this Plan shall constitute a good faith compromise of Claims, Interests and controversies relating to the contractual, legal and other rights that the Debtors may have with respect to any Claim against the KFM Debtors and any contractual, legal and other rights that the KFM Debtors may have with respect to any Claim against the Debtors; *provided*, however, that under no circumstance shall the provisions of this Section V.D be construed to release any Excluded Parties. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding

by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and the holders of Claims and Interests, and is fair, equitable and reasonable.

E.      *Plan Administration Trust Funding and AMH GUC Claim Administrator Reserve Funding*

On the Effective Date, the AMH Wind Down Reserve shall be funded by the AMH Debtors in accordance with the AMH Plan Administration Trust Agreement.  The AMH Wind Down Reserve shall vest in the AMH Plan Administration Trust pursuant to Article V.F of the Plan.

On the Effective Date, the AMR Wind Down Reserve shall be funded by the AMR Debtors in accordance with the AMR/SRII Plan Adminstration Trust Agreement.  The AMR Wind Down Reserve shall vest in the AMR/SRII Plan Administration Trust pursuant to Article V.F of the Plan.

On the Effective Date, the AMH GUC Claim Administrator Reserve shall be funded by the AMH Debtors in accordance with the AMH GUC Claim Administrator Agreement and Section V.B hereof.  From and after the Effective Date, all fees, costs, expenses, and obligations incurred by the AMH GUC Claim Administrator in resolving AMH General Unsecured Claims shall be paid exclusively from the AMH GUC Claim Administrator Reserve, provided, in each case, that such costs, expenses, and obligations shall be reasonable and documented, provided, further, that if the AMH GUC Claim Administrator determines after consultation with the AMH GUC Claim Oversight Committee that its services in that capacity have been completed, the AMH GUC Claim Administrator may, in its sole discretion, upon five Business Days' notice to the Bankruptcy Court, donate any surplus funds remaining in the AMH GUC Claim Administrator Reserve to a suitable charitable organization (for example, the American Bankruptcy Institute Endowment Fund, CARE, or similar organization) without any further action or order of the Bankruptcy Court if it determines that a distribution of the funds to Holders of Allowed AMH General Unsecured Claims is not feasible or practicable.

F.      *The Plan Administration Trusts/AMH GUC Administrator Agreement*

On the Effective Date, the AMH Plan Administrator shall sign the AMH Plan Administration Trust Agreement and cause the AMH Plan Administration Trust to accept, on behalf of the beneficiaries thereof, on the Effective Date or as soon as reasonably practicable thereafter (a) the AMH Claims Reserve and the Cash therein, *provided*, *however*, that, notwithstanding anything set forth herein, on the Effective Date, the AMH GUC Claim Administrator Reserve shall be transferred to the AMH GUC Claim Administrator and the AMH GUC Distribution Cash shall be transferred to the AMH GUC Claim Disbursing Agent, who shall hold the AMH GUC Distribution Cash in trust for the benefit of the Holders of Allowed Class 5 AMH General Unsecured Claims, (b) the AMH Wind Down Reserve and the Cash therein, (c) the Net Sale Proceeds, (d) the AMH Cash on Hand, and (e) all other non-Cash assets of the Estates of the AMH Debtors not subject to the Sale, in each case excluding the AMH Litigation Trust Assets (all of the assets described in (a) through (e), together with the proceeds thereof, the "**AMH Plan Administration Trust Assets**"), *provided*, *however*, that the AMH Plan Administration Trust, with the consent of the AMH Plan Administrator, may abandon or otherwise not accept any assets that the AMH Plan Administrator believes, in good faith, have no value to the AMH Plan Administration Trust.  Any assets the AMH Plan Administration Trust so abandons or otherwise does not accept shall not vest in the AMH Plan Administration Trust.  As of the Effective Date, all assets vested in the AMH Plan Administration Trust and all assets dealt with in the Plan shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.  Notwithstanding anything to the contrary in this Plan, the AMH Plan Administration Trust Assets shall not include the Professional Fee Claims Reserve, but shall include a reversionary interest in the Unused Professional Fee Reserve Amount.

The AMH Plan Administration Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party, *provided* that the Debtors and the AMH Plan Administrator shall take any further actions each deems reasonably necessary and appropriate to effect creation of the AMH Plan Administration Trust. The AMH Plan Administration Trust shall be established for the primary purpose of liquidating its assets (as applicable) and for making distributions in accordance with the Plan and the AMH Plan Administration Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the AMH Plan Administration Trust.

On the Effective Date, the AMR/SRII Plan Administrator shall sign the AMR/SRII Plan Administration Trust Agreement and cause the AMR/SRII Plan Administration Trust to accept, on behalf of the beneficiaries thereof, (a) the AMR Claims Reserve and the Cash therein, (b) the SRII Claims Reserve and the Cash therein, (c) the AMR Wind Down Reserve and the Cash therein, (d) the SRII Wind Down Reserve and the Cash therein, (e) the AMR Retained Causes of Action, (f) the SRII Retained Causes of Action, (g) all other non-Cash assets of the Estate of AMR, and (h) all other non-Cash assets of the Estates of the SRII Debtors (together with the proceeds of the assets described in (a) through (h), the "***AMR/SRII Trust Assets***"), *provided*, *however*, that the AMR/SRII Plan Administration Trust, with the consent of the AMR/SRII Plan Administrator, may abandon or otherwise not accept any assets that the AMR/SRII Plan Administrator believes, in good faith, have no value to the AMR/SRII Plan Administration Trust.  Any assets the AMR/SRII Plan Administration Trust so abandons or otherwise does not accept shall not vest in the AMR/SRII Plan Administration Trust.  As of the Effective Date, all assets vested in the AMR/SRII Plan Administration Trust and all assets dealt with in the Plan shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

The AMR/SRII Plan Administration Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party, *provided* that the Debtors and the AMR/SRII Plan Administrator shall take any further actions each deems reasonably necessary and appropriate to effect creation of the AMR/SRII Plan Administration Trust. The AMR/SRII Plan Administration Trust shall be established for the primary purpose of liquidating its assets (as applicable) and for making distributions in accordance with the Plan and the AMR/SRII Plan Administration Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the AMR/SRII Plan Administration Trust.

On or before the Effective Date, the AMH Debtors, AMH Plan Administrator, AMH GUC Claim Oversight Committee, and AMH GUC Claim Administrator shall execute the AMH GUC Claim Administrator Agreement and the AMH Debtors shall fund the AMH GUC Claim Administrator Reserve, which shall be transferred to the AMH GUC Claim Administrator. All expenses incurred by the AMH GUC Claim Administrator shall be the responsibility of and paid by the AMH GUC Claim Administrator solely from the AMH GUC Claim Administrator Reserve, in accordance with the AMH GUC Claim Administrator Agreement.

G.      *The AMH GUC Claim Administrator.*

The authority, duties, rights, privileges, and responsibilities of the AMH GUC Claim Administrator and the AMH GUC Claim Oversight Committee shall be specified in the AMH GUC Claim Administrator Agreement and this Plan.  The AMH GUC Claim Oversight Committee shall be a board appointed by the Committee of no more than 3 members, the initial members of whom shall be disclosed in the Plan Supplement. The AMH GUC Claim Administrator, in its discretion, may consult with and receive the consent of the majority of the AMH GUC Claim Oversight Committee regarding any matter, including, but not limited to, any issue concerning a Disputed AMH General Unsecured Claim, which the AMH GUC Claim Administrator reasonably determines may be expected to have a material effect on the total Allowed Amount of AMH General Unsecured Claims. The AMH GUC Claim Oversight Committee shall not be compensated for their service thereon. The members of the AMH GUC Claim Oversight Committee may be expanded, contracted, replaced or removed by the vote of a majority of the members of such committee then serving.

H.      *Certain Powers and Duties of the Plan Administration Trusts, the Plan Administrators, and the AMH GUC Claim Administrator*

The AMH Plan Administrator shall be the exclusive trustee of the assets of the AMH Plan Administration Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).  The powers, rights, and responsibilities of the AMH Plan Administrator shall be specified in the AMH Plan Administration Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect AMH Plan Administration Trust Assets; (b) pay taxes or other obligations incurred by the AMH Plan Administration Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution, and distribution of AMH Plan Administration Trust Assets; (d) calculate and implement distributions of AMH Plan Administration Trust Assets; (e) resolve issues involving AMH Debtor Claims and Interests pursuant to Article VIII of the Plan, subject to the exclusive rights of the AMH GUC Claim Administrator

to reconcile, object to, settle or otherwise administer AMH General Unsecured Claims pursuant to this Plan and the AMH GUC Claim Administrator Agreement; and (f) undertake all administrative functions of the Chapter 11 Cases, including the ultimate closing of the Chapter 11 Cases. The AMH Plan Administration Trust shall be treated as the successor to the AMH Debtors' and the AMH Debtors' Estates' rights under contract, tort, or other applicable law, excluding, for the avoidance of doubt, with respect to the AMH Litigation Trust Causes of Action.

