# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | § § | Case No. 19-35133 (MI) |
| Debtors.[1] | § § § | (Jointly Administered) |

## DISCLOSURE STATEMENT
## FOR AMENDED JOINT CHAPTER 11 PLAN OF KFM DEBTORS

> **THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Kelly DiBlasi
Lauren Tauro
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for KFM Debtors*

Dated: April 22, 2020
Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (0642); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); Oklahoma Energy Acquisitions, LP (3762); SRII Opco GP, LLC (3729); SRII Opco, LP (5874); Kingfisher Midstream, LLC (1357); Kingfisher STACK Oil Pipeline, LLC (8858); Oklahoma Produced Water Solutions, LLC (0256); and Cimarron Express Pipeline, LLC (1545).  The Debtors' mailing address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

DISCLOSURE STATEMENT, DATED APRIL 22, 2020

KINGFISHER MIDSTREAM, LLC, *ET AL.*

THE SOLICITATION OF VOTES (THE "SOLICITATION") WILL BE CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE AMENDED JOINT CHAPTER 11 PLAN OF KFM DEBTORS, DATED APRIL 22, 2020 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"). A COPY OF THE PLAN IS ATTACHED HERETO AS EXHIBIT A. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING CENTRAL TIME) ON MAY 20, 2020 UNLESS EXTENDED BY THE KFM DEBTORS (AS DEFINED BELOW) IN WRITING.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS APRIL 27, 2020 (THE "VOTING RECORD DATE").

---

### RECOMMENDATION BY THE KFM DEBTORS

The disinterested manager of the board of managers of Kingfisher Midstream, LLC and the members of each of its subsidiary debtors have unanimously approved the transactions contemplated by the Solicitation and the Plan. The KFM Debtors believe the Plan is in the best interests of all stakeholders and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

---

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH IN SECTION VIII OF THIS DISCLOSURE STATEMENT – "CERTAIN RISK FACTORS TO BE CONSIDERED" – BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARY AND STATEMENTS MADE IN THIS DISCLOSURE

STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF AND ANY EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN ANY DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION.  NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) THE ADMINISTRATIVE AGENT AND LENDERS WHO DO NOT "OPT OUT" OF THE RELEASES SET FORTH IN SECTION 10.6(b) OF THE PLAN; (II) ALL HOLDERS OF CLAIMS THAT VOTE TO

**ACCEPT THE PLAN; (III) ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND ABSTAIN FROM VOTING FROM THE PLAN OR VOTE TO REJECT THE PLAN BUT, IN EACH CASE, DO NOT "OPT OUT" OF THE RELEASES SET FORTH IN SECTION 10.6(b) OF THE PLAN; (IV) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE PRESUMED TO ACCEPT, OR DEEMED TO REJECT, THE PLAN AND DO NOT "OPT OUT" OF THE RELEASES SET FORTH IN SECTION 10.6(b) OF THE PLAN; AND (V) THE RELEASED PARTIES (AS DEFINED IN THE PLAN).**

**HOLDERS OF CLAIMS IN CLASS 3 HAVE RECEIVED AN OPT-OUT FORM WITH THEIR BALLOT.  HOLDERS OF CLAIMS IN NON-VOTING CLASSES (1, 2, AND 4) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR NOTICE OF NON-VOTING STATUS.**

**[ON APRIL 27, 2020, THE BANKRUPTCY COURT CONDITIONALLY APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION" AS THAT TERM IS USED IN SECTION 1125(a)(1) OF THE BANKRUPTCY CODE.] FINAL APPROVAL OF THIS DISCLOSURE STATEMENT WILL BE CONSIDERED AT THE CONFIRMATION HEARING ON MAY 27, 2020.  CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.  CREDITORS SHOULD CAREFULLY READ THE DISCLOSURE STATEMENT, IN ITS ENTIRETY, BEFORE VOTING ON THE PLAN.**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

   A.    Overview of Restructuring...........................................................................1
   B.    Voting Procedures........................................................................................3
   C.    Brief Overview of the Plan ..........................................................................4
   D.    Summary of Distributions and Voting Eligibility........................................5
   E.    Confirmation ................................................................................................8

II.   KFM DEBTORS' BUSINESS ...........................................................................8

III.  CORPORATE AND CAPITAL STRUCTURE ..................................................9

   A.    Corporate Structure......................................................................................9
   B.    Directors and Officers................................................................................11
   C.    KFM Debtors' Capital Structure................................................................12

IV.   KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES..15

   A.    AMR Bankruptcy Filing ............................................................................15
   B.    Prepetition Restructuring & Marketing Efforts .........................................15

V.    KEY EVENTS DURING CHAPTER 11 CASES...............................................16

   A.    Commencement of Chapter 11 Cases and First Day Motions.............................16
   B.    Bidding Procedures....................................................................................19
   C.    Auction, Sale Hearing, and Closing of Sale Transaction....................................19
   D.    Adequate Protection...................................................................................20

VI.   SUMMARY OF PLAN .....................................................................................21

   A.    General .......................................................................................................21
   B.    Administrative Expense Claims, Fee Claims, Priority Tax Claims, and
         Adequate Protection Claims .......................................................................21
   C.    Classification of Claims and Interests........................................................23
   D.    Treatment of Claims and Interests.............................................................25
   E.    Means for Implementation .........................................................................28
   F.    Distributions...............................................................................................34
   G.    Procedures for Resolving Claims...............................................................38
   H.    Executory Contracts and Unexpired Leases ..............................................40
   I.    Conditions Precedent to the Occurrence of the Effective Date ............................42
   J.    Effect of Confirmation ...............................................................................43
   K.    Retention of Jurisdiction ............................................................................48
   L.    Miscellaneous Provisions...........................................................................49

VII.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN .................54

|       | A.  | Consequences to the KFM Debtors ....................................................... | 55 |
|       | B.  | Consequences to U.S. Holders of Certain Claims ................................. | 56 |
|       | C.  | Withholding on Distributions and Information Reporting...................... | 57 |

| VIII. | CERTAIN RISK FACTORS TO BE CONSIDERED ....................................... | 58 |

|       | A.  | Certain Bankruptcy Law Considerations ............................................... | 58 |
|       | B.  | Additional Risk Factors to be Considered ............................................ | 59 |

| IX.   | CONFIRMATION OF PLAN ............................................................................. | 62 |

|       | A.  | Confirmation Hearing ........................................................................... | 62 |
|       | B.  | Objections to Confirmation .................................................................. | 63 |
|       | C.  | Requirements for Confirmation of Plan................................................ | 64 |

| X.    | CONCLUSION AND RECOMMENDATION..................................................... | 68 |

## **EXHIBITS**

**EXHIBIT A**      Plan

**EXHIBIT B**      Organizational Chart

**EXHIBIT C**      Liquidation Analysis

# I.
# INTRODUCTION

## A.    Overview of Restructuring

Kingfisher Midstream, LLC ("**Kingfisher Parent**") and its subsidiary debtors (collectively, the "**KFM Debtors**" or "**Kingfisher**") submit this Disclosure Statement in connection with the solicitation of votes on the Plan.[1]  The KFM Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on January 12, 2020 (the "**KFM Petition Date**").  The chapter 11 cases of the KFM Debtors are being jointly administered with the chapter 11 cases of their affiliates Alta Mesa Resources, Inc. ("**AMR**"), Alta Mesa Holdings, LP ("**AMH**"), and certain of their subsidiaries (collectively, the "**Initial Debtors**"), along with the chapter 11 cases of SRII Opco, LP ("**SRII OpCo**"), and  SRII Opco GP, LLC ("**SRII Opco GP**") (collectively, the "**SRII Debtors**" and, together with the KFM Debtors and the Initial Debtors, the "**Debtors**").  The Plan is a separate plan for the KFM Debtors only and does not apply to any of the other Debtors.

Shortly after the Initial Debtors commenced their chapter 11 cases on September 11, 2019, they filed a motion seeking to, among other things, sell all or substantially all or any portion or combination of their assets (the "**AMH Assets**") and, subject to the consent of Kingfisher, the assets of Kingfisher (the "**KFM Assets**" and, together with the AMH Assets, the "**Assets**").  On October 11, 2019, the Bankruptcy Court entered the *Order Establishing Procedures Relating to the Sale of All or a Portion of the Debtors' Assets* [Docket No. 317], which, among other things, established bidding procedures for the sale of the Assets (the "**AMH Bidding Procedures**").

Prior to the KFM Petition Date, Kingfisher, through Marc Beilinson, Kingfisher's disinterested manager (the "**Disinterested Manager**"), and Kingfisher's independent advisors, worked extensively to evaluate strategic alternatives available to maximize the value of the KFM Assets.  Through this analysis, the Disinterested Manager determined that a restructuring for the KFM Debtors would be necessary and best implemented through a sale of the KFM Assets.  As such, Kingfisher, the Initial Debtors, and each of their respective advisors, conducted a broad and robust marketing process (the "**Marketing Process**"), culminating in the pursuit of a joint sale of all or substantially all of the KFM Assets with the AMH Assets (the "**Joint Sale**").

After extensive, arm's length negotiations, on December 31, 2019, Kingfisher selected an affiliate of an indirect equity owner of the Debtors, BCE-Mach III LLC ("**BCE-Mach**" or the "**Purchaser**"), as the stalking horse bidder for the KFM Assets, subject to higher or otherwise better offers at an auction.  In connection therewith, Kingfisher entered into that certain Purchase and Sale Agreement (as has been and may be amended, restated, or amended and restated from time to time, the "**KFM Purchase Agreement**") to sell substantially all of the KFM Assets to the Purchaser and, on the same day, the Initial Debtors entered into a separate Purchase and Sale Agreement (as has been and may be amended, restated, or amended and restated from time to time,

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan or the Sale Motion (as defined below).

the "**AMH Purchase Agreement**" and, together with the KFM Purchase Agreement, the "**Purchase Agreements**") to sell substantially all of the AMH Assets to the Purchaser. Following execution of the KFM Purchase Agreement, on January 12, 2020, the KFM Debtors commenced these chapter 11 cases to swiftly implement a comprehensive restructuring through a sale of substantially all of the KFM Assets pursuant to section 363 of the Bankruptcy Code. After receiving ratification and approval of the AMH Bidding Procedures with respect to the KFM Debtors [Docket No. 861] (the "**KFM Bidding Procedures**"), the Debtors held a joint auction for the Assets on January 15, 2020 (the "**Auction**"). The Purchase Agreements were selected as the highest and best bids coming out of the Auction [Docket No. 888].

On January 17, 2020, the Initial Debtors and the KFM Debtors entered into amended and restated Purchase Agreements [Docket No. 930]. On January 24, 2020, the Bankruptcy Court entered orders approving the Joint Sale to the Purchaser [Docket Nos. 1013; 1016] (the "**Sale Transaction**").

After the Sale Transaction did not close on the target closing date and BCE-Mach notified the Debtors that it was unable to fund the purchase due to certain financial issues, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (A) Enforcing Sale Orders and Purchase and Sale Agreements; (B) Compelling Performance; and (C) Awarding Fees and Expenses Incurred by the Debtors' Estates as a Result of Delayed Closing* [Docket No. 1353] (the "**Motion to Enforce**"). After a status conference on the Motion to Enforce, the Bankruptcy Court authorized the Debtors to re-market their assets to generate new alternatives. The Debtors' advisors contacted approximately 70 parties and received several indications of interest during the remarketing process, including a revised proposal from the Purchaser. BCE-Mach's modified bid remained the best option available to maximize recovery of the AMH Assets and the KFM Assets. Accordingly, the Initial Debtors and the KFM Debtors each entered into certain amendments to the Purchase Agreements to reflect the Purchaser's modified bid. On April 2, 2020, the Debtors jointly filed the *Debtors' Emergency Motion for Entry of Orders (I) Authorizing AMH/AMR Debtors and KFM Debtors to Enter into and Perform Under Modified PSAs with BCE-MACH III and (II) Granting Related Relief* [Docket No. 1478] (the "**Modified PSAs Motion**"), requesting that the Bankruptcy Court authorize the Debtors to enter into and perform under the amended Purchase Agreements. The Bankruptcy Court held a hearing on April 8, 2020 and entered supplemental orders approving the amended Purchase Agreements [Docket Nos. 1512; 1513] (the "**Supplemental Sale Order**"). On April 9, 2020, the Debtors entered into further amended Purchase Agreements to document the final purchase price for the Assets, and the Sale Transaction with BCE-Mach closed that same day.

Pursuant to the Adequate Protection Order (as defined below), upon closing the KFM Debtors distributed $42,267,506 of the cash proceeds from the Sale Transaction to the Administrative Agent on behalf of the Lenders. The primary purpose of the Plan is to provide for the distribution of the remainder of the proceeds and implement the final wind down of the KFM Debtors and their estates.

This Disclosure Statement provides holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the KFM Debtors' business and certain historical events, (ii) the KFM Debtors' chapter 11 cases, (iii) the Plan, (iv) the rights of holders of Claims and Interests under the Plan, and (v) other information necessary to enable each holder

of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan. This Disclosure Statement also assists the Bankruptcy Court in determining whether the Plan complies with the provisions of the Bankruptcy Code and should be confirmed.

This Disclosure Statement is organized as follows:

i.    Section I provides an introduction and general information about the Plan and confirmation of the Plan.

ii.   Section II provides an overview of the KFM Debtors' business.

iii.  Section III discusses the KFM Debtors' corporate and capital structure.

iv.   Section IV discusses events leading to these chapter 11 cases.

v.    Section V discusses the events during these chapter 11 cases.

vi.   Section VI provides a summary of the Plan.

vii.  Section VII discusses certain U.S. federal income tax consequences of the Plan.

viii. Section VIII addresses risk factors associated with the Plan.

ix.   Section IX discusses confirmation of the Plan.

x.    Section X concludes this Disclosure Statement and recommends that eligible holders of Claims vote to accept the Plan.

**B.    Voting Procedures**

As set forth in more detail in Section VI of this Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the Plan. For each holder of a Claim entitled to vote, the KFM Debtors have enclosed, along with a copy of this Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote on the Plan. For detailed voting instructions, please refer to the specific voting instructions and the ballot enclosed with this Disclosure Statement. All completed ballots must be actually received by the KFM Debtors' claims, noticing and solicitation agent Prime Clerk LLC ("**Prime Clerk**") at the below address no later than 5:00 p.m. (Prevailing Central Time) on May 20, 2020 (the "**Voting Deadline**").

Via Regular Mail, Overnight Couriers, or Hand Delivery:

Kingfisher Ballot Processing
c/o Prime Clerk LLC
One Grand Central Place

60 East 42nd Street, Suite 1440
New York, NY 10165

The KFM Debtors will also be accepting ballots via electronic, online transmission through an e-ballot platform available on Prime Clerk's website.  Holders of Claims may cast an electronic ballot and electronically sign and submit such ballot via the platform.  Instructions for casting an electronic ballot are available on Prime Clerk's website at https://cases.primeclerk.com/altamesa.  The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any electronic ballot submitted in this manner and the creditor's electronic signature will be deemed to be an original signature that is legally valid and effective.  For the avoidance of doubt, electronic submissions of ballots may only be made via the e-ballot platform.  Ballots submitted by electronic mail, facsimile, or any other means of electronic submission will not be counted.

The record date for purposes of determining (i) which eligible holders of Claims are entitled to vote on the Plan and (ii) which holders of Claims and Interests are entitled to receive other notices is April 27, 2020 (the "**Voting Record Date**").

If you are holder of a Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact Prime Clerk at (877)-425-8075 (domestic), (917)-994-8378 (international), or email at kingfisherballots@PrimeClerk.com.

A Class of Claims is deemed to accept the Plan if at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that actually vote are cast in favor of the Plan.  Whether or not a holder of a Claim or Interest votes on the Plan, such holder will be bound by the terms and treatment as set forth in the Plan if the Plan is confirmed by the Bankruptcy Court.  Pursuant to section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

## C.      Brief Overview of the Plan

As discussed above, the KFM Assets were substantially liquidated pursuant to the Sale Transaction.  Additionally, as discussed in more detail below, a portion of the proceeds were distributed to the Lenders (as defined below) pursuant to the terms of the Lenders' Adequate Protection Order.  Accordingly, the purpose of the Plan is to effectuate the distribution of the remaining cash proceeds (the "**Sale Proceeds**") and other consideration (including the KFM ORRI) following the closing of the Sale Transaction and the liquidation of any remaining KFM Assets and the orderly wind down of the KFM Debtors' estates.  The Plan constitutes a joint chapter 11 plan for all of the KFM Debtors, and the classifications and treatment of Claims and Interests in the Plan apply to all of the KFM Debtors (but not any of the other Debtors).

A portion of the Sale Proceeds will be used to fund the costs of completing the chapter 11 cases (including satisfying Allowed Administrative Expense Claims and Fee Claims) and winding down the KFM Debtors' estates.  The remaining Sale Proceeds and other available Cash and non-Cash consideration in the KFM Debtors' estates are expected to be used exclusively

to pay Credit Agreement Claims. The KFM Debtors do not expect there to be any value from encumbered assets in excess of the Credit Agreement Claims and Adequate Protection Claims or unencumbered assets available to pay General Unsecured Claims.

Under the Plan, the KFM Debtors will appoint a Plan Administrator who will, among other things, steer the KFM Debtors toward a quick and efficient final resolution. The Plan Administrator will have the authority, on behalf the KFM Debtors, to implement all provisions of the Plan, including controlling and effectuating the Claims reconciliation process (if necessary); making distributions in accordance with the Plan; preparing, filing, and prosecuting any necessary filings; and prosecuting, settling, or otherwise resolving all preserved Causes of Action.

The distributions under the Plan will provide holders of Claims and Interests at least the same recovery as they would otherwise receive from distributions through a liquidation pursuant to chapter 7 of the Bankruptcy Code. The distributions under the Plan will be made more quickly than distributions by a chapter 7 trustee would be made, and a chapter 7 trustee would charge a substantial fee, which would reduce the amount available for distribution on account of Allowed Claims.

Section VI of this Disclosure Statement provides a more detailed description of the Plan.

**D.**     **Summary of Distributions and Voting Eligibility**

The following summary table briefly outlines the classification and treatment of Claims against and Interests in the KFM Debtors under the Plan and the voting eligibility of the holders of such Claims and Interests. This table is qualified in its entirety by reference to the full text of the Plan.

| Class | Type of Claim or Interest | Treatment | Impairment | Approximate Percentage Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| Class 1 | Other Priority Claims | The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Priority Claim, at the option of the Post-Effective Date KFM Debtors with the written consent of the Administrative Agent | Unimpaired | 100% | No (Deemed to accept) |

| | | | | | |
|---|---|---|---|---|---|
| | | (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code. | | | |
| Class 2 | Other Secured Claims | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim, at the option of the Post-Effective Date KFM Debtors with the written consent of the Administrative Agent (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | Unimpaired | 100% | No (Deemed to accept) |
| Class 3 | Credit Agreement Claims | (i) The Administrative Agent, on behalf of the Lenders, shall receive:<br>(1) on the Effective Date, Excess Distributable Cash of at least $1,300,000 and at least quarterly thereafter, additional distributions of Excess Distributable Cash, up to an amount necessary to satisfy the Credit Agreement Claims in full;<br>(2) immediately following the conclusion of the Wind Down pursuant to the Wind-Down Budget, and in any event not later than four months following the Effective Date (or such other date agreed to between the Plan Administrator and the Administrative Agent), to the extent such | Impaired | 20%[2] | Yes |

---

[2] Approximate percentage recovery includes all distributions made or to be made to holders of Credit Agreement Claims during these chapter 11 cases, including pursuant to the Adequate Protection Order.

| | | | | | |
|---|---|---|---|---|---|
| | | Credit Agreement Claims have not been satisfied in full under the foregoing subsection (1), the Excess Reserve Amounts, up to satisfaction in full of the Credit Agreement Claims; and<br><br>(3) to the extent there comes to exist any interest of the Post-Effective Date KFM Debtors in any Cash or other property following the indefeasible payment to the Administrative Agent under the foregoing subsections (1) and (2), such amounts up to satisfaction in full of the Credit Agreement Claims.<br><br>(ii) Each Lender (or an affiliate or other recipient designated by such Lender) shall receive an undivided interest in and to the KFM ORRI in a percentage (carried out to the ninth decimal place) equal to the quotient of the aggregate outstanding Credit Agreement Loans owed to such Lender divided by the aggregate Credit Agreement Loans owed to all Lenders under the Credit Agreement, which undivided interest shall be transferred and distributed in accordance with section 5.12 of the Plan. | | | |
| Class 4 | General Unsecured Claims | Holders of Allowed General Unsecured Claims shall not receive any Distribution under the Plan. | Impaired | 0% | No (Deemed to reject) |
| Class 5 | Intercompany Claims | On or after the Effective Date, all Allowed Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the KFM Debtors or Post-Effective Date KFM Debtors, as applicable, with the written consent of the Administrative Agent. | Unimpaired | 100% | No (Deemed to accept) |
| Class 6 | Intercompany Interests | On and after the Effective Date, subject to the Administrative Agent's prior written consent, all Intercompany Interests shall be cancelled when the applicable Post-Effective Date KFM Debtor is dissolved or merged out of existence in accordance with the Wind-Down. | Impaired | 0% | No (Deemed to reject) |

E.    **Confirmation**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **May 27, 2020 at 9:00a.m.** (Prevailing Central Time) before the Honorable Marvin Isgur, United States Bankruptcy Judge, for the United States Bankruptcy Court for the Southern District of Texas, via telephone and video conference (the "**Confirmation Hearing**").

Objections and responses to confirmation of the Plan, if any, must be served and filed so as to be received on or before the confirmation objection deadline, **May 20, 2020 at 5:00p.m.** (Prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the KFM Debtors without further notice, except for adjournments announced in open court or as indicated in any notice of agenda of matters scheduled for hearing filed with the Bankruptcy Court.

## II.
## KFM DEBTORS' BUSINESS

Kingfisher was a midstream oil and gas business with assets located in the Anadarko Basin in Oklahoma.  Kingfisher was formed in 2015 as a partnership between affiliates of ARM Energy Holdings LLC, High Mesa, Inc., and HPS Investments Partners, LLC ("**HPS**") to provide crude oil gathering and natural gas gathering and processing services in the Anadarko Basin.   By early 2018, Kingfisher had successfully contracted acreage dedications of approximately 300,000 gross acres in the STACK[3] play in Oklahoma and had natural gas processing capacity of 350 Mmcfd[4] and more than 400 miles of natural gas and crude oil pipelines. In February 2018, Kingfisher's midstream business was combined with AMH's upstream business when AMR[5] acquired the assets of AMH and Kingfisher.  In November 2018, the KFM Debtors purchased the Initial Debtors' produced water and gathering disposal system, which the KFM Debtors have since expanded.

Until closing the Sale Transaction, Kingfisher continued to operate its midstream oil and gas business and had substantial gas processing, crude oil gathering and storage, and produced water gathering and disposal assets that generated revenue for Kingfisher primarily through long-term, fee-based contracts.  Kingfisher Parent and Oklahoma Energy Acquisitions, LP ("**Oklahoma Energy**") – an Initial Debtor – were party to gathering agreements entered into in August 2015, under which Oklahoma Energy dedicated and delivered to Kingfisher crude oil, natural gas, and associated natural gas liquids for gathering and processing (collectively, each as amended from time to time, the "**Gathering Agreements**").

While approximately 80-90% of Kingfisher's revenue was derived from services performed under the Gathering Agreements, Kingfisher's assets were strategically positioned to provide similar services to other producers in the area.  The balance of Kingfisher's revenue was mainly derived from the sale of natural gas liquids (NGLs) through certain marketing services

---

[3] STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties. It refers to a geographic area in the Anadarko basin area of Oklahoma.

[4] "MMcfd" means millions of cubic feet per day.

[5] At the time of the transaction, AMR was known as Silver Run Acquisition Corporation II.

agreements and for services provided to customers for gathering and disposing of produced water. As of the KFM Petition Date, the KFM Debtors serviced six upstream producers other than the Initial Debtors.

As of the KFM Petition Date, Kingfisher's infrastructure and gathering system consisted of approximately 350 miles of low-pressure gas gathering lines, 100 miles of high-pressure 4"-16" rich gas transportation pipelines, 110 miles of crude gathering lines, and 225 miles of water pipelines.

In addition to the mapped assets, Kingfisher owned or operated two cryogenic natural gas processing plants with a combined 260 million cubic feet per day (*i.e.*, MMcfd) of gas processing capacity, field compression facilities and 50,000 barrels of crude storage plus 90 MMcfd in offtake processing capacity.

In the ordinary course of business, excluding under the Gathering Agreements, the KFM Debtors engaged in various routine transactions (the "**Intercompany Transactions**") with the Initial Debtors that resulted in intercompany receivables and payables. The KFM Debtors typically engaged in Intercompany Transactions to, among other things, receive the benefit of enterprise-wide management and support services and facilitate operations on a daily basis. The Intercompany Transactions include general administrative costs, including allocated office rent and supplies, insurance coverage on behalf of the KFM Debtors, costs related to services provided by third parties for the benefit of the KFM Debtors that were jointly billed or billed to the Initial Debtors and a portion of which was allocated to the KFM Debtors, and products or services purchased for the KFM Debtors' collective benefit, which were allocated accordingly. Amounts arising under the Gathering Agreements and amounts arising under the Intercompany Transactions were settled on a gross basis or netted together as a single settlement.