On the Effective Date, subject to the exclusive rights of the AMH GUC Claim Administrator to reconcile, object to, settle or otherwise administer AMH General Unsecured Claims pursuant to this Plan and the AMH GUC Claim Administrator Agreement, the AMH Plan Administration Trust shall also have the power, right, and responsibility to conduct the Wind Down and to take possession of all books, records, and files of the AMH Debtors and the AMH Debtors' Estates solely to the extent necessary for completion of the Plan Administration Process and to assist the AMH GUC Claim Administrator as set forth in the AMH GUC Claim Administrator Agreement. The AMH Plan Administration Trust shall provide for the retention and storage of such books, records, and files until the earlier of (x) the completion of the Plan Administration Process and (y) such time as the Plan Administration Trust determines, in accordance with the AMH Plan Administration Trust Agreement, that retention of same is no longer necessary or required, at which time such books, records and files shall be turned over to the AMH Litigation Trustee. At any time during the Plan Administration Process and upon the reasonable request of the AMH Litigation Trustee, the AMH Plan Administration Trust shall provide the AMH Litigation Trustee with any books, records, and files in the AMH Plan Administration Trust's possession.

All expenses incurred by the AMH Plan Administration Trust and the AMH Plan Administrator shall be the responsibility of and paid by the AMH Plan Administration Trust, in accordance with the AMH Plan Administration Trust Agreement. The AMH Plan Administrator shall be compensated in cash from funds reserved pursuant to the Wind Down Budget. All expenses and fees incurred by the AMH GUC Claim Administrator shall be the responsibility of and paid from the AMH GUC Claim Administrator Reserve and in accordance with the AMH GUC Claim Administrator Agreement. The AMH Plan Administrator shall not have any responsibility to pay expenses or fees incurred by the AMH GUC Claim Administrator that exceed the amount in the AMH GUC Claim Administrator Reserve.

The AMR/SRII Plan Administrator shall be the exclusive trustee of the assets of the AMR/SRII Plan Administration Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the AMR/SRII Plan Administrator shall be specified in the AMR/SRII Plan Administration Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect AMR/SRII Trust Assets; (b) pay taxes or other obligations incurred by the AMR/SRII Plan Administration Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution, and distribution of AMR/SRII Trust Assets, including the AMR Retained Causes of Action and the SRII Retained Causes of Action; (d) calculate and implement distributions of AMR/SRII Trust Assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of the AMR/SRII Plan Administration Trust Agreement, AMR Retained Causes of Action and the SRII Retained Causes of Action; (f) resolve issues involving AMR and SRII Debtor Claims and Interests pursuant to Article VIII of the Plan; and (g) undertake all administrative functions of the Chapter 11 Cases, including the ultimate closing of the Chapter 11 Cases. The AMR/SRII Plan Administration Trust shall be treated as the successor to the rights of AMR, AMR's Estate, the SRII Debtors, and the SRII Debtors' Estates under contract, tort, or other applicable law.

On the Effective Date, the AMR/SRII Plan Administration Trust shall also have the power, right, and responsibility to conduct the Wind Down and to take possession of all books, records, and files of AMR, AMR's Estate, the SRII Debtors and the SRII Debtors' Estates and provide for the retention and storage of such books, records, and files until such time as the AMR/SRII Plan Administration Trust determines, in accordance with the AMR/SRII Plan Administration Trust Agreement, that retention of same is no longer necessary or required.

All expenses incurred by the AMR/SRII Plan Administration Trust and the AMR/SRII Plan Administrator shall be the responsibility of and paid by the AMR/SRII Plan Administration Trust, in accordance with the AMR/SRII Plan Administration Trust Agreement.

In no event later than three (3) months after the Effective Date and on a quarterly basis thereafter until all Cash in the Claims Reserves and the Wind Down Reserves has been released or paid out in accordance with the Plan,

35

the AMH Plan Administrator and the AMR/SRII Plan Administrator shall file with the Bankruptcy Court reports setting forth the amounts, recipients, and dates of all distributions made by the AMH Plan Administrator and the AMR/SRII Plan Administrator, respectively, under the Plan through each applicable reporting period.

I.      *Federal Income Tax Treatment of the Plan Administration Trusts for the Plan Administration Trust Assets; Tax Reporting and Tax Payment Obligations*

For U.S. federal income tax purposes, it is intended that the Plan Administration Trusts (except with respect to the Claims Reserves) be classified as liquidating trusts under Treasury Regulation Section 301.7701-4(d). Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Plan Administration Trusts be treated as if they had received a distribution from the Estates of an undivided interest in each of the assets of the Plan Administration Trusts (to the extent of the value of their respective shares therein) and then contributed such interests to the Plan Administration Trusts.

1.      Plan Administration Trust Assets Treated as Owned by Beneficiaries of Plan Administration Trusts

For U.S. federal income tax purposes, the Plan Administration Trusts (except with respect to the Claims Reserves associated therewith) shall be treated as grantor trusts, and the beneficiaries of the Plan Administration Trusts shall be treated as the grantors of the Plan Administration Trusts and the owners of the assets thereof. Accordingly, for all U.S. federal income tax purposes, other than with respect to assets attributable to the Claims Reserves, all parties shall treat the transfer of assets (net of any applicable liabilities) to the Plan Administration Trusts for the benefit of the beneficiaries thereof as (a) a transfer by the Debtors of the assets of the Plan Administration Trusts (net of any applicable liabilities) directly to the beneficiaries of the Plan Administration Trusts (to the extent of the value of their respective shares in the assets of the Plan Administration Trusts), followed by (b) the transfer of the assets of the Plan Administration Trusts (net of any applicable liabilities) by the beneficiaries of the Plan Administration Trusts (to the extent of the value of their respective share in the assets of the Plan Administration Trusts) to the Plan Administration Trusts in exchange for the beneficial interests in the Plan Administration Trusts.

2.      Tax Reporting

The Plan Administration Trusts shall be responsible for filing all federal, state, local and non-U.S. tax returns required to be filed by the Debtors and the Plan Administration Trusts, including, but not limited to, the Claims Reserves associated therewith and any documentation related thereto for information reporting with respect to current or former employees, vendors or contractors of the Debtors. No later than 30 days prior to the due date of the Form 1065 for SRII, the Plan Administration Trusts shall provide a draft of such Form 1065 and the relevant Schedule K-1 to each Holder of SRII Interests for its review and comment. The Plan Administration Trusts agree to consider in good faith all reasonable comments that are timely received from each Holder of SRII Interests.

The Plan Administration Trusts shall file all tax returns for the Plan Administration Trusts, except with respect to the Claims Reserves associated therewith, as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Article V.I. Within a reasonable time following the end of the taxable year, the applicable Plan Administrator shall send to each holder of a beneficial interest appearing on its record during such year, a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit and each such holder shall report such items on their U.S. federal income tax returns. The applicable Plan Administrator may provide each such holder of a beneficial interest with a copy of the Form 1041 for the applicable Plan Administration Trust (without attaching any other holder's Schedule K-1 or other applicable information form) along with such holder's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement. The applicable Plan Administrator shall allocate the taxable income, gain, loss, deduction or credit of the applicable Plan Administration Trust, respectively, with respect to each holder of a beneficial interest to the extent required by the IRC (as defined in Article VI.A) and applicable law.

As soon as possible after the Effective Date, the Plan Administration Trusts shall make a good faith valuation of the assets of the Plan Administration Trusts, and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes. The Plan Administration Trusts also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Administration Trusts that are required by any taxing authority.

The Plan Administration Trusts shall file all income tax returns with respect to any income attributable to the Claims Reserves and shall, subject to Article V.I.3 of the Plan, pay the federal, state and local income taxes attributable to the Claims Reserves, based on the items of income, deduction, credit or loss allocable thereto.

The Plan Administration Trusts may request an expedited determination of the tax obligations of the Plan Administration Trusts, including the Claims Reserves, under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the Plan Administration Trusts for all taxable periods through the dissolution of the Plan Administration Trusts.

The Plan Administration Trusts shall comply with all withholding and reporting requirements imposed by any federal, state, local, or non-U.S. taxing authority, and all distributions made by the Plan Administration Trusts shall be subject to any such withholding and reporting requirements.

3.   Payment of Taxes

The Plan Administration Trusts shall be responsible for payments of all Allowed tax obligations of the Debtors including Priority Tax Claims and Administrative Claims, in addition to any taxes imposed on the Plan Administration Trusts or their assets, including the Claims Reserves associated therewith. In the event, and to the extent, any Cash retained on account of disputed claims in the Claims Reserves associated with the Plan Administration Trusts is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Plan Administration Trusts allocable to, or retained on account of, disputed claims, such taxes shall be (a) reimbursed from any subsequent Cash amounts retained on account of disputed claims, or (b) to the extent such disputed claims have subsequently been resolved, deducted from any amounts distributable by the Plan Administration Trusts as a result of the resolutions of such disputed claims.

*J.*      *Authority to Pursue, Settle, or Abandon Retained Causes of Action*

From and after the Effective Date, except as otherwise set forth in this Article V.J, prosecution and settlement of all AMR Retained Causes of Action and SRII Retained Causes of Action shall be the sole responsibility of the AMR/SRII Plan Administration Trust pursuant to the Plan, the Confirmation Order and the AMR/SRII Plan Administration Trust Agreement.  From and after the Effective Date, the AMR/SRII Plan Administration Trust shall have exclusive rights, powers, and interests of AMR's Estate and the SRII Debtors' Estates to pursue, settle, or abandon such AMR Retained Causes of Action and SRII Retained Causes of Action as the sole representative of the estates pursuant to section 1123(b)(3) of the Bankruptcy Code.