The KFM Debtors' real property interests included land associated with their cryogenic natural gas processing plants, the KFM Debtors' gathering systems, disposal wells, and all buildings and other structures, facilities, improvements or fixtures located thereon. The KFM Debtors and the Initial Debtors also shared office space and reimbursed each other for rent (as applicable), including an office lease in Oklahoma City, Oklahoma for which the Initial Debtors (as applicable) reimbursed the KFM Debtors for their shared portion of the rent and an office lease in Houston, Texas, for which the KFM Debtors reimbursed the Initial Debtors.

## III.
## CORPORATE AND CAPITAL STRUCTURE

### A.    Corporate Structure

Kingfisher consists of four limited liability companies formed under Delaware law. Kingfisher Parent is the company that owns, either directly or indirectly, 100% of the membership interests in each of its subsidiaries. A copy of the Debtors' organizational chart is annexed hereto as **Exhibit B**. Below is a simplified chart illustrating the KFM Debtors' organizational structure as of the KFM Petition Date:



Each of the KFM Debtors, its owner, and its primary business purpose (prior to closing the Sale Transaction) is summarized in the following chart:

| Debtor | Owner(s) | Business Purpose |
|---|---|---|
| Kingfisher Parent | SRII OpCo | Conducted midstream business and borrower under Credit Agreement |
| Kingfisher STACK Oil Pipeline, LLC ("**KSOP**") | Kingfisher Parent | Owner of 100% interest in Cimarron Express Pipeline, LLC ("**Cimarron**") |
| Oklahoma Produced Water Solutions, LLC | Kingfisher Parent | Owned Kingfisher's produced water gathering pipelines, disposal wells, and related facilities |
| Cimarron | KSOP | Formed on May 8, 2018 as part of a joint venture in crude oil pipeline with non-Debtor third-party Ergon Oklahoma Pipeline, LLC ("**Ergon**"); development has since been abandoned[6] |

---

[6] The joint venture was terminated pursuant to a membership interest redemption agreement entered into between KSOP, Cimarron, and Ergon on November 14, 2019.  As a result, KSOP now owns 100% of the equity interests in Cimarron.

B.        **Directors and Officers**

Kingfisher is controlled by the Board of Kingfisher Parent.  The Board consists of nine members, eight of which also serve as members of the boards of directors of AMR and AMH:[7]

| Name | Position (Affiliation) |
| --- | --- |
| Pierre F. Lapeyre, Jr. | Director (Riverstone; AMR; AMH) |
| David M. Leuschen | Director (Riverstone; AMR; AMH) |
| Donald R. Dimitrievich | Director (HPS; AMR; AMH) |
| William W. McMullen | Director (BCE; AMR; AMH) |
| Sylvia Kerrigan | Director (Independent; AMR; AMH) |
| Donald R. Sinclair | Director (Independent; AMR; AMH) |
| Jeffrey H. Tepper | Director (Independent; AMR; AMH) |
| Diana J. Walters | Director (Independent; AMR; AMH) |
| Marc Beilinson | Director (Disinterested) |

Pursuant to resolutions adopted by the Board in September 2019, the Board delegated to Marc Beilinson, as the Disinterested Manager, the power to exercise, in his sole discretion, all of the powers and authority of the Board, to the fullest extent permitted by applicable law, over the AMH Litigation (as defined below), any related party transaction,[8] and any other matter in which the Disinterested Manager is advised by counsel that a conflict exists or may exist between Kingfisher and the Initial Debtors.[9]

The KFM Debtors' senior management team consists of the following individuals:

| Name | Position |
| --- | --- |
| Mark P. Castiglione | Chief Executive Officer |
| John H. Campbell, Jr. | President and Chief Operating Officer |
| Randy L. Limbacher | Vice President of Strategy |
| Kimberly O. Warnica | Vice President, General Counsel, Chief Compliance Officer, and Secretary |

---

[7] Kingfisher and AMH have identical boards of managers other than Marc Beilinson for Kingfisher Parent and Patrick Bartels for AMH, each of which serves as a disinterested manager for their respective board.

[8] A "related party transaction" includes a transaction or arrangement (or any series of similar transactions or arrangements) in which Kingfisher Parent and/or any of its subsidiaries was, is, or will be a participant, and in which any Initial Debtor or any of its direct or indirect subsidiaries (other than direct or indirect subsidiaries of the Kingfisher Parent) had, has, or will have a material interest, whether direct or indirect.  For the avoidance of doubt, the joint marketing of assets of the Kingfisher Parent and any Initial Debtor and the transactions contemplated by the KFM Purchase Agreement were deemed to be related party transactions.

[9] The Disinterested Manager was appointed as an independent manager to Kingfisher Parent's Board through a written consent of the sole member of Kingfisher Parent on August 29, 2019.

11

C.        **KFM Debtors' Capital Structure**

The following description of the KFM Debtors' capital structure is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

i.        *Equity Ownership*

Kingfisher Parent is a wholly owned subsidiary of SRII Opco, which is a limited partnership managed by its general partner SRII Opco GP.  AMR owns 100% of the equity interests in SRII Opco GP and 47.75% of the limited partnership units of SRII Opco.  The remaining 52.25% of SRII Opco's limited partnership units are owned by contributors High Mesa Holdings, LP; KFM Holdco, LLC; and Riverstone VI Alta Mesa Holdings, L.P. and their affiliates and related parties.

ii.        *Prepetition Indebtedness*

As of the KFM Petition Date, the KFM Debtors have funded debt obligations in the amount of approximately $224 million under a prepetition credit facility.  Specifically, Kingfisher Parent is party to that certain Amended and Restated Credit Agreement, dated as of May 30, 2018 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, (the "**Credit Agreement**"), by and among Kingfisher Parent, as borrower, Wells Fargo Bank, N.A., as administrative agent for and on behalf of the lenders party thereto from time to time (in such capacity, the "**Administrative Agent**"), and the lenders party thereto from time to time (the "**Lenders**," and the claims thereunder, the "**Credit Agreement Claims**").  The scheduled maturity date of the Credit Agreement is May 30, 2023.

Pursuant to the Credit Agreement, the Lenders agreed to provide Kingfisher Parent with revolving loans and other extensions of credit in an aggregate amount not to exceed $300 million, subject to certain customary limitations on Kingfisher Parent's ability to borrow under the credit facility and ongoing financial covenants, including a maximum total leverage ratio, a maximum senior secured leverage ratio, and a minimum interest coverage ratio.

Pursuant to the Credit Agreement and related Loan Documents (as defined therein), the Credit Agreement Claims are guaranteed by each of the KFM Debtors and are secured by senior liens on substantially all of the KFM Debtors' material real property and personal property, including each Kingfisher Debtor's equity interests in the subsidiary guarantors.  Additionally, SRII Opco has also pledged its membership interests in Kingfisher Parent as security for the Credit Agreement Claims.

iii.        *Trade Payables and Ordinary Course Obligations*

In addition to the KFM Debtors' funded debt obligations under the Credit Agreement, as of the KFM Petition Date, the KFM Debtors owed an estimated $9.0 million[10] in outstanding unsecured obligations to certain third-party suppliers, vendors, and other ordinary

---

[10] $2.1 million of the $9.0 million is attributable to AMH under the MSA.

course unsecured creditors, including upstream producers, transportation providers, and surface land-owners. The KFM Debtors made payments to certain third-party suppliers and vendors pursuant to the relief granted in the Trade Order (as defined below).

### iv.    Legal Proceedings

On September 12, 2019, AMH and Oklahoma Energy (the "**AMH Plaintiffs**") commenced an adversary proceeding in their chapter 11 cases, captioned Adv. Proc. No. 19-03609-MI (the "**AMH Litigation**"), against Kingfisher Parent and KFM Debtor Oklahoma Produced Water Solutions, LLC (the "**KFM Defendants**") seeking, among other things, a declaratory judgment that the Gathering Agreements between Kingfisher, on the one hand, and the AMH Plaintiffs on the other hand, do not create covenants that run with the land under Oklahoma law and that Oklahoma Energy could reject the Gathering Agreements under section 365 of the Bankruptcy Code. The KFM Defendants opposed these allegations and asserted counterclaims for relief, including a request for declaratory judgment that the Gathering Agreement covenants qualify as real property covenants under Oklahoma law and create covenants that run with the land that cannot be rejected under section 365 of the Bankruptcy Code. In addition, the AMH Plaintiffs asserted fraudulent transfer claims and aiding and abetting breaches of fiduciary duties by the KFM Defendants, and the KFM Defendants asserted counterclaims against the AMH Plaintiffs for negligent misrepresentation, promissory estoppel, and unjust enrichment related to the Gathering Agreements as well as the November 2018 produced water transaction.[11] On December 20, 2019, the Bankruptcy Court granted summary judgment on the KFM Defendants' motion finding that the Gathering Agreements created real property covenants and embodied covenants that run with the land and that, accordingly, Oklahoma Energy could not reject such covenants under the Bankruptcy Code [Adversary Docket No. 672] (the "**Count I Summary Judgment**").[12] The Bankruptcy Court stayed the AMH Litigation and only three of the six pleaded counts remain – alleged breaches of fiduciary duties and breach of the crude oil gathering agreement – pursuant to the Court's *Order Granting Plaintiff's Emergency Motion to Stay Adversary Proceeding*, Adv. Proc. No. 19-03609 (MI) [Docket No. 241].

On April 7, 2020, the KFM Debtors entered into a settlement term sheet with (i) the Initial Debtors, (ii) the AMH Agent, (iii) AMR, (iv) the Committee, (v) the Ad Hoc Noteholder Group (vi) BCE-Mach, and (vii) the KFM Administrative Agent, pursuant to which (among other things) the AMH Plaintiffs agreed to release all claims related to the AMH Litigation and the Initial Debtors and certain of their constituents agreed to release all existing or potential challenges or objections to the Administrative Agent's liens and Claims, the Sale Transaction, and the Plan, in exchange for the KFM Debtors contributing $100,000 to the Initial Debtors' estates. The relevant terms of this settlement term sheet are incorporated in the Plan and the *Joint Plan of Liquidation of Alta Mesa Resources, Inc. and its AMH and SRII Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, filed on April 17, 2020 [Docket No. 1562], including the mutual releases set forth therein.

---

[11] In addition, the AMH Plaintiffs split and abated a separate cause of action for constructive fraudulent transfer in Adv. Pro. No. 19-3684.

[12] In addition to the Count I Summary Judgment, the Bankruptcy Court orally found Count III moot for the reasons stated in the Count I Summary Judgment. *See* 12/9/2019 Hrg. Tr. at 9.

In addition, Kingfisher Parent is a defendant in pending cases commenced prior to the KFM Petition Date by Mustang Gas Products, LLC ("**Mustang**")[13] and Chisholm Oil & Gas Operating LLC ("**Chisholm**").[14]  While the KFM Debtors continue to work to resolve each of the foregoing disputes, the KFM Debtors reserve all rights and will address the allegations made at the appropriate time.

In the Mustang litigation, Mustang alleges that certain of the KFM Debtors and the Initial Debtors colluded to wrongfully divert to the KFM Debtors gas production dedicated to Mustang and seeks injunctive relief and unspecified damages.  On October 28, 2019, Mustang filed a motion for relief from the automatic stay in the Initial Debtors' chapter 11 cases to continue prosecuting the collusion claims [Docket No. 421] (the "**Lift Stay Motion**").  On January 23, 2020, the KFM Debtors filed an objection to the Lift Stay Motion, stating, among other things, that Mustang failed to show cause to modify the automatic stay [Docket Nos. 1001; 1003].  On February 13, 2020, Mustang withdrew the Lift Stay Motion.

On January 21, 2020, Mustang commenced a separate adversary proceeding styled *Mustang Gas Products, LLC v. Oklahoma Energy Acquisitions LP*, Adv. Proc. No. 20-3015 (the "**Mustang Adversary**"), seeking a declaratory judgment that certain gas purchase agreements with prior upstream producers and with a unit operator constitute covenants running with the land. The Mustang Adversary Proceeding seeks a declaration that gas purchase agreements with prior producers are real property interests that run with the land, and thus enjoy priority over the liens that may be held by Wells Fargo Bank, National Association, as administrative agent under the Initial Debtors' credit facility (the "**AMH Agent**").  Mustang seeks to encumber the proceeds from the sale of the AMH Assets, but not the proceeds of the sale of the KFM Assets.  While the Mustang Adversary proceeding is against several defendants, including Kingfisher Parent, no relief is specifically requested against Kingfisher Parent.  The AMH Agent, a defendant in the Mustang Adversary Proceeding, filed a motion to dismiss on February 7, 2020.  On March 6, 2020, Mustang filed a notice of voluntary dismissal of the Mustang Adversary without prejudice.

In the Chisholm litigation, Chisholm alleges that Kingfisher Parent breached a certain gas gathering agreement and seeks damages for improper payments and charges.[15] Chisholm objected to the assignment of the Amended and Restated Gas Purchase Agreement (the "**GPA**") to BCE-Mach pursuant to the Sale Transaction [Docket No. 890].  The KFM Debtors and Chisholm continue to discuss whether the GPA can be assumed and assigned and the amount of any Cure Cost that would be payable in connection with such assumption.

In addition, Kingfisher Parent filed a complaint against KFM HoldCo, LLC

---

[13] *See Mustang Gas Products LLC v. Oklahoma Energy Acquisitions, LP, Alta Mesa Resources, LP; Alta Mesa Resources, Inc., Alta Mesa Holdings, LP; High Mesa Inc., f/k/a Alta Mesa Investment Holdings, Inc.; Alta Mesa Services, LP; ARM Midstream, LLC; HPS Investment Partners f/k/a Highbridge Principal Strategies, LLC, BCE-Mesa Holdings, LLC and Kingfisher Midstream, LLC*, Case No. CJ-17-22, filed in the District Court of Kingfisher County, Oklahoma.

[14] *See Chisholm Oil & Gas Operating, LLC v. Kingfisher Midstream, LLC*, Case No. CJ-2019-2166, filed in the District Court of Tulsa County, Oklahoma.

[15] Chisholm and Kingfisher Parent are parties to an Amended and Restated Gas Gathering Purchase Agreement dated April 10, 2017 but effective as of May 1, 2017 (the "**GPA**").

("**HoldCo**") on August 30, 2019 for breach of contract (the "**HoldCo Litigation**").[16]  In the HoldCo Litigation, Kingfisher Parent seeks reimbursement of legal fees from HoldCo in the amount of approximately $2.3 million pursuant to a contribution agreement in connection with a transaction between Kingfisher Parent, HoldCo, and AMR in 2017.  On October 11, 2019, HoldCo filed a response to the complaint, generally denying the allegations and setting forth affirmative defenses.  On December 12, 2019, the District Court entered a scheduling order, setting forth, among other items, that an agreement for alternative dispute resolution as well as all dispositive motions and pleadings must be filed and heard by July 13, 2020.

## IV.
## KEY EVENTS LEADING TO
## COMMENCEMENT OF THE CHAPTER 11 CASES

### A.     AMR Bankruptcy Filing

The KFM Debtors' business suffered as a direct result of the challenges faced by the Initial Debtors.  While Kingfisher's midstream business was less susceptible to commodity prices than AMH's upstream business, the decline in commodity prices since late 2018, in addition to poor well performance, and the limitations imposed on AMH following its bankruptcy filing, eliminated AMH's ability to conduct the development necessary to meet its anticipated growth targets and, as a result, Kingfisher's projected revenue and cash flow was significantly reduced. Because the KFM Debtors' revenue was heavily correlated to the Initial Debtors' production levels, the severe operational challenges faced by the Initial Debtors made the KFM Debtors' restructuring necessary.  Specifically, the Initial Debtors' poorer than expected well performance and inability to sustain adequate drilling levels severely impacted the KFM Debtors' financial performance.  The combination of AMH's prolonged performance challenges, AMH's suspended capital program, and the resulting decrease in production estimates (and thus, Kingfisher's projected cash flows) resulted in Kingfisher's capital structure becoming unsustainable in light of the KFM Debtors' obligations under the Credit Agreement.

Additionally, the Lenders asserted violations under the terms of the Credit Agreement, and the KFM Debtors have not had access to funds thereunder to cover operating and professional service costs since September 2019.

### B.     Prepetition Restructuring & Marketing Efforts

On September 9, 2019, at the Disinterested Manager's direction, the KFM Debtors retained Quinn Emanuel Urquhart & Sullivan, LLP ("**Quinn Emanuel**"), with respect to restructuring and litigation issues.  On October 11, 2019, at the Disinterested Manager's direction, the KFM Debtors retained Evercore Partners to serve as their investment banker and to market their assets (Quinn Emanuel and Evercore Partners being the "**Initial Advisors**").  The Initial Advisors along with the KFM Debtors, with the assistance of the Initial Debtors and their advisors, including Perella Weinberg Partners LP, spent several months conducting the Marketing Process

---

[16] *See Kingfisher Midstream, LLC v. KFM HoldCo, LLC*, Case No. 2019-62128, filed in the District Court of Harris County, Texas.

for both a Joint Sale or a separate sale of Kingfisher's assets.

Prior to the KFM Petition Date, the KFM Debtors, through the Disinterested Manager and Kingfisher's Initial Advisors, evaluated strategic alternatives available to Kingfisher in light of the Initial Debtors' financial condition and the correlating impact on Kingfisher. The KFM Debtors considered and evaluated multiple scenarios, including renegotiating the Gathering Agreements and operating Kingfisher as a standalone business. The Disinterested Manager determined that there was no viable out-of-court scenario in which the KFM Debtors could service their debt obligations under the Credit Agreement and that pursuing a sale of the KFM Assets provided the best opportunity to maximize the value of such assets.

Over the course of the Marketing Process, potential buyers of the KFM Assets requested a "free and clear" sale order and bids would not provide enough value to satisfy Kingfisher's debt obligations in full. Accordingly, the Disinterested Manager determined that any value-maximizing sale transaction would have to be implemented through chapter 11.

In late November 2019, Kingfisher engaged Weil, Gotshal & Manges LLP as co-counsel, to work alongside the Disinterested Manager, Kingfisher's existing advisors, and the management team, as well as AMH and its counsel and professionals to, among other things, constructively work toward a value maximizing sale of the KFM Assets. These efforts and the Marketing Process culminated in the KFM Debtors' entry into the KFM Purchase Agreement on December 31, 2019 with a purchase price of $85.25 million, well below funded debt obligations of $224 million.

On December 31, 2019, the KFM Debtors served a prepetition notice on all interested parties, including the KFM Debtors' creditor matrix, notifying them of entry into the KFM Purchase Agreement (the "**Prepetition Notice**"), which described key terms of the KFM Purchase Agreement and further detailed the KFM Debtors' intent to implement the sale through chapter 11 proceedings. The Prepetition Notice also described the key terms and implementation of the AMH Purchase Agreement. The KFM Purchase Agreement was subsequently amended and restated on January 17, 2020 [Docket No. 930] and further amended on April 2, 2020 and April 9, 2020.

The KFM Debtors commenced these chapter 11 cases on the KFM Petition Date, as required by the terms of the KFM Purchase Agreement, to implement their sale process and to allow the KFM Debtors to consummate their duties and pursue the Sale Transaction.

## V.
## KEY EVENTS
## DURING CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases and First Day Motions

On the KFM Petition Date, the KFM Debtors filed various "first-day" motions (collectively, the "**First Day Pleadings**") seeking certain immediate relief from the Bankruptcy Court authorizing the KFM Debtors to continue to operate in chapter 11 and avoid irreparable harm due to the commencement of the chapter 11 cases. A brief description of the First Day Pleadings is set forth below. The Bankruptcy Court granted substantially all of the relief requested

in the First Day Pleadings on either a final or interim basis and entered various orders authorizing the KFM Debtors to continue operations in the ordinary course of business.  A hearing to consider final approval of certain of the First Day Pleadings was held on February 11, 2020.

### i.      Joint Administration Motion

The KFM Debtors requested entry of an order directing joint administration of the chapter 11 cases of the KFM Debtors with the chapter 11 cases of the Initial Debtors and SRII Opco and SRII Opco GP for procedural purposes only.  The Bankruptcy Court granted this relief [Docket No. 896].

### ii.      Cash Management Motion

The KFM Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the various KFM Debtors.  Following the KFM Petition Date, the KFM Debtors obtained authority from the Bankruptcy Court to continue using their existing cash management system, bank accounts, and related business forms, as well as to continue their Intercompany Transfers, to avoid disruption in the KFM Debtors' operations and facilitate the efficient administration of the chapter 11 cases [Docket No. 871].

### iii.      Taxes

To minimize any disruption to the KFM Debtors' operations and ensure the efficient administration of the chapter 11 cases, following the KFM Petition Date, the KFM Debtors obtained authority from the Bankruptcy Court to pay all taxes, fees, and similar charges and assessments, whether arising pre- or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course of the KFM Debtors' businesses [Docket No. 860].

### iv.      Insurance

In connection with the operation of the KFM Debtors' business, the KFM Debtors are the named insureds under one insurance policy maintained by the KFM Debtors and are beneficiaries under various other insurance policies maintained by the Initial Debtors on behalf of the KFM Debtors.  The policies were designed to protect the KFM Debtors' property, assets, and business operations.  The types of insurance policies maintained by the KFM Debtors include liability and property insurance programs.

The maintenance of certain insurance coverage was and is essential to the KFM Debtors' operations and is required by laws, various regulations, financing agreements, and contracts.  Accordingly, following the KFM Petition Date, the KFM Debtors obtained authority from the Bankruptcy Court to continue to honor their insurance obligations in the ordinary course [Docket No. 859].

### v.      Trade Creditors

The KFM Debtors paid, in the ordinary course of business, for goods and services related to the KFM Debtors' ongoing business operations and other ordinary course claims to trade creditors.  The trade creditors were essential to maintaining the going concern value of the KFM

Debtors' enterprise and payment of the trade claims was necessary to continue the KFM Debtors' business and maximize value during these chapter 11 cases. Accordingly, following the KFM Petition Date, the KFM Debtors obtained authority from the Bankruptcy Court to continue to honor and pay the trade claims to their trade creditors on an interim basis [Docket No. 872]. The KFM Debtors obtained authority from the Bankruptcy Court to continue to honor and pay trade claims on a final basis on February 11, 2020 [Docket No. 1132] (the "**Trade Order**").

### vi. Utilities

In the ordinary course of business, the KFM Debtors incurred certain expenses related to the essential utility services such as natural gas, water, and sewage, electric, and other utility services. The KFM Debtors obtained approval of procedures to provide such utility providers with adequate assurance that the KFM Debtors would continue to honor their obligations in the ordinary course [Docket Nos. 902; 1308].

### vii. Cash Collateral Motion

On the KFM Petition Date, the KFM Debtors also filed a motion to use cash collateral throughout the chapter 11 case (the "**Cash Collateral**") and provide adequate protection to the Lenders in connection therewith, on consensual terms agreed to with the Lenders. The Bankruptcy Court entered an interim order approving the use of Cash Collateral on January 17, 2020 (the "**Interim Cash Collateral Order**") [Docket No. 903]. The Bankruptcy Court entered a final order approving the use of Cash Collateral on February 11, 2020 [Docket No. 1137] (the "**Final Cash Collateral Order**" and, together with the Interim Cash Collateral Order, the "**Cash Collateral Orders**").

As set forth in the Cash Collateral Orders, to reach a compromise regarding the use of the Cash Collateral, the KFM Debtors stipulated to a number of findings and conditions with respect to the Credit Agreement, including (i) adequate protection liens on the KFM Debtors' property, (ii) superpriority claims, (iii) payment of reasonable and documented fees and out-of-pocket expenses of the Administrative Agent's advisors, and (iv) monthly reporting obligations, as well as releases of claims (if any) against the Lenders and their affiliates.

Furthermore, the Cash Collateral Orders provided that the Lenders were entitled to adequate protection for any potential diminution in value of the collateral as a consequence of the use, sale, or lease of the collateral, with such adequate protection taking the form of, among other things, additional liens on the KFM Debtors' assets and super-priority claims under section 507(b) of the Bankruptcy Code.