All AMR/SRII Retained Causes of Action are reserved and preserved and shall not be impacted or affected in any way by deemed consolidation of the estates.

*K.*      *AMH Litigation Trust*

1.   Litigation Trust Funding.

The AMH Litigation Trust Contribution Parties shall contribute the AMH Litigation Trust Funds to the AMH Litigation Trust on the Effective Date to be placed in a segregated account and held in trust by the AMH Litigation Trustee in accordance with the AMH Litigation Trust Agreement. The AMH Litigation Trust Funds shall vest in the AMH Litigation Trust on the Effective Date pursuant to this Article V.K. of the Plan.

2.   Creation of AMH Litigation Trust.

On the Effective Date, the AMH Litigation Trustee shall sign the AMH Litigation Trust Agreement and cause the AMH Litigation Trust to accept, on behalf of the beneficiaries thereof, on the Effective Date or as soon as reasonably practicable thereafter the AMH Litigation Trust Causes of Action (and any proceeds arising therefrom, including under the D&O Policies), and the AMH Debtors shall be deemed to have irrevocably transferred the AMH Litigation Trust Causes of Action (and any proceeds arising therefrom, including under the D&O Policies) to the AMH Litigation Trust; *provided, however*, that the AMH Litigation Trust may abandon or otherwise not accept any

assets that the AMH Litigation Trustee believes, in good faith, have no value to the AMH Litigation Trust; *provided, further*, that no abandonment or non-acceptance shall have occurred, or be deemed to have occurred, without an express written statement of such abandonment or non-acceptance by the AMH Litigation Trustee.  Any assets the AMH Litigation Trust so abandons or otherwise does not accept shall not vest in the AMH Litigation Trust. As of the Effective Date, all assets vested in the AMH Litigation Trust shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

The AMH Litigation Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party, *provided* that the AMH Debtors and the AMH Litigation Trustee shall take any further actions each deems reasonably necessary and appropriate to effect creation of the AMH Litigation Trust. The AMH Litigation Trust shall be established for the primary purpose of prosecution and settlement of the AMH Litigation Trust Causes of Action and for making distributions in accordance with the Plan and the AMH Litigation Trust Agreement, and will have no objective other than as set forth in the AMH Litigation Trust Agreement. The AMH Litigation Trustee shall have the sole right to pursue any existing or potential AMH Litigation Trust Causes of Action, by, among other things, informal demand or commencement of litigation.

Beneficiaries of the AMH Litigation Trust shall have the option to contribute additional causes of action to the AMH Litigation Trust or to a separate trust on terms to be determined by the Ad Hoc Noteholder Group, in consultation with the AMH Debtors and the Prepetition AMH RBL Agent.

3.    The AMH Litigation Trustee.

From and after the Effective Date, the AMH Litigation Trustee shall be appointed as the exclusive trustee of the assets of the AMH Litigation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 601(b)(3) pursuant to the AMH Litigation Trust Agreement, the Plan, and the Confirmation Order, until death, resignation or discharge and the appointment of a successor AMH Litigation Trustee in accordance with the terms of the AMH Litigation Trust Agreement. The responsibilities of the AMH Litigation Trustee shall include those set forth in the AMH Litigation Trust Agreement and this Plan. The AMH Litigation Trustee shall have the authority, without limitation and without further Bankruptcy Court approval:

(a)    with respect to the AMH Litigation Trust Causes of Action, to exercise, in a manner not inconsistent with the Plan, all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any member, officer, director or shareholder of the AMH Debtors with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders;

(b)    to receive, manage, invest, supervise and protect AMH Litigation Trust Assets;

(c)    to pay obligations and expenses incurred by the AMH Litigation Trust;

(d)    to maintain accounts, to calculate and make distributions to holders of AMH Litigation Trust Interests provided for or contemplated in the Plan and take other actions consistent with the Plan and the implementation thereof;

(e)    after the Effective Date, to adjust AMH Litigation Trust Interests in accordance with the Plan, the Confirmation Order or the AMH Litigation Trust Agreement, without supervision or approval of the Bankruptcy Court and free of any restriction of the Bankruptcy Code, the Bankruptcy Rules, and the local rules of the Bankruptcy Court, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the AMH Litigation Trust Agreement;

(f)    to make decisions, regarding the retention or engagement of professionals by the AMH Litigation Trust and the AMH Litigation Trustee and to pay the fees and charges incurred by the AMH Litigation Trustee on the AMH Litigation Trust's behalf on or after the

Effective Date for fees and expenses of professionals (including those retained by the AMH Litigation Trustee), disbursements, expenses or related support services relating to the AMH Litigation Trust or as otherwise provided in the AMH Litigation Trust Agreement, *provided* that any such professionals shall be compensated solely from the AMH Litigation Trust and in no event shall the AMH Litigation Trustee or any of its professionals have or make any claim for reimbursement of fees or expenses against any Person other than the AMH Litigation Trustee or any property other than the AMH Litigation Trust;

(g)     to file, if necessary, any and all tax and information returns required with respect to the AMH Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) or otherwise, make tax elections by and on behalf of the AMH Litigation Trust and pay taxes, if any, payable by the AMH Litigation Trust;

(h)     to prosecute or settle AMH Litigation Trust Causes of Action in accordance with the terms of the AMH Litigation Trust Agreement, for the benefit of holders of AMH Litigation Trust Interests, and exercise, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other nonjudicial proceeding and pursue to settlement or judgment of such actions;

(i)     to purchase or create and carry all insurance policies and pay all insurance premiums and costs the AMH Litigation Trustee deems necessary or advisable;

(j)     to establish, oversee and administer, additional trusts for the benefit of holders of AMH Litigation Trust Interests (including, without limitation, trusts vested with direct Claims or Causes of Action contributed by holders of AMH Litigation Trust Interests) and allocate assets or other resources of the AMH Litigation Trust to facilitate the establishment, oversight and administration of such additional trusts, in each case as the AMH Litigation Trustee deems reasonably necessary or appropriate in the AMH Litigation Trustee's sole discretion;

(k)     to raise additional funding for the AMH Litigation Trust in order to (i) pursue the AMH Litigation Trust Causes of Action, support distributions to holders of AMH Litigation Trust Interests provided for or contemplated in the Plan and (ii) support or facilitate any other function, duty or responsibility of the AMH Litigation Trust or the AMH Litigation Trustee that is contemplated by this Plan or the AMH Litigation Trust Agreement, in each case in accordance with the AMH Litigation Trust Agreement; and

(l)     to exercise such other powers as may be vested in or assumed by the AMH Litigation Trustee pursuant to the Plan, the AMH Litigation Trust Agreement, the Confirmation Order or other orders of the Bankruptcy Court and take all other actions not inconsistent with the provisions of the Plan which the AMH Litigation Trustee deems reasonably necessary or desirable with respect to implementing the Plan.

With respect to any AMH Litigation Trust Causes of Action, the AMH Litigation Trustee shall stand in the same position as the AMH Debtors with respect to any claim the AMH Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege, and the AMH Litigation Trustee shall succeed to all of the AMH Debtors' rights to preserve, assert or waive any such privilege.

The AMH Debtors or the AMH Plan Administrators, as appropriate, will cooperate with the AMH Litigation Trustee and its professionals, as applicable, solely in relation to the activities of the AMH Litigation Trustee authorized hereunder, including by providing reasonable, good-faith access to personnel, systems, and books and records to the extent and at such times as providing such access will not interfere with the discharge of the primary obligations of the AMH Debtors, the AMH Plan Administrators, and their respective personnel.

To the extent that the AMH Debtors or the AMH Plan Administrators determine that responding to any particular information request from the AMH Litigation Trustee requires the AMH Debtors, the AMH Plan Administrators, or their personnel to expend material time or resources outside the ordinary course of their operations or responsibilities, the AMH Debtors, the AMH Plan Administrators, or their personnel shall communicate the same to the AMH Litigation Trustee, together with a range of expected costs to satisfy such information request. Such parties shall work in good faith to address any disputes arising in connection with such cost analysis. The AMH Litigation Trust shall satisfy any agreed-upon cost expenditures; in the absence of such agreement, the AMH Litigation Trustee may withdraw its information request, the AMH Debtors or the AMH Plan Administrators may determine not to satisfy such request, and all parties' rights are reserved to raise any such disputes with the Bankruptcy Court.

All expenses incurred by the AMH Litigation Trust and the AMH Litigation Trustee, shall be the responsibility of and paid by the AMH Litigation Trust, in accordance with the AMH Litigation Trust Agreement.

L.     *Treatment of AMH Litigation Trust Causes of Action*

From and after the Effective Date, except as otherwise set forth in this Article V.L, prosecution and settlement of all AMH Litigation Trust Causes of Action shall be the sole responsibility of the AMH Litigation Trust, and all rights, powers, and interests of the AMH Debtors' Estates in respect of the AMH Litigation Trust Causes of Action shall be transferred to and vest exclusively in the AMH Litigation Trust, pursuant to the Plan, the Confirmation Order and the AMH Litigation Trust Agreement.  From and after the Effective Date, the AMH Litigation Trustee shall have exclusive rights, powers, and interests to pursue, settle, or abandon such AMH Litigation Trust Causes of Action.