The Cash Collateral Orders contain certain events of default and expiration terms and established milestones for a dual-track process for the KFM Debtors to pursue the Sale Transaction followed by a chapter 11 plan. Certain milestones and deadlines set forth in the Cash Collateral Orders have been extended pursuant to notices of extension filed on February 21, 2020 [Docket No. 1234], March 27, 2020 [Docket No. 1444], and April 14, 2020 [Docket No. 1551]. The milestones and deadlines are set forth below and the KFM Debtors have satisfied or expect to comply with such dates.

| Milestone | Date |
|---|---|
| Supplemental Bidding Procedures Motion Filed | January 13, 2020 |
| Supplemental Bidding Procedures Order Entered | January 15, 2020 |
| Interim Cash Collateral Order Entered | January 15, 2020 |
| Sale Hearing Held | January 21, 2020 |
| Sale Order Entered | January 24, 2020 |
| Final Cash Collateral Order Entered | February 11, 2020 |
| Sale Transaction Closes | April 15, 2020 |
| Plan and Disclosure Statement Filed | April 20, 2020 |
| Disclosure Statement Order Entered | May 5, 2020 |
| Solicitation of Votes Commenced | May 8, 2020 |
| Confirmation Hearing Held | June 12, 2020 |
| Confirmation Order Entered | June 15, 2020 |

## B.     Bidding Procedures

On January 13, 2020, the KFM Debtors filed the *Emergency Motion of KFM Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365, 503, and 507 and Fed. R. Bankr. P. 2002, 6004, 6006, 9006, 9007, 9008, 9014, and 9019 for Orders (I) (A) Ratifying and Approving Bidding Procedures, (B) Ratifying and Approving Stalking Horse Purchase Agreement, (C) Approving Bid Protections, (D) Ratifying and Approving Assumption and Assignment Procedures, (E) Ratifying and Approving Assignment Objection Procedures and Rights Objections Procedures, (F) Scheduling Auction and Sale Hearing, (G) Ratifying and Approving Form and Manner of Notice Thereof; (II) Authorizing (A) Sale of Substantially All of Debtors Assets Free and Clear of All Claims, Encumbrances, and Liabilities, (B) Debtors Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Assignment of Other Contracts; and (III) Granting Related Relief* [Docket No 817] (the "**Sale Motion**").  On January 14, 2020, the Bankruptcy Court entered an order approving certain aspects of the Sale Motion, including the bidding procedures [Docket No. 861] (the "**Supplemental Bidding Procedures Order**").

The Supplemental Bidding Procedures Order, as set forth below, established a timeline and related deadlines in connection with the Sale Transaction.  The KFM Debtors have complied with all the deadlines set forth in the Supplemental Bidding Procedures Order.

| Deadlines/Key Dates | Date |
|---|---|
| Bid Deadline (parties other than Administrative Agent) | January 8, 2020 |
| Bid Deadline (Administrative Agent) | Prior to Auction |
| Auction | January 15, 2020 |
| Sale Objection Deadline | January 17, 2020 |
| Sale Objection Deadline (Administrative Agent) | January 20, 2020 |
| Sale Hearing | January 21, 2020 |

## C.     Auction, Sale Hearing, and Closing of Sale Transaction

On January 14, 2020, a group of holders of 7.875% of senior notes due 2024 issued by AMH and Alta Mesa Finance Services Corp. (the "**Ad Hoc Noteholder Group**") submitted a

bid pursuant to the Supplemental Bidding Procedures Order. Pursuant to the Supplemental Bidding Procedures Order, the KFM Debtors designated the Ad Hoc Noteholder Group as a "Qualified Bidder" and conducted the joint Auction.

At the Auction, the KFM Debtors, in consultation with their advisors and the advisors to the KFM Administrative Agent, selected the Purchaser's bid as the highest or best Qualified Bid for the Assets. The Ad Hoc Noteholder Group was selected as the Backup Bidder. On January 16, 2020, the KFM Debtors, jointly with the Initial Debtors, filed the Post-Auction Notice identifying BCE-Mach as the Successful Bidder for the Assets in accordance with the Supplemental Bidding Procedures Order [Docket No. 888].

Pursuant to the Supplemental Bidding Procedures Order, beginning on January 21, 2020, the Bankruptcy Court conducted a hearing to consider approval of the sale of the Assets to BCE-Mach, free and clear of all Liens, Claims, Interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code (the "**Sale Hearing**"). On January 24, 2020, the Bankruptcy Court entered an order approving the sale of the KFM Assets to BCE-Mach [Docket No. 1016] and of the AMH Assets to BCE-Mach [Docket No. 1013]. Pursuant to Bankruptcy Rule 9019, the allocation of joint Sale Proceeds contemplated by the Original Purchase Agreements and as described in the Sale Motion was determined to be a reasonable resolution of the issues among the relevant Initial Debtors, the KFM Debtors, and the Lenders with respect to the allocation and constituted a good faith compromise and settlement of all claims, encumbrances, and liabilities in connection with the allocation, with preserved exceptions set forth in the Sale Order.

The Sale Transaction did not close on the target closing date and the Purchaser notified the Debtors that it was unable to fund the purchase on the agreed upon terms. The Debtors filed the Motion to Enforce on March 10, 2020. After a status conference on the Motion to Enforce, the Debtors re-marketed their assets and received several indications of interest from alternative purchasers. However, the Debtors determined that a revised proposal from the Purchaser remained the best option available to maximize recovery of the AMH Assets and the KFM Assets. Accordingly, on April 2, 2020, the Debtors filed the Modified PSAs Motion seeking emergency consideration and approval of such revised proposal. The Bankruptcy Court conducted a status conference on April 2, 2020 and that same day the Debtors entered into certain amendments to their respective Purchase Agreements. On April 8, 2020, the Bankruptcy Court conducted a hearing on the matter and entered the Supplemental Sale Order and a corresponding order for the Initial Debtors' sale. Thereafter, on April 9, 2020, the Debtors entered into second amendments to their respective Purchase Agreements to document the final purchase price. The Sale Transaction with the Purchaser closed on April 9, 2020. Discovery and a hearing on the Motion to Enforce were adjourned indefinitely.

## D.     Adequate Protection

On February 13, 2020, the KFM Administrative Agent filed the *Emergency Motion of Wells Fargo Bank, N.A. (KFM Debtors) Pursuant to §§ 105(a) and 363(e) for Adequate Protection* [Docket No. 1163] (the "**Adequate Protection Motion**"). Pursuant to the Adequate Protection Motion, the KFM Administrative Agent requested that $60 million of the net sale proceeds be paid by the KFM Debtors to the KFM Administrative Agent upon the closing of the Sale Transaction for distribution to the Lenders as adequate protection of the KFM Administrative

Agent's Cash Collateral and to protect the benefit of the bargain of the KFM Administrative Agent with respect to the Collateral. A hearing was held on the Adequate Protection Motion on February 20, 2020, and the Bankruptcy Court entered an order approving the Adequate Protection Motion on March 3, 2020 [Docket No. 1324].

On April 7, 2020, the KFM Administrative Agent filed the *Emergency Motion of Wells Fargo Bank, N.A. (KFM Debtors) to Amend Adequate Protection Order* [Docket No. 1496] (the "**Modified Adequate Protection Motion**"). Pursuant to the Modified Adequate Protection Motion, the KFM Administrative Agent requested that the adequate protection payment be lowered in correlation with the modified purchase price under the amended KFM Purchase Agreement. On April 8, 2020, the Bankruptcy Court entered an order approving the Modified Adequate Protection Motion [Docket No. 1514] (the "**Adequate Protection Order**") and, in connection with the closing of the Sale Transaction on April 9, 2020, the KFM Debtors distributed $42,267,506 to the KFM Administrative Agent on behalf of the Lenders.

**VI.**
**SUMMARY OF PLAN**

**A.      General**

This section of this Disclosure Statement summarizes the Plan, a copy of which is attached hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan. **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the Plan, and (iii) contains other provisions necessary to implement the Plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the Plan (1) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (2) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.

**B.      Administrative Expense Claims, Fee Claims, Priority Tax Claims, and Adequate Protection Claims**

**i.      Treatment of Administrative Expense Claims.**

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment or as otherwise provided in the Plan, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of

business by the KFM Debtors shall be paid by the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

On the Effective Date, subject to (i) the occurrence of the Initial Debtors/SRII Debtors Plan Effective Date and (ii) the inclusion in the Initial Debtors/SRII Debtors Plan of releases of the other Released Parties by the AMH Releasing Parties in the form and substance reasonably acceptable to the KFM Debtors and the Administrative Agent solely as such releases apply to the KFM Debtors and the Releasing Parties, the AMH Administrative Expense Claim shall be Allowed in the amount of $100,000, and paid in full in Cash to the AMH Debtors as soon as reasonably practicable after satisfaction of such conditions.

### ii.    *Treatment of Fee Claims.*

(a)    All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred on or after the KFM Petition Date through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. Subject to the Wind-Down Budget, the KFM Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)    On the Effective Date, the KFM Debtors shall fund the Fee Reserve Account in an amount equal to the Professional Persons' good faith estimates of the Fee Claims, in each case acceptable in writing to the Administrative Agent. Funds held in the Fee Reserve Account shall not be considered Cash Collateral, property of the KFM Debtors' Estates, or property of the Post-Effective Date KFM Debtors, but shall revert and be paid to the Administrative Agent, on behalf of the Lenders, only after all Allowed Fee Claims have been paid in full. Funds in the Fee Reserve Account shall be held in trust for Professional Persons retained by the KFM Debtors and for no other parties until all Allowed Fee Claims Allowed by the Bankruptcy Court have been paid in full. Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which a Final Order relating to any such Allowed Fee Claim is entered or (ii) on such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable. The Post-Effective Date KFM Debtors' obligations with respect to Allowed Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Reserve Account. To the extent that funds held in the Fee Reserve Account are insufficient to satisfy the amount of Allowed Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan and such Professional Persons shall be entitled to all rights and protections provided for pursuant to the Cash Collateral Order. No Liens, claims, or interests shall encumber the Fee Reserve Account in any way, other than customary

liens in favor of the depository bank at which the Fee Reserve Account is maintained.

### iii.      *Treatment of Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### iv.      *Treatment of Adequate Protection Claims.*

Allowed Adequate Protection Claims are entitled to administrative expense priority status senior to all Administrative Expense Claims and secured by Adequate Protection Liens on all of the KFM Debtors' Assets, on the terms and conditions set forth in the Cash Collateral Order, subject only to Claims covered by the Carve-Out (as defined in the Cash Collateral Order). Allowed Adequate Protection Claims shall be indefeasibly paid in full in Cash on the Effective Date or as otherwise may be agreed to by the KFM Debtors and the Administrative Agent.  The Confirmation Order shall contain findings and conclusions of law allowing the Adequate Protection Claims in an amount acceptable in writing to the Administrative Agent.

## C.      Classification of Claims and Interests

### i.      *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### ii.      *Formation of KFM Debtor Groups for Convenience Only.*

The Plan groups the KFM Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Distributions in respect of Claims against the KFM Debtors under the Plan.  Such groupings shall not affect any KFM Debtor's status as a separate legal entity, change the organizational structure of the KFM Debtors' business enterprise, constitute a substantive consolidation of any of the KFM Debtors, constitute a change of control of any KFM Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all KFM Debtors shall continue to exist as separate legal entities.

### iii.        Summary of Classification of Claims and Interests.

The following table designates the Classes of Claims against and Interests in the KFM Debtors and specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each KFM Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | Credit Agreement Claims | Impaired | Yes |
| Class 4 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| Class 5 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Intercompany Interests | Impaired | No (Deemed to reject) |

### iv.        Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### v.        Elimination of Vacant Classes.

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### vi.        Voting Classes; Presumed Acceptance by Non-Voting Classes.

With respect to each KFM Debtor, if a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### vii.        Voting; Presumptions; Solicitation.

(a)        **Acceptance by Impaired Class**.  Only holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.  Class 3 shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Credit Agreement Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Credit Agreement Claims actually voting in such Class have voted to accept the

Plan.

(b)     **Deemed Acceptance by Unimpaired Classes**.  Holders of Claims in Classes 1, 2, and 5 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)     **Deemed Rejection by Certain Impaired Classes**.  Holders of Claims in Class 4 and Interests in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### viii.     *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the KFM Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### ix.     *No Waiver.*

Nothing contained in the Plan shall be construed to waive a KFM Debtor's or other Person's right to object on any basis to any Claim.

## D.     Treatment of Claims and Interests

### i.     *Class 1:  Other Priority Claims.*

(a)     **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Priority Claim, at the option of the Post-Effective Date KFM Debtors with the written consent of the Administrative Agent (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(b)     **Impairment and Voting**:  Allowed Other Priority Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

ii.     ***Class 2:  Other Secured Claims.***

(a)     **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim, at the option of the Post-Effective Date KFM Debtors with the written consent of the Administrative Agent (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b)     **Impairment and Voting**:  Allowed Other Secured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

iii.     ***Class 3:  Credit Agreement Claims.***

(a)     **Allowance**:  The Credit Agreement Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $224,000,000, plus all interest, fees, costs, charges, and expenses due and owing pursuant to the terms of the Loan Documents as of the KFM Petition Date.

(b)     **Treatment**:

(i)     The Administrative Agent, on behalf of the Lenders, shall receive:

1.     on the Effective Date, Excess Distributable Cash of at least $1,300,000, and at least quarterly thereafter, additional distributions of Excess Distributable Cash, up to an amount necessary to satisfy the Credit Agreement Claims in full;

2.     immediately following the conclusion of the Wind Down pursuant to the Wind-Down Budget, and in any event not later than four months following the Effective Date (or such other date agreed to between the Plan Administrator and the Administrative Agent),, to the extent such Credit Agreement Claims have not been satisfied in full under the foregoing subsection (i), the Excess Reserve Amounts, up to satisfaction in full of the Credit Agreement Claims; and

3.     to the extent there comes to exist any interest of the Post-Effective Date KFM Debtors in any Cash or other property following the indefeasible payment to the Administrative

26

Agent under the foregoing subsections (i) and (ii), such amounts up to satisfaction in full of the Credit Agreement Claims.

(ii)     Each Lender (or an affiliate or other recipient designated by such Lender) shall receive an undivided interest in and to the KFM ORRI in a percentage (carried out to the ninth decimal place) equal to the quotient of the aggregate outstanding Credit Agreement Loans owed to such Lender divided by the aggregate Credit Agreement Loans owed to all Lenders under the Credit Agreement (such percentage with respect to any Lender, the "***Lender's Percentage***"), which undivided interest shall be transferred  and distributed in accordance with section 5.12 of the Plan.

(c)     **Impairment and Voting**: Credit Agreement Claims are Impaired.  Holders of Credit Agreement Claims are entitled to vote to accept or reject the Plan.

### iv.     Class 4:  General Unsecured Claims.

(a)     **Treatment:**  Holders of Allowed General Unsecured Claims shall not receive any Distribution under the Plan.

(b)     **Impairment and Voting**:  Allowed General Unsecured Claims are Impaired and are not projected to receive any Distribution under the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively deemed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed General Unsecured Claims.

### v.     Class 5:  Intercompany Claims.

(a)     **Treatment**:  On or after the Effective Date, all Allowed Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the KFM Debtors or Post-Effective Date KFM Debtors, as applicable, with the written consent of the Administrative Agent.

(b)     **Impairment and Voting**: Allowed Intercompany Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### vi.     Class 6:  Intercompany Interests.

(a)     **Treatment**:  On and after the Effective Date, subject to the Administrative Agent's prior written consent, all Intercompany Interests shall be cancelled when the applicable Post-Effective Date KFM Debtor is dissolved or merged out of existence in accordance with the Wind-Down.

(b)   **Impairment and Voting**:  Allowed Intercompany Interests are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, the holders of Intercompany Interests are conclusively deemed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

## E.   Means for Implementation

### i.   *Joint Chapter 11 Plan; Severability.*

The Plan is a joint chapter 11 plan for each of the KFM Debtors.  Notwithstanding the combination of separate plans for the KFM Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each KFM Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more KFM Debtors, it may still confirm the Plan with respect to any other KFM Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### ii.   *Plan Administrator.*

(a)   Appointment.  Marc Beilinson shall be appointed and serve as Plan Administrator for each of the Post-Effective Date KFM Debtors as of the Effective Date.

(b)   Authority.  Subject to Section 5.7 of the Plan, upon the Effective Date, the Plan Administrator shall have the authority and right on behalf of each KFM Debtor, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including to:

> (i)   subject to Article VII of the Plan and Bankruptcy Court approval when necessary, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of the Plan, including to object to, seek to subordinate, compromise, or settle any and all Claims against the KFM Debtors (other than the Credit Agreement Claims); *provided, however*, that, for the avoidance of doubt, nothing in subsection 5.2(b)(i) of the Plan (A) shall modify any rights of the Administrative Agent or Lenders to object to any Claims on their own behalf in accordance with the Bankruptcy Code and Bankruptcy Rules;

> (ii)   make Distributions to holders of Allowed Claims in accordance with the Plan;

> (iii)   take any action necessary or desirable in connection with the distribution and transfer and assignment of the KFM ORRI pursuant to Sections 4.3(b)(ii) and 5.12 of the Plan, including by executing, delivering, filing, or recording any documents, contracts, instruments of assignment or conveyance, or other agreements in connection therewith;

28

(iv)     subject to the Wind-Down Budget, exercise its reasonable business judgment to direct and control the Wind-Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(v)      prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(vi)     with the written consent Administrative Agent (acting at the direction of the Required Lenders) and subject to Bankruptcy Court approval when necessary, prosecute all Causes of Action on behalf of the KFM Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the KFM Debtors and their Estates;

(vii)    subject to the Wind-Down Budget, retain and compensate professionals to assist in performing its duties under the Plan;

(viii)   subject to the Wind-Down Budget, make payments on account of Fee Claims and any other payments to Professional Persons (consistent with the terms of any Bankruptcy Court order approving such retention and subject to any applicable Bankruptcy Court approval requirements), as well as other professionals who may be engaged after the Effective Date;

(ix)     maintain the books and records and accounts of the KFM Debtors (in good faith consultation with the Administrative Agent;

(x)      invest Cash of the KFM Debtors, including any Cash proceeds realized from the liquidation of any Assets, including any Causes of Action, and any income earned thereon;

(xi)     subject to the Wind-Down Budget, incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan;

(xii)    administer each KFM Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each KFM Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such KFM Debtor ending after the KFM Petition Date through the liquidation of such KFM Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each KFM Debtor or its estate before any taxing authority in all matters including any action, suit, proceeding, or audit;

(xiii)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the KFM Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xiv)    consult with and update the Administrative Agent when reasonably requested, including with respect to Claims and the Claims reconciliation process, Causes of Action, the Wind-Down, and other actions relating to implementation of the Plan and provide an accounting to the Administrative Agent of all post-Effective receipts and disbursements on a monthly basis or such other frequency as agreed to between the Plan Administrator and Administrative Agent;

(xv)    pay Statutory Fees in accordance with Section 12.2 of the Plan;

(xvi)    close the Chapter 11 Cases; and

(xvii)    perform other duties and functions that are consistent with the implementation of the Plan.

(c)    <u>Indemnification</u>.  Subject to the Wind-Down Budget, each of the KFM Debtors shall indemnify and hold harmless the Plan Administrator for any losses incurred in such capacity, except to the extent such losses are determined by Final Order to be the result of the Plan Administrator's intentional fraud, criminal conduct, or willful misconduct.

(d)    <u>Removal/Resignation/Replacement</u>.  The Administrative Agent (acting at the direction of the Required Lenders) may replace or remove the Plan Administrator at any time in its discretion.  If the Plan Administrator resigns or is otherwise removed, the Administrative Agent may select a replacement Plan Administrator who shall be appointed effective upon such selection.

### iii.    *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, subject to Bankruptcy Court approval to the extent necessary, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the KFM Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the KFM Debtors, and any corporate action required by the KFM Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the KFM Debtors or the Estates.

### iv.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, subject to Bankruptcy Court approval to the extent necessary, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record

such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### v.      Preservation of Rights of Action.

Other than Causes of Action against a Person that are waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Confirmation Order, or by another Bankruptcy Court order (including the Sale Order) or transferred to the Purchaser pursuant to the Purchase Agreement, the KFM Debtors reserve any and all Causes of Action, which on the Effective Date shall vest in the Post-Effective Date KFM Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the KFM Debtors, the Post-Effective Date KFM Debtors, or the Plan Administrator will not pursue any and all available Causes of Action against them.  Subject to the written consent of the Administrative Agent, on and after the Effective Date, the Plan Administrator, shall have, including through its authorized agents or representatives, the exclusive right and authority to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Plan Administrator may determine is in the best interests of the KFM Debtors and their Estates without further notice to or action, order, or approval of the Bankruptcy Court.

### vi.      Corporate Governance.

(a)      Corporate Form.  On the Effective Date, each of the KFM Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator in accordance with the terms of the Plan and applicable law.

(b)      Board of Managers and Officers.  The Plan Administrator shall serve as the sole officer and manager of each Post-Effective Date KFM Debtor after the Effective Date.  The Plan Administrator may also elect such additional managers(s) and officer(s) of each Post-Effective Date KFM Debtor as the Plan Administrator deems necessary to implement the Plan and the actions contemplated herein.  The Plan Administrator shall also have the power to act by written consent to remove any officer or manager of any Post-Effective Date KFM Debtor at any time with or without cause.

(c)      Corporate Existence.  After the Effective Date, the Plan Administrator shall, subject to the Administrative Agent's prior written consent and consistent with applicable non-bankruptcy law and consistent with the implementation of the Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Post-Effective Date KFM Debtor (including the cancellation of all Interests in a Post-Effective Date KFM Debtor) and complete the winding up of such Post-Effective Date KFM Debtor as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Post-Effective Date KFM Debtor or its members or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit; *provided*, *however*, that the

31

foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Post-Effective Date KFM Debtor. The Plan Administrator may, subject to the Administrative Agent's prior written consent and to the extent required by applicable non-bankruptcy law, maintain a Post-Effective Date KFM Debtor as a corporate entity in good standing until such time as such Post-Effective Date KFM Debtor is dissolved or merged out of existence in accordance with Section 5.7 of the Plan.

(d)     Certificate of Formation and Limited Liability Agreements.   As of the Effective Date, the certificate of incorporation, certificate of formation, operating agreement, by-laws, and any other organizational document, of the KFM Debtors shall, with the consent of the Administrative Agent, be amended to the extent necessary to carry out provisions of the Plan.

### vii.     Wind-Down.

(a)     After the Effective Date, pursuant to the Plan, the Wind-Down Budget, and subject to the reasonable discretion of the Plan Administrator, the Plan Administrator shall, in an expeditious but orderly manner, implement the Wind-Down with respect to each Post-Effective Date KFM Debtor pursuant to the Wind-Down Budget, and shall not unreasonably and unduly prolong the duration of the Wind-Down.

(b)     Wind-Down Reserve.   On the Effective Date, the KFM Debtors shall fund the Wind-Down Reserve in accordance with the Wind-Down Budget and in an amount acceptable to the Administrative Agent (acting at the direction of the Required Lenders). The Cash in the Wind-Down Reserve shall be property of the Post-Effective Date KFM Debtors but shall remain subject to the Liens of the Administrative Agent. The Plan Administrator may use the funds in the Wind-Down Reserve to fund the Wind-Down and expenses of the Post-Effective Date KFM Debtors in accordance with the Wind-Down Budget. Any funds remaining in the Wind-Down Reserve after the Post-Effective Date KFM Debtors have completed the activities described in Section VI.E.vii(a) of the Plan shall be Excess Reserve Amounts distributed in accordance with the terms of the Plan. The Plan Administrator shall not use Cash other than as set forth in the Wind-Down Budget. The initial Wind-Down Budget shall be included in the Plan Supplement and shall cover the period beginning on the Effective Date and ending on fourth Friday thereafter. By no later than 5:00 p.m. (prevailing Central Time) on the second Friday following the Effective Date, and every four weeks thereafter, the Plan Administrator shall provide the Administrative Agent a proposed Wind-Down Budget for the next four-week period. The Administrative Agent (acting at the direction of the Required Lenders) may determine whether to approve the proposed Wind-Down Budget and to extend the Wind-Down Budget in its sole and absolute discretion.

(c)     On or after the Effective Date, the Post-Effective Date KFM Debtors or Plan Administrator may, subject to the terms of the Plan and the Amended Organizational Documents, (i) cause any or all of the Post-Effective Date KFM Debtors to be merged into one or more of the Post-Effective Date KFM Debtors, dissolved, or otherwise consolidated, (ii) cause the transfer of Assets between or among the Post-Effective Date KFM Debtors, and (iii) engage in any other transaction in furtherance of the Plan.

### viii.    *Establishment of Claims Reserve.*

On the Effective Date, the KFM Debtors shall establish and fund the Claims Reserve from Distributable Cash.  The Claims Reserve shall be used to pay Allowed Administrative Expense Claims (including Fee Claims), Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims (to the extent such Claims do not receive other treatment that leaves such Claims Unimpaired) in accordance with the terms of the Plan.  Any amounts remaining in the Claims Reserve after satisfaction of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims and shall constitute Excess Reserve Amounts and be distributed in accordance with the Plan.

### ix.    *Establishment of Fee Reserve Account.*

On the Effective Date, the KFM Debtors shall fund the Fee Reserve Account from Distributable Cash.  The Fee Reserve Account shall be used to pay Allowed Fee Claims in accordance with the terms of the Plan.  Any amounts remaining in the Fee Reserve Account after satisfaction of all Allowed Fee Claims shall constitute Excess Reserve Amounts and be distributed with the Plan.

### x.    *KFM/AMH Settlement*

Pursuant to sections 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, including on account of the Allowed AMH Administrative Expense Claim and the releases contained in the Plan and in the Initial Debtors/SRII Debtors Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and other rights that an Initial Debtor or SRII Debtor may have with respect to any Claim against the KFM Debtors, and any contractual, legal and other rights that a KFM Debtor may have with respect to any claim against the Initial Debtors or SRII Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the KFM Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.  Allowance of the AMH Administrative Expense Claim on the Effective Date pursuant to Section 2.1 of the Plan is subject to the occurrence of the Initial Debtors/SRII Debtors Plan Effective Date and the inclusion in the Initial Debtors/SRII Debtors Plan of releases of the other Released Parties by the AMH Releasing Parties in form and substance reasonably acceptable to the KFM Debtors and the Administrative Agent.  Allowance of the AMH Administrative Expense Claim pursuant to the Plan is in exchange for the releases provided by (i) the AMH Releasing Parties, and (ii) the Purchaser Parties and the Representatives of the Purchaser Parties in favor of (w) the KFM Debtors, (x) the Administrative Agent, (y) the Lenders, and (z) each of their Representatives, including without limitation the release of any challenge to the Administrative Agent's liens and the agreement not to object to the Plan.