All AMH Litigation Trust Causes of Action are reserved and preserved and shall not be impacted or affected in any way by deemed consolidation of the estates.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any AMH Litigation Trust Cause of Action against them as any indication that the AMH Litigation Trust will not pursue any and all available AMH Litigation Trust Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such AMH Trust Litigation Causes of Action as a consequence of the Confirmation or Consummation.

M.     *Federal Income Tax Treatment of the AMH Litigation Trust for the AMH Litigation Trust Assets; Tax Reporting and Tax Payment Obligations*

For U.S. federal income tax purposes, it is intended that the AMH Litigation Trust be classified as a liquidating trust under Treasury Regulation Section 301.7701-4(d). Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the AMH Litigation Trust be treated as if they had received a distribution from the Estates of an undivided interest in each of the assets of the AMH Litigation Trust (to the extent of the value of their respective shares therein) and then contributed such interests to the AMH Litigation Trust.

1.     AMH Litigation Trust Assets Treated as Owned by Beneficiaries of AMH Litigation Trust

For U.S. federal income tax purposes, the AMH Litigation Trust shall be treated as a grantor trust, and the beneficiaries of the AMH Litigation Trust shall be treated as the grantors of the AMH Litigation Trust and the owners of the assets thereof.  Accordingly, for all U.S. federal income tax purposes, all parties shall treat the transfer of assets (net of any applicable liabilities) to the AMH Litigation Trust for the benefit of the beneficiaries thereof as (a) a transfer by the Debtors of the assets of the AMH Litigation Trust (net of any applicable liabilities) directly to the beneficiaries of the AMH Litigation Trust (to the extent of the value of their respective shares in the assets of the AMH Litigation Trust), followed by (b) the transfer of the assets of the AMH Litigation Trust (net of any applicable liabilities) by the beneficiaries of the AMH Litigation Trust (to the extent of the value of their respective share in the assets of the AMH Litigation Trust) to the Litigation Trust in exchange for the beneficial interests in the AMH Litigation Trust.

2.    Tax Reporting

The AMH Litigation Trust shall file all tax returns for the AMH Litigation Trust, as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Article V.M.  Within a reasonable time following the end of the taxable year, the AMH Litigation Trustee, as applicable, shall send to each holder of a beneficial interest appearing on its record during such year, a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit and each such holder shall report such items on their U.S. federal income tax returns. The AMH Litigation Trustee may provide each such holder of a beneficial interest with a copy of the Form 1041 for the AMH Litigation Trust (without attaching any other holder's Schedule K-1 or other applicable information form) along with such holder's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement. The AMH Litigation Trustee shall allocate the taxable income, gain, loss, deduction or credit of the AMH Litigation Trust with respect to each holder of a beneficial interest to the extent required by the IRC and applicable law.

As soon as possible after the Effective Date, the AMH Litigation Trust shall make a good faith valuation of the assets of the AMH Litigation Trust, and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes. The AMH Litigation Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the AMH Litigation Trust that are required by any taxing authority.

The AMH Litigation Trust may request an expedited determination of the tax obligations of the AMH Litigation Trust, under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the AMH Litigation Trust for all taxable periods through the dissolution of the AMH Litigation Trust.

The AMH Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or non-U.S. taxing authority, and all distributions made by the AMH Litigation Trust shall be subject to any such withholding and reporting requirements.

*N.    Cancellation of Documents*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, debentures, certificates and other documents evidencing Claims against and Interests in a Debtor or the Debtors including, without limitation, under and in connection with the Prepetition AMH RBL Credit Documents and the Prepetition Senior Notes Indenture, shall, with respect to the Debtors, be canceled and deemed rejected and terminated without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, *provided*, *however*, that any such documents shall remain in force to the extent applicable with respect to distributions of any property under the Plan.

Except as set forth in this Article V.N, the Prepetition AMH RBL Agent and its respective agents shall be relieved of all further duties and responsibilities related to the Loan Documents (as defined in the Prepetition AMH RBL Credit Agreement) and the Plan, except with respect to such other rights of the Prepetition AMH RBL Agent that, pursuant to the Prepetition AMH RBL Credit Agreement, survive the termination of the Loan Documents. Subsequent to the performance by the Prepetition AMH RBL Agent of its obligations pursuant to the Plan, the Prepetition AMH RBL Agent and its agents shall be relieved of all further duties and responsibilities related to the Loan Documents.

Except as set forth in this Article V.N, the Indenture Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the Prepetition Senior Notes Indenture and the Plan, except with respect to such other rights of the Indenture Trustee that, pursuant to the Prepetition Senior Notes Indenture, survive the termination of the Prepetition Senior Notes Indenture. Subsequent to the performance by the Indenture Trustee of its obligations pursuant to the Plan, the Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Senior Notes Indenture.

Notwithstanding the foregoing or anything else contained herein, the cancellation of the Prepetition Senior Notes Indenture shall not itself alter or otherwise affect the obligations or rights of the Indenture Trustee, on the one hand, and the holders of the Prepetition Senior Notes, on the other hand, pursuant to the Prepetition Senior Notes

Indenture, and all other agreements related to the Prepetition Senior Notes (collectively, the "*Prepetition Senior Notes Documents*") vis-à-vis each other. Without limiting the generality of the foregoing, (i) the Prepetition Senior Notes Documents shall be deemed to be cancelled as permitted by section 1123(a)(5)(F) of the Bankruptcy Code and (ii) except to the extent provided herein with respect to the rights and obligations of the Indenture Trustee against the holders of the Prepetition Senior Notes, only the following rights and obligations of the Indenture Trustee shall remain in effect after the Effective Date (in each case, to the extent set forth in the Prepetition Senior Notes Documents): (A) rights, as trustee, to any payment of fees, expenses and indemnification obligations and the Indenture Trustee Charging Lien and any other liens securing such rights to payment including, but not limited to, from or on property distributed under this Plan on account of the Prepetition Senior Notes Claims, (B) rights and obligations relating to distributions to be made to the holders of Prepetition Senior Notes by or on behalf of the Indenture Trustee from any source, (C) rights and obligations relating to representation of the interests of the holders of Prepetition Senior Notes by the Indenture Trustee in these chapter 11 cases to the extent not released or discharged by this Plan or any order of the Bankruptcy Court, including, for the avoidance of doubt, the ability of the Indenture Trustee to assert claims in respect of the Prepetition Senior Notes against non-Debtor parties after the Effective Date and (D) rights and obligations relating to participation by the Indenture Trustee in any proceedings and appeals related to this Plan. Notwithstanding the continued effectiveness of such rights and obligations after the Effective Date, the Indenture Trustee shall have no obligation to object to claims against the Debtors. For the avoidance of doubt, after the performance by the Indenture Trustee and its representatives, including, without limitation, its professionals of any duties that are required under this Plan, the Confirmation Order, or the Prepetition Senior Notes Documents, the Indenture Trustee and its professionals shall be relieved of and released from all obligations arising thereunder.

O.     *Filing of Monthly and Quarterly Reports and Payment of Statutory Fees*

The filing of the final monthly report (for the period after the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the applicable Plan Administrator. All Statutory Fees with respect to the period prior to the Effective Date shall be paid by the Debtors in Cash on the Effective Date or other required payment date. With respect to the period after the Effective Date, the applicable Plan Administrator shall be obligated to pay quarterly Statutory Fees from the applicable Claims Reserves to the Office of the United States Trustee and such obligation shall continue until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

P.     *Directors, Managers and Officers of the Debtors*

Following the Confirmation Date and prior to the occurrence of the Effective Date, the then current officers, directors and managers of each of the Debtors shall continue in their respective capacities in accordance with the applicable by-laws or other organizational documents and the Debtors shall execute such documents and take such other action as is necessary to effectuate the actions provided for in the Plan.

On and after the Effective Date, subject to the rights vested in the AMH Litigation Trustee, the board of managers or directors of each Debtor shall be terminated and all of the officers, managers, and directors of the Debtors, to the extent they have not already done so, shall be deemed to have resigned from their respective positions with the Debtors, as applicable; provided, however, that nothing herein shall prohibit the Plan Administration Trusts from employing or retaining any officer, manager, or director in accordance with the applicable AMH Plan Administration Trust Agreement.