### xi.     Excess Cash.

In the event that all Credit Agreement Claims are indefeasibly paid in full in Cash and excess Cash remains with the Post-Effective Date KFM Debtors after paying all costs of the Wind-Down, Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, each holder of an Allowed General Unsecured Claim shall be entitled to receive payment in Cash of such holder's Pro Rata share of the balance of the Post-Effective Date KFM Debtors' Cash as of such time.

### xii.     KFM ORRI

The Administrative Agent (acting at the direction of the Required Lenders) shall have sole authority to determine the means for distribution and transfer and assignment of each Lender's Percentage of the KFM ORRI to each Lender (or its affiliate or other designated recipient) pursuant to the Plan, including with respect to when any such distribution, transfer and/or assignment shall occur; provided that each Lender shall have the sole discretion to designate any Person or entity to act as its assignee or designee of each such Lender's Percentage of the KFM ORRI, and may take any action necessary or desirable with respect to such transfer and assignment, including without limitation establishing one or more separate Persons to take assignment of the same.  The KFM Debtors and the Plan Administrator shall take all actions as may be requested by the Administrative Agent (acting at the direction of the Required Lenders) to effectuate or consummate the distribution and transfer and assignment of the KFM ORRI to the Lenders by the Plan Administrator and the KFM Debtors.

## F.     <u>Distributions</u>

### i.     Distributions Generally.

The Plan Administrator shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.  All Distributions made to the Administrative Agent under the Plan shall be deemed to be indefeasible payments to the Administrative Agent and none of the KFM Debtors, the Post-Effective Date KFM Debtors, the Plan Administrator, any holders of Claims or Interests, or any other Entity shall have any Cause of Action or other recourse against the Administrative Agent to recover to such Distributions or otherwise.

### ii.     Postpetition Interest and Penalties on Claims.

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the KFM Petition Date or penalties on any Claim.

### iii.     Date of Distributions.

(a)     Except as otherwise provided in the Plan, the Plan Administrator shall make the Initial Distribution to holders of Allowed Claims after establishment of the Wind-Down Reserve, funding of the Fee Reserve Account, and satisfaction in full or establishment of reserves

sufficient to pay claims in the Claims Reserve, no later than the Initial Distribution Date and thereafter, the Plan Administrator shall from time to time determine the subsequent Distribution Dates.

(b)     Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is payable in accordance with the Plan and the Bankruptcy Code.

### iv.     Distribution Record Date.

As of the close of business on the Distribution Record Date, the claims register shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims.  The Post-Effective Date KFM Debtors and the Plan Administrator shall have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date.

### v.     Distributions After Effective Date.

Distributions, if any, made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### vi.     Undelivered or Unclaimed Distributions.

In the event that any Distribution to any holder is returned as undeliverable, no Distribution to such holder shall be made unless and until the Post-Effective Date KFM Debtors or the Plan Administrator, as applicable, using commercially reasonable efforts, has determined the then current address of such holder, at which time such Distribution shall be made to such holder without interest; provided, however, that, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the applicable Distribution Date is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Post-Effective Date KFM Debtors automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### vii.     Manner of Payment under Plan.

Except as specifically provided herein, at the option of the Plan Administrator or the Post-Effective Date KFM Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the KFM Debtors.

### viii.     Delivery of Distributions.

Subject to Bankruptcy Rule 9010, the Plan Administrator shall make all Distributions to any holder of an Allowed Claim as and when required by the Plan at (i) the address

of such holder on the books and records of the KFM Debtors or their agents or (ii) at the address in any written notice of address change delivered to the KFM Debtors or the Plan Administrator, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any Distribution to any holder is returned as undeliverable, no Distribution or payment to such holder shall be made unless and until the Plan Administrator has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such Distribution shall be made to such holder without interest.

### ix.     *Disbursing Agent.*

All Distributions under the Plan shall be made by the Plan Administrator on and after the Effective Date as provided herein.  The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties.  The Post-Effective Date KFM Debtors shall use commercially reasonable efforts to provide the Plan Administrator with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the KFM Debtors' or Post-Effective Date KFM Debtors' books and records.  The Post-Effective Date KFM Debtors shall cooperate in good faith with the Plan Administrator to comply with the reporting and withholding requirements outlined in Section 6.14 of the Plan.

### x.      *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of the Plan).

### xi.     *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in the Plan and subject to Section 6.2 of the Plan or as otherwise required by law, Distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any; *provided*, *however*, that Section 6.11 of the Plan shall not apply to Distributions to the Administrative Agent or the Lenders on account of Allowed Credit Agreement Claims.

### xii.    *Minimum Cash Distributions.*

The Plan Administrator shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash in an amount less than one-hundred dollars ($100); *provided*, *however*, that if any Distribution is not made pursuant to Section 6.12 of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.  The Plan Administrator shall not be required to make any final Distributions of Cash in an amount less than fifty dollars ($50) to any holder of an Allowed Claim. If the amount of any final Distributions to holders of Allowed Claims would be fifty dollars ($50) or less, then no further Distribution shall be made by the Plan Administrator and any surplus Cash shall be donated and distributed to a Tax Code § 501(c)(3) tax-exempt organization selected by the Plan Administrator.

36

### xiii.    *Setoffs and Recoupments.*

The Plan Administrator may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off or recoup against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Post-Effective Date KFM Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided*, *however*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Effective Date KFM Debtor or its successor of any claims, rights, or Causes of Action that a Post-Effective Date KFM Debtor or its successor or assign may possess against the holder of such Claim.

### xiv.    *Withholding and Reporting Requirements.*

(a)    <u>Withholding Rights</u>.  In connection with the Plan, any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    <u>Forms</u>.  Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Plan Administrator or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Plan Administrator or such other Person any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a non-U.S. Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Plan Administrator or such other Person.  If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the KFM Debtors and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against any KFM Debtor and its respective property.

### xv.    *Claims Paid by Third Parties.*

The Plan Administrator shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the KFM Debtors or the Post-Effective Date KFM Debtors.  If a holder of a Claim receives a Distribution from the KFM Debtors or the Post-Effective Date KFM Debtors on account of such Claim and also receives payment from a third party on account of such Claim, such holder shall, within fourteen (14) days

of receipt thereof, repay or return the Distribution to the KFM Debtors or the Post-Effective Date KFM Debtors, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total Allowed amount of such Claim as of the date of any such Distribution under the Plan.  The failure of such holder to timely repay or return such Distribution shall result in the holder owing the Post-Effective Date KFM Debtor interest on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

### xvi.    Claims Payable by Third Parties.

Except for with respect to Credit Agreement Claims, no Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the insurance policies to which the KFM Debtors' are a beneficiary until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; *provided*, *however*, that Section 6.16 of the Plan shall not restrict Distributions on an Allowed Claim that is Allowed in an amount that does not exceed an applicable self-insured retention or deductible amount under one or more such insurance policies.  To the extent that one or more of the insurers agrees to satisfy a Claim in whole or in part, then immediately upon such insurers' satisfaction, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims register by the Plan Administrator without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### G.    Procedures for Resolving Claims

#### i.    Allowance of Claims.

After the Effective Date, the Post-Effective Date KFM Debtors and the Plan Administrator shall have and shall retain any and all rights and defenses that the KFM Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.

#### ii.    Objections to Claims.

As of the Effective Date, objections to Claims against the KFM Debtors may be interposed and prosecuted only by the Plan Administrator or the Administrative Agent at its election; *provided, however*, that objections to General Unsecured Claims may not be interposed or prosecuted by the Plan Administrator until after all Credit Agreement Claims have been indefeasibly paid in full in Cash under the Plan or the Administrative Agent otherwise consents. For the avoidance of doubt, nothing in section 7.2 of the Plan shall modify any rights of the Administrative Agent or Lenders to object to any Claims on their own behalf in accordance with the Bankruptcy Code and Bankruptcy Rules.  Any objections to Claims other than General Unsecured Claims shall be served and filed (i) on or before the ninetieth (90th) day following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim or (ii) such

later date as ordered by the Bankruptcy Court upon motion filed by the Post-Effective Date KFM Debtors or the Plan Administrator with the written consent of the Administrative Agent. The Plan Administrator may seek Bankruptcy Court approval of procedures to govern objections to General Unsecured Claims only after all Credit Agreement Claims have been indefeasibly paid in full in Cash under the Plan.

### iii.    *Estimation of Claims.*

The Plan Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim that is not a General Unsecured Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the KFM Debtors or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any such Claim at any time during litigation concerning any objection to any such Claim, including, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any such contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the KFM Debtors or Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.

The Plan Administrator may at any time after all Credit Agreement Claims have been indefeasibly paid in full in Cash under the Plan request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim that is a General Unsecured Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the KFM Debtors or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any such Claim at any time during litigation concerning any objection to any such Claim, including, during the pendency of any appeal relating to any such objection; *provided, however*, that requests for estimation of General Unsecured Claims may not be interposed or prosecuted by the Plan Administrator unless the Administrative Agent consents.  In the event that the Bankruptcy Court estimates any such contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the KFM Debtors or Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.

### iv.    *Resolution of Claims.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Except as otherwise provided in the Plan, the Confirmation Order or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator, subject to the written consent of the Administrative Agent, shall retain and may enforce, sue on, settle, resolve, withdraw, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the KFM Debtors or

39

their Estates may hold against any Person, without the approval of the Bankruptcy Court.  Subject to the written consent of the Administrative Agent, the Plan Administrator or its successor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the KFM Debtors.

### v.    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### vi.    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  On a date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Administrator in the Plan Administrator's sole discretion, the Plan Administrator shall provide to the holder of such Claim the Distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## H.    Executory Contracts and Unexpired Leases

### i.    *Rejection of Executory Contracts and Unexpired Leases.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the KFM Debtors are a party shall be deemed rejected except for an executory contract and unexpired lease that: (i) is specifically designated as a contract or lease to be assumed by the KFM Debtors pursuant to the Plan, including as set forth in the Plan Supplement; (ii) was previously assumed or rejected by the KFM Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to the 365 Schedule; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the KFM Debtors on or before the Confirmation Date; or (v) is the subject of a pending Cure Dispute.

(b)    Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract or unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Post-Effective Date KFM Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.  For the avoidance of doubt, all executory contracts and unexpired leases assumed and assigned pursuant to the Purchase Agreement and Sale Order shall be assumed in accordance with the terms thereof, including with respect to the notice and cure process contemplated thereby, and assigned to Purchaser in accordance with the terms thereof.

(c)    Assumption of any executory contract or unexpired lease pursuant to the

Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the Effective Date.

### ii.    *KFM Debtors' Indemnification Obligations.*

Any obligations of the KFM Debtors pursuant to their certificates of formation, limited liability company agreements, or other organizational documents and agreements to indemnify current and former officers, managers, members, agents, or employees with respect to all present and future actions, suits, and proceedings against the KFM Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the KFM Debtors shall be subject to the same treatment as General Unsecured Claims under the Plan, *provided*, *however*, that nothing in Section 8.2 of the Plan shall increase the priority of any Claims arising from the foregoing. All such obligations shall be deemed and treated as executory contracts to be rejected under the Plan unless such obligation previously was assumed and assigned to the Purchaser.

### iii.    *Rejection Damages Claims.*

Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the KFM Debtors' executory contracts or unexpired leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on Kingfisher Claims Processing Center, c/o Prime Clerk LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 no later than twenty-one (21) days after the Confirmation Date.

Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any Distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the KFM Debtors, the Post-Effective Date KFM Debtors, the KFM Debtors' Estates, or the property for any of the foregoing without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the KFM Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

### iv.    *Insurance Policies.*

All insurance policies to which any KFM Debtor is a beneficiary as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable KFM Debtor and shall continue in full force and effect thereafter in accordance with

their respective terms and vest in the Post-Effective Date KFM Debtors.

### v. *Purchase Agreement.*

The KFM Debtors' assumption or rejection of any executory contract or unexpired lease pursuant to the Plan shall be subject in all respects to the Purchaser's rights and obligations, including any cure obligations assumed by the Purchaser, in accordance with the Purchase Agreement and Sale Order.

### vi. *Reservation of Rights.*

(a)     Neither the exclusion nor the inclusion by the KFM Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the KFM Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the KFM Debtors or the Post-Effective Date KFM Debtors or their respective affiliates has any liability thereunder.

(b)     Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the KFM Debtors or the Post-Effective Date KFM Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the KFM Debtors or Post-Effective Date KFM Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## I.    Conditions Precedent to the Occurrence of the Effective Date

### i. *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)     the Bankruptcy Court has entered the Confirmation Order and such Confirmation Order is a Final Order; and

(b)     all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and shall have become binding on all parties thereto

### ii.    *Waiver of Conditions Precedent.*

(a)    The conditions precedent to the occurrence of the Effective Date set forth in Section VI.I.i(b) may be waived by the KFM Debtors and the Administrative Agent, without leave of or order of the Bankruptcy Court.  If the Plan is confirmed for fewer than all of the KFM Debtors, only the conditions applicable to the KFM Debtor or KFM Debtors for which the Plan is confirmed must be satisfied or waived by the KFM Debtors and the Administrative Agent for the Effective Date to occur.

(a)    Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### iii.    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived by the KFM Debtors and the Administrative Agent in accordance with Section 9.2 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date set forth by the KFM Debtors with the written consent of the Administrative Agent in a notice filed with the Bankruptcy Court prior to the expiration of such period, the KFM Debtors may, with the written consent of the Administrative Agent, deem the Plan null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the KFM Debtors, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the KFM Debtors or any other Person.

## J.    **Effect of Confirmation**

### i.    *Binding Effect.*

On and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any KFM Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### ii.    *Vesting of Assets.*

Except as otherwise provided in the Plan, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the KFM Debtors under or in connection with the Plan, shall vest in each respective Post-Effective Date KFM Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  Subject to the terms of the Plan, and after the Effective Date, the Post-Effective Date KFM Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or

approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

### iii.     Pre-Confirmation Injunctions and Stays.

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### iv.     Injunction against Interference with Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest (other than the Administrative Agent as set forth in the Plan), along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### v.     Plan Injunction.

(a)     Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims against or Interests in any or all of the KFM Debtors and other parties in interest, along with their respective Representatives, are permanently enjoined from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a KFM Debtor, a Post-Effective Date KFM Debtor, an Estate, or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in subsection 10.5(a)(i) of the Plan or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a KFM Debtor, a Post-Effective Date KFM Debtor, an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in subsection 10.5(a)(ii) of the Plan or any property of any such transferee or successor, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a KFM Debtor, a Post-Effective Date KFM Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in subsection 10.5(a)(iii) of the Plan or any property of any such transferee or successor, (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, to the full extent permitted by applicable law, and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

(b)     By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.5 of the Plan.

*vi.*     ***Releases.***

(a)     **Releases by KFM Debtors.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the KFM Debtors, the Post-Effective Date KFM Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the KFM Debtors, the Post-Effective Date KFM Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the KFM Debtors, the Post-Effective Date KFM Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the KFM Debtors, the KFM Debtors' capital structure, the Post-Effective Date KFM Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the KFM Debtors or the Post-Effective Date KFM Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the KFM Debtors' in or out-of-court restructuring and recapitalization efforts, including in connection with Alta Mesa Resources, Inc.'s business combination transaction that was consummated on or around February 9, 2018, intercompany transactions between or among a KFM Debtor and another KFM Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Purchase Agreement, the Supplemental Bidding Procedures Order, the Sale Transaction, the Sale Order, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission.**

(b)     **Releases by Holders of Claims or Interests.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent**

permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the KFM Debtors, the Post-Effective Date KFM Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the KFM Debtors, the KFM Debtors' capital structure, the Post-Effective Date KFM Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the KFM Debtors or the Post-Effective Date KFM Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the KFM Debtors' in or out-of-court restructuring and recapitalization efforts, including in connection with Alta Mesa Resources, Inc.'s business combination transaction that was consummated on or around February 9, 2018, intercompany transactions between or among a KFM Debtor and another KFM Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Purchase Agreement, the Supplemental Bidding Procedures Order, the Sale Transaction, the Sale Order, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above (i) do not release any post-Effective Date obligations of any Person or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (ii) do not modify any settlements between and among the Lenders and the Administrative Agent.

### vii.    Exculpation.

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of confirmation and consummation of the Plan, making Distributions, implementing the Wind Down, the Disclosure Statement, the Sale Transaction, the Purchase Agreement, the Sale Order, or the solicitation of votes for, or confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the KFM Debtors or the Post-Effective Date KFM Debtors; or the transactions in furtherance of any of the foregoing; other than (i) Claims or Causes of Action

arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations under the Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on the Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or Distributions made pursuant to the Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

### viii.    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### ix.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the KFM Debtors reserve the right to reclassify any Allowed Claim or Interest (other than the Credit Agreement Claims) in accordance with any contractual, legal, or equitable subordination relating thereto.

### x.    *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan, including in Sections 10.5, 10.6, 10.7 and 10.8 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the KFM Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action.  The Post-Effective Date KFM Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the KFM Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

K.     **Retention of Jurisdiction**

      *i.*      *Retention of Jurisdiction.*

      On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

      (a)     to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

      (b)     to determine any motion, adversary proceeding, including any pending adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

      (c)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Code 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

      (d)     to ensure that Distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

      (e)     to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

      (f)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

      (g)     to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

      (h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

      (i)     to hear and determine all Fee Claims;

      (j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Purchase Agreement, the Sale Order, the Confirmation Order, or any transactions or payments in furtherance thereof, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)      to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan;

(m)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)      to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)      to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(q)      to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Sale Order, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(r)      to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of the Plan, including,  the releases, discharge, exculpations, and injunctions issued thereunder;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the KFM Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(t)      to recover all Assets of the KFM Debtors and property of the Estates, wherever located; and

(u)      to enter a final decree closing each of the Chapter 11 Cases.

## L.      **Miscellaneous Provisions**

### i.      ***Bar Dates for Certain Claims.***

The Confirmation Order shall set the Bar Date for Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims as the date that is thirty (30) days after the Effective Date, which is the last date by which any Person must have filed a Proof

of Claim (with respect to Priority Tax Claims, Other Priority Claims, and Other Secured Claims) or an application for allowance of Administrative Expense Claims incurred prior to the Effective Date against any KFM Debtor or be forever barred from asserting such Claim, *provided, however*, that AMH shall not be required to file an application for allowance with respect to the AMH Administrative Expense Claim.  Notwithstanding the foregoing, holders of Administrative Expense Claims that are based on liabilities incurred in the ordinary course of the applicable KFM Debtors' businesses (other than Claims of Governmental Units for taxes and for interest and/or penalties related to such taxes) in an amount less than $20,000 shall not be required to file any request for payment of such Administrative Expense Claims.  Such Administrative Expense Claims, unless objected to by the KFM Debtors, the Post-Effective Date KFM Debtors, or the Plan Administrator, shall be paid by the Post-Effective Date KFM Debtors, in Cash, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim.  For the avoidance of doubt, holders of Administrative Expense Claims pursuant to section 503(b)(9) of the Bankruptcy Code shall be required to file a proof of Administrative Expense Claim on or before the Bar Date for Administrative Expense Claims.  Payment by the Post-Effective Date KFM Debtors or the Plan Administrator, as applicable, of Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims shall be subject to the applicable Bar Date.

### ii.       *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the KFM Debtors (prior to the Effective Date) or the Post-Effective Date KFM Debtors (after the Effective Date) shall pay all Statutory Fees, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each KFM Debtor's case.  The obligations under Section 12.2 of the Plan shall remain for each KFM Debtor until such time as a final decree is entered closing the Chapter 11 Case for such KFM Debtor, a Final Order converting such KFM Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such KFM Debtor's Chapter 11 Case is entered.

### iii.      *Exemption from Certain Transfer Taxes.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any KFM Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the KFM Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any stamp tax, or similar tax, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### iv.     Request for Expedited Determination of Taxes.

The KFM Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the KFM Petition Date through the Effective Date.

### v.     Dates of Actions to Implement Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### vi.     Plan Modifications.

The Plan may be amended, modified, or supplemented by the KFM Debtors with the written consent of the Administrative Agent (acting at the direction of the Required Lenders) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, subject to the written consent of the Administrative Agent (acting at the direction of the Required Lenders), the KFM Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan.

### vii.     Revocation or Withdrawal of Plan.

The KFM Debtors reserve the right, subject to the acceptance of the Administrative Agent, to revoke or withdraw the Plan prior to the Effective Date as to any or all of the KFM Debtors.  If, with respect to a KFM Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such KFM Debtor does not occur on the Effective Date, then, with respect to such KFM Debtor (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such KFM Debtor or any other Person, (b) prejudice in any manner the rights of such KFM Debtor or any other Person, or (c) constitute an admission of any sort by any KFM Debtor or any other Person.

### viii.     Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the KFM Debtors, with the written consent of the Administrative Agent, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid,

void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with section 12.8 of the Plan, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the KFM Debtors or the Post-Effective Date KFM Debtors (as the case may be), and (iii) nonseverable and mutually dependent.

### ix.      Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that any corporate governance matters relating to the KFM Debtors shall be governed by the laws of the jurisdiction of formation of the applicable KFM Debtor.

### x.      Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the KFM Debtors, the Post-Effective Date KFM Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including the Plan Administrator.

### xi.      Successors and Assigns.

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### xii.      Entire Agreement.

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan, *provided*, *however*, that the Cash Collateral Order and Sale Order shall survive and remain in full force in effect except for as expressly set forth herein.

### xiii.      Computing Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule

9006 shall apply.

      *xiv.*    **Exhibits to Plan.**

      All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

      *xv.*    **Notices.**

      All notices, requests, and demands hereunder shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

      (a)  if to the KFM Debtors:

15021 Katy Freeway, 4th Floor
Houston, Texas 77094
Attn:   Mark Castiglione; Kim Warnica
Phone: (281) 530-0991
Email: mcastiglione@altamesa.net; kwarnica@altamesa.net

– and –

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn: Alfredo R. Pérez
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C., Kelly DiBlasi, and Lauren Tauro
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Ray.Schrock@weil.com; Kelly.DiBlasi@weil.com;
Lauren.Tauro@weil.com

*Attorneys for KFM Debtors*

      (b)  if to the Post-Effective Date KFM Debtors:

Marc Beilinson
mbeilinson@gmail.com

– and –

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn: Alfredo R. Pérez
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email: Alfredo.Perez@weil.com


– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C., Kelly DiBlasi, and Lauren Tauro
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Ray.Schrock@weil.com; Kelly.DiBlasi@weil.com;
Lauren.Tauro@weil.com

*Attorneys for Post-Effective Date KFM Debtors*

    (c)  if to the Administrative Agent:

VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Attn:  William L. Wallander, Esq.
Telephone:  (214) 220-7905
Facsimile:  (214) 999-7905
Email: bwallander@velaw.com

*Attorneys for Administrative Agent*

***xvi.    Reservation of Rights.***

    None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the KFM Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the KFM Debtors with respect to any Claims or Interests prior to the Effective Date.

**VII.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN**

    The   following   discussion   summarizes   certain   U.S.   federal   income   tax

54

consequences of the implementation of the Plan to the KFM Debtors and to certain holders of Allowed Claims.  This summary does not address the U.S. federal income tax consequences to holders of Claims who are deemed to have rejected the Plan.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed U.S. Treasury regulations thereunder (the "**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**") as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis.  Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  The KFM Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan.  This summary does not address state, local, or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, any other Debtor entity, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income).  Additionally, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

This discussion assumes that the Credit Agreement Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and, unless otherwise indicated below, that the various debt and other arrangements to which the KFM Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

> ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

## A.     Consequences to the KFM Debtors

Kingfisher Parent and each of the subsidiaries of Kingfisher Parent is treated as a

disregarded entity for U.S. federal income tax purposes. As disregarded entities, Kingfisher Parent and its subsidiaries are not themselves subject to U.S. federal income tax. Accordingly, the U.S. federal income tax consequences of the Plan generally will not be borne by Kingfisher Parent or its subsidiaries, but instead will be borne by the owner (or its direct or indirect owners) of Kingfisher Parent for U.S. federal income tax purposes. Pursuant to the Sale Transaction, the KFM Debtors transferred substantially all of their assets to BCE-Mach in exchange for the Sale Proceeds and the KFM ORRI in a taxable transaction; provided that in connection with the Sale Transaction, AMH (and each other "Seller" under the AMH Purchase Agreement) will deliver to Kingfisher Parent the KFM ORRI on behalf of BCE-Mach. Because the KFM Debtors are disregarded entities, any gain or loss realized on such transfer of assets, or any potential income arising from cancellation of indebtedness, will be realized by the owner of Kingfisher Parent for U.S. federal income tax purposes, SRII OpCo (or its direct or indirect owners).

*Accordingly, SRII OpCo and its owners are urged to consult their tax advisors regarding the U.S. federal income tax consequences to them.*

## B.   Consequences to U.S. Holders of Certain Claims

The discussion below applies only to U.S. Holders. As used herein, the term "**U.S. Holder**" means a beneficial owner of Credit Agreement Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Credit Agreement Claims, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such instruments, you are urged to consult your tax advisor.