On and after the Effective Date, subject to the rights vested in the AMH Litigation Trustee, the AMH Plan Administrator shall serve as the sole shareholder, interest holder, officer, director or manager of each of the AMH Debtors, as applicable, under applicable state law. The AMH Plan Administrator, subject to the terms and conditions of the Plan and the AMH Plan Administration Trust Agreement, shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

On and after the Effective Date, the AMR/SRII Plan Administrator shall serve as the sole shareholder, interest holder, officer, director or manager of each of AMR and the SRII Debtors, as applicable, under applicable state law. The AMR/SRII Plan Administrator, subject to the terms and conditions of the Plan and the AMR/SRII Plan Administration Trust Agreement, shall be authorized to execute, deliver, file or record such documents, contracts,

instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

On and after the Effective Date, the AMH Litigation Trustee shall serve as the trustee of the AMH Litigation Trust. The AMH Litigation Trustee, subject to the terms and conditions of the Plan and the AMH Litigation Trust Agreement, shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Q.      *Corporate Authorization*

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, interest holders, directors, members, or managers of one or more of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to Section 303 of the Delaware General Corporation Law or other applicable law of the states in which the Debtors are organized, without any requirement of further action by the stockholders, interest holders, directors, members, or managers of the Debtors. After the Effective Date, to the extent necessary or appropriate to implement the Plan, the applicable Plan Administrator or the AMH Litigation Trustee, as applicable, shall have all authority to address any and all matters and to take any and all actions and to execute and deliver any and all documents that would have required the approval of, and to act on behalf of, the stockholders, interest holders, directors, members, or managers of one or more of the Debtors, in each case subject to the rights vested in the AMH Litigation Trustee.

R.      *Insurance Policies*

Before the AMR/AMH Petition Date, the Debtors and KFM Debtors obtained the D&O Tail Coverage for the current and former directors, officers, and managers. After the Effective Date, all members, managers, directors, and officers of the Debtors and KFM Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, subject to and in accordance with the terms and conditions of such D&O Tail Coverage.

On the Effective Date, the AMH Debtors' rights under and to each Insurance Policy shall vest in the AMH Plan Administration Trust and AMR's and the SRII Debtors' rights under and to each Insurance Policy shall vest in the AMR/SRII Plan Administration Trust. Confirmation and Consummation of this Plan, and the vesting of the Insurance Policies in the applicable Plan Administration Trusts as set forth herein, shall not impair or otherwise affect (x) any parties' rights to coverage thereunder, including in respect of any claims pending as of the Effective Date or pursued or made thereafter, including any claims pursued or made by the AMH Litigation Trustee on behalf of the AMH Litigation Trust, or (y) any available defenses of the Debtors or the Plan Administration Trusts or any Insurer under the Insurance Policies.

S.      *Effectuating Documents and Further Transactions*

Prior to the Effective Date, the Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan. After the Effective Date, the applicable Plan Administrator or the AMH Litigation Trustee, as applicable, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.

T.      *Employee and Retiree Benefits*

All employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors' employees and independent contractors, including retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, as and to the extent set forth in the *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee*

*Benefit Programs, and (II) Granting Related Relief* [Docket No. 8], shall remain in full force and effect until the conclusion of the Wind Down and the resignation or termination of all employees of the Debtors. The Debtors maintain no programs providing for retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code).

U.    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate or personal property transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

V.    *Assignment of Reserved ORRI*

On or as soon as practicable after the Effective Date, the AMH Debtors (as applicable) shall convey and assign the Reserved ORRI to the Holders of Prepetition AMH RBL Claims, in partial satisfaction of the Prepetition AMH RBL Claims as set forth in Section III.C.2 hereof. In connection which such conveyance and assignment, the AMH Debtors shall execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably requested by the Prepetition AMH RBL Agent to effectuate and further evidence the terms and conditions of the Plan.

W.    *Exchange of SRII Interests*

At any time prior to the Effective Date, by notice to SRII and AMR, any holder of an SRII Interest will have the option, in its sole and absolute discretion, to exercise, in whole or in part, the redemption and exchange rights pursuant to Article XI of Amended and Restated Agreement of Limited Partnership of SRII Opco, LP, dated as of February 9, 2018 and Section 4.3(c)(v) of the Second Amended and Restated Certificate of Incorporation, dated February 9, 2018, of AMR, and related agreements, and without the giving of any other notice, whereupon the Debtors will take all actions reasonably necessary to effectuate such redemption and exchange, including the redemption of the common units in SRII owned by such person in exchange for shares of Class A common Stock of AMR, which AMR shares will be treated as AMR Interests in accordance with Article III.C.11 hereof.

### ARTICLE VI.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Treatment of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, as of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale, and are not the subject of a pending motion to reject, assume, or assume and assign as of the Effective Date, (2) are not identified on the Schedule of Assumed Contracts to be Filed with the Plan Supplement, and (3) have not expired under their own terms prior to the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

B.    *Rejection of Indemnification Obligations*

The Debtors, and upon the Effective Date, the AMH Plan Administration Trust or the AMR/SRII Plan Administration Trust, as applicable, shall be deemed to have rejected all of the obligations in place on and before the Effective Date under the Indemnification Provisions for Indemnified Parties for Claims related to or arising out of any actions, omission, or transactions occurring before the Effective Date.

C.     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

D.     *Rejection Damages Claim*

All Claims arising from the rejection of Executory Contracts or Unexpired Leases under this Plan must be Filed with the Balloting Agent and served upon the applicable Plan Administrator and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date; *provided*, that the foregoing deadline shall apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of Section VI.A above, and the deadline for filing any rejection damage Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to separate Court order shall be the applicable deadline under the Claims Bar Date Order. Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a General Unsecured Claim against the applicable Debtor.

E.     *Reservation of Rights*

Nothing contained in this Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of rejection, the Debtors shall have sixty (60) days following entry of a Final Order resolving such dispute (or such later date as may be ordered by the Bankruptcy Court) to alter their treatment of such contract or lease.

F.     *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VII.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

A.     *Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions*

1.     Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VII.  Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered before, on or at any time after the Effective Date. Notwithstanding the foregoing, all distributions to holders of AMH Litigation Trust Interests shall be made by the

AMH Litigation Trustee pursuant to the terms of the Plan, the Confirmation Order and the AMH Litigation Trust Agreement.

       2.    Entitlement to Distributions

On and after the Effective Date, the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date. Accordingly, the Disbursing Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Distribution Record Date. The Prepetition AMH RBL Agent may, in its sole discretion, limit the further assignment of Prepetition AMH RBL Claims to allow for the accurate recording of the holders of Prepetition AMH RBL Claims as of the close of business on the Distribution Record Date with respect to the Prepetition AMH RBL Claims.

*B.*    *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Debtors as Disbursing Agent or such other Entity designated by the Debtors as a Disbursing Agent on the Effective Date, which may be the AMH Plan Administrator; *provided, however,* that notwithstanding anything set forth herein, the AMH GUC Claim Disbursing Agent shall be exclusively authorized and obligated to make all required distributions to the Holders of Allowed Class 5 AMH General Unsecured Claims from AMH GUC Distribution Cash. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. For purposes of the distribution on account of the Prepetition AMH RBL Claims, the Prepetition AMH RBL Agent shall (a) be deemed to be the Holder of all Prepetition AMH RBL Claims and (b) make distributions to the Holders of Prepetition AMH RBL Claims pursuant to the terms of the Prepetition AMH RBL Credit Agreement. For purposes of any distributions on account of the Prepetition Senior Notes Claims to be made under this Plan, (a) the Indenture Trustee shall be deemed to be the Holder of all Prepetition Senior Notes Claims and (b) all Cash to be distributed under this Plan on account of the Prepetition Senior Notes Claims shall be paid to the Indenture Trustee for distribution pursuant to and in accordance with the terms of the Prepetition Senior Notes Indenture, subject to the Indenture Trustee Charging Lien. In accordance with the foregoing, the delivery of any applicable property to be distributed to Holders of Prepetition AMH RBL Claims or Prepetition Senior Notes Claims to the Prepetition AMH RBL Agent or the Indenture Trustee, respectively, shall satisfy all applicable distribution obligations under the Plan. All reasonable and documented fees and expenses of the Prepetition AMH RBL Agent and the Indenture Trustee (including the reasonable and documented fees and expenses of their respective counsel and agents) incurred in connection with such distributions shall be paid by the AMH Plan Administration Trust.

For the avoidance of doubt, all distributions to Holders of Litigation Trust Interests shall be made by the AMH Litigation Trustee pursuant to the terms of the Plan, the Confirmation Order and the AMH Litigation Trust Agreement.

*C.*    *Distributions on Account of Claims Allowed After the Effective Date*

       1.    Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

       2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the applicable Disbursing Agent, (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such

Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (a) such Holders' address on its proof of claim, if applicable, (b) such Holders' address listed on a notice filed with the Bankruptcy Court, if applicable, or (c) if neither (a) or (b) are available, the address of record for the Holder listed on the Debtors' schedules.

2.      Undeliverable Distributions and Unclaimed Property

(a)     Failure to Claim Undeliverable Distributions

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date the distribution was returned.  After such date, all unclaimed property or interests in property shall revert to the applicable Plan Administrator or the AMH Litigation Trustee, as applicable (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

(b)     Failure to Present Checks

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the issuance of such check shall have its Claim for such un-negotiated check discharged and shall be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the applicable Plan Administration Trust or the AMH Litigation Trust, as applicable.  In such cases, any Cash held for payment on account of such Claims shall be property of the applicable Plan Administration Trust or the AMH Litigation Trust, as applicable, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

E.      *Compliance with Tax Requirements/Allocations*

In connection with this Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Disbursing Agent reserves the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Debtors, the Plan Administrators, or the Disbursing Agent may require, as a condition to the receipt of a distribution, that a Holder furnish to the Debtors, Plan Administrators, or Disbursing Agent, as applicable, any necessary or appropriate tax documentation, including Form W-8 or Form W-9, as applicable to each Holder. If any Holder fails to comply with such a request within three (3) months, such distribution in respect of such Holder may be withheld as required by applicable law and in such event, shall be deemed an undeliverable distribution and shall be treated in accordance with Art. VII.D.2 hereof. Without limitation of the generality of the foregoing, the Debtors, the Plan Administrators, or the Disbursing Agent may condition any distribution it may make to a Holder on such entity's receipt of such information and documentation as the Debtors, the Plan Administrators, or the Disbursing Agent, as applicable, determines in its discretion is necessary to effect a distribution in accordance with applicable law, including tax law, and withhold, as required by applicable law, a distribution to any Holder who fails to provide such documentation and information.