### i.   *Gain or Loss*

Pursuant to the Plan, in full satisfaction of their Allowed Claims, each holder of a Credit Agreement Claim will receive (i) the KFM ORRI, (ii) the Excess Distributable Cash, up to an amount necessary to satisfy the Credit Agreement Claims in full; and (iii) to the extent such Credit Agreement Claims have not been satisfied in full, the Excess Reserve Amounts, up to

satisfaction in full of the Credit Agreement Claims. Accordingly, in general, a U.S. Holder of a Credit Agreement Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of any Cash and the value of any non-Cash consideration received in satisfaction of its Claim (other than any Cash or non-Cash consideration received in respect of accrued but unpaid interest, if any), and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest, if any). *See* discussion of "Distributions in Respect of Accrued Interest" below.

Generally, the gain or loss recognized by a U.S. Holder with respect to a Claim will be a capital gain or loss unless the Claim was acquired at a market discount, and depending on whether and the extent to which the U.S. Holder previously claimed a bad debt deduction. Any such capital gain or loss generally will be long-term if the U.S. Holder's holding period in the Claim is more than one year. A U.S. Holder that purchased its Claim from a prior holder at a "market discount" (relative to the principal amount of the Claim at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the U.S. Holder's adjusted tax basis in the debt instrument is less than its stated principal amount by at least a *de minimis* amount. Under these rules, any gain recognized in the payment of Cash or non-Cash consideration on the Claim (other than any Cash or non-Cash consideration received in respect of accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claim, such deferred amounts would become deductible at the time of the discharge of the Claim.

### ii. *Distributions in Respect of Accrued Interest*

In general, to the extent that any Cash or non-Cash consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

You are urged to consult your tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

### C.   Withholding on Distributions and Information Reporting

Payments of interest and any other reportable payments, including amounts received pursuant to the Plan, generally will be subject to information reporting and may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is

not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a credit against or refund of that recipient's U.S. federal income tax liability, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to exempt recipients, such as corporations and financial institutions.  You are urged to consult your tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  You are urged to consult your tax advisor regarding these Treasury Regulations and whether the contemplated transactions under the Plan would be subject to these Treasury Regulations and require disclosure on your tax return.

The foregoing summary has been provided for informational purposes only.  Each U.S. Holder is urged to consult its tax advisor concerning the U.S. federal, state, local, and other tax consequences applicable under the Plan.

## VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

### A.     Certain Bankruptcy Law Considerations

#### *i.*     *Risk of Non-Confirmation of the Plan*

Although the KFM Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.

The Bankruptcy Code requires that a chapter 11 plan comply with certain requirements (including the requirements of section 1129 of the Bankruptcy Code) in order to be confirmed.  The Bankruptcy Court may determine that one or more of those requirements is not satisfied with respect to the Plan.  If the Bankruptcy Court makes such a determination, the KFM Debtors could be required to restart the solicitation process and (i) seek the approval of a new disclosure statement, (ii) solicit or re-solicit votes from the holders of Claims or Interests, and (iii) seek the confirmation of a newly proposed plan.  Alternatively, if the confirmation requirements are not satisfied with respect to the Plans of some, but not all, of the KFM Debtors, the KFM Debtors may choose to sever such plans and proceed with confirmation of the Plan for the remaining KFM Debtors.

### ii. *Risk Related to Cash Collateral Order*

In the event of a breach of one of the milestones or another event of default under the Cash Collateral Order, the Lenders may seek, among other things, to exercise certain remedies with respect to cash collateral, and to take certain other actions against the KFM Debtors. Additionally, under the Cash Collateral Order, the right to use Cash Collateral can expire and, without the Lenders' consent, the KFM Debtors would not have access to Cash Collateral or liquidity to continue operation in these chapter 11 cases.  In such case, the KFM Debtors may need to seek postpetition financing.

### B.     Additional Risk Factors to be Considered

### i. *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests entitled to vote on a plan of reorganization or liquidation does not accept such plan of reorganization or liquidation, respectively, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the Plan, the bankruptcy court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

### ii. *Claim Objections*

The KFM Debtors may object to a proof of claim filed by or on behalf of a holder of a Claim.  The distribution estimates set forth in this Disclosure Statement are not applicable to any holder of any Claim whose Claim is or may be subject to an objection.  Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### iii. *Distributions*

While the KFM Debtors have endeavored to project what they believe are likely distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things: (i) recoveries generated in connection with the liquidation of all of the KFM Debtors' remaining assets; (ii) the outcome of objections to Claims; and (iii) the cost and expenses of such actions and generally administering and winding down the KFM Debtors' Estates.

### iv. *Administrative Insolvency*

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (*i.e.*, allowed administrative expense claims) receive cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment.  Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to

priority under section 507(a) of the Bankruptcy Code (*i.e.*, allowed priority tax claims) receive regular installment payments in cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan.  Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as cash equal to the full allowed amount of such claim).

The KFM Debtors presently believe that they have sufficient cash to pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, and/or that they will be able to reach agreements with the holders of such Claims as to any different treatment of such Claims, as necessary.  However, if the Debtors are administratively insolvent, then the Bankruptcy Court may not confirm the Plan and the Bankruptcy Court may convert the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, either or both of which possible outcomes would likely entail significantly greater risk of delay, expense, and uncertainty to the KFM Debtors and their Estates.

### v. *The KFM Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the KFM Debtors as of the KFM Petition Date, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The KFM Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### vi. *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the KFM Debtors, the chapter 11 cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### vii. *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### viii. *No Admission Made*

Nothing contained in the Plan will constitute an admission of, or be deemed

evidence of, the tax or other legal effects of the Plan on the KFM Debtors or on holders of Claims or Interests.

### ix.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The KFM Debtors may seek to investigate, file, and prosecute Causes of Action and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Causes of Action.

### x.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, Causes of Action, or rights of the KFM Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or Causes of Action of the KFM Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### xi.    Information Was Provided by KFM Debtors and Was Relied Upon by KFM Debtors' Advisors

The KFM Debtors' advisors have relied upon information provided by the KFM Debtors in connection with the preparation of this Disclosure Statement.  Although the KFM Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### xii.    Amendment, Waiver, Modification, or Withdrawal of Plan

Under certain circumstances, the KFM Debtors may, prior to the Confirmation or the substantial consummation of the Plan, and subject to the provisions of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the Plan, amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.

### xiii.    Non-Occurrence or Delayed Occurrence of the Effective Date

Although the KFM Debtors believe that the Effective Date will occur shortly after the Confirmation Date following the satisfaction of any applicable conditions precedent, there can be no assurance as to the precise timing of the Effective Date.  If the conditions precedent to the Effective Date, as described in Article X of the Plan, have not occurred or otherwise been waived by the date that is sixty (60) days after the entry of the Confirmation Order or by such later date as

set forth by the Debtor in a notice filed with the Bankruptcy Court prior to the expiration of such period, then, then, upon filing a notice with the Bankruptcy Court, the KFM Debtors may deem the Plan null and void in all respects.  Under such circumstances, no distributions would be made under the Plan, the KFM Debtors and all holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the date of confirmation, and the KFM Debtors' obligations with respect to all Claims and Interests would remain unchanged.

### xiv.    Conversion to Chapter 7

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the KFM Debtors, the chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the KFM Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The KFM Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to the KFM Debtors' creditors than as provided for in the Plan, as further detailed in Section VIII of this Disclosure Statement.

### xv.    Dismissal of the Chapter 11 Cases

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the KFM Debtors, one or more of the chapter 11 cases may be dismissed by order of the Bankruptcy Court.

### xvi.    Cost of Administering the Debtors' Estates

Liquidation of the KFM Debtors' remaining assets and the disbursement of the proceeds of such liquidation, as well as the wind-down of the KFM Debtor entities, will require certain administrative costs that may vary based on a variety of factors, including many out of the KFM Debtors' control.  Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

## IX.
## CONFIRMATION OF PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Confirmation Hearing has been scheduled for May 27, 2020.  Notice of the Confirmation Hearing will be provided to all known holders of Claims or Interests (or their representatives) and other persons and entities required by the Bankruptcy Code and the Bankruptcy Rules.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

**B.**     <u>**Objections to Confirmation**</u>

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the KFM Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the Honorable Marvin Isgur, United States Bankruptcy Judge, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

a)     **KFM Debtors** at
    Kingfisher Midstream, LLC
    15021 Katy Freeway, 4th Floor
    Houston, Texas 77094
    Attn: Kim Warnica (kwarnica@AltaMesa.net)

b)     **Counsel to KFM Debtors** at
    Weil, Gotshal & Manges LLP
    700 Louisiana Street, Suite 1700
    Houston, Texas 77002
    Attn:   Alfredo R. Pérez (Alfredo.Perez@weil.com)
    Telephone: (713) 546-5000
    Facsimile: (713) 224-9511

    -and-

    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, New York 10153
    Attn:  Ray C. Schrock, P.C., Kelly DiBlasi, Esq., and Lauren Tauro, Esq.
    (Ray.Schrock@weil.com; Kelly.Diblasi@weil.com; Lauren.Tauro@weil.com)
    Telephone: (212) 310-8000
    Facsimile:  (212) 310-8007

c)     **Office of the U.S. Trustee** at
    Office of the United States Trustee for the Southern District of Texas
    515 Rusk Street, Suite 3516
    Houston, Texas 77002
    Attn: Stephen Statham; Hector Duran (Stephen.Statham@usdoj.gov;
    Hector.Duran.Jr@usdoj.gov)
    Telephone: (713) 718-4650
    Facsimile: (713) 718-4670

d)     **Counsel to the Administrative Agent** at
    Vinson & Elkins LLP
    2001 Ross Avenue

Suite 3900
Dallas, TX 75201
Attn:  William L. Wallander, Esq. (bwallander@velaw.com)
Telephone: (214) 220-7700

---

**IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

**C.**     **Requirements for Confirmation of Plan**

      ***i.***     ***Requirements of Section 1129(a) of the Bankruptcy Code***

      **1.**     **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(a)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(b)     The KFM Debtors have complied with the applicable provisions of the Bankruptcy Code.

(c)     The Plan has been proposed in good faith and not by any means proscribed by law.

(d)     Any payment made or promised by the KFM Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

(e)     The KFM Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the KFM Debtors, an affiliate of the KFM Debtors participating in a joint plan with the KFM Debtors, or a successor to the KFM Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

(f)     With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the KFM Debtors were liquidated on the Effective Date under chapter 7 of the

64

Bankruptcy Code.  See discussion of "Best Interests Test" below.

(g)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

(h)    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Claims will be paid in full on the Effective Date.

(i)    At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

(j)    Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the KFM Debtors or any successor to the KFM Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See "Feasibility Analysis" below.

(k)    All fees payable under section 1930 of title 28 have been paid or the Plan provides for the payment of all such fees on, or reasonably practicable thereafter, the Effective Date of the Plan.

## 2.    <u>Best Interests Test</u>

As noted above, the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the KFM Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This requirement is referred to as the "best interests test."

The best interests test requires the Bankruptcy Court to determine what the holders of Allowed Claims and Allowed Interests in each impaired Class would receive from a liquidation of the KFM Debtors' assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a hypothetical liquidation of the KFM Debtors' assets and properties (after subtracting the amounts attributable to the aforesaid Claims) is then compared with the value offered to such Classes of Claims and Interests under the Plan.

Under the Plan, all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  This conclusion is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests and (ii) the Liquidation Analysis prepared by the KFM Debtors' financial advisor that is annexed as **<u>Exhibit C</u>** hereto.

The Liquidation Analysis is based on a number of significant assumptions which

are described therein.  The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the KFM Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the KFM Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 3. Feasibility Analysis

The Plan provides for the liquidation of the KFM Debtors and their Estates.  The KFM Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan.  Accordingly, the KFM Debtors believe the Plan satisfies the feasibility requirement imposed by section 1129(a)(11) of the Bankruptcy Code.

### 4. No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan.  A plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

Under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority.  Accordingly, the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

### 5. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirements that no class of claims receive more than 100% of the allowed amount of the claims in such class and that if a class is not paid in full, no class junior in priority receives a distribution.  The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class.  In order to demonstrate that a plan is "fair and equitable," the Plan proponent must demonstrate the following:

(a) *Secured Creditors*.  With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section

66

363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

(b)     *Unsecured Creditors*.  With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the Plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

(c)     *Equity Interests*.  With respect to a class of equity interests, a proposed plan must provide the following: (i) that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (ii) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

As to any Class that may reject the Plan, the Plan satisfies the "fair and equitable" requirement because, as to any such dissenting Class, no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

### ii.     *Alternative to Confirmation and Consummation of the Plan*

The KFM Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the KFM Debtors have concluded that the Plan is the best option for the KFM Debtors and their Estates and will maximize recoveries to parties-in-interest—assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan include a liquidation of the KFM Debtors under chapter 7 of the Bankruptcy Code.

### 1.     <u>Liquidation Under Chapter 7</u>

In a chapter 7 case, a trustee is appointed to liquidate a debtor's assets and make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining Sale Proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, equity

67

interest holders receive the balance that remains, if any, after all creditors are paid.

The liquidation analysis further describing the financial recovery in a liquidation is annexed hereto as **Exhibit C**.

### 2.   Alternative Plans

The KFM Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the KFM Debtors' Estates. The Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## X.
## CONCLUSION AND RECOMMENDATION

Confirmation and implementation of the Plan is in the best interests of all creditors. The KFM Debtors urge holders of Impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than the Voting Deadline, May 20, 2020.

Dated: April 22, 2020
       Houston, Texas                 Respectfully submitted,

Kingfisher Midstream, LLC and its subsidiary
Debtors

By:    /s/ Mark P. Castiglione
Name:  Mark P. Castiglione
Title:   Chief Executive Officer

**<u>Exhibit A</u>**

**Plan**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **ALTA MESA RESOURCES, INC.,** *et al.*, | § | **Case No. 19-35133 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

## AMENDED JOINT CHAPTER 11 PLAN OF KFM DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Kelly DiBlasi
Lauren Tauro
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for KFM Debtors*

Dated:   April 22, 2020
　　　　 Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (0642); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); Oklahoma Energy Acquisitions, LP (3762); SRII Opco GP, LLC (3729); SRII Opco, LP (5874); Kingfisher Midstream, LLC (1357); Kingfisher STACK Oil Pipeline, LLC (8858); Oklahoma Produced Water Solutions, LLC (0256); and Cimarron Express Pipeline, LLC (1545).  The Debtors' mailing address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

**TABLE OF CONTENTS**

Page

**ARTICLE I      Definitions and Interpretation.**..........................................................1
    1.1    Definitions.........................................................................................1
    1.2    Interpretation; Application of Definitions; Rules of Construction. ...........................12
    1.3    Reference to Monetary Figures.........................................................12
    1.4    Controlling Document. ....................................................................13

**ARTICLE II     Administrative Expense Claims, Fee Claims, Priority Tax Claims,
               and Adequate Protection Claims.**.......................................................13
    2.1    Treatment of Administrative Expense Claims..............................................13
    2.2    Treatment of Fee Claims................................................................13
    2.3    Treatment of Priority Tax Claims........................................................14
    2.4    Treatment of Adequate Protection Claims................................................15

**ARTICLE III    Classification of Claims and Interests**.........................................15
    3.1    Classification in General.................................................................15
    3.2    Formation of KFM Debtor Groups for Convenience Only. ...............................15
    3.3    Summary of Classification of Claims and Interests.......................................15
    3.4    Special Provision Governing Unimpaired Claims........................................16
    3.5    Elimination of Vacant Classes. .........................................................16
    3.6    Voting Classes; Presumed Acceptance by Non-Voting Classes............................16
    3.7    Voting; Presumptions; Solicitation......................................................16
    3.8    Cramdown................................................................................17
    3.9    No Waiver. ..............................................................................17

**ARTICLE IV     Treatment of Claims and Interests**...............................................17
    4.1    Class 1:  Other Priority Claims.........................................................17
    4.2    Class 2:  Other Secured Claims. .......................................................17
    4.3    Class 3:  Credit Agreement Claims......................................................18
    4.4    Class 4:  General Unsecured Claims.....................................................19
    4.5    Class 5:  Intercompany Claims..........................................................19
    4.6    Class 6:  Intercompany Interests........................................................19

**ARTICLE V      Means for Implementation**............................................................20
    5.1    Joint Chapter 11 Plan; Severability.....................................................20
    5.2    Plan Administrator.......................................................................20
    5.3    Corporate Action........................................................................22
    5.4    Effectuating Documents; Further Transactions. .........................................22
    5.5    Preservation of Rights of Action........................................................23

i

5.6      Corporate Governance. ...............................................................................................23
5.7      Wind-Down..................................................................................................................24
5.8      Establishment of Claims Reserve. ..............................................................................25
5.9      Establishment of Fee Reserve Account. .....................................................................25
5.10     KFM/AMH Settlement. ...............................................................................................25
5.11     Excess Cash. ................................................................................................................26
5.12     KFM ORRI. .................................................................................................................26

**ARTICLE VI   Distributions.** .................................................................................................26
6.1      Distributions Generally. ..............................................................................................26
6.2      Postpetition Interest and Penalties on Claims. ...........................................................26
6.3      Date of Distributions. ..................................................................................................26
6.4      Distribution Record Date. ............................................................................................27
6.5      Distributions After Effective Date. .............................................................................27
6.6      Undelivered or Unclaimed Distributions. ...................................................................27
6.7      Manner of Payment under Plan....................................................................................27
6.8      Delivery of Distributions. ...........................................................................................27
6.9      Disbursing Agent. ........................................................................................................28
6.10     No Distribution in Excess of Amount of Allowed Claim.............................................28
6.11     Allocation of Distributions Between Principal and Interest. .......................................28
6.12     Minimum Cash Distributions. .....................................................................................28
6.13     Setoffs and Recoupments. ...........................................................................................29
6.14     Withholding and Reporting Requirements. .................................................................29
6.15     Claims Paid by Third Parties. ......................................................................................29
6.16     Claims Payable by Third Parties...................................................................................30

**ARTICLE VII  Procedures for Resolving Claims.** .................................................................30
7.1      Allowance of Claims.....................................................................................................30
7.2      Objections to Claims.....................................................................................................30
7.3      Estimation of Claims. ..................................................................................................31
7.4      Resolution of Claims. ..................................................................................................31
7.5      No Distributions Pending Allowance. .........................................................................32
7.6      Distributions After Allowance. ...................................................................................32

**ARTICLE VIII  Executory Contracts and Unexpired Leases**...............................................32
8.1      Rejection of Executory Contracts and Unexpired Leases............................................32
8.2      KFM Debtors' Indemnification Obligations.................................................................33
8.3      Rejection Damages Claims. .........................................................................................33
8.4      Insurance Policies. .......................................................................................................33
8.5      Purchase Agreement. ...................................................................................................34

ii

8.6     Reservation of Rights.................................................................................34

**ARTICLE IX   Conditions Precedent to Occurrence of Effective Date**..................34

9.1     Conditions Precedent to Effective Date........................................................34

9.2     Waiver of Conditions Precedent. ..................................................................35

9.3     Effect of Failure of a Condition. ..................................................................35

**ARTICLE X    Effect of Confirmation**.............................................................35

10.1    Binding Effect................................................................................................35

10.2    Vesting of Assets. .........................................................................................35

10.3    Pre-Confirmation Injunctions and Stays. .....................................................36

10.4    Injunction against Interference with Plan. ....................................................36

10.5    Plan Injunction..............................................................................................36

10.6    Releases.........................................................................................................37

10.7    Exculpation. ..................................................................................................38

10.8    Injunction Related to Releases and Exculpation...........................................39

10.9    Subordinated Claims.....................................................................................39

10.10  Retention of Causes of Action and Reservation of Rights. ..........................39

**ARTICLE XI   Retention of Jurisdiction**........................................................40

11.1    Retention of Jurisdiction...............................................................................40

**ARTICLE XII  Miscellaneous Provisions**........................................................42

12.1    Bar Dates for Certain Claims........................................................................42

12.2    Payment of Statutory Fees. ...........................................................................42

12.3    Exemption from Certain Transfer Taxes. .....................................................42

12.4    Request for Expedited Determination of Taxes.............................................43

12.5    Dates of Actions to Implement Plan. ............................................................43

12.6    Plan Modifications.........................................................................................43

12.7    Revocation or Withdrawal of Plan................................................................43

12.8    Severability. ..................................................................................................44

12.9    Governing Law. .............................................................................................44

12.10  Immediate Binding Effect..............................................................................44

12.11  Successors and Assigns..................................................................................44

12.12  Entire Agreement...........................................................................................44

12.13  Computing Time. ...........................................................................................45

12.14  Exhibits to Plan.............................................................................................45

12.15  Notices. .........................................................................................................45

12.16  Reservation of Rights....................................................................................47

Each of Kingfisher Midstream, LLC, Kingfisher STACK Oil Pipeline, LLC, Oklahoma Produced Water Solutions, LLC, and Cimarron Express Pipeline, LLC, as debtors and debtors in possession (each, a "*KFM Debtor*" and collectively, the "*KFM Debtors*") proposes the following joint chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

**ARTICLE I          DEFINITIONS AND INTERPRETATION.**

      **1.1**    *Definitions.*

The following terms shall have the respective meanings specified below:

*365 Schedule* means that certain schedule of executory contracts and unexpired leases to be assumed by the KFM Debtors and assigned to the Purchaser in accordance with the terms of the Purchase Agreement, filed at Docket Nos. 864 and 1524, as may be amended, modified, or supplemented from time to time in accordance with the Purchase Agreement and Sale Order.

*Ad Hoc Noteholder Group* has the meaning set forth in the Initial Debtors/SRII Debtors Plan.

*Adequate Protection Claims* has the meaning set forth in the Cash Collateral Order.

*Adequate Protection Liens* has the meaning set forth in the Cash Collateral Order.

*Administrative Agent* means Wells Fargo Bank, N.A., in its capacity as administrative agent under the Credit Agreement.

*Administrative Expense Claim* means any Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 363, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the KFM Petition Date and through the Effective Date of preserving the Estates and operating the business of the KFM Debtors and (ii) Fee Claims.

*Allowed* means, with respect to any Claim against or Interest in a KFM Debtor, (i) any Claim as to which the relevant KFM Debtors and the holder of the Claim agree to the amount of the Claim, (ii) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed in accordance with the terms set forth in this Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (iii) any Claim or Interest that is compromised, settled, or resolved pursuant to the authority of the KFM Debtors or the Plan Administrator, as applicable, (iv) any Claim or Interest arising on or before the Effective Date as to which the liability of the KFM Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (v) any Claim that is listed in the Schedules as liquidated, non-contingent, and undisputed, or (vi) any Claim or Interest expressly allowed under this Plan, the Confirmation Order, the Cash

Collateral Order, or other Final Order of the Bankruptcy Court.  For the avoidance of doubt, except for in accordance with the foregoing clauses (i) through (iv), a Disputed Claim shall not be an Allowed Claim until so determined by a Final Order.

*Amended Organizational Documents* means, with respect to each Post-Effective Date KFM Debtor, the form of certificate of incorporation, certificate of formation, bylaws, limited liability company agreement, or other similar organizational documents, as applicable, for such Post-Effective Date KFM Debtor.

*AMH* means Initial Debtor Alta Mesa Holdings, LP.

*AMH Administrative Expense Claim* means an Administrative Expense Claim of the Initial Debtors against KFM Parent.

*AMH Releasing Parties* means (i) the Prepetition AMH RBL Agent and the Prepetition AMH RBL Lenders and their Representatives; (ii) the Initial Debtors and their Representatives; (iii) the SRII Debtors and their Representatives; (iv) the Committee and each of its members; (vi) each member of the Ad Hoc Noteholder Group; and (vii) the Indenture Trustee.

*Asset* means all of the rights, title, and interests of a KFM Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible property, other than any Asset (as defined in the Purchase Agreement) that was transferred to the Purchaser in accordance with the terms of the Purchase Agreement and the Sale Order.

*Assumed Obligations* has the meaning set forth in the Purchase Agreement.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

*Bar Date* means the date fixed by order(s) of the Bankruptcy Court (including this Plan or the Confirmation Order) by which any Persons, including Governmental Units, asserting a Claim against any KFM Debtor must have filed a Proof of Claim or application for allowance of such Claim (as applicable) with the Bankruptcy Court against such KFM Debtor or be forever barred from asserting such Claim.

2

**Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**Cash** means legal tender of the United States of America.

**Cash Collateral** has the meaning set forth in the Cash Collateral Order.

**Cash Collateral Order** means the interim and final orders authorizing the KFM Debtors' use of Cash Collateral, entered on January 17, 2020 [Docket No. 903] and February 11, 2020 [Docket No. 1137] (each as may be amended, modified, or otherwise supplemented from time to time).

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the KFM Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including claims and causes of action arising under sections 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code), (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer or preferential transfer claim.

**Chapter 11 Case** means, with respect to a KFM Debtor, such KFM Debtor's case under chapter 11 of the Bankruptcy Code commenced on the KFM Petition Date in the Bankruptcy Court, jointly administered with the Initial Debtors and the SRII Debtors under chapter 11 of the Bankruptcy Code pursuant to the *Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 896].

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any KFM Debtor.