F.      *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the Certificates or other documentation underlying each such Claim, and all such surrendered Certificates and other documentations shall be deemed to be canceled pursuant to Article V.J hereof, except to the extent otherwise provided herein.

G.      *Claims Paid or Payable by Third Parties*

   1.   Claims Paid by Third Parties

The Debtors, the applicable Plan Administrator, or the AMH Litigation Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed upon order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the applicable Plan Administrator or the AMH Litigation Trustee. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the applicable Plan Administrator or the AMH Litigation Trustee on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Plan Administrator or the AMH Litigation Trustee, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the Distribution Date.

   2.   Claims Payable by Third Parties

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon payment from such Insurers, such Claim may be expunged upon an order or approval of the Bankruptcy Court or deemed satisfied in full.

   3.   Applicability of Insurance Policies

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against the Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

H.      *Allocation of Plan Distributions between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, such distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (or original issue discount).

# ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance and Disallowance of Claims*

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code.  Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the applicable Plan Administration Trust after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the AMR/AMH Petition Date or the SRII Petition Date, as applicable.

B.    *Prosecution of Objections to Claims*

The applicable Plan Administrator or, in the case of AMH General Unsecured Claims, the AMH GUC Claim Administrator, shall have the authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan; *provided, however*, that the AMH GUC Claim Administrator shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to AMH General Unsecured Claims, as set forth in the AMH GUC Claim Administrator Agreement and this Plan.  From and after the Effective Date, the applicable Plan Administrator or AMH, GUC Claim Administrator, as applicable may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  The applicable Plan Administrator or AMH GUC Claim Administrator, as applicable, may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary; *provided, however*, that for the avoidance of doubt, the underlying Claim shall remain under the jurisdiction of the Bankruptcy Court and shall not be disallowed other than by order of the Bankruptcy Court.

With respect to the foregoing duties of the applicable Plan Administrator or the AMH GUC Claim Administrator to  File, settle, compromise, withdraw, or litigate to judgment any objections to Claims, the applicable Plan Administrator or the AMH GUC Claim Administrator, as the case may be, shall stand in the same position as the AMH Debtors with respect to any claim the AMH Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege, and the applicable Plan Administrator or the AMH Claim Administrator, as the case may be, shall succeed to all of the AMH Debtors' rights to preserve, assert or waive any such privilege.

The AMH Debtors or the AMH Plan Administrators and their respective professionals, as appropriate,  and the AMH GUC Claim Administrator and its professionals, as applicable, will cooperate with each other  in relation to their respective activities  in respect to objecting to, settling or otherwise reconciling claims as provided herein, including by providing reasonable, good-faith access to personnel, systems, and books and records to the extent and at such times as providing such access will not interfere with the discharge of the primary obligations of the AMH Debtors, the AMH Plan Administrators, and their respective personnel and consulting with each other to avoid duplication of effort.

In addition, and notwithstanding anything to the contrary in the Plan, the Prepetition AMH RBL Agent, on behalf of the Prepetition AMH RBL Lenders, shall retain the right to object to any Administrative Claim(s), Other Priority Claim(s), Priority Tax Claim(s) or Other Secured Claims asserted against the AMH Debtors for the duration of the Claims Objection Deadline associated with the AMH Debtors' Chapter 11 Cases.

C.    *Estimation of Claims*

The applicable Plan Administrator or AMH GUC Claim Administrator, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the applicable Plan Administrator or AMH GUC Claim Administrator, as applicable, has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any

appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the applicable Plan Administrator or AMH GUC Claim Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

D.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the applicable AMH Plan Administrator shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that:

1.      All provisions, terms and conditions hereof are approved in the Confirmation Order.

2.      The Confirmation Order shall have been entered by the Bankruptcy Court, in form and substance acceptable to the Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee.  The Confirmation Order shall provide that, among other things, the Plan Administrators and the AMH Litigation Trustee, as applicable, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the other contracts, instruments and other agreements or documents created in connection with or described in this Plan.

3.      The Sale shall have been consummated pursuant to the Purchase Agreement.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms, and conditions are satisfied (or waived pursuant to the provisions of Article IX.C hereof), and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied or waived.

1.      The Plan, the Definitive Documents, and all other documents contemplated thereby, including any amendments, modifications, or supplements thereto, shall be acceptable to the Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee (in each case, to the extent of their consent rights as provided in this Plan), and, with respect to Articles V.B, V.R, IX.C, and X.B of this Plan (in each case, to the extent impacting or relating to the KFM Debtors or the KFM Releasing Parties), the KFM Debtors and KFM Agent.

2.      All Definitive Documents shall have been executed, delivered, filed (if applicable) and shall be in full force and effect, and all conditions precedent to effectiveness set forth in the Definitive Documents shall have been satisfied or waived in accordance with the terms thereof.

3.      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan and the Definitive Documents and no order, injunction or judgment shall have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare

illegal the transactions contemplated by this Plan, and no law shall have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by this Plan.

4.   Payment in full in Cash by the applicable Debtors of any and all accrued but unpaid reasonable and documented Fee Claims, Prepetition AMH RBL Agent Fees, and Committee Fees for which the Debtors have received invoices or estimates prior to the Effective Date shall have been made.

5.   The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee.  The Confirmation Order shall provide that, among other things, the Plan Administrators, AMH GUC Claim Administrator, and the AMH Litigation Trustee, as applicable, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the other contracts, instruments and other agreements or documents created in connection with or described in this Plan.

6.   The Plan Administration Trust Agreements, the AMH GUC Claim Administrator Agreement, and the AMH Litigation Trust Agreement shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

7.   Payment in full in Cash by the AMH Debtors of (i) the AMH GUC Distribution Cash to the AMH GUC Claim Disbursing Agent, and (ii) the AMH GUC Claim Administrator Reserve to the AMH GUC Claim Administrator.

8.   All actions, documents, certificates, and agreements necessary to implement this Plan shall (i) have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect.

9.   The Interim Distribution shall have been distributed to the Prepetition AMH RBL Agent, which distribution shall be unconditionally and fully vested in, and not subject to any clawback from, the Prepetition AMH RBL Agent.

*C.*     *Waiver of Conditions*

Each of the conditions to Confirmation and to Consummation set forth in this Article IX may be waived with the written consent of the Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee without notice, leave, approval or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; *provided*, that notwithstanding the foregoing, (1) the condition in Section IX.B.1 above may be waived, with respect to any Definitive Document, with only the consent of the Debtors and any Entity having consent rights over such Definitive Document; (2) any waiver of the condition in Section IX.B.1, to the extent such waiver relates to Articles V.B, V.R, IX.C, or X.B of this Plan and impacts or relates to the KFM Debtors or the KFM Releasing Parties, shall require the consent of the KFM Debtors and KFM Agent; (3) the condition in Section IX.B.6 above may be waived with only the consent of the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group and the Committee, as applicable; and (4) the condition in Section IX.B.9 above may be waived with the consent of the Debtors and the Prepetition AMH RBL Agent only.

*D.*     *Effect of Nonoccurrence of Conditions*

If the Consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, any distribution to be made on account of such Allowed Claim or Allowed Interest, including, without limitation, all controversies among the Debtors, the Prepetition AMH RBL Agent, the Prepetition AMH RBL Lenders, the Ad Hoc Noteholder Group, the Committee, and all other Holders of Claims against and Interests in the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrators, the Prepetition AMH RBL Agent, and the Ad Hoc Noteholder Group, as applicable, may compromise and settle Claims against them and Causes of Action against other Entities, including the AMR/SRII Retained Causes of Action; *provided*, that the AMH Litigation Trustee shall have the sole authority to compromise and settle the AMH Litigation Trust Causes of Action.

For the avoidance of doubt, notwithstanding anything to the contrary contained in this Plan, nothing shall release the AMH Litigation Trust Causes of Action.