**Claims Reserve** means a segregated account subject to the Liens of the Administrative Agent, as such Liens existed prior to the Effective Date, which shall be established on or prior to the Effective Date and funded with Cash in an estimated amount acceptable in writing to the Administrative Agent[2] to pay (or reserve for payment of) any

---

[2]  Unless expressly provided otherwise herein, any determination, agreement, decision, consent, election, approval, acceptance, waiver, designation, authorization, or other similar circumstance or matter of the Administrative Agent

(i) Allowed Administrative Expense Claims, (ii) Allowed Priority Tax Claims, (iii) Allowed Other Priority Claims, (iv) Allowed Other Secured Claims, and (v) Disputed Cure Claims, in each case to the extent such Claims do not receive other treatment that leaves such Claims Unimpaired; *provided, however*, that all Cash remaining in the Claims Reserve after payment of all relevant Allowed Claims in accordance with the terms of this Plan shall be distributed to the Administrative Agent in accordance with the terms of this Plan.

*Class* means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

*Closing Date* has the meaning set forth in the Purchase Agreement.

*Committee* has the meaning set forth in the Initial Debtors/SRII Debtors Plan.

*Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

*Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court in form and substance acceptable in writing to the Administrative Agent (i) approving (a) the Disclosure Statement pursuant to section 1125 and 1126(b) of the Bankruptcy Code and (b) the solicitation of votes and voting procedures and (ii) confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

*Credit Agreement* means that certain *Amended and Restated Credit Agreement*, dated as of May 30, 2018 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time), by and among KFM Parent, as borrower, the Administrative Agent, and the Lenders party thereto from time to time.

*Credit Agreement Claims* means all Claims against the KFM Debtors arising under or in connection with the Credit Agreement and all Loan Documents relating thereto.

*Credit Agreement Loans* means the revolving loans borrowed under the Credit Agreement.

*Cure Amount* means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the KFM Debtors in accordance with the terms of an executory contract or unexpired lease of the KFM Debtors and (ii) permit the KFM Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

---

hereunder or related hereto, shall be in the Administrative Agent's sole and absolute discretion, acting at the direction of the Required Lenders.

**Cure Dispute** means an unresolved objection regarding assumption, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues related to assumption of an executory contract or unexpired lease.

**Disclosure Statement** means the disclosure statement for this Plan, including all exhibits and schedules thereto, as may be amended, modified, or otherwise supplemented from time to time, in each case in form and substance acceptable in writing to the Administrative Agent, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**Disputed** means, with respect to a Claim, (i) any Claim that is disputed under this Plan or otherwise or as to which the KFM Debtors or Post-Effective Date KFM Debtors, as applicable, have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required by order of the Bankruptcy Court to be filed but as to which a Proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules, as unliquidated, contingent, or disputed, and as to which no request for payment or Proof of Claim has been filed, (iv) any Claim that is otherwise disputed by any of the KFM Debtors or Post-Effective Date KFM Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved, or overruled by a Final Order, or (v) any other Claim for which the time for parties in interest to object has not expired.  To the extent the KFM Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the KFM Debtors or Post-Effective Date KFM Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

**Disputed Cure Claims** the amount that a counterparty to a Cure Dispute alleges must be paid in order for an executory contract or unexpired lease to either be assumed by the KFM Debtors or assumed by the KFM Debtors and assigned to the Purchaser pursuant to the Purchase Agreement.

**Distributable Cash** means (i) the Sale Proceeds, (ii) all other Cash and Cash equivalents of the KFM Debtors as of the Effective Date, and (iii) the proceeds of any Assets, including the proceeds of any Cause of Action pursued by the KFM Debtors or Plan Administrator on behalf of the Post-Effective Date KFM Debtors.

**Distribution** means the payment or distribution of consideration to holders of Allowed Claims pursuant to this Plan.

**Distribution Date** means the date or dates, including the Initial Distribution Date, as determined by the Plan Administrator in accordance with the terms of this Plan, on which the Plan Administrator makes a Distribution to holders of Allowed Claims.

**Distribution Record Date** means, except as otherwise provided in this Plan, the Effective Date.

**Effective Date** means the date which is the first Business Day on which all conditions to the effectiveness of this Plan set forth in Section 9.1 of this Plan have been satisfied or waived in accordance with the terms of this Plan.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the KFM Debtors created under section 541 of the Bankruptcy Code.

*Excess Distributable Cash* means the Distributable Cash remaining after the funding of (i) the Claims Reserve, (ii) the Wind-Down Reserve, (iii) the Fee Reserve Account, and (iv) Allowed Adequate Protection Claims.

*Excess Reserve Amounts* means any amounts remaining in the (i) Claims Reserve, (ii) Wind-Down Reserve, and (iii) Fee Reserve Account, if any, after the (a) satisfaction in full of all Allowed Administrative Expense Claims (including Fee Claims), Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims (to the extent such Claims do not receive other treatment that leaves such Claims Unimpaired), (b) conclusion of the Wind-Down in accordance with the terms of this Plan, and (c) resolution of all Cure Disputes.

*Exculpated Parties* means, collectively, and in each case only in their capacities as such during the Chapter 11 Cases, (i) the KFM Debtors, (ii) the Post-Effective Date KFM Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' Representatives and each of their respective heirs, executors, estates, and nominees, in each case in their capacity as such.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the KFM Petition Date through and including the Effective Date by Professional Persons.

*Fee Reserve Account* means the account established pursuant to the terms and conditions of the Cash Collateral Order, which account shall be funded by the KFM Debtors on the Effective Date with additional Cash in an amount equal to the total estimated amount of Fee Claims as acceptable in writing to the Administrative Agent.

*Final Order* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

*General Unsecured Claim* means any Claim, other than a Credit Agreement Claim, Other Secured Claim, Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, or Intercompany Claim, that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court; *provided*, *however*, that any Claim that is an Assumed Obligation under the Purchase Agreement shall not be a General Unsecured Claim.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indenture Trustee* has the meaning set forth in the Initial Debtors/SRII Debtors Plan.

*Initial Debtors* means Alta Mesa Resources, Inc., Alta Mesa Holdings, LP, Alta Mesa Holdings GP, LLC, OEM GP, LLC, Alta Mesa Finance Services Corp., Alta Mesa Services, LP, and Oklahoma Energy Acquisitions, LP, each as debtors and debtors in possession.

*Initial Debtors/SRII Debtors Plan* means that certain *Joint Plan of Liquidation of Alta Mesa Resources, Inc. and its AMH and SRII Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 1562], including all appendices, exhibits, schedules, and supplements thereto, filed in the chapter 11 cases of the Initial Debtors and SRII Debtors, as may be amended, modified, or otherwise supplemented from time to time in accordance with the Bankruptcy Code and the terms thereof.

*Initial Debtors/SRII Debtors Plan Effective Date* means the "Effective Date" as defined in the Initial Debtors/SRII Debtors Plan.

*Initial Distribution* means the first Distribution that the Plan Administrator makes to holders of Allowed Claims.

*Initial Distribution Date* means the date on which the Plan Administrator shall make the Initial Distribution, which shall not be less than five Business Days after the Effective Date.

*Intercompany Claim* means any Claim against a KFM Debtor held by another KFM Debtor.

*Intercompany Interest* means any Interests in any of the KFM Debtors.

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a KFM Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument, evidencing any fixed or contingent ownership interest in any KFM Debtor, whether or not transferable and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the applicable KFM Debtor, that existed immediately before the Effective Date.

*KFM Debtors* has the meaning set forth in the introductory paragraph of this Plan.

*KFM ORRI* has the meaning set forth in the Purchase Agreement.

*KFM Parent* means Kingfisher Midstream, LLC.

*KFM Petition Date* means, with respect to a KFM Debtor, the date on which such KFM Debtor commenced its Chapter 11 Case.

*Lenders* means the lenders from time to time party to the Credit Agreement as lenders thereunder.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Loan Documents* has the meaning set forth in the Credit Agreement.

*Other Priority Claim* means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

*Other Secured Claim* means any Secured Claim other than a Priority Tax Claim or a Credit Agreement Claim.

*Person* means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*Plan* means this amended joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to this Plan contained in the Plan Supplement), as may be amended, modified, or otherwise supplemented from time to time in accordance with the Bankruptcy Code and the terms hereof.

*Plan Administrator* means Marc Beilinson, or if Marc Beilinson declines to serve, such other individual Person acceptable in writing to the Administrative Agent (acting at the direction of the Required Lenders), who will serve as the administrator of the Post-Effective Date KFM Debtors and effectuate the Wind-Down pursuant to this Plan (or such other Person that may subsequently be appointed as Plan Administrator pursuant to this Plan).

*Plan Administrator Agreement* means an agreement in form and substance acceptable to the Administrative Agent (acting at the direction of the Required Lenders) setting forth the economic arrangement and terms pursuant to which the Plan Administrator will perform its duties pursuant to this Plan.

*Plan Supplement* means any supplement or supplements to this Plan containing certain documents relevant to the implementation of this Plan, to be filed with the Bankruptcy Court no later than seven (7) calendar days before the Voting Deadline and in each case in form and substance acceptable in writing to the Administrative Agent (acting at the direction of the Required Lenders), which shall include (i) the Amended Organizational Documents of Post-

8

Effective Date KFM Parent, (ii) a list of Causes of Action to be retained by the Post-Effective Date KFM Debtors, (iii) the Plan Administrator Agreement; (iv) the Wind-Down Budget; and (v) a schedule of executory contracts or unexpired leases to be assumed by the KFM Debtors pursuant to this Plan; *provided*, *however*, that, through the Effective Date, the KFM Debtors, with the written consent of the Administrative Agent (acting at the direction of the Required Lenders), shall have the right to amend or supplement documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan.

>  ***Post-Effective Date KFM Parent*** means KFM Parent after the Effective Date.

>  ***Post-Effective Date KFM Debtor*** means a KFM Debtor after the Effective Date.

>  ***Prepetition AMH RBL Agent*** has the meaning set forth in the Initial Debtors/SRII Debtors Plan.

>  ***Prepetition AMH RBL Lenders*** has the meaning set forth in the Initial Debtors/SRII Debtors Plan.

>  ***Priority Tax Claim*** means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

>  ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

>  ***Professional Person*** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

>  ***Proof of Claim*** means a proof of Claim filed against any of the KFM Debtors in the Chapter 11 Cases.

>  ***Purchase Agreement*** means that certain Amended and Restated Purchase and Sale Agreement, dated January 17, 2020 (as the same may be amended, restated or amended and restated from time to time, including pursuant to (i) that certain First Amendment to Amended and Restated Purchase and Sale Agreement, dated April 2, 2020 and (ii) that certain Second Amendment to Amended and Restated Purchase and Sale Agreement, dated April 9, 2020), by and among the KFM Debtors, as sellers, and the Purchaser, as buyer, and AMH for the limited purpose of conveying the KFM ORRI, which was approved by the Bankruptcy Court pursuant to the Sale Order.

>  ***Purchaser*** means BCE-Mach III LLC, a Delaware limited liability company.

>  ***Purchaser Parties*** means (i) Bayou City Energy Management LLC; (ii) BCE-AMH Holdings, LLC; (iii) BCE-AMR Holdings LLC; (iv) BCE-MESA Holdings, LLC; (v) William W. McMullen; (vi) Mark Stoner; (vii) Andrew Koehler; (viii) Mach Resources LLC; (ix) BCE-Mach LLC; (x) BCE-Mach II LLC; and (xi) any Representative of a Person identified

9

in (i) through (x) above, and in the case of each of the Persons identified in clauses (i) through (x) above, in their applicable capacities with respect to the KFM Debtors or the Purchaser.

*Purchase Price* has the meaning set forth in the Purchase Agreement.

*Released Parties* means, collectively, (i) the KFM Debtors, (ii) the Administrative Agent, (iii) the Lenders, (iv) the Purchaser and Purchaser Parties, (v) the AMH Releasing Parties, and (vi) with respect to each of the foregoing Persons in clauses (i) through (iv), such Persons' Representatives; *provided*, *however*, that any Person that "opts out" of providing the releases set forth in Section 10.6(b) of this Plan on their ballot shall not be a Released Party. Notwithstanding the foregoing, Released Parties shall not include the Representatives of the KFM Debtors or the AMH Releasing Parties (y) if the Initial Debtors/SRII Debtors Plan does not include mutual releases of the other Released Parties by the AMH Releasing Parties in form and substance reasonably acceptable to the KFM Debtors and the Administrative Agent and (z) unless and until the Initial Debtors/SRII Debtors Plan Effective Date has occurred.

*Releasing Parties* means, collectively, in each case in its capacity as such: (i) the Administrative Agent and Lenders that do not "opt out" of the releases set forth in Section 10.6(b) of this Plan, (ii) all holders of Claims that vote to accept this Plan, (iii) all holders of Claims that are entitled to vote to accept or reject this Plan and that abstain from voting on this Plan or vote to reject this Plan but, in each case, do not "opt out" of the releases set forth in Section 10.6(b) of this Plan, (iv) all holders of Claims or Interests that are presumed to accept, or deemed to reject, this Plan and that do not "opt out" of the releases set forth in Section 10.6(b) of this Plan, and (v) the Released Parties.

*Representatives* means, with respect to a Person, such Person's current and former (i) equity holders, (ii) controlled subsidiaries, (iii) officers, (iv) directors, (v) managers, (vi) principals, (vii) members, (viii) employees, (ix) agents, (x) advisory board members, (xi) financial advisors, (xii) partners, (xiii) attorneys, (xiv) accountants, (xv) investment bankers, (xvi) consultants, (xvii) representatives, and (xviii) other professionals, each in their capacity as such, it being understood that Representatives of the Purchaser shall include the Purchaser Parties; *provided*, *however*, that under no circumstances shall Representatives include (a) KFM Holdco, LLC or (b) the equity holders of Initial Debtor Alta Mesa Resources, Inc.

*Required Lenders* has the meaning set forth in the Credit Agreement.

*Sale Order* means that certain *Order Pursuant to 11 U.S.C. §§ 105, 363, 365, 503, and 507 and Fed. R. Bankr. P. 2002, 6004, 6006, 9006, 9007, 9008, 9014, and 9019 (I) Authorizing (A) Sale of Substantially all of KFM Debtors' Assets Free and Clear of All Claims, Encumbrances, and Liabilities and (B) KFM Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 1016] entered by the Bankruptcy Court on January 24, 2020, as supplemented by that certain *Supplemental Order Authorizing KFM Debtors to Enter Into and Perform Under Modified PSA with BCE-Mach III* LLC [Docket No. 1513] entered by the Bankruptcy Court on April 8, 2020.

*Sale Proceeds* means the Purchase Price to the extent paid in Cash on or after the Closing Date, after taking into account adjustments and payment of certain costs and expenses pursuant to the terms of the Purchase Agreement and the Sale Order.

*Sale Transaction* means the sale of all or substantially all of the KFM Debtors' assets pursuant to the Purchase Agreement.

*Schedules* means the schedules of Assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests, and all amendments or supplements thereto filed by the KFM Debtors with the Bankruptcy Court.

*Secured Claim* means a Claim to the extent (i) secured by a Lien on property of a KFM Debtor's Estate, the amount of which is equal to or less than the value of such property (a) as set forth in this Plan, (b) as agreed to by the holder of such Claim and the KFM Debtors or Post-Effective Date KFM Debtors, as applicable, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

*SRII Debtors* means SRII Opco GP, LLC and SRII Opco, LP, as debtors and debtors in possession.

*Statutory Fees* means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Supplemental Bidding Procedures Order* means that certain *Order Pursuant to 11 U.S.C. §§ 105, 363, 365, 503, and 507 and Fed. R. Bankr. P. 2002, 6004, 6006, 9006, 9007, 9008, 9014, and 9019 (I) Ratifying and Approving Bidding Procedures, (II) Ratifying and Approving Stalking Horse Purchase Agreement, (II) Ratifying and Approving Assumption and Assignment Procedures, (IV) Ratifying and Approving Assignment Objection Procedures and Rights Objections Procedures, (V) Scheduling Auction and Sale Hearing, (VI) Ratifying and Approving Form and Manner of Notice Thereof, and (VII) Granting Related Relief, in Connection With Sale of All or a Portion of the KFM Assets* [Docket No. 861] entered by the Bankruptcy Court on January 14, 2020.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Voting Deadline* means May 20, 2020 at 5:00 p.m. prevailing Central Time, or such other date and time as may set by the Bankruptcy Court.

*Wind-Down Budget* means the four-week budget acceptable in writing to the Administrative Agent (acting at the direction of the Required Lenders) to govern the Wind-Down, which may be amended from time to time following the Effective Date to include

subsequent periods or otherwise in accordance with the Plan and with the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders).

   ***Wind-Down Reserve*** means a segregated account subject to the Liens of the Administrative Agent, as such Liens existed prior to the Effective Date, which shall be established on or prior to the Effective Date and funded with Cash in an estimated amount acceptable in writing to the Administrative Agent (acting at the direction of the Required Lenders) to fund the Wind-Down pursuant to Section 5.7 of this Plan, including fees and expenses owed to professionals for services rendered after the Effective Date and Statutory Fees; *provided*, *however*, that all Cash remaining in the Wind-Down Reserve after all relevant amounts have been paid and the Wind-Down is complete in accordance with the terms of this Plan shall be distributed to the Administrative Agent for the benefit of the Lenders in accordance with the terms of this Plan.

   ***Wind-Down*** means the process following the closing of the Sale Transaction and the Effective Date for making Distributions pursuant to the Plan; liquidating or abandoning any remaining Assets; pursuing, settling, or abandoning Causes of Action; and winding-down, dissolving, and liquidating the Estates.

   **1.2**  ***Interpretation; Application of Definitions; Rules of Construction.***

   Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

   **1.3**  ***Reference to Monetary Figures.***

   All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4     *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.   The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

### ARTICLE II          ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, PRIORITY TAX CLAIMS, AND ADEQUATE PROTECTION CLAIMS.

### 2.1     *Treatment of Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment or as otherwise provided in this Plan, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the KFM Debtors shall be paid by the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

On the Effective Date, subject to (i) the occurrence of the Initial Debtors/SRII Debtors Plan Effective Date and (ii) the inclusion in the Initial Debtors/SRII Debtors Plan of releases of the other Released Parties by the AMH Releasing Parties in the form and substance reasonably acceptable to the KFM Debtors and the Administrative Agent solely as such releases apply to the KFM Debtors and the other Released Parties, the AMH Administrative Expense Claim shall be Allowed in the amount of $100,000 and paid in full in Cash to the AMH Debtors as soon as reasonably practicable after satisfaction of such conditions.

### 2.2     *Treatment of Fee Claims.*

(a)     All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred on or after the KFM Petition Date through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or

before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.   Subject to the Wind-Down Budget, the KFM Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On the Effective Date, the KFM Debtors shall fund the Fee Reserve Account in an amount equal to the Professional Persons' good faith estimates of the Fee Claims, in each case acceptable in writing to the Administrative Agent.  Funds held in the Fee Reserve Account shall not be considered Cash Collateral, property of the KFM Debtors' Estates, or property of the Post-Effective Date KFM Debtors, but shall revert and be paid to the Administrative Agent, on behalf of the Lenders, only after all Allowed Fee Claims have been paid in full.  Funds in the Fee Reserve Account shall be held in trust for Professional Persons retained by the KFM Debtors and for no other parties until all Allowed Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which a Final Order relating to any such Allowed Fee Claim is entered or (ii) on such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable.   The Post-Effective Date KFM Debtors' obligations with respect to Allowed Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Reserve Account.  To the extent that funds held in the Fee Reserve Account are insufficient to satisfy the amount of Allowed Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of this Plan and such Professional Persons shall be entitled to all rights and protections provided for pursuant to the Cash Collateral Order.  No Liens, claims, or interests shall encumber the Fee Reserve Account in any way, other than customary liens in favor of the depository bank at which the Fee Reserve Account is maintained.

## 2.3     *Treatment of Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### 2.4 *Treatment of Adequate Protection Claims*.

Allowed Adequate Protection Claims are entitled to administrative expense priority status senior to all Administrative Expense Claims and secured by Adequate Protection Liens on all of the KFM Debtors' Assets, on the terms and conditions set forth in the Cash Collateral Order, subject only to Claims covered by the Carve-Out (as defined in the Cash Collateral Order). Allowed Adequate Protection Claims shall be indefeasibly paid in full in Cash on the Effective Date or as otherwise may be agreed to by the KFM Debtors and the Administrative Agent. The Confirmation Order shall contain findings and conclusions of law allowing the Adequate Protection Claims in an amount acceptable in writing to the Administrative Agent.

## ARTICLE III          CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1 *Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2 *Formation of KFM Debtor Groups for Convenience Only*.

This Plan groups the KFM Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making Distributions in respect of Claims against the KFM Debtors under this Plan. Such groupings shall not affect any KFM Debtor's status as a separate legal entity, change the organizational structure of the KFM Debtors' business enterprise, constitute a substantive consolidation of any of the KFM Debtors, constitute a change of control of any KFM Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under this Plan, all KFM Debtors shall continue to exist as separate legal entities.

### 3.3 *Summary of Classification of Claims and Interests*.

The following table designates the Classes of Claims against and Interests in the KFM Debtors and specifies which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject this Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each KFM Debtor.

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | Credit Agreement Claims | Impaired | Yes |
| Class 4 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| Class 5 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Intercompany Interests | Impaired | No (Deemed to reject) |

### 3.4 *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.6 *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each KFM Debtor, if a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims in such Class.

### 3.7 *Voting; Presumptions; Solicitation.*

(a) **Acceptance by Impaired Class.** Only holders of Claims in Class 3 are entitled to vote to accept or reject this Plan. Class 3 shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Credit Agreement Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Credit Agreement Claims actually voting in such Class have voted to accept this Plan.

(b) **Deemed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1, 2, and 5 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c) **Deemed Rejection by Certain Impaired Classes.** Holders of Claims in Class 4 and Interests in Class 6 are deemed to have rejected this Plan pursuant to section 1126(g)

16

of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject this Plan.

### 3.8 *Cramdown*.

If any Class is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the KFM Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.9 *No Waiver*.

Nothing contained in this Plan shall be construed to waive a KFM Debtor's or other Person's right to object on any basis to any Claim.

## ARTICLE IV        TREATMENT OF CLAIMS AND INTERESTS.

### 4.1 *Class 1:  Other Priority Claims*.

(a)     **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by this Plan. Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Priority Claim, at the option of the Post-Effective Date KFM Debtors with the written consent of the Administrative Agent (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(b)     **Impairment and Voting**:  Allowed Other Priority Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.2 *Class 2:  Other Secured Claims*.

(a)     **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by this Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim, at the option of the Post-Effective Date KFM Debtors with the written consent of the Administrative Agent (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any

17

interest required under section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b)    **Impairment and Voting**:    Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.3    *Class 3:  Credit Agreement Claims*.

(a)    **Allowance**:  The Credit Agreement Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $224,000,000, plus all interest, fees, costs, charges, and expenses due and owing pursuant to the terms of the Loan Documents as of the KFM Petition Date.

(b)    **Treatment**:

(i)    The Administrative Agent, on behalf of the Lenders, shall receive:

(1)    on the Effective Date, Excess Distributable Cash of at least $1,300,000, and at least quarterly thereafter, additional distributions of Excess Distributable Cash, up to an amount necessary to satisfy the Credit Agreement Claims in full;

(2)    immediately following the conclusion of the Wind Down pursuant to the Wind-Down Budget, and in any event not later than four months following the Effective Date (or such other date agreed to between the Plan Administrator and the Administrative Agent), to the extent such Credit Agreement Claims have not been satisfied in full under the foregoing subsection (i), the Excess Reserve Amounts, up to satisfaction in full of the Credit Agreement Claims; and

(3)    to the extent there comes to exist any interest of the Post-Effective Date KFM Debtors in any Cash or other property following the indefeasible payment to the Administrative Agent under the foregoing subsections (i) and (ii), such amounts up to satisfaction in full of the Credit Agreement Claims.

(ii)    Each Lender (or an affiliate or other recipient designated by such Lender) shall receive an undivided interest in and to the KFM ORRI in a percentage (carried out to the ninth decimal place) equal to the quotient of the aggregate outstanding Credit Agreement Loans owed to such Lender divided by the aggregate Credit Agreement Loans owed to all Lenders under the Credit Agreement (such percentage with respect to any Lender, the "***Lender's***

18

*Percentage*"), which undivided interest shall be transferred and distributed in accordance with section 5.12 of this Plan.

(c)     **Impairment and Voting**:   Credit Agreement Claims are Impaired. Holders of Credit Agreement Claims are entitled to vote to accept or reject this Plan.

### 4.4     *Class 4:  General Unsecured Claims.*

(a)     **Treatment**:  Holders of Allowed General Unsecured Claims shall not receive any Distribution under this Plan.

(b)     **Impairment and Voting**:   Allowed General Unsecured Claims are Impaired and are not projected to receive any Distribution under this Plan.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed General Unsecured Claims.

### 4.5     *Class 5:  Intercompany Claims.*

(a)     **Treatment**:  On or after the Effective Date, all Allowed Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the KFM Debtors or Post-Effective Date KFM Debtors, as applicable, with the written consent of the Administrative Agent.

(b)     **Impairment and Voting**:   Allowed Intercompany Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.6     *Class 6:  Intercompany Interests.*

(a)     **Treatment**:  On and after the Effective Date, subject to the Administrative Agent's prior written consent, all Intercompany Interests shall be cancelled when the applicable Post-Effective Date KFM Debtor is dissolved or merged out of existence in accordance with the Wind-Down.