B.    *Releases by the Debtors*

**1.    *AMR Debtor Releases*.  To the extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, effective on and after the Effective Date, the AMR Released Parties shall be deemed released and discharged by AMR, the SRII Debtors and their Estates from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of AMR or the SRII Debtors, that AMR, the SRII Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, AMR, an SRII Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring and recapitalization efforts, including in connection with AMR's business combination transaction that was consummated on or around February 9, 2018, intercompany transactions between or among a Debtor and another Debtor or a Debtor and a KFM Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Purchase Agreement, the Bidding Procedures Order, the Sale, the Sale Order, the Disclosure Statement, the Plan, or any Restructuring, contract, instrument, release, or other agreement or document created or entered into in connection with the Purchase Agreement, the Bidding Procedures Order, the Sale, the Sale Order, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however,* that the foregoing "*AMR Debtor Releases*" shall not operate to waive or release any Causes of Action:  (a) of any AMH Debtor or (b) any Debtor:  (1) against an  AMR Released Party arising from any contractual obligations owed to the Debtors that are pursuant to an Executory Contract that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2)  that constitute AMR/SRII Retained Causes of Action or AMH Litigation Trust Causes of Action under this Plan; (3) that have been acquired by the Purchaser pursuant to the Purchase Agreement in connection with the Sale; or (4) arising from claims for fraud, gross negligence, willful misconduct, or criminal conduct (*provided*, that the foregoing shall not limit the releases set forth in the Sale Order in**

connection with the Sale).  Notwithstanding anything to the contrary in the foregoing, the "*AMR Debtor Releases*" set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section X.B.1, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (i) in exchange for the good and valuable consideration provided by the AMR Released Parties; (ii) a good faith and settlement and compromise of the claims released by this Section X.B.1; (iii) in the best interests of the AMR Debtor, its estates and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any Entity or Person asserting any claim or Cause of Action released by this Section X.B.1.

2.  *AMH Debtor Releases*.  To the extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, effective on and after the Effective Date, the AMH Released Parties shall be deemed released and discharged by the AMH Debtors and their Estates from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the AMH Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, an AMH Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring and recapitalization efforts, including in connection with AMR's business combination transaction that was consummated on or around February 9, 2018, intercompany transactions between or among a Debtor and another Debtor or a Debtor and a KFM Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Purchase Agreement, the Bidding Procedures Order, the Sale, the Sale Order, the Disclosure Statement, the Plan, or any Restructuring, contract, instrument, release, or other agreement or document created or entered into in connection with the Purchase Agreement, the Bidding Procedures Order, the Sale, the Sale Order, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however,* that the foregoing "*AMH Debtor Releases*" shall not operate to waive or release any Causes of Action of any Debtor: (1) against an AMH Released Party arising from any contractual obligations owed to the Debtors that are pursuant to an Executory Contract that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2)  that constitute AMR/SRII Retained Causes of Action or AMH Litigation Trust Causes of Action under this Plan; (3) that have been acquired by the Purchaser pursuant to the Purchase Agreement in connection with the Sale; (4) arising from claims for fraud, gross negligence, willful misconduct, or criminal conduct (*provided*, that the carve-outs in this clause (4) shall (x) not limit the releases set forth in the Sale Order in connection with the Sale or (y) apply to any claims against any KFM Releasing Party); or (5) against any Excluded Party.  Notwithstanding anything to the contrary in the foregoing, the "*AMH Debtor Releases*" set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section X.B.2, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (i) in exchange for the good and valuable consideration provided by the AMH Released Parties; (ii) a good faith and settlement and compromise of the claims released by this Section X.B.2; (iii) in the best interests of the AMH Debtors, their estates and all Holders of Claims and Interests; (iv) fair, equitable and

reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any Entity or Person asserting any claim or Cause of Action released by this Section X.B.2.

C.    *Releases by Holders of Claims and Interests*

1.    *AMR Third-Party Releases.* **To the extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, effective on and after the Effective Date, each AMR Releasing Party is deemed to have released and discharged (i) each AMR Released Party and (ii) each other AMR Releasing Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity or Person, including any other AMR Releasing Parties and AMR Released Parties, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring and recapitalization efforts, including in connection with AMR's business combination transaction that was consummated on or around February 9, 2018, intercompany transactions between or among a Debtor and another Debtor or a Debtor and a KFM Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Purchase Agreement, the Bidding Procedures Order, the Sale, the Sale Order, the Disclosure Statement, the Plan, or any Restructuring, contract, instrument, release, or other agreement or document created or entered into in connection with the Purchase Agreement, the Bidding Procedures Order, the Sale, the Sale Order, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the "*AMR Third-Party Releases*" set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any prepetition or postpetition claim or Cause of Action of one creditor of the AMR Debtors against another (excluding the Prepetition AMH RBL Agent and Prepetition AMH RBL Lenders) relating to goods or services provided to such Debtors.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section X.C.1, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (i) in exchange for the good and valuable consideration provided by the AMR Released Parties and the AMR Releasing Parties; (ii) a good faith and settlement and compromise of the claims released by this Section X.C.1; (iii) in the best interests of the AMR Debtor, its estates and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any Entity or Person asserting any claim or Cause of Action released by this Section X.C.1.**

2.    *AMH Third-Party Releases.* **To the extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, effective on and after the Effective Date, each AMH Releasing Party is deemed to have released and discharged (i) each AMH Released Party and (ii) each other AMH Releasing Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity or Person, including any other AMH Releasing Parties and AMH Released Parties, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring and recapitalization efforts, including in connection with AMR's business combination transaction that was consummated on or around February 9, 2018, intercompany transactions between or among a Debtor and another Debtor or a Debtor and a KFM Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Purchase Agreement, the**

Bidding Procedures Order, the Sale, the Sale Order, the Disclosure Statement, the Plan, or any Restructuring, contract, instrument, release, or other agreement or document created or entered into in connection with the Purchase Agreement, the Bidding Procedures Order, the Sale, the Sale Order, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the "*AMH Third-Party Releases*" set forth above do not (a) release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any prepetition or postpetition claim or Cause of Action of one creditor of the AMH Debtors against another (excluding the Prepetition AMH RBL Agent and Prepetition AMH RBL Lenders) relating to goods or services provided to such Debtors, or (b) waive or release any Causes of Action against any Excluded Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section X.C.2, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (i) in exchange for the good and valuable consideration provided by the AMH Released Parties and the AMH Releasing Parties; (ii) a good faith and settlement and compromise of the claims released by this Section X.C.2; (iii) in the best interests of the AMH Debtors, their estates and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any Entity or Person asserting any claim or Cause of Action released by this Section X.C.2.

D.    *Restrictions on Lender Releases.*

Notwithstanding anything to the contrary in this Article X, any release contemplated herein by the Prepetition AMH RBL Agent and the Prepetition AMH RBL Lenders in favor of the KFM Debtors and their bankruptcy estates shall only be as to Causes of Action held by such entity solely in its capacity as the agent or lender under the Prepetition AMH RBL Credit Documents, and any release contemplated by the KFM Agent and the KFM Lenders in favor of the AMH Debtors and the AMR Debtors and their bankruptcy estates shall only be as to Causes of Action held by such entity solely in its capacity as the agent or lender under the KFM Credit Agreement.

E.    *Exculpation*

To the fullest extent permitted by applicable law, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for those that are determined in a final order to have constituted actual fraud, gross negligence, willful misconduct, or criminal conduct.

F.    *Permanent Injunction*

Except as otherwise expressly provided in the Plan or related documents, or for obligations issued pursuant to the Plan, from and after the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, all AMR Releasing Parties and all AMH Releasing Parties are permanently enjoined from taking any of the following actions against any AMR Released Parties or AMH Released Parties, respectively:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, or subrogation against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed

**a motion requesting the right to perform such setoff on or before the Confirmation Date; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or the Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds.**

G.      *Setoffs*

Except as otherwise expressly provided for in the Plan, each Debtor, Plan Administrator, the AMH GUC Claims Administrator, and the AMH Litigation Trustee (as applicable), pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any claims, rights and Causes of Action of any nature that such Debtor, the Plan Administrator, the AMH GUC Claim Administrator or the AMH Litigation Trustee, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor of any such claims, rights and Causes of Action that such Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date. For the avoidance of doubt, the filing of a proof of claim is sufficient to preserve a right of set off hereunder.

H.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Plan Administration Trusts.

I.      *Preservation of All Causes of Action Not Expressly Settled or Released*

The Debtors expressly reserve all Causes of Action for later adjudication by, as applicable, the Debtors, the Plan Administrators, or the AMH Litigation Trustee (including, without limitation, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except in each case where such Causes of Action have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the AMR Debtor Releases and the AMH Debtor Releases contained in Article X.B.1 and Article X.B.2, respectively, the AMR Third-Party Releases and the AMH Third-Party Releases contained in Article X.C.1 and Article X.C.2, respectively, and the Exculpation contained in X.E hereof) or any other Final Order (including, without limitation, the Sale Order or the Confirmation Order). In addition, the Debtors, the Plan Administrators, and the AMH Litigation Trustee, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

J.      *Limitations on Executable Assets with Respect to the Specified Directors and Officers Claims.*

Any recovery by or on behalf of the AMH Debtors or the AMH Litigation Trust (and the beneficiaries thereof) against any of the Specified Directors and Officers, including in each case by way of settlement or judgment or otherwise, shall be limited to the remaining limits of the D&O Insurance Coverage.  No party, including the AMH Litigation Trust, shall collect, execute, or garnish upon any assets of the Specified Directors and Officers, and shall only seek to collect on any settlement or judgment against the Specified Directors and Officers for the limited purpose of triggering the D&O Insurance Coverage.  In the event D&O Insurance Coverage is denied for any settlement or judgment in the Debtors or AMH Litigation Trust's favor, the Specified Directors and Officers shall assign any claims for coverage or other rights of recovery they may have against the D&O Insurance Coverage insurers to the AMH Litigation Trust.