(b)     **Impairment and Voting**:  Allowed Intercompany Interests are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, the holders of Intercompany Interests are conclusively deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

**ARTICLE V            MEANS FOR IMPLEMENTATION.**

      **5.1**     *__Joint Chapter 11 Plan; Severability__.*

      This Plan is a joint chapter 11 plan for each of the KFM Debtors. Notwithstanding the combination of separate plans for the KFM Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each KFM Debtor. Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more KFM Debtors, it may still confirm this Plan with respect to any other KFM Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

      **5.2**     *__Plan Administrator__.*

      (a)     <u>Appointment</u>. Marc Beilinson shall be appointed and serve as Plan Administrator for each of the Post-Effective Date KFM Debtors as of the Effective Date.

      (b)     <u>Authority</u>. Subject to Section 5.7 of this Plan, upon the Effective Date, the Plan Administrator shall have the authority and right on behalf of each KFM Debtor, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of this Plan, including to:

      (i)     subject to Article VII of this Plan and Bankruptcy Court approval when necessary, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise, or settle any and all Claims against the KFM Debtors (other than the Credit Agreement Claims); *provided*, *however*, that, for the avoidance of doubt, nothing in this subsection (i) shall modify any rights of the Administrative Agent or Lenders to object to any Claims on their own behalf in accordance with the Bankruptcy Code and Bankruptcy Rules;

      (ii)     make Distributions to holders of Allowed Claims in accordance with this Plan;

      (iii)     take any action necessary or desirable in connection with the distribution and transfer and assignment of the KFM ORRI pursuant to Sections 4.3(b)(ii) and 5.12 of this Plan, including by executing, delivering, filing, or recording any documents, contracts, instruments of assignment or conveyance, or other agreements in connection therewith;

      (iv)     subject to the Wind-Down Budget, exercise its reasonable business judgment to direct and control the Wind-Down under this Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(v)  prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(vi)  with the written consent of the Administrative Agent (acting at the direction of the Required Lenders) and subject to Bankruptcy Court approval when necessary, prosecute all Causes of Action on behalf of the KFM Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the KFM Debtors and their Estates;

(vii)  subject to the Wind-Down Budget, retain and compensate professionals to assist in performing its duties under this Plan;

(viii)  subject to the Wind-Down Budget, make payments on account of Fee Claims and any other payments to Professional Persons (consistent with the terms of any Bankruptcy Court order approving such retention and subject to any applicable Bankruptcy Court approval requirements), as well as other professionals who may be engaged after the Effective Date;

(ix)  maintain the books and records and accounts of the KFM Debtors (in good faith consultation with the Administrative Agent);

(x)  invest Cash of the KFM Debtors, including any Cash proceeds realized from the liquidation of any Assets, including any Causes of Action, and any income earned thereon;

(xi)  subject to the Wind-Down Budget, incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan;

(xii)  administer each KFM Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each KFM Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such KFM Debtor ending after the KFM Petition Date through the liquidation of such KFM Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each KFM Debtor or its estate before any taxing authority in all matters including any action, suit, proceeding, or audit;

(xiii)  prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the KFM Debtors that

21

are required hereunder, by any Governmental Unit or applicable law;

(xiv)    consult with and update the Administrative Agent when reasonably requested, including with respect to Claims and the Claims reconciliation process, Causes of Action, the Wind-Down, and other actions relating to implementation of the Plan and provide an accounting to the Administrative Agent of all post-Effective receipts and disbursements on a monthly basis or such other frequency as agreed to between the Plan Administrator and Administrative Agent;

(xv)    pay Statutory Fees in accordance with Section 12.2 of this Plan;

(xvi)    close the Chapter 11 Cases; and

(xvii)    perform other duties and functions that are consistent with the implementation of this Plan.

(c)    <u>Indemnification</u>.  Subject to the Wind-Down Budget, each of the KFM Debtors shall indemnify and hold harmless the Plan Administrator for any losses incurred in such capacity, except to the extent such losses are determined by Final Order to be the result of the Plan Administrator's intentional fraud, criminal conduct, or willful misconduct.

(d)    <u>Removal/Resignation/Replacement</u>.  The Administrative Agent (acting at the direction of the Required Lenders) may replace or remove the Plan Administrator at any time in its discretion.  If the Plan Administrator resigns or is otherwise removed, the Administrative Agent may select a replacement Plan Administrator who shall be appointed effective upon such selection.

### 5.3    *Corporate Action*.

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, subject to Bankruptcy Court approval to the extent necessary, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the KFM Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the KFM Debtors, and any corporate action required by the KFM Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the KFM Debtors or the Estates.

### 5.4    *Effectuating Documents; Further Transactions*.

On and after the Effective Date, subject to Bankruptcy Court approval to the extent necessary, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and

take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan in the name of and on behalf of the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

### 5.5    *Preservation of Rights of Action.*

Other than Causes of Action against a Person that are waived, relinquished, exculpated, released, compromised, or settled in this Plan, the Confirmation Order, or by another Bankruptcy Court order (including the Sale Order) or transferred to the Purchaser pursuant to the Purchase Agreement, the KFM Debtors reserve any and all Causes of Action, which on the Effective Date shall vest in the Post-Effective Date KFM Debtors.  No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the KFM Debtors, the Post-Effective Date KFM Debtors, or the Plan Administrator will not pursue any and all available Causes of Action against them.  Subject to the written consent of the Administrative Agent, on and after the Effective Date, the Plan Administrator, shall have, including through its authorized agents or representatives, the exclusive right and authority to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Plan Administrator may determine is in the best interests of the KFM Debtors and their Estates without further notice to or action, order, or approval of the Bankruptcy Court.

### 5.6    *Corporate Governance.*

(a)    <u>Corporate Form</u>.  On the Effective Date, each of the KFM Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator in accordance with the terms of this Plan and applicable law.

(b)    <u>Board of Managers and Officers</u>.  The Plan Administrator shall serve as the sole officer and manager of each Post-Effective Date KFM Debtor after the Effective Date. The Plan Administrator may also elect such additional managers(s) and officer(s) of each Post-Effective Date KFM Debtor as the Plan Administrator deems necessary to implement this Plan and the actions contemplated herein.  The Plan Administrator shall also have the power to act by written consent to remove any officer or manager of any Post-Effective Date KFM Debtor at any time with or without cause.

(c)    <u>Corporate Existence</u>.  After the Effective Date, the Plan Administrator shall, subject to the Administrative Agent's prior written consent and consistent with applicable non-bankruptcy law and consistent with the implementation of this Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Post-Effective Date KFM Debtor (including the cancellation of all Interests in a Post-Effective Date KFM Debtor) and complete the winding up of such Post-Effective Date KFM Debtor as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Post-Effective Date KFM Debtor or its members or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit; provided,

however, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Post-Effective Date KFM Debtor. The Plan Administrator may, subject to the Administrative Agent's prior written consent and to the extent required by applicable non-bankruptcy law, maintain a Post-Effective Date KFM Debtor as a corporate entity in good standing until such time as such Post-Effective Date KFM Debtor is dissolved or merged out of existence in accordance with Section 5.7 of this Plan.

(d)     <u>Certificate of Formation and Limited Liability Agreements</u>.  As of the Effective Date, the certificate of incorporation, certificate of formation, operating agreement, by-laws, and any other organizational document, of the KFM Debtors shall, with the consent of the Administrative Agent, be amended to the extent necessary to carry out provisions of this Plan.

### 5.7     *<u>Wind-Down</u>*.

(a)     After the Effective Date, pursuant to this Plan, the Wind-Down Budget, and subject to the reasonable discretion of the Plan Administrator, the Plan Administrator shall, in an expeditious but orderly manner, implement the Wind-Down with respect to each Post-Effective Date KFM Debtor pursuant to the Wind-Down Budget, and shall not unreasonably and unduly prolong the duration of the Wind-Down.

(b)     <u>Wind-Down Reserve</u>.  On the Effective Date, the KFM Debtors shall fund the Wind-Down Reserve in accordance with the Wind-Down Budget and in an amount acceptable to the Administrative Agent (acting at the direction of the Required Lenders). The Cash in the Wind-Down Reserve shall be property of the Post-Effective Date KFM Debtors but shall remain subject to the Liens of the Administrative Agent. The Plan Administrator may use the funds in the Wind-Down Reserve to fund the Wind-Down and expenses of the Post-Effective Date KFM Debtors in accordance with the Wind-Down Budget. Any funds remaining in the Wind-Down Reserve after the Post-Effective Date KFM Debtors have completed the activities described in Section 5.7(a) of this Plan shall be Excess Reserve Amounts distributed in accordance with the terms of this Plan. The Plan Administrator shall not use Cash other than as set forth in the Wind-Down Budget. The initial Wind-Down Budget shall be included in the Plan Supplement and shall cover the period beginning on the Effective Date and ending on fourth Friday thereafter. By no later than 5:00 p.m. (prevailing Central Time) on the second Friday following the Effective Date, and every four weeks thereafter, the Plan Administrator shall provide the Administrative Agent a proposed Wind-Down Budget for the next four-week period. The Administrative Agent (acting at the direction of the Required Lenders) may determine whether to approve the proposed Wind-Down Budget and to extend the Wind-Down Budget in its sole and absolute discretion.

(c)     On or after the Effective Date, the Post-Effective Date KFM Debtors or Plan Administrator may, subject to the terms of this Plan and the Amended Organizational Documents, (i) cause any or all of the Post-Effective Date KFM Debtors to be merged into one or more of the Post-Effective Date KFM Debtors, dissolved, or otherwise consolidated, (ii) cause the transfer of Assets between or among the Post-Effective Date KFM Debtors, and (iii) engage in any other transaction in furtherance of this Plan.

24

### 5.8    *Establishment of Claims Reserve.*

On the Effective Date, the KFM Debtors shall establish and fund the Claims Reserve from Distributable Cash.  The Claims Reserve shall be used to pay Allowed Administrative Expense Claims (including Fee Claims), Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims (to the extent such Claims do not receive other treatment that leaves such Claims Unimpaired) in accordance with the terms of this Plan.  Any amounts remaining in the Claims Reserve after satisfaction of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims and shall constitute Excess Reserve Amounts and be distributed in accordance with this Plan.

### 5.9    *Establishment of Fee Reserve Account.*

On the Effective Date, the KFM Debtors shall fund the Fee Reserve Account from Distributable Cash.  The Fee Reserve Account shall be used to pay Allowed Fee Claims in accordance with the terms of this Plan.  Any amounts remaining in the Fee Reserve Account after satisfaction of all Allowed Fee Claims shall constitute Excess Reserve Amounts and be distributed in accordance with this Plan.

### 5.10    *KFM/AMH Settlement.*

Pursuant to sections 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to this Plan, including on account of the Allowed AMH Administrative Expense Claim and the releases contained in this Plan and in the Initial Debtors/SRII Debtors Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and other rights that an Initial Debtor or SRII Debtor may have with respect to any Claim against the KFM Debtors, and any contractual, legal and other rights that a KFM Debtor may have with respect to any claim against the Initial Debtors or SRII Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the KFM Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.  Allowance of the AMH Administrative Expense Claim on the Effective Date pursuant to Section 2.1 of this Plan is subject to the occurrence of the Initial Debtors/SRII Debtors Plan Effective Date and the inclusion in the Initial Debtors/SRII Debtors Plan of releases of the other Released Parties by the AMH Releasing Parties in form and substance reasonably acceptable to the KFM Debtors and the Administrative Agent.  Allowance of the AMH Administrative Expense Claim pursuant to this Plan is in exchange for the releases provided by (i) the AMH Releasing Parties, and (ii) the Purchaser Parties and the Representatives of the Purchaser Parties in favor of (w) the KFM Debtors, (x) the Administrative Agent, (y) the Lenders, and (z) each of their Representatives, including without limitation the release of any challenge to the Administrative Agent's liens and the agreement not to object to this Plan.

### 5.11   *Excess Cash*.

In the event that all Credit Agreement Claims are indefeasibly paid in full in Cash and excess Cash remains with the Post-Effective Date KFM Debtors after paying all costs of the Wind-Down, Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, each holder of an Allowed General Unsecured Claim shall be entitled to receive payment in Cash of such holder's Pro Rata share of the balance of the Post-Effective Date KFM Debtors' Cash as of such time.

### 5.12   *KFM ORRI*.

The Administrative Agent (acting at the direction of the Required Lenders) shall have sole authority to determine the means for distribution and transfer and assignment of each Lender's Percentage of the KFM ORRI to each Lender (or its affiliate or other designated recipient) pursuant to this Plan, including with respect to when any such distribution, transfer and/or assignment shall occur; *provided*, that each Lender shall have the sole discretion to designate any Person or entity to act as its assignee or designee of each such Lender's Percentage of the KFM ORRI, and may take any action necessary or desirable with respect to such transfer and assignment, including without limitation establishing one or more separate Persons to take assignment of the same.  The KFM Debtors and the Plan Administrator shall take all actions as may be requested by the Administrative Agent (acting at the direction of the Required Lenders) to effectuate or consummate the distribution and transfer and assignment of the KFM ORRI to the Lenders by the Plan Administrator and the KFM Debtors.

## ARTICLE VI        DISTRIBUTIONS.

### 6.1   *Distributions Generally*.

The Plan Administrator shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan.  All Distributions made to the Administrative Agent under this Plan shall be deemed to be indefeasible payments to the Administrative Agent and none of the KFM Debtors, the Post-Effective Date KFM Debtors, the Plan Administrator, any holders of Claims or Interests, or any other Entity shall have any Cause of Action or other recourse against the Administrative Agent to recover to such Distributions or otherwise.

### 6.2   *Postpetition Interest and Penalties on Claims*.

Except as otherwise provided in this Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the KFM Petition Date or penalties on any Claim.

### 6.3   *Date of Distributions*.

(a)      Except as otherwise provided in this Plan, the Plan Administrator shall make the Initial Distribution to holders of Allowed Claims after establishment of the Wind-Down Reserve, funding of the Fee Reserve Account, and satisfaction in full or establishment of

reserves sufficient to pay claims in the Claims Reserve, no later than the Initial Distribution Date and thereafter, the Plan Administrator shall from time to time determine the subsequent Distribution Dates.

(b)      Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is payable in accordance with this Plan and the Bankruptcy Code.

### 6.4     *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the claims register shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims.  The Post-Effective Date KFM Debtors and the Plan Administrator shall have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date.

### 6.5     *Distributions After Effective Date.*

Distributions, if any, made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6     *Undelivered or Unclaimed Distributions.*

In the event that any Distribution to any holder is returned as undeliverable, no Distribution to such holder shall be made unless and until the Post-Effective Date KFM Debtors or the Plan Administrator, as applicable, using commercially reasonable efforts, has determined the then current address of such holder, at which time such Distribution shall be made to such holder without interest; *provided*, *however*, that, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the applicable Distribution Date is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Post-Effective Date KFM Debtors automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with this Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### 6.7     *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Plan Administrator or the Post-Effective Date KFM Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the KFM Debtors.

### 6.8     *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Plan Administrator shall make all Distributions to any holder of an Allowed Claim as and when required by this Plan at (i) the

address of such holder on the books and records of the KFM Debtors or their agents or (ii) at the address in any written notice of address change delivered to the KFM Debtors or the Plan Administrator, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any Distribution to any holder is returned as undeliverable, no Distribution or payment to such holder shall be made unless and until the Plan Administrator has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such Distribution shall be made to such holder without interest.

### 6.9     *Disbursing Agent*.

All Distributions under this Plan shall be made by the Plan Administrator on and after the Effective Date as provided herein.  The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties.  The Post-Effective Date KFM Debtors shall use commercially reasonable efforts to provide the Plan Administrator with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the KFM Debtors' or Post-Effective Date KFM Debtors' books and records.  The Post-Effective Date KFM Debtors shall cooperate in good faith with the Plan Administrator to comply with the reporting and withholding requirements outlined in Section 6.14 of this Plan.

### 6.10    *No Distribution in Excess of Amount of Allowed Claim*.

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of this Plan).

### 6.11    *Allocation of Distributions Between Principal and Interest*.

Except as otherwise provided in this Plan and subject to Section 6.2 of this Plan or as otherwise required by law, Distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any; provided, however, that this Section 6.11 shall not apply to Distributions to the Administrative Agent or the Lenders on account of Allowed Credit Agreement Claims.

### 6.12    *Minimum Cash Distributions*.

The Plan Administrator shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash in an amount less than one-hundred dollars ($100); *provided, however*, that if any Distribution is not made pursuant to this Section 6.12, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.  The Plan Administrator shall not be required to make any final Distributions of Cash in an amount less than fifty dollars ($50) to any holder of an Allowed Claim.  If the amount of any final Distributions to holders of Allowed Claims would be fifty dollars ($50) or less, then no further Distribution shall be made by the Plan Administrator and any surplus Cash shall be donated and distributed to a Tax Code § 501(c)(3) tax-exempt organization selected by the Plan Administrator.

### 6.13    *Setoffs and Recoupments*.

The Plan Administrator may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off or recoup against any Allowed Claim and the Distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Post-Effective Date KFM Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided*, *however*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Effective Date KFM Debtor or its successor of any claims, rights, or Causes of Action that a Post-Effective Date KFM Debtor or its successor or assign may possess against the holder of such Claim.

### 6.14    *Withholding and Reporting Requirements*.

(a)    Withholding Rights.  In connection with this Plan, any party issuing any instrument or making any Distribution described in this Plan shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all Distributions pursuant to this Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Distribution pursuant to this Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to this Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    Forms. Any party entitled to receive any property as an issuance or Distribution under this Plan shall, upon request, deliver to the Plan Administrator or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Plan Administrator or such other Person any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a non-U.S. Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Plan Administrator or such other Person.  If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the KFM Debtors and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against any KFM Debtor and its respective property.

### 6.15    *Claims Paid by Third Parties*.

The Plan Administrator shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the KFM Debtors or the Post-Effective Date KFM Debtors.  If a holder of a Claim receives a Distribution from the KFM Debtors or the Post-Effective Date KFM Debtors on account of such Claim and also receives payment from a third party on account of such Claim, such holder shall, within fourteen

(14) days of receipt thereof, repay or return the Distribution to the KFM Debtors or the Post-Effective Date KFM Debtors, to the extent the holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total Allowed amount of such Claim as of the date of any such Distribution under this Plan.  The failure of such holder to timely repay or return such Distribution shall result in the holder owing the Post-Effective Date KFM Debtor interest on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

### 6.16   *Claims Payable by Third Parties.*

Except for with respect to Credit Agreement Claims, no Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the insurance policies to which the KFM Debtors' are a beneficiary until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; *provided*, *however*, that this Section 6.16 shall not restrict Distributions on an Allowed Claim that is Allowed in an amount that does not exceed an applicable self-insured retention or deductible amount under one or more such insurance policies.  To the extent that one or more of the insurers agrees to satisfy a Claim in whole or in part, then immediately upon such insurers' satisfaction, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims register by the Plan Administrator without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VII        PROCEDURES FOR RESOLVING CLAIMS.

### 7.1   *Allowance of Claims.*

After the Effective Date, the Post-Effective Date KFM Debtors and the Plan Administrator shall have and shall retain any and all rights and defenses that the KFM Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.

### 7.2   *Objections to Claims.*

As of the Effective Date, objections to Claims against the KFM Debtors may be interposed and prosecuted only by the Plan Administrator or the Administrative Agent at its election; *provided, however*, that objections to General Unsecured Claims may not be interposed or prosecuted by the Plan Administrator until after all Credit Agreement Claims have been indefeasibly paid in full in Cash under this Plan or the Administrative Agent otherwise consents.  For the avoidance of doubt, nothing in this Section 7.2 shall modify any rights of the Administrative Agent or Lenders to object to any Claims on their own behalf in accordance with the Bankruptcy Code and Bankruptcy Rules.  Any objections to Claims other than General Unsecured Claims shall be served and filed (i) on or before the ninetieth (90th) day following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a

Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim or (ii) such later date as ordered by the Bankruptcy Court upon motion filed by the Post-Effective Date KFM Debtors or the Plan Administrator with the written consent of the Administrative Agent. The Plan Administrator may seek Bankruptcy Court approval of procedures to govern objections to General Unsecured Claims only after all Credit Agreement Claims have been indefeasibly paid in full in Cash under this Plan.

### 7.3 *Estimation of Claims*.

The Plan Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim that is not a General Unsecured Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the KFM Debtors or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any such Claim at any time during litigation concerning any objection to any such Claim, including, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any such contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the KFM Debtors or Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.

The Plan Administrator may at any time after all Credit Agreement Claims have been indefeasibly paid in full in Cash under this Plan request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim that is a General Unsecured Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the KFM Debtors or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any such Claim at any time during litigation concerning any objection to any such Claim, including, during the pendency of any appeal relating to any such objection; *provided, however*, that requests for estimation of General Unsecured Claims may not be interposed or prosecuted by the Plan Administrator unless the Administrative Agent consents. In the event that the Bankruptcy Court estimates any such contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the KFM Debtors or Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.

### 7.4 *Resolution of Claims*.

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another. Except as otherwise provided in this Plan, the Confirmation Order or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator, subject to the written consent of the Administrative Agent, shall retain and may enforce, sue on, settle, resolve, withdraw, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes

of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the KFM Debtors or their Estates may hold against any Person, without the approval of the Bankruptcy Court.   Subject to the written consent of the Administrative Agent, the Plan Administrator or its successor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the KFM Debtors.

> ### 7.5    *No Distributions Pending Allowance*.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or Distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

> ### 7.6    *Distributions After Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan.   On a date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Administrator in the Plan Administrator's sole discretion, the Plan Administrator shall provide to the holder of such Claim the Distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## ARTICLE VIII    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

> ### 8.1    *Rejection of Executory Contracts and Unexpired Leases*.

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the KFM Debtors are a party shall be deemed rejected except for an executory contract and unexpired lease that: (i) is specifically designated as a contract or lease to be assumed by the KFM Debtors pursuant to this Plan, including as set forth in the Plan Supplement; (ii) was previously assumed or rejected by the KFM Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to the 365 Schedule; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the KFM Debtors on or before the Confirmation Date; or (v) is the subject of a pending Cure Dispute.

(b)    Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.   Each executory contract or unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Post-Effective Date KFM Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law. For the avoidance of doubt, all executory contracts and unexpired leases assumed and assigned pursuant to the Purchase Agreement and Sale Order shall be assumed in accordance with the terms thereof, including with respect to the notice and cure process contemplated thereby, and assigned to Purchaser in accordance with the terms thereof.

(c)     Assumption of any executory contract or unexpired lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the Effective Date.

### 8.2     *KFM Debtors' Indemnification Obligations.*

Any obligations of the KFM Debtors pursuant to their certificates of formation, limited liability company agreements, or other organizational documents and agreements to indemnify current and former officers, managers, members, agents, or employees with respect to all present and future actions, suits, and proceedings against the KFM Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the KFM Debtors shall be subject to the same treatment as General Unsecured Claims under this Plan, *provided*, *however*, that nothing in this Section 8.2 of this Plan shall increase the priority of any Claims arising from the foregoing.  All such obligations shall be deemed and treated as executory contracts to be rejected under this Plan unless such obligation previously was assumed and assigned to the Purchaser.

### 8.3     *Rejection Damages Claims.*

Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the KFM Debtors' executory contracts or unexpired leases pursuant to this Plan or otherwise, must be filed with Bankruptcy Court and served on Kingfisher Claims Processing Center, c/o Prime Clerk LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 no later than twenty-one (21) days after the Confirmation Date.

Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any Distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the KFM Debtors, the Post-Effective Date KFM Debtors, the KFM Debtors' Estates, or the property for any of the foregoing without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the KFM Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

### 8.4     *Insurance Policies.*

All insurance policies to which any KFM Debtor is a beneficiary as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by

the applicable KFM Debtor and shall continue in full force and effect thereafter in accordance with their respective terms and vest in the Post-Effective Date KFM Debtors.

## 8.5     *Purchase Agreement*.

The KFM Debtors' assumption or rejection of any executory contract or unexpired lease pursuant to this Plan shall be subject in all respects to the Purchaser's rights and obligations, including any cure obligations assumed by the Purchaser, in accordance with the Purchase Agreement and Sale Order.

## 8.6     *Reservation of Rights*.

(a)     Neither the exclusion nor the inclusion by the KFM Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the KFM Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the KFM Debtors or the Post-Effective Date KFM Debtors or their respective affiliates has any liability thereunder.

(b)     Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the KFM Debtors or the Post-Effective Date KFM Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the KFM Debtors or the Post-Effective Date KFM Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the KFM Debtors or Post-Effective Date KFM Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE IX     CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 9.1     *Conditions Precedent to Effective Date*.

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)     the Bankruptcy Court has entered the Confirmation Order and such Confirmation Order is a Final Order; and

(b)     all actions, documents, and agreements necessary to implement and consummate this Plan shall have been effected or executed and shall have become binding on all parties thereto.

### 9.2 *Waiver of Conditions Precedent*.

(a)     The conditions precedent to the occurrence of the Effective Date set forth in Section 9.1(b) may be waived by the KFM Debtors and the Administrative Agent, without leave of or order of the Bankruptcy Court.  If this Plan is confirmed for fewer than all of the KFM Debtors, only the conditions applicable to the KFM Debtor or KFM Debtors for which this Plan is confirmed must be satisfied or waived by the KFM Debtors and the Administrative Agent for the Effective Date to occur.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.3 *Effect of Failure of a Condition*.