In the event the AMH Litigation Trustee opts to assert one or more claims against Tim J. Turner, the AMH Litigation Trustee shall provide Turner with advance written notice of such claims (the "***Turner Claims***"), in whatever form the AMH Litigation Trustee deems appropriate in the AMH Litigation Trustee's sole discretion.  If Mr. Turner seeks a coverage determination from the insurer under the applicable D&O Insurance Coverage within 5 business days of receipt of such notice, and Mr. Turner promptly communicates such request to the AMH Litigation Trustee via overnight courier or email (in Mr. Turner's sole discretion), the AMH Litigation Trustee shall not file the Turner Claims until such insurer provides such coverage determination (and Turner shall promptly communicate such determination to the AMH Litigation Trustee via overnight courier or email, in Mr. Turner's sole discretion).  If Turner receives a denial of coverage, the AMH Litigation Trustee shall not pursue the Turner Claims until the Coverage Determination Date (as defined below).  For purposes of this paragraph, "***Coverage Determination Date***" shall be defined as the earlier of (i) the date on which the applicable insurer agrees in writing to provide coverage for such claim, and (ii) the date on which an order of a court of competent jurisdiction finding that the claim is covered by the applicable D&O Insurance Coverage policy becomes final and non-appealable.

Notwithstanding anything to the contrary herein, and with respect to James T. Hackett only, to the extent Mr. Hackett has a right of reimbursement, indemnification, or exculpation (a "***Reimbursement Right***") for any liability recoverable against his assets, then such recovery is permissible up to the amount of any reimbursement obtainable by Mr. Hackett through such Reimbursement Right for such liability.  This paragraph shall be null and void if used as a basis to void the Reimbursement Right.

## ARTICLE XI.

## BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, and this Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

1.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending before the Bankruptcy Court on the Effective Date;

6.    adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

7.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of any Entity's obligations incurred in connection with the Sale and the Purchase Agreement except as expressly set forth in the Purchase Agreement, in which case the forum selection clauses set forth in the Purchase Agreement shall govern in all respects;

10.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions and other provisions contained in Article X and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VII;

13.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.  determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.  enter an order or Final Decree concluding or closing the Chapter 11 Cases;

16.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.  consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.  hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

22.  enforce all orders previously entered by the Bankruptcy Court; and

23.  adjudicate all other matters over with the Bankruptcy Court has jurisdiction;

*provided*, *however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XIII.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.  *Modifications and Amendments*

Subject to the limitations and rights contained in this Plan:  (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; *provided*, that any such modifications pursuant to this Section XIII.A shall be acceptable to the AMH Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee.

B.  *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.  *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw this Plan subject to the terms hereof, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (x) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (y) prejudice in any manner the rights of the Debtors or any other Entity; or (z) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

D.      *Substantial Consummation of the Plan*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE XIV.

### MISCELLANEOUS PROVISIONS

A.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

B.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Filing of the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

C.      *Further Assurances*

The Debtors, all Holders of Claims receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

D.      *Payment of Fees and Expenses*

Prior to or as of the Effective Date, the Debtors shall promptly pay in full Cash any and all accrued but unpaid reasonable and documented Prepetition AMH RBL Agent Fees and Committee Fees for which the Debtors have received invoices or estimates prior to the Effective Date.

E.      *Service of Documents*

Any pleading, notice, or other document required by this Plan to be served on or delivered to the Debtors, the Committee, the Plan Administrators, or the AMH Litigation Trustee shall be sent by overnight mail or electronic mail to:

> *For the Debtors:*
>
> Alta Mesa Resources, Inc.
> 15021 Katy Freeway, 4th Floor
> Houston, Texas 77094
> Attn:    Mark Castiglione
>             Kim Warnica
> Phone:  (281) 530-0991
> Email:   mcastiglione@altamesa.net
>             kwarnica@altamesa.net
>
> **with copies to:**
>
> *For AMR, the AMH Debtors, and the SRII Debtors:*

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attn:    George A. Davis
           Annemarie V. Reilly
           Brett M. Neve
Phone:   (212) 906-1200
Fax:     (212) 751-4864
Email:   george.davis@lw.com
           annemarie.reilly@lw.com
           brett.neve@lw.com

-and-

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Attn:    Caroline A. Reckler
Phone:   (312) 876-7700
Fax:     (312) 993-9767
Email:   caroline.reckler@lw.com

-and-

Latham & Watkins LLP
555 Eleventh Street, Suite 1000
Washington, D.C. 20004
Attn:    Andrew Sorkin
Phone:   (202) 637-2200
Fax:     (202) 637-2201
Email:   andrew.sorkin@lw.com

-and-

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, TX 77002
Attn:    John F. Higgins, IV
           Eric M. English
           Aaron J. Power
           M. Shane Johnson
Phone:   (713) 226-6000
Fax:     (713) 226-6248
Email:   jhiggins@porterhedges.com
           eenglish@porterhedges.com
           apower@porterhedges.com
           sjohnson@porterhedges.com

*For the Committee:*

Brown Rudnick LLP
Seven Times Square
New York, NY 10036
Attn:    Robert J. Stark
           Michael Winograd

Andrew M. Carty
Phone:   (212) 209-4800
Fax:     (212) 209-4801
Email:   rstark@brownrudnick.com
         mwinograd@brownrudnick.com
         acarty@brownrudnick.com

-and-

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Attn:    Steve B. Levine
Phone:   (617) 856-8200
Fax:     (617) 856-8201
Email:   slevine@brownrudnick.com

-and-

Snow Spence Green LLP
America Tower
2929 Allen Parkway, Suite 2800
Houston, Texas 77019
Attn:    Phil Snow
         Kenneth Green
         Aaron Guerrero
Phone:   (713) 335-4800
Fax:     (713) 335-4848
Email:   psnow@snowspencelaw.com
         kgreen@snowspencelaw.com
         aguerrero@snowspencelaw.com

*For the AMH Plan Administrator:*

Michael A. Tribolet
2305A Elmen Street
Houston, Texas 77019
Phone: 713-502-5000

*For the AMR/SRII Plan Administrator:*

[Notice information to be specified in Plan Supplement or amended Plan.]

*For the AMH Litigation Trustee:*

[Notice information to be specified in Plan Supplement or amended Plan]


F.      *Dissolution of Committee*

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except for purposes of filing applications for Professional compensation in accordance with Article II.A.2 of this Plan.

G.      *Nonseverability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, at the request of the Debtors, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation must be in form and substance acceptable to the Debtors, the Prepetition AMH RBL Agent, the Ad Hoc Noteholder Group, and the Committee; *provided, further,* that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

H.      *Return of Security Deposits*

Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court or the underlying Administrative Claim has not been paid in full, all security deposits provided by the Debtors to any Person or Entity at any time after the AMR/AMH Petition Date, or the SRII Petition Date, as applicable, shall be turned over to the applicable Plan Administration Trust within twenty (20) days after the Effective Date, without deduction or offset of any kind.

I.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement*

Except as otherwise indicated herein and except for the terms and conditions of the Sale, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

K.      *Exhibits*

All exhibits and schedules attached hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan.  To the extent any exhibit, schedule or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit, non-schedule or non-document portion of the Plan shall control.

L.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

M.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order or the Sale Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided* that, in the event of any conflict with any provision of the AMH Litigation Trust Agreement, the AMH Litigation Trust Agreement shall govern and control; *provided, further* that in the event of any conflict with any provision of the Plan and/or the Confirmation Order with respect to the Sale, on the one hand, and the Sale Order, on the other hand, the Sale Order shall govern.  Notwithstanding the foregoing or anything else herein, or anything in the Sale Order, all AMH Litigation Trust Causes of Action, including all Causes of Action of the AMH Debtors against the Excluded Parties, shall vest in the AMH Litigation Trust.  In the event of a conflict between any provision of the Plan and the Confirmation Order, the Confirmation Order shall govern and control.

N.      *Filing of Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

O.      *Tax Reporting and Compliance*

The Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the AMR/AMH Petition Date or the SRII Petition Date, as applicable, through, and including, the Effective Date.

*[Remainder of page intentionally left blank]*

Dated:  April 17, 2020

Respectfully submitted,

**ALTA MESA RESOURCES, INC.,**
a Delaware corporation,
on behalf of itself and the other Debtors


By:      /s/ Mark Castiglione
         Mark Castiglione
         Chief Executive Officer

## <u>Schedule 1</u>

1. Bill Guttermuth
2. Craig W. Collins
3. Curtis Emerson
4. David E. McClure
5. Diana J. Walters
6. Donald R. Sinclair
7. David Murrell
8. Homer "Gene" Cole
9. Jeffrey H. Tepper
10. Jeffrey Layne
11. Jeffrey T. Janik
12. John C. Regan
13. John H. Campbell, Jr.
14. Kevin J. Bourque
15. Kimberly O. Warnica
16. M. Brannon Kuykendall
17. Marc Beilinson
18. Mark P. Castiglione
19. Michael Tapp
20. Patrick Bartels
21. Randy L. Limbacher
22. Robert Albergotti
23. Ronald J. Smith
24. Scott K. Cowand
25. Scott R. Grandt
26. Sylvia J. Kerrigan
27. William McMullen