If the conditions listed in Section 9.1 of this Plan are not satisfied or waived by the KFM Debtors and the Administrative Agent in accordance with Section 9.2 of this Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date set forth by the KFM Debtors with the written consent of the Administrative Agent in a notice filed with the Bankruptcy Court prior to the expiration of such period, the KFM Debtors may, with the written consent of the Administrative Agent, deem this Plan null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the KFM Debtors, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the KFM Debtors or any other Person.

## ARTICLE X        EFFECT OF CONFIRMATION.

### 10.1 *Binding Effect*.

On and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any KFM Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.

### 10.2 *Vesting of Assets*.

Except as otherwise provided in this Plan, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the KFM Debtors under or in connection with this Plan, shall vest in each respective Post-Effective Date KFM Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  Subject to the terms

of this Plan, on and after the Effective Date, the Post-Effective Date KFM Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.

### 10.3     *Pre-Confirmation Injunctions and Stays*.

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.4     *Injunction against Interference with Plan*.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest (other than the Administrative Agent as set forth in this Plan), along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.5     *Plan Injunction*.

(a)     Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims against or Interests in any or all of the KFM Debtors and other parties in interest, along with their respective Representatives, are permanently enjoined from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a KFM Debtor, a Post-Effective Date KFM Debtor, an Estate, or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a KFM Debtor, a Post-Effective Date KFM Debtor, an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a KFM Debtor, a Post-Effective Date KFM Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor, (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan, to the full extent permitted by applicable law, and (v) commencing or

continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan.

(b)     By accepting Distributions pursuant to this Plan, each holder of an Allowed Claim shall be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in Section 10.5 of this Plan.

### 10.6    *Releases*.

(a)     **Releases by KFM Debtors.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the KFM Debtors, the Post-Effective Date KFM Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the KFM Debtors, the Post-Effective Date KFM Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the KFM Debtors, the Post-Effective Date KFM Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the KFM Debtors, the KFM Debtors' capital structure, the Post-Effective Date KFM Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the KFM Debtors or the Post-Effective Date KFM Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the KFM Debtors' in or out-of-court restructuring and recapitalization efforts, including in connection with Alta Mesa Resources, Inc.'s business combination transaction that was consummated on or around February 9, 2018, intercompany transactions between or among a KFM Debtor and another KFM Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Purchase Agreement, the Supplemental Bidding Procedures Order, the Sale Transaction, the Sale Order, the Disclosure Statement, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, or any other act or omission.**

(b)     **Releases by Holders of Claims or Interests.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this**

**Plan, and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the KFM Debtors, the Post-Effective Date KFM Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the KFM Debtors, the KFM Debtors' capital structure, the Post-Effective Date KFM Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the KFM Debtors or the Post-Effective Date KFM Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the KFM Debtors' in or out-of-court restructuring and recapitalization efforts, including in connection with Alta Mesa Resources, Inc.'s business combination transaction that was consummated on or around February 9, 2018, intercompany transactions between or among a KFM Debtor and another KFM Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Purchase Agreement, the Supplemental Bidding Procedures Order, the Sale Transaction, the Sale Order, the Disclosure Statement, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, or any other act or omission.**

Notwithstanding anything to the contrary in the foregoing, the releases set forth above (i) do not release any post-Effective Date obligations of any Person under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan, and (ii) do not modify any settlements between and among the Lenders and the Administrative Agent.

### 10.7    *Exculpation.*

**To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of confirmation and consummation of this Plan, making Distributions, implementing the Wind Down, the Disclosure Statement, the Sale Transaction, the Purchase Agreement, the Sale Order, or**

the solicitation of votes for, or confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the KFM Debtors or the Post-Effective Date KFM Debtors; or the transactions in furtherance of any of the foregoing; other than (i) Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations under the Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on this Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or Distributions made pursuant to this Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

### 10.8    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

### 10.9    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the KFM Debtors reserve the right to reclassify any Allowed Claim or Interest (other than the Credit Agreement Claims) in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.10   *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in this Plan, including in Sections 10.5, 10.6, 10.7, and 10.8, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the KFM Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the

Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action.  The Post-Effective Date KFM Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the KFM Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**ARTICLE XI**        **RETENTION OF JURISDICTION.**

> **11.1**   ***Retention of Jurisdiction.***

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, including any pending adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Code 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that Distributions to holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to Distributions under this Plan;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court,

including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      to hear and determine all Fee Claims;

(j)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Purchase Agreement, the Sale Order, the Confirmation Order, or any transactions or payments in furtherance thereof, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)      to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan;

(m)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)      to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)      to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(q)      to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Sale Order, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(r)      to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of this Plan, including,  the releases, discharge, exculpations, and injunctions issued thereunder;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the KFM Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(t)      to recover all Assets of the KFM Debtors and property of the Estates, wherever located; and

(u)      to enter a final decree closing each of the Chapter 11 Cases.

**ARTICLE XII          MISCELLANEOUS PROVISIONS.**

### 12.1     *Bar Dates for Certain Claims*.

The Confirmation Order shall set the Bar Date for Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims as the date that is thirty (30) days after the Effective Date, which is the last date by which any Person must have filed a Proof of Claim (with respect to Priority Tax Claims, Other Priority Claims, and Other Secured Claims) or an application for allowance of Administrative Expense Claims incurred prior to the Effective Date against any KFM Debtor or be forever barred from asserting such Claim, *provided*, *however*, that the Initial Debtors shall not be required to file an application for allowance with respect to the AMH Administrative Expense Claim.   Notwithstanding the foregoing, holders of Administrative Expense Claims that are based on liabilities incurred in the ordinary course of the applicable KFM Debtors' businesses (other than Claims of Governmental Units for taxes and for interest and/or penalties related to such taxes) in an amount less than $20,000 shall not be required to file any request for payment of such Administrative Expense Claims.  Such Administrative Expense Claims, unless objected to by the KFM Debtors, the Post-Effective Date KFM Debtors, or the Plan Administrator, shall be paid by the Post-Effective Date KFM Debtors, in Cash, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim.    For the avoidance of doubt, holders of Administrative Expense Claims pursuant to section 503(b)(9) of the Bankruptcy Code shall be required to file a proof of Administrative Expense Claim on or before the Bar Date for Administrative Expense Claims.  Payment by the Post-Effective Date KFM Debtors or the Plan Administrator, as applicable, of Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims shall be subject to the applicable Bar Date.

### 12.2     *Payment of Statutory Fees*.

On the Effective Date and thereafter as may be required, the KFM Debtors (prior to the Effective Date) or the Post-Effective Date KFM Debtors (after the Effective Date) shall pay all Statutory Fees, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each KFM Debtor's case.  The obligations under this Section 12.2 shall remain for each KFM Debtor until such time as a final decree is entered closing the Chapter 11 Case for such KFM Debtor, a Final Order converting such KFM Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such KFM Debtor's Chapter 11 Case is entered.

### 12.3     *Exemption from Certain Transfer Taxes*.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any KFM Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the KFM Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or

42

other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any stamp tax, or similar tax, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.4  *Request for Expedited Determination of Taxes.*

The KFM Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the KFM Petition Date through the Effective Date.

### 12.5  *Dates of Actions to Implement Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.6  *Plan Modifications.*

This Plan may be amended, modified, or supplemented by the KFM Debtors with the written consent of the Administrative Agent (acting at the direction of the Required Lenders) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, subject to the written consent of the Administrative Agent (acting at the direction of the Required Lenders), the KFM Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan.

### 12.7  *Revocation or Withdrawal of Plan.*

The KFM Debtors reserve the right, subject to the acceptance of the Administrative Agent, to revoke or withdraw this Plan prior to the Effective Date as to any or all of the KFM Debtors.  If, with respect to a KFM Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such KFM Debtor does not occur on the Effective Date, then, with respect to such KFM Debtor (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such KFM Debtor or any other Person, (b) prejudice in any manner the rights of such KFM Debtor or any other Person, or (c) constitute an admission of any sort by any KFM Debtor or any other Person.

**12.8** *Severability*.

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the KFM Debtors with the written consent of the Administrative Agent, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this section, is (i) valid and enforceable pursuant to its terms, (ii) integral to this Plan and may not be deleted or modified without the consent of the KFM Debtors or the Post-Effective Date KFM Debtors (as the case may be), and (iii) nonseverable and mutually dependent.

**12.9** *Governing Law*.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that any corporate governance matters relating to the KFM Debtors shall be governed by the laws of the jurisdiction of formation of the applicable KFM Debtor.

**12.10** *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the KFM Debtors, the Post-Effective Date KFM Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including the Plan Administrator.

**12.11** *Successors and Assigns*.

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

**12.12** *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants,

agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan, *provided*, *however*, that the Cash Collateral Order and Sale Order shall survive and remain in full force in effect except for as expressly set forth herein.

### 12.13   *Computing Time*.

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.14   *Exhibits to Plan*.

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

### 12.15   *Notices*.

All notices, requests, and demands hereunder shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)      if to the KFM Debtors:

15021 Katy Freeway, 4th Floor
Houston, Texas 77094
Attn:   Mark Castiglione; Kim Warnica
Phone: (281) 530-0991
Email: mcastiglione@altamesa.net; kwarnica@altamesa.net

– and –

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn: Alfredo R. Pérez
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email: Alfredo.Perez@weil.com

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C., Kelly DiBlasi, and Lauren Tauro
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Ray.Schrock@weil.com; Kelly.DiBlasi@weil.com;
Lauren.Tauro@weil.com

*Attorneys for KFM Debtors*

(b)      if to the Post-Effective Date KFM Debtors:

Marc Beilinson
mbeilinson@gmail.com

– and –

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn: Alfredo R. Pérez
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email: Alfredo.Perez@weil.com

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C., Kelly DiBlasi, and Lauren Tauro
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Ray.Schrock@weil.com; Kelly.DiBlasi@weil.com;
Lauren.Tauro@weil.com

*Attorneys for Post-Effective Date KFM Debtors*

(c)      if to the Administrative Agent:

VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Attn:  William L. Wallander, Esq.
Telephone:  (214) 220-7905
Facsimile:  (214) 999-7905
Email: bwallander@velaw.com

*Attorneys for Administrative Agent*

**12.16**  ***Reservation of Rights.***

None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the KFM Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the KFM Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated: April 22, 2020
        Houston, Texas

Respectfully submitted,


/s/ *Mark P. Castiglione*
Name: Mark P. Castiglione
Title:   Chief Executive Officer


on behalf of


Kingfisher Midstream, LLC
Kingfisher STACK Oil Pipeline, LLC
Oklahoma Produced Water Solutions, LLC
Cimarron Express Pipeline, LLC

*[Signature Page to Amended Joint Chapter 11 Plan of KFM Debtors]*

**<u>Exhibit B</u>**

**Organizational Chart**

## Organizational Chart



**<u>Exhibit C</u>**

**Liquidation Analysis**

## INTRODUCTION

Kingfisher Midstream, LLC and its subsidiaries (collectively, the "**KFM Debtors**"), with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the *Amended Joint Plan of KFM Debtors* (as amended, supplemented, or modified from time to time, the "**Plan**") and related disclosure statement (as amended, supplemented, or modified from time to time, the "**Disclosure Statement**") pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").[1]

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court must find, as a condition to confirmation of the Plan, that each holder of an impaired Claim against or Interest in the KFM Debtors either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the KFM Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To demonstrate that the proposed Plan satisfies the "best interests" of creditors test under section 1129(a)(7) of the Bankruptcy Code, the KFM Debtors, with the assistance of their advisors, have prepared the following Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

NEITHER THE KFM DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REFLECTED IN THE LIQUIDATION ANALYSIS.  ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

### Statement of Limitations:

The determination of the costs of, and proceeds from, the hypothetical liquidation of the KFM Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the KFM Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the KFM Debtors, their management, and their advisors.  Inevitably, some assumptions in the Liquidation Analysis would likely not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in a chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the KFM Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or Plan, as applicable.

In preparing the Liquidation Analysis, the KFM Debtors estimated Allowed Claims based upon a review of the KFM Debtors' financial information to account for estimated liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Expense Claims and chapter 7 Administrative Expense Claims, such as wind-down costs, trustee fees, and tax liabilities.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims incorporated into this Liquidation Analysis.  Therefore, the KFM Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION BY THE KFM DEBTORS.   THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Chapter 7 Conversion Date and Appointment of Chapter 7 Trustee:**

The Liquidation Analysis has been prepared assuming that the KFM Debtors' chapter 11 cases are converted to chapter 7 cases on or about June 15, 2020 (the "**Chapter 7 Conversion Date**"), which is an estimate of the milestone requirement for the entry of a Confirmation Order as outlined in the Cash Collateral Orders.  The Liquidation Analysis takes into account (i) the closing of the Sale Transaction with BCE-Mach on April 9, 2020, (ii) the KFM Debtors' receipt of the cash proceeds and non-cash consideration for the Sale Transaction, and (iii) the KFM Debtors' payment of $42,267,506 to the KFM Administrative Agent upon closing the Sale Transaction pursuant to the Adequate Protection Order.  The KFM Assets, other than the KFM ORRI, are valued at their forecast net book value as of the Chapter 7 Conversion Date.  It is assumed that, on the Chapter 7 Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") who would sell or otherwise dispose of all of the KFM Debtors' remaining assets not sold to BCE-Mach.  All of the KFM Debtors' cash proceeds, net of any liquidation-related costs and other administrative expenses and priority claims, would be distributed in order to satisfy Allowed Claims and Interests in accordance with the priority scheme set forth in the Bankruptcy Code.  The Liquidation Analysis, however, does not assign a value to the KFM ORRI and assumes that the KFM ORRI would be distributed to the Lenders by the Trustee and not otherwise monetized. Including recovery values for the KFM ORRI would not result in a different outcome under the Plan or a hypothetical Chapter 7.

There can be no assurance that the recoveries realized from the sale or other dispositions of the remaining assets not sold to BCE-Mach would, in fact, approximate the amounts reflected in this Liquidation Analysis.

Under the Plan, the vast majority of the KFM Debtors' assets were liquidated pursuant to the Sale Transaction, and any remaining assets will be liquidated as part of the broader, post-Effective Date Wind-Down.  Accordingly, many of the assumptions and transactions underlying the Plan would

remain the same in a Chapter 7 liquidation. However, if a Trustee is appointed, the KFM Debtors expect that the Trustee would be required to invest substantial time and resources to diligence and analyze the KFM Debtors' remaining assets (including Causes of Action) and investigate the Claims filed against the KFM Debtors' estates. The KFM Debtors also expect that there would be additional administrative costs in a Chapter 7 liquidation on account of the (i) delay associated with appointing a Trustee, (ii) expected fees of the Trustee, and (iii) the Trustee's professional fees, which would impact creditors' recoveries.

**Global Notes & Assumptions:**

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

1. The Liquidation Analysis assumes that the KFM Debtors would be liquidated in a jointly administered and substantively consolidated proceeding.

2. *Dependence on Unaudited Financial Statements* – The Liquidation Analysis contains numerous estimates. Proceeds available for recovery are based upon the KFM Debtors' unaudited books and records, the results of the Sale Transaction, and a forecast of net cash-flows leading up to the Chapter 7 Conversion Date.

3. *Chapter 7 Liquidation Costs & Length of Liquidation Process* – Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses associated with selling or otherwise monetizing the KFM Debtors' assets, would be entitled to payment in full prior to any distributions to Administrative Expense Claims and Other Priority Claims. The estimates used in the Liquidation Analysis for the Trustee are pursuant to the fee guidelines in section 326(a) of the Bankruptcy Code. It is assumed that the chapter 7 Administrative Expense Claims and Other Priority Claims, post-chapter 7 conversion expenses and professional fees, and the Trustee fees are entitled to payment in full prior to distribution to holders of any other Claims.

4. *Preference or Fraudulent Transfers* – No recovery or related litigation costs have been attributed to any potential preference, fraudulent transfer, or other litigation or avoidance action under the Bankruptcy Code due to, among other issues, the costs of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters. Additionally, the substantial majority of any potential Causes of Action the KFM Debtors were sold to BCE-Mach pursuant to the Purchase Agreement, with the exception of a limited number of Causes of Action that were retained under Section 2.2 of the of the Purchase Agreement. It is likely that any potential proceeds from retained Causes of Action would be recoverable under both the Plan and in a Chapter 7 liquidation.

5. *Distribution of Net Proceeds* – Administrative Expense Claim and Other Priority Claim amounts, trustee fees, and other such Claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay Credit Agreement Claims and, thereafter, Allowed General

Unsecured Claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full.  The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

**<u>Conclusion:</u>**

The KFM Debtors have determined, based on the following analysis, that upon the Effective Date, the Plan will provide all holders of Claims against and Interests in the KFM Debtors with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the KFM Debtors under chapter 7 of the Bankruptcy Code, and as such the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

**NET PROCEEDS AVAILABLE FOR DISTRIBUTION**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Kingfisher Midstream, LLC Consolidated | | | | | | |
| | | | | | Liquidation | | Proposed Plan | |
| | | Balance Sheet | | Pro-Forma | Low Recovery | High Recovery | Recovery | |
| ($ in thousands) | Notes | 12/31/2019 | Adj. | 5/4/2020 | % $ | % $ | $ | |
| **Assets:** | | | | | | | | |
| Cash and Cash Equivalents | A | $  8,651 | $ 46,246 | $  54,897 | 100% $  54,897 | 100% $  54,897 | $  46,184 | |
| Accounts Receivable | B | 15,191 | (15,191) | - | 0% - | 0% - | - | |
| Prepaids & Deposits | C | 3,584 | (873) | 2,711 | 72% 1,957 | 93% 2,519 | 2,711 | |
| Property, Plant & Equipment | D | 129,788 | (129,788) | - | 0% - | 0% - | - | |
| Other Assets | E | 1,849 | (1,849) | - | 0% - | 0% - | - | |
| **Gross Liquidation Proceeds** | | | | | $  56,855 | $  57,417 | $  48,895 | |
| **Ch. 7 Administrative Costs** | | | | | | | | |
| Ch. 7 Trustee Fees | F | | | | (1,729) | (1,746) | - | |
| Ch. 7  Professional Fees | G | | | | (1,706) | (1,148) | - | |
| Ch. 11  Professional Fee Carve-Out | H | | | | (1,000) | (1,000) | - | |
| Wind-Down Costs | I | | | | (1,815) | (1,815) | (4,061) | |
| **Total Ch. 7 Administrative Costs** | | | | | $  (6,249) | $  (5,709) | $  (4,061) | |
| **Net Liquidation Proceeds Available for Distribution** | | | | | $  50,605 | $  51,708 | $  44,834 | |

## SUMMARY OF ESTIMATED CLAIMS RECOVERY

| | Notes | Claims Estimate | Liquidation | | | | Proposed Plan | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Kingfisher Midstream, LLC Consolidated | | | Low Recovery | | High Recovery | | Projected Recovery | |
| | | | % | $ | % | $ | % | $ |
| Administrative Claims | J | $        14,087 | *100%* | $   14,087 | *100%* | $   14,087 | *n/a* | $       100 |
| Priority Tax Claims | K | - | *n/a* | - | *n/a* | - | *n/a* | - |
| Other Priority Claims | L | - | *n/a* | - | *n/a* | - | *n/a* | - |
| Other Secured Claims | M | - | *n/a* | - | *n/a* | - | *n/a* | - |
| Credit Agreement Claims | N | 224,040 | *16%* | 36,518 | *17%* | 37,620 | *20%* | 44,734 |
| Sub-Total | | | | 50,605 | | 51,708 | | 44,834 |
| **Net Liquidation Proceeds Available for Subordinated Claims** | | | | - | | - | | - |
| General Unsecured Claims | O | 186,971 | *0%* | - | *0%* | - | *0%* | - |
| Intercompany Claims | P | - | *0%* | - | *0%* | - | *0%* | - |
| Intercompany Interests | Q | N/A | *n/a* | - | *n/a* | - | *n/a* | - |

6

**<u>Specific Notes to the Liquidation Analysis:</u>**

***Gross Liquidation Proceeds -***

Except as noted herein, the Liquidation Analysis was developed using the KFM Debtors' unaudited books and records as of December 31, 2019, the results of the Sale Transaction, and a pro forma cash forecast of net cash-flows leading up to the Chapter 7 Conversion Date.

**A.  Cash & Cash Equivalents**

Cash and Cash Equivalents consist of all operating Cash held by the KFM Debtors.  The pro-forma balance is based on the KFM Debtors' forecasted Cash balance as of the liquidation date, which is expected to be fully recoverable. Under the Plan scenario, Cash for unpaid Administrative Expense Claims will be placed into a segregated account on the Effective Date.

**B.  Accounts Receivable**

The pro-forma book balance of accounts receivable as of the liquidation date is estimated to be zero as the KFM Debtors expect to collect all outstanding accounts receivable prior to such date.

**C.  Prepaids & Deposits**

Prepaids and Deposits include prepaid insurance, incentive pay, retainers, and various business deposits primarily related transportation and saltwater disposal services, which are assets excluded from the Sale Transaction.  The pro-forma amount of prepaid insurance and incentive pay is expected to be zero as of the liquidation date.  Any retainer amounts outstanding at the liquidation date will be net against unpaid chapter 11 professional fees and are included in ***Item J***.  The Liquidation Analysis assumes recovery of 72% to 93% on the business deposits.  A majority of the deposits are expected to be returned to the KFM Debtors after close of the Sale Transaction.  A portion of the balances, however, may be set-off against unpaid prepetition amounts owed to the deposit counter-parties.

**D.  Property, Plant & Equipment**

Property, Plant & Equipment includes compressors, the gas processing plant, pipeline systems, saltwater disposal infrastructure, equipment, and other fixed assets that are included in the Sale Transaction.  As such, the Liquidation Analysis assumes the pro-forma balance of these assets is zero.

**E.  Other Assets**

Other Assets consist of deferred loan costs and right-of-use assets.  The pro-forma balance of Other Assets as of the liquidation date is estimated to be zero as the deferred loan costs have been written off and any value associated with the right-of-use assets will be transferred to the BCE/Mach.

*Liquidation Adjustments –*

## F.  Ch. 7 Trustee Fees

Compensation for the chapter 7 Trustee would be limited to the fee guidelines in section 326(a) of the Bankruptcy Code.  The KFM Debtors have estimated Trustee fees based on the fee guidelines as provided by the U.S. Trustee.

## G.  Ch. 7 Professional Fees

Chapter 7 professional fees include estimates for certain professionals required during the Wind-Down period and are estimated at a range of 2% to 3% of liquidation proceeds.

## H.  Ch. 11 Professional Fee Carve-Out

The Chapter 11 Professional Fee Carve-Out amount represents the fees to be incurred by chapter 11 professional post conversion as allowed by the carve-out provision in the Cash Collateral Orders.

## I.  Wind-Down Costs

Under a liquidation scenario, Wind-Down costs consist of general and administrative costs required to wind-down the back office and accounting functions of the KFM Debtors' estates and include employee and software costs.  Under the Plan, Wind-Down costs consist of all costs incurred by the Plan Administrator to implement the Plan and resolve any outstanding Claims.  The Wind-Down Reserve includes amounts sufficient to pay the costs of winding down the KFM Debtors' estates, including chapter 11 Administrative Expense Claims and the costs of liquidating the KFM Debtors under applicable law.  Though the costs to fund the Wind-Down of the KFM Debtors' estates have been funded into the Wind-Down Reserve, any amounts incurred by a Chapter 7 Trustee would be in excess of such amounts and are not currently accounted for in the Wind-Down Reserve.

*Claims –*

## J.  Administrative Expense Claims

Administrative Expense Claims consist of all earned and unpaid chapter 11 professional fees as of the liquidation date and amounts owed to the AMH Debtors as part of the settlement of the intercompany claims between the KFM Debtors and the AMH Debtors. The Liquidation Analysis projects a recovery rate of 100% for these Claims. Under the Plan scenario all unpaid Administrative Expense Claims will be placed into a designated escrow account at emergence.

## K.  Priority Tax Claims

The KFM Debtors assume there will be no Priority Tax Claims as of the liquidation date.

**L.  Other Priority Claims**

The KFM Debtors assume there will be no Other Priority Claims as of the liquidation date.

**M. Other Secured Claims**

The KFM Debtors assume there will be no Other Secured Claims as of the liquidation date.

**N.  Credit Agreement Claims**

Credit Agreement Claims consist of all Claims against the KFM Debtors arising under or in connection with the Credit Agreement and all documents relating thereto.   The Liquidation Analysis projects a recovery rate of 16% - 17% for these Claims.

**O.  General Unsecured Claims**

General Unsecured Claims consists of credit agreement deficiency claims.  Amounts for contract rejection damages, litigation, or any other General Unsecured Claims have not been included.  The Liquidation Analysis projects no recovery for General Unsecured Claims.

**P.  Intercompany Claims**

Intercompany Claims consist of any Claim against a KFM Debtor held by another KFM Debtor.  The Liquidation Analysis projects no recovery for Intercompany Claims.

**Q.  Intercompany Interests**

Intercompany Interests consist of any Interest in any of the KFM Debtors.  The Liquidation Analysis projects no recovery for Intercompany Interests.